1   DAWN SESTITO (S.B. #214011)
    dsestito@omm.com
2   JUSTINE M. DANIELS (S.B. #241180)
    jdaniels@omm.com
3   O'MELVENY & MYERS LLP
    400 South Hope Street, 18th Floor
4   Los Angeles, California  90071-2899
    Telephone:    +1 213 430 6000
5   Facsimile:    +1 213 430 6407

6   DAVID H. MCCRAY (S.B. #169113)
    dmccray@bdlaw.com
7   BEVERIDGE & DIAMOND PC
    456 Montgomery Street, Suite 1800
8   San Francisco, California 94104-1251
    Telephone:    +1 415 262 4000
9   Facsimile:    +1 415 262 4040

10  Attorneys for Petitioner and Plaintiff
    Exxon Mobil Corporation

11
                    UNITED STATES DISTRICT COURT
12
                    CENTRAL DISTRICT OF CALIFORNIA
13

14

15  EXXON MOBIL CORPORATION,              Case No.

16                   Petitioner and Plaintiff,   **VERIFIED PETITION FOR WRIT OF**
                                                 **MANDATE AND COMPLAINT FOR**
16                                               **DECLARATORY RELIEF AND**
17        v.                                     **DAMAGES**

17  SANTA BARBARA COUNTY BOARD OF
18  SUPERVISORS,

19                   Respondent and              **DEMAND FOR JURY TRIAL**
                     Defendant.
20

21

22          Petitioner and Plaintiff Exxon Mobil Corporation ("ExxonMobil") hereby submits this

23  Verified Petition for Writ of Mandate and Complaint for Declaratory Relief and Damages,

24  directed to Respondent and Defendant the Santa Barbara County Board of Supervisors (the

25  "Board"), and alleges as follows:

26                                  **INTRODUCTION**

27          1.      This case involves the denial of a permit application for reasons completely

28  unrelated to its merits.  The requested project would permit trucking on an interim basis for

ExxonMobil's Santa Ynez Unit ("SYU"), providing numerous benefits to the community. Rather than focus on the merits of the project, however, the Board improperly treated the consideration of the project as a referendum on offshore production as well as the transportation and use of crude oil in the County of Santa Barbara (the "County"). But that was not the issue before it. The only question before the Board was whether the project complies with federal, state, and local law. It does. Ironically, while the Board purportedly made its decision in the name of environmentalism, the Project denial deprives consumers of a local, lower carbon intensive, and more heavily regulated energy source than foreign-produced oil and gas.

2. Formed in 1970, the SYU unit consists of three offshore platforms—Hondo, Heritage, and Harmony (the "Platforms") located on submerged lands leased from the United States in federal waters off the coast of the County—and an onshore processing center ("LFC") located in Las Flores Canyon, near Goleta. The wells beneath the Platforms still have significant reserves, and the Platforms are well-maintained.

3. ExxonMobil built LFC and started transporting SYU's oil to third-party refineries via pipeline to address the concerns of the County and the environmental community. LFC's design incorporates cost-effective energy conservation techniques like water-conserving fixtures and a cogeneration facility. Permitted nitrogen oxide (NOx) and reactive organic carbon (ROC) emissions are fully mitigated and allowable emissions are offset to maintain compliance with the County's Air Quality Attainment Plan, resulting in a net air quality benefit to the County.

4. Some crude oil produced and processed at SYU helps to fuel California's transportation sector. SYU's oil has less than half the carbon intensity of oil imported from overseas because ExxonMobil fully complies with stringent federal, state, and local environmental regulations. Promoting reliance on locally produced energy is important.

5. SYU has a long history of safe, incident-free operations. The unit has received 14 federal safety awards. All SYU's employees participate in rigorous, continual training to ensure that they are ready to work safely every day.

6. During its normal operations, SYU supported employees and third-party contractors who contributed to the County's economy. ExxonMobil did its part too, paying

1   millions of dollars each year in property taxes that helped to fund the Santa Ynez Valley School

2   district, local emergency services, infrastructure, and other public services.

3       7.      But SYU has been forced to shut down operations.  On May 19, 2015, one of the

4   two pipelines used to transport the SYU's crude oil ruptured and Plains All American Pipeline,

5   LLC's ("Plains"), the owner and operator, shut both pipelines down.  These pipelines were

6   ExxonMobil's only means to transport oil from SYU.  About a month later, SYU suspended

7   operations and initiated preservation efforts, including trucking its remaining inventory—

8   approximately 400,000 barrels of oil in 2,500 truckloads—to the Phillips 66 Santa Maria Pump

9   Station ("SMPS") in Santa Barbara County without any accidents.  Since the shutdown,

10   ExxonMobil has spent about $100 million each year to maintain SYU.

11       8.      ExxonMobil wants to bring its employees back to work and continue operating

12   SYU to meet part of California's energy need in a safe and environmentally sound way.  To that

13   end, on September 22, 2017, ExxonMobil filed a permit application with the County for the

14   Interim Trucking for Santa Ynez Unit Phased Restart Project, Case No. 17RVP-00000-00081

15   ("Permit Application").  The Permit Application seeks authorization to amend SYU's Final

16   Development Plan 87-DP-32cz (the "Development Plan"), allowing ExxonMobil to temporarily

17   truck SYU's crude oil first to SMPS until it closes, and then to the Plains Pentland Terminal

18   ("Pentland") in Kern County for up to seven years or until a pipeline becomes available,

19   whichever is shorter (the "Project").  During this time, SYU would produce and process crude oil

20   at around 39% of its baseline capacity, returning to full capacity when a pipeline becomes

21   available.  This phased restart is one of the safest ways to bring SYU back on line.

22       9.      For four years, ExxonMobil worked closely with the Santa Barbara County

23   Planning and Development staff ("P&D Staff") and relevant County agencies to evaluate the

24   Project and to ensure that all potential adverse impacts were mitigated to the maximum extent

25   feasible and the Project met the highest applicable safety and environmental standards.

26   ExxonMobil submitted voluminous documentation and reports in support of the Project,

27   including analyses of the Project's potential impacts on air quality, emissions, traffic, and risk

28   management for the transportation of crude oil.  Several hearings were held, giving the public and

interested groups multiple opportunities to comment.  Pursuant to the California Environmental Quality Act ("CEQA"), the County's staff prepared three supplemental environmental impact reports ("SEIRs"), including the final SEIR dated August 16, 2021 ("Final SEIR").  Relevant state agencies, including the California Department of Transportation ("Caltrans"), submitted opinions.  None objected to the Project.

10.     Based on this extensive record, on September 8, 2021, the P&D Staff issued a comprehensive report (the "Staff Report") finding that the Project fully complies with CEQA. Specifically, the Staff Report found that:

- The Project mitigates the only unavoidable potential impact—risk of oil spills—to the maximum extent feasible.
- The Project mitigates the significant impacts—air quality, increases in Green House Gases ("GHG"), and traffic—to the point of insignificance.
- Alternatives to the Project are not feasible.

11.     The Staff Report further found that the risk of oil spills—at most, one every 17 years—was outweighed by the Project's benefits, which include:

- Returning locally produced, low-carbon-intensity oil to California markets;
- Reducing GHGs by using 2017 or newer model trucks, which are more fuel efficient and produce lower emissions than older trucks;
- Contributing over $200,000 to the Coastal Resources Mitigation Fund ("CRMF");
- Providing the County over $1 million each year in additional tax revenues;
- Restoring the SYU jobs that were lost as a result of the shutdown; and
- Increasing spending at local business.

12.     The Staff Report also found that the Project complies with Santa Barbara County land use regulations because—among other things—(1) the Project utilizes roadways that are adequate and properly designed to carry the type and quantity of traffic the Project would generate; and (2) the Project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area.

13.     Based on these findings, the Staff Report recommended that the Santa Barbara County Planning and Development Commission ("Commission") conditionally approve the

- 4 -

1  project at its September 29, 2021 hearing and recommended that the Board approve the Project.

2  But that did not happen.

3      14.    Instead, the Commission voted, three to two, to not recommend the Project and

4  directed the P&D staff to prepare new findings and a new recommendation for Project denial.

5  The Commission asserted that the benefits of the Project did not outweigh the risk of oil spills.

6  The Commission also claimed that State Route 166 was not adequate for the Project and that the

7  Project would be detrimental to the general welfare, health, and safety of the neighborhood.

8  These conclusions were based on unsupported public comments and pure conjecture.  That is not

9  substantial evidence.  Indeed, they are directly contradicted by the findings in the Staff Report,

10  Final SEIR, and the voluminous record underlying those analyses.

11      15.    On March 8, 2022, the Board voted, three to two, to follow the Commission's

12  recommendation for Project denial and adopted the Commission's faulty, unsupported reasoning.

13  Certain Board members added in their own speculations including, but not limited to:

14  • Vice Chair Das Williams declared that "the transportation [of oil] by truck is not
   the appropriate way to transport it based on the environmental safety impact to the
15  County."

16  • Supervisor Gregg Hart asserted that the Project's benefits were "substantially less
   than those of the County's coastal hospitality industry, which is significantly
17  threatened by the possibility of oil spills."

18  • Chair Joan Hartmann stated: "So we can think about it in terms of just the
   trucking.  I do believe, however, that we need to think about this more broadly and
19  we do have discretion about the baseline.  The baseline in my view is current
   conditions and the current conditions are that we are in a climate crisis . . ."
20

21      16.    Not only were these and other conclusions not supported by substantial evidence,

22  they were not properly before the Board.  Yet, they formed the basis for the Project denial.  In

23  doing so, the Board committed a prejudicial abuse of discretion and misapplied CEQA.  The

24  Board then went even further by issuing a *de facto* ban on trucking oil in violation of Santa

25  Barbara County's land use regulations.

26      17.    The Project denial was an arbitrary, capricious, and unlawful prejudicial abuse of

27  discretion.  It also (1) violates the Takings Clauses of the United States and California

28  Constitutions by substantially impairing ExxonMobil's property rights without just

- 5 -

1  compensation; (2) violates the Commerce Clauses of the United States and California

2  Constitutions by unjustifiably discriminating against commerce of oil in or through Santa Barbara

3  County; and (3) constitutes an illegal exercise of the County's police powers by affecting

4  residents outside of Santa Barbara County without due consideration of the regional welfare.

5        18.      To remedy these injuries, ExxonMobil seeks a writ of mandate compelling the

6  Board to vacate and set aside the Project denial and directing the Board to reconsider the Project

7  in light of the requirements of CEQA and all other applicable state and local policies, laws,

8  ordinances, and regulations.  ExxonMobil also seeks declaratory relief, damages—in an amount

9  to be proven at trial—and its attorney's fees and costs.

10                          **JURISDICTION AND VENUE**

11       19.      This action arises under the laws of the United States and the State of California.

12  This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the state

13  law claims pursuant to 28 U.S.C. § 1332.  ExxonMobil and the Board are citizens of different

14  states and the aggregate amount in controversy and the value of the rights at issue in this action

15  exceed the sum of $75,000 exclusive of interest and costs.  Further, this Court has supplemental

16  jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

17       20.      The Court has the authority to grant mandamus relief pursuant to California Code

18  of Civil Procedure section 1094.5.  ExxonMobil exhausted its administrative remedies.[1]

19       21.      The Court has authority to grant declaratory relief pursuant to 28 U.S.C. § 2201

20  and 2202.

21       22.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Board

22  resides in the Central District of California and a substantial part of the events or omissions

23  giving rise to this action occurred within the Central District of California.[2]

24

25  [1] As a coastal development permit is not at issue, there is no administrative appeal to the
California Coastal Commission available, and the Coastal Commission confirmed that it does not

26  have jurisdiction over this matter.

27  [2] The filing of this complaint and ExxonMobil's participation in this lawsuit shall not be
construed as a waiver of ExxonMobil's personal jurisdiction defense in any other matter.

28  ExxonMobil does not consent to personal jurisdiction in California in connection with any other
matter.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

**PARTIES**

23.     Petitioner and Plaintiff Exxon Mobil Corporation is a New Jersey corporation, headquartered and with its principal place of business in Texas.  ExxonMobil owns and operates SYU, which consists of LFC located in Las Flores Canyon and the Platforms located approximately 12 miles west of the County in federal waters.

24.     Respondent and Defendant Board of Supervisors of the County of Santa Barbara is Santa Barbara County's legally constituted legislative body comprised of five elected officials.

**GENERAL ALLEGATIONS**

**A.     The Project Is Essential to Restarting SYU**

25.     While SYU has been shut down operationally since 2015, ExxonMobil maintains the integrity of the unit and its equipment through ongoing inspections, maintenance, and surveillance, monitored by 60 employees.  These efforts cost the company approximately $100 million annually in operating costs for the shut-in Platforms alone.  In addition, ExxonMobil continues to pay over $1 million each year to the County in property taxes.[3]  While SYU remains shuttered, ExxonMobil does not receive any revenues or economically beneficial use from this property or its related leases from the United States.

26.     In September 2017, ExxonMobil submitted the Permit Application to the County requesting approval for the Project.  As part of the Project, ExxonMobil sought to install and operate a new tanker truck loading rack and attendant equipment on a previously disturbed pad at the LFC facility.  New piping within the facility would transport crude oil to the truck loading rack, and the LFC facility's vapor recovery system would capture truck vapors for processing and use as fuel.  All trucks used would incorporate stringent safety controls and complete detailed inspections prior to leaving LFC.[4]

27.     The Project is a key component of ExxonMobil's plan for a phased restart of SYU's offshore crude oil production and processing at LFC.  The restart would include reactivating the offshore Platforms and LFC, limiting production and processing to approximately

---

[3] Staff Report, Attachment A, Findings for Approval at A-10.
[4] *Id.*, Attachment B, Conditions of Approval at 76.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

39% of the baseline period levels.  When a pipeline becomes available, ExxonMobil intends to return to full production, which it may do without any additional authorizations required from the Board pursuant to its vested right to operate SYU.[5]  This phased restart is one of the safest ways to bring SYU back online.

**B.     The Project Mitigated All Potential Adverse Impacts to the Maximum Extent Feasible**

28.     The P&D Staff reviewed the Project for compliance with applicable federal, state, and local laws, including CEQA, Santa Barbara County's Land Use and Development Code ("LUDC"), and Coastal Zoning Ordinance ("CZO").

29.     The SEIRs identified one Class I risk—significant and unavoidable impact—defined in the SEIR as the risk of an oil spill of five gallons or more in environmentally sensitive areas—and five Class II risks—significant but mitigatable impacts—relating to air quality, GHGs, and traffic safety.  ExxonMobil worked closely with the P&D Staff and relevant County agencies to revise the Project, ensuring that all adverse impacts were mitigated to the maximum extent feasible and the Project met all applicable safety and environmental standards.

30.     **Oil Spills (Class I).**  The Project, as revised, includes a number of measures designed to prevent spills by minimizing the potential for accidents through improvements to truck operation safety and to lessen the magnitude of a spill's effects by bolstering emergency response services:

a.   **The Truck Hazard Mitigation Plan (Cond. XX-5A)**—addresses various aspects of truck operation safety with the goal of minimizing the potential for an accident or release to occur, including:

i.   conducting safety and operability inspections that follow, at a minimum, state and federal truck standards of each crude oil truck prior to its loading and departure from LFC, with any truck that receives an unsatisfactory inspection losing permission to transport crude oil from LFC until the issue has been corrected;

ii.   requiring a minimum of two years of commercial driver experience for

---

[5] Staff Report at 3–4, 7; Final SEIR, Executive Summary at ES-9.

hazardous materials and completion of a training course in defensive driving, emergency response, and other driving skills;

        iii.  training on Project-specific requirements including loading and transportation procedures, local traffic concerns and hazards, driver safety, driver courtesy, and utilization of dedicated routes;

        iv.  creating an integrated fleet geographical information management system that (1) provides real-time satellite tracking and mapping of locations, speeds, and other parameters and (2) measures compliance with speed limits, acceleration, and deceleration for trucks in a specific area and/or at a specific time of day; and

        v.  requiring that the trucks be year 2017 models or newer and have dual-sided dashboard video cameras, Roll Stability Control systems, Electronic Driver Vehicle Inspection Report system, and speed monitoring and limiting systems;

    b.  **Updates to SYU's Emergency Plans (Cond. XX-5B)**—adds the truck loading rack and truck loading operations to SYU's current emergency plan;

    c.  **Trucking Company Financial Responsibility (Cond. XX-5C)**—requires that any companies contracted to truck under the Project demonstrate the financial ability to cover the cost of an oil spill in an amount of at least $5 million;

    d.  **The Trucking Route Oil Spill Contingency Plan (Cond. XX-5D)**—ensures that each trucking company has a plan that covers policies and procedures for trucking routes, spill notifications, spill protection measures, recognizing at-risk resources, response resources, and training exercises; and

    e.  **Funding the Santa Barbara County Fire Department's acquisition of an oil spill response trailer and an unmanned aerial vehicle (Conds. XX-5E and -5F)**—facilitates coordination between ExxonMobil and emergency service providers.[6]

Each of these measures would have been a condition of approval had the County approved

---

[6] *Id.* at 18–20; *see also id.*, Attachment A, Findings for Approval at A-3–4.

the Project.[7]

31.     ExxonMobil also accepted the P&D Staff recommendations:

a. **Prohibiting trucking during heavy rain events**—defined as a predicted 50% chance of receiving ½ inch of rain or more in a 24-hour period in the areas along the truck routes, which reduces the probability of truck accidents and the likely severity of an oil spill impacting sensitive resources because it lessens the likelihood of a spill entering creeks and drainage for storm waters; and

b. **Limiting trucking to SMPS only**—trucking would be routed to SMPS only while still operational, with no more than 70 trucks per day.  When SMPS closes, trucks would be re-routed to Pentland and operations decreased to no more than 68 trucks per day.[8]

32.     While the risk of oil spills cannot be eliminated or reduced to less than significant levels, the foregoing safety protocols and measures mitigate it to the maximum extent feasible. These conditions would reduce the likelihood of oil spills by approximately 33% with the probability of a spill once in 52 years while transporting SYU's oil to SMPS and once every 17 years while trucking to Pentland, both far exceeding the intended life of the Project.[9]

33.     <u>**Air Quality and GHGs (Class II).**</u>  The Project also included proposed conditions of approval designed to reduce the impacts on air quality, climate change, and GHG emissions:

a. **Trucking Emissions Management Plan (Cond. XX-3A)**—keeps truck emissions below the County's threshold for mobile source emissions by implementing fleet specifications, operational and reporting requirements, and emission calculations; and

b. **GHG Reduction and Reporting Plan (Cond. XX-4)**—fully offsets the Project's construction and operational GHG emissions by requiring one-to-one reductions or offsets—with onsite reductions being given priority over credits—and annual reports to the County.[10]

34.     These measures would reduce potential air quality and GHG impacts to less than

---

[7] *Id.*, Attachment A, Findings for Approval at A-3–4; *see generally id.*, Attachment B, Conditions of Approval.

[8] *See* Staff Report at 5; *id.*, Attachment B, Conditions of Approval at 77–78.

[9] Staff Report at 19.

[10] *See id.* at 20–21.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

1    significant levels.

2        35.    **Traffic (Class II).**  The Project was further modified to reduce its potential impact

3    on traffic volume and safety, reducing traffic impacts to less than significant levels, including:

4            a.    **Truck Trip Restrictions (Conds. XX-7A through C)**—prohibits truck travel

5    during peak morning and evening hours to ensure that the Project's trucks do not exceed the

6    County's traffic volume thresholds; and

7            b.    **Calle Real Time-of-Day and Speed Restrictions (Cond. XX-7D)**—prevents

8    conflicts between trucks and school buses by prohibiting truck travel during the morning and

9    afternoon periods when school buses are present and restricting Project truck speeds on Calle

10   Real to 35 miles per hour.[11]

11   **C.    The Staff Report Recommended Approving the Project**

12       36.    In September 2021, the P&D Staff released the Staff Report, which provides a

13   detailed analysis of the Project's design, potential adverse impacts identified in the Final SEIR

14   and conditions of approval designed to mitigate those impacts.  It also notes the applicable

15   County agencies' support for the Project.  The Staff Report recommended that the Board approve

16   the Project based on its consistency with applicable federal, state, and local laws, the County's

17   Comprehensive Plan, and evidentiary support for the findings required under CEQA and the

18   County's land use regulations.

19       37.    **CEQA.**  The Staff Report found that (1) the Project mitigates the only unavoidable

20   impact—risk of oil spills—to the maximum extent feasible; (2) the significant risks—air quality,

21   increases in GHGs, and traffic—are mitigated to the point of insignificance by the conditions of

22   approval; and (3) alternatives to the Project are not feasible.[12]

23       38.    The Staff Report further found that, even though the potential impact of oil spills

24   cannot be mitigated to less than significant levels, this is acceptable when weighed against the

25   Project's economic, environmental, technological, and social benefits.  Accordingly, the Staff

26   Report recommended issuing a Statement of Overriding Considerations, including the following

27   _____

28   [11] *See id.* at 21.
     [12] *See id.*, Attachment A, Findings for Approval at A-1–7.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

findings:

a.   The Project will return locally produced, low-carbon-intensity oil to California markets, reinstating California's energy independence by fulfilling local industries' demand for oil.

b.   Oil is currently transported across greater distances to SMPS in older tanker trucks subject to few emissions standards.  The Project's SMPS-only trucking could displace about 38 of those older SMPS-bound trucks daily, offsetting its baseline air and GHG emissions and reducing tanker truck traffic on Highway 101/State Route 166.

c.   The Project requires ExxonMobil to annually contribute $231,600 to the CMFR for projects that enhance affected coastal areas.

d.   In addition to the property taxes it is currently paying, ExxonMobil will pay approximately $1.24 million annually in County property taxes on the Project.  Such local tax revenues support local services like public safety and schools.

e.   The Project restores between 200 and 250 employee and contractor jobs in offshore operations and onshore processing.  It will also create up to 30 additional temporary (between three to six months) jobs for construction of the truck loading rack.  These jobs will likely be filled from the local labor pool, stimulating the local economy.

f.   The Project will likely return expenditures at local businesses through increased local spending for operations, maintenance, equipment rentals, transportation, restaurants, hotel stays, contracting for services, and local government fees provided by vendors who will spend new revenues at other local businesses.[13]

39.   **LUDC and CZO.**  The Staff Report also found that the Project complies with Santa Barbara County land use regulations—including LUDC subsections 35.82.080.E.1(c) and (e) and CZO subsections 35-174.7.1(c) and (e)—because, among other things, (1) the Project utilizes roadways that are adequate and properly designed to carry the type and quantity of traffic the Project would generate; and (2) the Project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible

---

[13] *Id.* at A-7–11.

1    with the surrounding area.[14]

2    **D.    The Planning and Development Commission Disregarded the Evidence in the Record**

3          40.    After four years of public comments, significant revisions to the Project, and

4    hundreds of pages of supporting reports and analyses from the County's agencies, the Project

5    finally came for a vote before the Commission on September 29, 2021.  The P&D Staff made

6    their presentation in support of the Commission recommending approval of the Project to the

7    Board of Supervisors.  The Commission declined to do so.

8          41.    In a three to two vote, the Commission opted to continue the hearing and directed

9    the P&D Staff to return with Findings for Recommended Denial of the Project on the grounds

10   that the Commission could not make the findings (1) supporting a CEQA Statement of Overriding

11   Considerations and (2) required by LUDC subsections 35.82.080.E.1(c) and (e) and CZO

12   subsections 35-174.7.1(c) and (e).

13         42.    The Commission apparently made this decision based on the statements of certain

14   commentators at the hearing, who raised concerns about aggressive drivers on State Route 166

15   passing slow-moving trucks.  No such findings or supporting evidence appeared in the detailed

16   traffic analysis in the Final SEIR prepared by the County's own traffic consultants.  Nor can

17   support be found in the Staff Report, the traffic analysis prepared by the County's traffic

18   consultant, the statewide safety thresholds, or the opinions of Caltrans and the transportation

19   engineers who reviewed the Project.

20         43.    The Commission ignored the Staff Report's finding that the Project's one

21   significant and unavoidable impact, oil spills—which had been mitigated to the fullest extent

22   feasible—is acceptable when weighed against its environmental and economic benefits.  Instead,

23   the Commission asserted that any impact on the use of domestic oil would be *de minimis* and that

24   the findings that the Project would increase local jobs and expenditures at local businesses were

25   not supported by substantial evidence.  The Commission also concluded that the purported

26   increased risk of accidents meant that roads were not adequate for the Project and that the Project

27   would be detrimental to the general welfare, health, and safety of the neighborhood.

28   _____
     [14] *Id.* at A-11–19.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

44.     Pursuant to the Commission's instructions, the P&D Staff returned with a cursory memorandum and Findings for Denial, simply parroting the Commission's unsubstantiated claims.  No further studies were conducted.  No further evidence was entered into the record.

45.     On November 3, 2021, the Planning Commission voted—three to two—to recommend that the Board of Supervisors adopt the Findings for Denial and deny the Project.

**E.     The Board's Denial of the Project Was Not Supported by Substantial Evidence**

46.     On March 8, the Board—by a vote of three to two—followed the Planning Commission's recommendations to deny the Project, rather than the detailed Staff Report also provided to the Board.  The Board agreed with the Commission's recommendation that a CEQA Statement of Overriding Considerations could not be made because the benefits of the Project were not supported by substantial evidence and did not outweigh the significant and unavoidable risk of oil spills[15]—defined in the SEIR as a spill of five gallons or more—occurring, at most, once every 17 years after mitigation.[16]  The Board also adopted the Commission's recommendations that findings required by LUDC subsections 35.82.080.E.1(c) and (e) and CZO subsections 35-174.7.1(c) and (e) could not be made.[17]

**Statement of Overriding Considerations**

47.     **Impact of Local Oil Production.**  The Board's vague conclusion that the Project would only have a *de minimis* impact on domestic oil use and demand is not supported by substantial evidence.[18]  The Final SEIR recognized that domestic oil produced under the United States, California, and Santa Barbara's strict environmental and safety laws could displace some of the foreign oil being imported into California.  The use of local oil also reduces the GHGs, criteria pollutants, and risk of spills associated with international marine tankering.  If the Project had been approved, the locally produced oil would be expected to reduce GHGs.

> With the shut-in of the SYU facilities in 2015, other sources of crude, likely from foreign or other California or U.S. sources, replaced this supply in the California

---

[15] *See* Cnty. of Santa Barbara Bd. of Supervisors Action Letter (Mar. 16, 2022) ("BOS Ltr.") at 2–3.
[16] *See* Staff Report at 19; *see also* Final SEIR at 4.3–56.
[17] *See* BOS Ltr. at 3–4.
[18] *See id.* at 2.

- 14 -
PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

market.  Figure 4.2-2 shows the crude supply sources to California refineries between 2000 and 2017.  As this figure shows, the swing crude for California is foreign crude, which has increased from 25.7% to 57.5% of total supply to California refineries between 2000 and 2018 (CEC 2019).

*The proposed Project would allow for the restart of the LFC facilities and production at the SYU, which would return some of this local crude oil production to the California refinery market.  It is likely that the return of SYU crude to the California market would displace some imported foreign crude, thereby reducing GHG emissions from tankering and the use of higher carbon intensity crude oils.*[19]

48.     The importance of local oil production and achieving energy independence is particularly acute now as gas prices soar as a result of Russia's invasion of Ukraine and the federal government scrambles to promote the development of more local energy.

49.     Contrary to the Board's intent, the Project denial promotes the degradation of the environment in the County and surrounding areas by depriving consumers of a local, lower-carbon intensive, and more heavily regulated energy source than foreign-produced oil and gas that must now satisfy consumer demand.  The Project denial improperly prioritizes the County's interests to the detriment of interests outside the County.

50.     **Economic Benefits to the County.**  The Board claimed that the economic benefits arising from the jobs and local expenditures created by the Project were based on "conclusory statements" unsupported by substantial evidence and noted that "these benefits may not be as secure or as high quality as indicated by [ExxonMobil]."[20]  The only support for the Board's conclusion comes from public commentary and conjecture.  The Staff Report found that:

*The project will allow for a phased return to pre-shut-in levels of ExxonMobil employee and contractor jobs for both LFC and the offshore platforms, i.e., approximately 100 employees or contractors at LFC and 100 to 150 employees or contractors for the offshore operations.  The economic stimulus of these returned jobs will also extend indirectly throughout the community to the extent these dollars are spent and re-spent locally.*  Community economic benefits are realized by employment income from the return of local jobs.  *For every dollar of income, workers spend a percentage within their community on a myriad of day to day goods and services including food, recreation, education and healthcare.  The recipients of these payments, in turn, contribute a percentage into local businesses (household-to-business activity).*  This exchange continues to repeat, contributing to community benefits beyond the household income of the project employee, from household-to-business activity, to business-to-business activity.

[19] Final SEIR at 4.2–29 (emphasis added); *see also* Staff Report, Attachment A, Findings for Approval at A-8–9.
[20] BOS Ltr. at 2.

- 15 -

> This ripple effect in the economy through local employment is the generally accepted economic concept of indirect, induced benefit.[21]

The Staff Report also found that the Project would create approximately 30 new temporary jobs associated with the building of the new truck loading rack at LFC that would have similar impacts for approximately three to six months.[22]

51.    The Board also asserted that any economic benefits from the Project were "substantially less than those of the County's coastal hospitality industry, which is significantly threatened by the possibility of oil spills."[23]  This assertion appears to be based solely on a comment made by one Supervisor during the hearing.  There are no studies or other evidence in the record weighing these purported impacts against the jobs and other local economic benefits of the Project, much less the millions in increased tax revenues and hundreds of thousands of dollars for the CMFR it will generate.  Nor are there any studies or other evidence indicating that a trucking accident would necessarily impact the coast or the coastal hospitality industry, making this conclusion speculative and unquantified.  In fact the Final SEIR found that the impacts of an oil spill on recreational users would be less than significant.[24]

52.    **Reduction in Traffic and GHGs.**  The Board concluded that any local GHG benefits would end once SMPS closes in 2023 and that the shift to processing at Pentland would result in an increase in traffic, carbon impacts, and the risk of accidents along State Route 166.[25] Again, this speculation is contradicted by the concrete evidence in the record.  The Staff Report addressed this specific scenario and found:

> **Transportation and Circulation.**  Under cumulative conditions while the SMPS is operational, the only roadway or intersection that would have a potentially significant impact is the U.S. Highway 101 Southbound on-ramp/State Route 166 intersection during both AM and PM peak hours.  With the implementation of the

---

[21] Staff Report, Attachment A, Findings for Approval at A-10 (emphasis added).

[22] *Id.* at A-11.

[23] BOS Ltr. at 3.

[24] *See* Final SEIR at 6–13 (concluding that the impacts of an oil spill on recreational users would be less than significant).

[25] As the Final SEIR notes, while SMPS is slated to close in 2023, this timeline is far from certain. "[T]he exact timing of when the SMR, SMPS, and their associated pipelines would be shutdown is unknown and could possibly be delayed by the permitting of the Rodeo Renewed Project."  *Id.* at 6–4.

- 16 -

identified cumulative traffic mitigation measure, which is carried forward as a condition of approval, the Modified Project's contribution to cumulative traffic impacts would be less than significant with mitigation.  ***Once the SMPS is permanently shut down, crude oil trucks currently traveling west on Highway 166 to get to the SMPS would no longer occur.  However, it is possible that crude oil trucks currently going to the SMPS from the Santa Maria area could start using the U.S. Highway101/State Route 166 East interchange to get to the Pentland Terminal.  Under this cumulative scenario, the net increase in crude oil trucks using this interchange would be about nine trucks per day.  A net increase of nine trucks per day would reduce the cumulative impact at the U.S. Highway 101/State Route 166 East interchange to less than significant after the SMPS is permanently shut down.***[26]

The Final SEIR also addressed the eventual closure of SMPS and found that, even under those circumstances, trucking related to the Project did not significantly increase emissions.[27]  To the contrary, it found that the permanent shutdown of the SMPS and its pipelines will result in a substantial net reduction in baseline emissions in the Santa Barbara Basin.[28]

53.   **"Detriment[] to the Environment Generally."**  CEQA required the Board to balance the Project's benefits—including its region-wide or statewide environmental benefits—against the *unavoidable* risk of oil spills.[29]  The Board did not respect this statutory limit.  Instead it concluded that the Project would be "detrimental to the environment generally."[30]

54.   The Board abused its discretion by not limiting itself to the issue noticed for the March 8 hearing.

55.   The Board's attempt to weigh the Project's benefits against an undefinable, unquantifiable impact is not supported by substantial evidence.  It also eschews the Staff Report's and Final SEIR's findings that the Project mitigates all potential impacts to the maximum feasible extent and complies with all federal, state, and local laws, including the County's specific environmental and transportation thresholds.[31]

---

[26] Staff Report at 23–24.
[27] *Id.* at 4, 17.
[28] Final SEIR, Executive Summary at ES-18, ES-35–36.
[29] CAL. CODE REGS. tit. 14, § 15093(a).
[30] BOS Ltr. at 2.
[31] Staff Report, Attachment A, Findings for Approval at A-1–6, A-11–19; Final SEIR, Executive Summary at ES-1, ES-22–39 (Tables ES-1–5); Final SEIR at 4.4-1–10.

**Findings Required by Land Use Development Code and Coastal Zoning Ordinance**

56.     The Board also presumed that the closure of SMPS would cause a significant increase in the number of tanker trucks on Calle Real, U.S. Highway 101, and—in particular—State Route 166, which in turn would increase traffic and accidents.  Consequently, the Board determined streets and highways are not adequate to carry the type and quantity of traffic generated by the Project.  It also found the risk of accidents made the Project detrimental to the general welfare, health, and safety of County residents and other users of those roads.[32]  Again, the Board relied on public comments—rather than the Final SEIR and Staff Report—to reach these conclusions.

57.     As discussed above, the Staff Report found that the closure of SMPS would not materially impact traffic and would only lead to a net increase of *nine trucks per day*.  This "would *reduce* the cumulative impact at the U.S. Highway 101/State Route 166 East interchange to less than significant *after* the SMPS is permanently shut down."[33]

58.     The Board's concerns regarding the roads' capacity to accommodate the Project are equally unfounded.  The traffic analysis prepared by the County's traffic consultant, statewide safety thresholds, and the opinion of Caltrans—the expert state agency tasked with regulating California's highway systems, including the traffic thresholds–demonstrate that the Project would not exceed any safety or capacity thresholds.[34]

59.     The Final SEIR also found that the Project's impact on traffic and truck accidents would be less than significant and that those impacts would be mitigated:

> ***The approved and pending projects for the cumulative analysis are expected to have a minimal effect on traffic volumes along State Route 166***, and would increase the V/C ratio by less than one percent.  ***The proposed Project's contribution to cumulative traffic impacts along State Route 166 would be less than significant.  … [And that] cumulative oil truck accidents along State Route 166 would be less than significant.***  Implementation of ***the Applicant-proposed avoidance and minimization measures,*** as well as mitigation measure RISK-2

---

[32] BOS Ltr. at 3–4.
[33] Staff Report at 24.
[34] *See* ExxonMobil Interim Trucking Permit Project Revised Traffic & Circulation Study, at 14–15, 24–26.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

***would reduce the likelihood of an accident by about 33%***, and would further reduce the Project's contribution to cumulative safety risk along State Route 166.[35]

60.     The Board also noted that "[e]xisting driver behavior, which data shows an increase in traffic fatalities[,] is problematic."[36]  That is an issue for local law enforcement to address, not a reason to deny the Project.  In any event, the Project specifically mitigates potential traffic hazards caused by slow-moving oversized vehicles by imposing higher training, technological, and safety standards for the trucks that would serve SYU.[37]  In addition, the County Public Works Department required ExxonMobil to develop a Traffic Management Plan with protocols for the passage of emergency vehicles and regular traffic and safe movement in constrained locations like intersections and curves with turning radii that cannot adequately accommodate passage of any oversized vehicles.[38]

61.     Lastly, contrary to the Board's conclusions, the Staff Report found that the Project and related mitigation are not detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood.

## 2.1 LUDC DEVELOPMENT PLAN FINDINGS

**Findings required for all Preliminary or Final Development Plans**.  In compliance with Subsection 35.82.080.E.1 of the County Land Use and Development Code, prior to the approval or conditional approval of an application for a Preliminary or Final Development Plan the review authority shall first make all of the following findings, as applicable:

. . . .

5.  ***The proposed project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area.***

Potential public health and safety risks associated with the Modified Interim Trucking Project are discussed in Sections 4.1 and 4.3 of the Final SEIR, incorporated herein by reference, and include health risks associated with toxic air emissions from truck loading equipment and emissions of diesel particulate matter

[35] Final SEIR at 4.5–36; *see also id.* at 4.3-52–54 (Table 4.3-16 and Figures 4.3-12–13); Staff Report at 21.

[36] BOS Ltr. at 3.

[37] *See, e.g.*, Staff Report, Attachment B, Conditions of Approval at 82–84 (Cond. XX-5A); *id.* at 90–92 (Conds. XX-7A, XX-8); *see also* Final SEIR at 4.5-29–30.

[38] Staff Report, Attachment B, Conditions of Approval, Cnty. of Santa Barbara Pub. Works Dep't Letter (July 21, 2020) at 2–3.

from truck transportation of crude oil.  The Final SEIR Section 4.1 (Impact AQ.5) evaluated the project's Health Risk Assessment and concludes that the project's health risks due to toxic air emissions and diesel particulate emissions will be below the cancer and acute and chronic health risk thresholds adopted by the SBCAPCD Board.  ***Implementation of adopted conditions of approval will ensure the Project will not be detrimental to the comfort, convenience and general welfare of the neighborhood.  These measures include vegetation management to improve visibility on Calle Real (Condition XX-6E), restrictions on the use of compression release engine brakes (jake brakes) on Calle Real to reduce noise (Condition XX-6F), limitations on trucking to avoid school bus hours (Condition XX-7C), speed limit restrictions on Calle Real (Condition XX-7D), and crossing guards at the Calle Real/El Capitan State Beach Road intersection on specific weekend days to avoid conflicts with recreational users (Condition XX-6G).  Based on the analyses in the Final SEIR and as discussed in Table 6 of the September 8, 2021 Planning Commission staff report and incorporated herein by reference, the Planning Commission recommends that the Board of Supervisors finds that the proposed construction and operation of the project will not be detrimental to the health, safety, and general welfare of the neighborhood and will not be incompatible with the surrounding area.***[39]

The Staff Report also made the same finding regarding CZO section 35-174.7.1.[40]

**F.     The Board's *De Facto* Ban on Trucking Oil Violates the County's Coastal Land Use Plan, Local Coastal Land Use Policy, and Related Regulations**

62.     The Project denial was completely unrelated to its merits.  It was driven by the Board's efforts to improperly restrict the production and transportation of oil in and off the coast of Santa Barbara County, even though that issue was not before the Board.  In fact, ExxonMobil has a vested right to operate SYU without any authorizations required from the Board.[41]

63.     In the course of denying the Project, the Board declared that "the transportation [of oil] by truck is not the appropriate way to transport it based on the environmental safety impact to the County."[42]  This determination was based on a passing comment of one Supervisor and is not supported by substantial evidence.

64.     Taken together with the County's prior rejections of the transportation of oil via rail or marine tanker, ExxonMobil and other members of the oil and gas industry have no way to

---

[39] Staff Report, Attachment A, Findings for Approval at A-11, A-13–14; *see also* Final SEIR at 4.1-28, 4.4-14–15, 4.5-27.

[40] Staff Report, Attachment A, Findings for Approval at A-15, A-17–18.

[41] Final SEIR, Executive Summary at ES-9; *see also* Staff Report at 7.

[42] BOS Ltr. at 2.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

move their products if a pipeline is not available.[43] The Board knew this. This *de facto* ban on trucking crude oil is wholly inconsistent with the County's current regulatory regime.

65. The County's Coastal Land Use Plan recognizes that the oil and gas industry must have a way of getting its products to market:

> ***Oil transportation is one of the key issues associated with oil development in Santa Barbara County . . . . The County should assure that producers have access to competitive markets***, however, the County need not provide unlimited flexibility to all producers. ***Since pipelines*** are not yet in place and ***may not be constructed to all refining centers, other methods of oil transportation are needed for*** production that precedes pipeline construction and ***operation and for refining centers not served by pipeline.***"[44]

Likewise, the County's Coastal Land Use Plan Policy 6-8(d) states that, "[u]ntil pipelines become available, and for refining centers not served by pipeline, other modes of oil transportation are allowed consistent with County policies."[45]

66. The County's ordinances and codes regulating the oil and gas industry allow for transportation of oil when pipelines are otherwise unavailable. For example, CZO section 35-154.5(i), in relevant part, specifies:

> Permits for expanding, modifying, or constructing crude oil processing or related facilities shall be conditioned to require that all oil processed by the facility shall be transported from the facility and the County by pipeline as soon as the shipper's oil refining center of choice is served by pipeline.
>
> ***Transportation by a mode other than pipeline may be permitted only:***
>
> 1) Within the limits of the permitted capacity of the alternative mode; and
>
> ***2) When the environmental impacts of the alternative transportation mode are required to be mitigated to the maximum extent feasible; and***
>
> ***3) When the shipper has made a commitment to the use of a pipeline when operational to the shipper's refining center of choice; and***

---

[43] *See, e.g.*, Coastal Land Use Plan Policy 6-8(d) ("Rail is not preferred for large volume shipments of oil."); Staff Report, Attachment B, Conditions of Approval at 12, 21 (Development Plan Conds. IV-A.14, IX-2) (each requiring removal of SYU's prior marine tankering facilities). In any event, as noted in the Final SEIR, neither rail nor marine transport are viable options for SYU and their use would cause more significant environmental impact than trucking. *See* Final SEIR at 2-23–24.

[44] County of Santa Barbara Coastal Land Use Plan (adopted 6/18/1984, republished June 2019) at 66–67 (emphasis added).

[45] Staff Report at 29 (Coastal Land Use Plan Policy 6-8(d)).

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

4) When the County has determined use of a pipeline is not feasible by making one of the following findings:

> *a) A pipeline to the shippers' refining center of choice has inadequate capacity or is unavailable within a reasonable period of time . . . .*[46]

LUDC section 35.52.060.B.10.b allows for transportation by a mode other than pipeline: "(1) *For that fraction of the oil that cannot feasibly be transported by pipeline*; and (2) When the environmental impacts of *the alternative transportation mode are required to be mitigated to the maximum extent feasible*."[47]

67.     The Development Plan also contemplates non-pipeline oil transportation in the event that a pipeline is unavailable.  Specifically, Condition VI-1 stipulates that "transportation by a mode other than pipeline may be permitted only in accordance" with the foregoing regulations.[48] The Staff Report found that the Project complied with this criteria.[49]

68.     CZO section 35-154.5(i) and LUDC section 35.52.060.B.10.b properly balance the need of the industry to move its products when a pipeline is infeasible or unavailable and the need to protect the environment by mitigating the alternative transportation mode to the "maximum extent feasible."  The Project denial breaks this balance.

69.     The statements of the Board members who voted against the Project demonstrate that the Project denial was not based on any purported flaw or safety concern—indeed the Staff Report found that the risks associated with the Project were mitigated to the maximum extent feasible[50]—but rather based on the Board's unofficial policy to oust oil commerce from Santa Barbara County.

---

[46] *Id.* at 58–60 (CZO § 35-154.5(i)) (emphasis added).

[47] *Id.* at 54 (LUDC § 35.52.060.B.10.b) (emphasis added).

[48] *Id.*, Attachment B, Conditions of Approval at 17 (Development Plan Cond. VI-1).  In addition, pursuant to Condition XI-2.k of the Development Plan, the County could conduct up to two surprise oil spill drills each year that could be held on "the property, offshore at the marine terminal, or along Highway 101 for a simulated tanker truck spill."  *Id.* at 41–42.

[49] *See* Staff Report at 29 (Coastal Land Use Plan Policy 6-8(d)); *id.* at 54 (LUDC § 35.52.060.B.10.b); *id.* at 58–60 (CZO § 35-154.5(i)).

[50] *See, id.*, Attachment A, Findings for Approval at A-1–6.

- 22 -

1 | **Vice Chair Das Williams:**

2 | *[P]roduction of local oil may have benefits above the importation of foreign oil*,
which I'll get to that argument; *however, transportation by truck is not the*
3 | *appropriate way to transport it and I cannot find that the benefits of the project*
*outweigh the significant environmental impacts.*
4 |

5 | You know, being that *I've spent most of my life as a foot soldier for the local*
*environmental movement, I'll say that it took decades of negotiation, fighting,*
*public hearings to get to the point where most of the oil in the County was* --
6 | most of the volume was pipelined. . . .

7 | And you know, that is the safer way.  That is the -- and *I find it sad that through*
*the negligence of another oil company that that balance or that sort of piece was*
8 | *ruptured and now we fight over the future after that pipeline rupture.*

9 | **Supervisor Gregg Hart:**

10 | *Many people today commented on the need to increase oil production in the*
*Santa Barbara Channel to offset the oil produced in Russia.  I believe these*
11 | *comments miss the fundamental choice we're facing today from the combination*
*of climate change and the threat posed by Russia's invasion of Ukraine.  We*
12 | *must reduce our dependence on fossil fuels to achieve true energy independence.*

13 | Our country and the world have faced oil shocks in the past: the OPEC oil
embargo in the '70s, the Iranian revolution, the Iran-Iraq war.  *The policy mistake*
14 | *we made each time oil supplies were interrupted by events was not taking*
*advantage of those crises to advance renewable energy supplies.  We can't make*
15 | *this mistake again.*

16 | While our decision today is limited in scope to the temporary trucking program
that would allow the Santa Ynez Unit to restart operations before the
17 | reconstruction of a pipeline, *I believe that our community wants to send a clear*
*message that we are unwilling to risk damage to our environment in exchange*
18 | *for short-term corporate profits, uncertain local jobs, and modest tax revenue.*

19 | **Chair Joan Hartmann:**

20 | *We often talk about the transition to renewable energy and it's always way out*
*there, but once it starts happening, it starts happening quickly.*  One of my
21 | favorite images is of 1900 in New York on Fifth Avenue where there's 50 horses
and one car.  Thirteen years later in 1913, there's 40 cars and one horse-drawn
22 | carriage.  *Once change starts, it can really happen quickly, and I believe that's*
*going to be the case with our transition to renewable energy.*
23 |

24 | *So we can think about it in terms of just the trucking.  I do believe, however, that*
*we need to think about this more broadly and we do have discretion about the*
25 | *baseline.  The baseline in my view is current conditions and the current*
*conditions are that we are in a climate crisis and the GHGs from this, it could*
26 | *offset the trucking, although only one-tenth of it would be local, but the facility*
*itself is the largest greenhouse gas emitter in our County.*

27 | *And then the burning of the fossil fuels itself, that is not mitigated for either, so*
*is this really the direction to go when we are facing a climate crisis?*  I just, for
28 | my way of thinking, that is just not the case.

- 23 -

70.     These comments show that the Board exceeded its authority by morphing consideration of the Project into a referendum on the production, transportation, and use of oil in and off the coast of Santa Barbara County.

**G.     The Project Denial Impairs ExxonMobil's Vested Right to Restart and Operate SYU**

71.     Since forming SYU in 1970, ExxonMobil has invested significant resources in the Unit's growth, development, and operation.  ExxonMobil acquired and maintains 16 federal leases for the 114 offshore wells in connection with the Hondo, Heritage, and Harmony Platforms.  It went through the permitting process to obtain the Development Plan and built LFC to address the County's concerns regarding transportation of oil and gas via tanker ship.

72.     The wells beneath the Platforms still have significant reserves.

73.     Since the Plains pipelines became inoperative, ExxonMobil has spent over a $100 million each year on the carrying costs for SYU.

74.     ExxonMobil has a vested right to restart and operate SYU.  As the Final SEIR noted, "[a]lthough pipeline transportation is not available, ExxonMobil can restart production at the SYU facilities at any time without approval from County decision-makers."[51]

75.     The Project would enable ExxonMobil to restart SYU, producing and processing oil at approximately 39% of the baseline period production levels.  Once a pipeline becomes available, SYU will return to full production.

76.     The Development Plan and local law currently allow ExxonMobil to truck SYU oil because a pipeline is unavailable and the Staff Report finds that all potential impacts will be mitigated to the maximum extent feasible.[52]

77.     For four years, ExxonMobil worked closely with the P&D Staff and the County's agencies to ensure that the Project conformed to all applicable federal, state, and local laws.  ExxonMobil expended significant funds during the permitting process.  ExxonMobil made these efforts in reliance on its ability to secure a permit to truck oil so that it could restart SYU.

---

[51] Final SEIR, Executive Summary at ES-9; *see also* Staff Report at 7.
[52] *See* Staff Report at 29 (Coastal Land Use Plan Policy 6-8(d)); *id.* at 54 (LUDC § 35.52.060.B.10.b); *id.* at 58–60 (CZO § 35-154.5(i)).

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**

#### **Petition for Writ of Administrative Mandate**
**(Cal. Code Civ. Proc. § 1094.5)**

78.     ExxonMobil realleges and incorporates by reference the allegations set forth in paragraphs 1 through 77 above as if fully set forth herein.

79.     ExxonMobil seeks a writ of mandate pursuant to California Code of Civil Procedure section 1094.5 directing the Board to set aside the Project denial.

80.     ExxonMobil has a vested right to restart and operate SYU.  The Project denial impairs those rights.

81.     The Board's arbitrary, capricious, and unlawful denial of the Project is a prejudicial abuse of discretion.

82.     The Project denial—pursuant to CEQA section 15093(a), LUDC subsections 35.82.080.E.1(c) and (e), and CZO subsections 35-174.7.1(c) and (e)—was not supported by substantial evidence.

83.     The Board abused its discretion and acted in an arbitrary, capricious, and unlawful manner by disregarding the limits on review imposed by CEQA.

84.     CEQA section 15093(a) "requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits, including region-wide or statewide environmental benefits, of a proposed project against its unavoidable environmental risks when determining whether to approve the project."

85.     The Board did not respect this statutory limit.  Instead, it concluded that the Project would be "detrimental to the environment generally."

86.     In addition, this conclusion was not supported by substantial evidence.

87.     The Board also abused its discretion and acted in an arbitrary, capricious, and unlawful manner and in excess of its jurisdiction by imposing a *de facto* ban on the transportation of oil via truck, which is statutorily allowable in certain instances, all of which apply to the Project.

- 25 -

88.     The County's Coastal Land Use Plan and Local Coastal Plan Policy 6-8(d) recognize that the oil and gas industry must have a way of getting its products to market if a pipeline is unavailable.

89.     CZO section 35-154.5(i) and LUDC section 35.52.060.B.10.b allow non-pipeline oil transportation if a pipeline is unavailable and the company mitigates to the maximum extent feasible.  SYU's Development Plan expressly incorporates and authorizes ExxonMobil to transport oil by means other than a pipeline subject to these regulations.  The Project meets these criteria.

90.     The County has previously rejected the transportation of oil via rail or tanker ship, leaving trucking as the only alternative if a pipeline is not available.

91.     In denying the Project, the Board declared that transportation of oil by truck is not appropriate.  This conclusion was not supported by substantial evidence.

92.     The County's prior restrictions on transport by rail and tanker ship and the Board's new prohibition on the use of trucks leave ExxonMobil and other members of the oil and gas industry with no means of transporting their products to market if a pipeline is unavailable.  This unlawful restriction violates the County's Coastal Land Use Plan, Local Coastal Land Use Policy 6-8(d), CZO section 35-154.5(i), and LUDC section 35.52.060.B.10.b.

93.     ExxonMobil seeks a writ of mandate to vacate and set aside the denial of ExxonMobil's Project application and to reconsider ExxonMobil's Project application in light of the Court's opinion and judgment, all requirements of CEQA, and all other applicable state and local policies, laws, ordinances, and regulations.

**SECOND CAUSE OF ACTION**

**Declaratory Relief, or in the Alternative, Petition for Writ of Mandate—Unconstitutional Taking of Property**
**(28 U.S.C. §§ 2201, 2202; Cal. Code Civ. Proc. § 1094.5, in the alternative)**

94.     ExxonMobil realleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as if fully set forth herein.

95.     The Project denial substantially impairs ExxonMobil's property rights without just compensation and, thus, violates the Fifth and Fourteenth Amendments of the U.S. Constitution

- 26 -

1    and Article I, section 19 of the California Constitution.

2         96.    ExxonMobil has a vested right to restart and operate SYU.

3         97.    The Project denial eliminates ExxonMobil's ability to restart and operate SYU,

4    substantially eliminating all economically viable use of ExxonMobil's property for the benefit of

5    the public without just compensation.  Therefore, the Project denial effects a *per se* taking.

6         98.    The Project denial also effects an unconstitutional taking under traditional

7    regulatory takings principles.  The economic impact on ExxonMobil is severe.  In effect, the

8    Project denial prohibits the restart and operation of SYU.  The Project denial also interferes with

9    ExxonMobil's reasonable investment-backed expectations.  The County's Coastal Land Use Plan

10   and Local Coastal Plan Policy 6-8(d) recognize that the oil and gas industry must have a way of

11   getting products to market if a pipeline is unavailable.  CZO section 35-154.5(i) and LUDC

12   section 35.52.060.B.10.b allow non-pipeline oil transportation if a pipeline is unavailable and the

13   company mitigates potential impacts to the maximum extent feasible.  SYU's Development Plan

14   expressly authorizes ExxonMobil to transport oil by means other than a pipeline subject to these

15   regulations.  The Project met this criteria.  ExxonMobil had no reason to believe that the Board

16   would alter the County's longstanding regulatory regime by declaring that the transportation of

17   oil by truck is not appropriate.  The character of the Board's action is akin to a physical taking of

18   ExxonMobil's property and provides ExxonMobil with no countervailing benefits that would

19   offset the costs the Project denial imposes.

20        99.    Because of these impacts, the Project denial should be invalidated.  The Board

21   violated the Taking Clause of the Fifth Amendment to the U.S. Constitution, as applied to the

22   states by the Fourteenth Amendment, which prohibits the temporary or permanent taking of

23   private property for public use without prior, just compensation.  The Board also violated Article

24   I, section 19 of the California Constitution, which prohibits the temporary or permanent taking or

25   damaging of private property for public use without prior, just compensation.

26        100.   Accordingly, ExxonMobil seeks a declaration that the Project denial is invalid as it

27   constitutes an uncompensated taking in violation of the Fifth and Fourteenth Amendments of the

28   U.S. Constitution and Article I, section 19 of the California Constitution.

101.    In the alternative, ExxonMobil requests a writ directing the Board to set aside their action denying the Project be issued to the extent, if any, that the Court concludes that section 1094.5 is applicable here.

### THIRD CAUSE OF ACTION

**Declaratory Relief and Damages—United States Constitution Commerce Clause**
**(28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983)**

102.    ExxonMobil realleges and incorporates by reference the allegations set forth in paragraphs 1 through 101 above as if fully set forth herein.

103.    Oil and gas are articles of commerce subject to the sole power of Congress to regulate interstate commerce under the Commerce Clause of the U.S. Constitution.

104.    The Commerce Clause provides that only "[t]he Congress shall have the Power … [t]o regulate Commerce … among the several States …."  U.S. Constitution, Art. I, § 8, cl. 3.  Likewise, the Commerce Clause bars state or local governments from unjustifiably discriminating against or burdening the flow of articles of commerce or passing laws that regulate commerce outside of their borders.  U.S. Constitution, Art. I, § 7, cl. 3.  These two dictates of the Commerce Clause protect the same scope of interests.

105.    The campaign for, intent of, and effect of the Project denial are to implement the Board's unofficial policy to oust oil and gas commerce from Santa Barbara County.  The Project denial effectively labels oil and gas producers and transporters—including ExxonMobil—as outsiders and imposes insurmountable barriers, thereby excluding them from the California and national markets for oil and gas.  Oil and gas transportation comprises part of and substantially affects the market for energy and falls under the national law and regulations that control the transportation and production of oil and gas.  Because it is undisputed that no pipeline transportation option is available, the Project denial and the Board's policy to eliminate oil and gas production amounts to a *de facto* ban on crude oil production and transportation in and off the coast of Santa Barbara County.  This ban imposes hundreds of millions of dollars of costs and lost revenues on ExxonMobil by forcing the shutdown of Santa Barbara County and offshore Platforms crude oil operations, while maintaining that infrastructure until a pipeline becomes

- 28 -

available.  This disruption is particularly severe given the complete lack of alternative transportation methods and viable short-term storage facilities.

106.    The Project denial provides no environmental benefits to the County and deprives consumers of a local, lower-carbon-intensive, and more heavily regulated energy source than the foreign-produced oil and gas that must now satisfy consumer demand.

107.    The Project denial—on its face and as applied—reflects a policy to prohibit the production and transportation of crude oil in and off the coast of Santa Barbara County, while explicitly favoring the local coastal hospitality industry.  The Project denial enacts a barrier against the transportation of crude oil that originates outside the County.  The Project denial disrupts and ends large-scale transportation of crude oil and forces many workers into unemployment.  The Project denial ends millions of dollars of purchases and sales of labor, services, vehicles, trucking equipment and supplies, fuels, and housing that impact and are part of the national economy.

108.    The Project denial constitutes an undue burden on interstate commerce, outweighing the illusory, asserted benefits of the denial, and violates the Commerce Clause.

109.    Congress has not explicitly authorized a total, discriminatory ban on transportation of oil and gas such as the Project denial.

110.    The Board denied the Project with a discriminatory purpose making the denial *per se* invalid.

111.    The Project denial has an impermissible extraterritorial reach when aggregating burdens to commerce, should other localities impose similar restrictions as Santa Barbara County's denial.

112.    At all times, the Board acted under color of state law.

113.    The Project denial deprives ExxonMobil of its rights under the Commerce Clause of the United States Constitution, in violation of 42 U.S.C. § 1983, and ExxonMobil is entitled to damages and attorneys' fees.  The Commerce Clause protects ExxonMobil from ordinances and local agency actions that discriminate against or unduly burden commerce or impose burdens beyond the jurisdiction's borders.  The Project denial prevents ExxonMobil from conducting its

- 29 -

business of transporting crude oil, a class of business that is national and regulated by Congress. ExxonMobil is damaged in the millions of dollars as the company faces the loss of all of its current business originating from the production of crude oil from SYU.

114.    As a direct and proximate result of the Board's actions, ExxonMobil has suffered and continues to suffer substantial damages in an amount to be proven at trial.

115.    Accordingly, ExxonMobil seeks a declaration that the Project denial violates the Commerce Clause of the United States Constitution.

## FOURTH CAUSE OF ACTION

### Declaratory Relief—California Constitution
### (28 U.S.C. §§ 2201, 2202)

116.    ExxonMobil realleges and incorporates by reference the allegations set forth in paragraphs 1 through 115 above as if fully set forth herein.

117.    Consistent with the federal Constitution's Commerce Clause, the California Constitution bars discrimination by local governments against the flow of commerce within California, bars measures that unduly burden that commerce, and bars measures that regulate commerce outside a locality's borders.

118.    The production and transportation of oil and gas in California is a highly regulated industry and substantially affects commerce.

119.    The Project denial—on its face and as applied—prohibits the transportation of crude oil within the County destined for refining and consumption outside of its boundaries, thereby denying transportation outside of the County, while allowing other trucking to continue.

120.    The Project denial—on its face and as applied—seeks to terminate oil and gas industry activities in the County while favoring its local coastal hospitality industry.

121.    In its intent and effect, the Project denial discriminates against commerce in oil and gas produced and refined outside Santa Barbara County.

122.    The Project denial constitutes an undue burden on commerce in violation of the California Constitution.

123.    The Project denial has an impermissible extraterritorial reach when aggregating

1    burdens to commerce, should other localities impose similar restrictions as the Board's denial.

2        124.    Accordingly, Plaintiff seeks a declaration that the Project denial is in violation of

3    the California Constitution.

4                            **FIFTH CAUSE OF ACTION**

5              **Declaratory Relief—Illegal Exercise of Police Power**
                            **(28 U.S.C. §§ 2201, 2202)**
6

7        125.    ExxonMobil realleges and incorporates by reference the allegations set forth in

8    paragraphs 1 through 124 above as if fully set forth herein.

9        126.    The denial of a permit is an exercise of a county's police power under the

10   California Constitution.  Cal. Const. Art XI, § 7.

11       127.    California Constitution Art XI, § 7 states that "[a] County or city may make and

12   enforce within its limits all local, police, sanitary, and other ordinances and regulations not in

13   conflict with general laws."

14       128.    A locality's capacity to use its police power is not unlimited.  Under California

15   law, a local jurisdiction may not exercise its police power in a manner that does not in fact

16   reasonably relate to the general welfare, including of other communities.  Local actions must

17   reasonably accommodate the regional welfare.

18       129.    The Project denial significantly affects residents outside Santa Barbara County.

19   For example, the Project denial increases energy prices and deprives areas outside Santa Barbara

20   County of millions of dollars of purchases and sales of labor, services, vehicles, trucking

21   equipment and supplies, fuels, and housing.

22       130.    In denying the Project, the Board made no attempt to accommodate competing

23   interests on a regional basis and failed to properly base its decision on a "real or substantial

24   relation to the public welfare."  The Project denial therefore exceeds the County's police power

25   under the California Constitution.

26       131.    Accordingly, ExxonMobil seeks a declaration that the Project denial is an invalid

27   exercise of police power.

28

1

**SIXTH CAUSE OF ACTION**

2

**Inverse Condemnation—Unconstitutional Taking of Property**
**(42 U.S.C. § 1983; U.S. Const. amend. V; Cal. Const. art. I, § 19)**

3

4          132.     ExxonMobil realleges and incorporates by reference the allegations set forth in

5   paragraphs 1 through 131, above, as if fully set forth herein.

6          133.     ExxonMobil owns SYU, including interests in the leases, wells, and Platforms in

7   federal waters and LFC.

8          134.     ExxonMobil has a vested right to restart and operate SYU.

9          135.     The Project denial eliminates ExxonMobil's ability to restart and operate SYU,

10  substantially eliminating all economically viable use of ExxonMobil's property for the benefit of

11  the public without just compensation.  Therefore, the Project denial effects a *per se* taking.

12         136.     The Project denial also effects an unconstitutional taking under traditional

13  regulatory takings principles.  The economic impact on ExxonMobil is severe.  In effect, the

14  Project denial prohibits the restart and operation of SYU.  The Project denial also interferes with

15  ExxonMobil's reasonable investment-backed expectations.  The County's Coastal Land Use Plan

16  and Local Coastal Plan Policy 6-8(d) recognize that the oil and gas industry must have a way of

17  getting its products to market if a pipeline is unavailable.  CZO section 35-154.5(i) and LUDC

18  section 35.52.060.B.10.b allow non-pipeline oil transportation if a pipeline is unavailable and the

19  company mitigates potential impacts to the maximum extent feasible.  SYU's Development Plan

20  expressly authorizes ExxonMobil to transport oil by means other than a pipeline subject to these

21  regulations.  The Project met this criteria.  ExxonMobil had no reason to believe that the Board

22  would alter the County's longstanding regulatory regime by declaring that the transportation of

23  oil by truck is not appropriate.  The character of the Board's action is akin to a physical taking of

24  ExxonMobil's property and provides ExxonMobil with no countervailing benefits that would

25  offset the costs the Project denial imposes.

26         137.     As a direct and proximate result of the Board's unconstitutional taking of

27  ExxonMobil's property in violation of the Fifth and Fourteenth Amendments of the U.S.

28  Constitution and Article I, section 19 of the California Constitution, ExxonMobil has suffered

1  substantial damages, plus interest, in an amount to be proven at trial.

2  **PRAYER FOR RELIEF**

3  WHEREFORE, ExxonMobil respectfully requests that the Court:

4  A.    Issue a writ of mandate directing the Board:

5        1.    To vacate and set aside denial of ExxonMobil's Project application;

6        2.    To reconsider ExxonMobil's Project application in light of the Court's

7  opinion and judgment;

8  B.    Issue a declaratory judgment that:

9        1.    The denial of ExxonMobil's Project application violates the Takings

10  Clauses of the United States Constitution and the California Constitution and is therefore invalid

11  and unenforceable, or in the alternative issue a writ of mandate directing the Board to set aside

12  the Project denial to the extent, if any, the Court concludes that section 1094.5 is applicable here;

13       2.    The denial of ExxonMobil's Project application violates the Commerce

14  Clause of the United States Constitution and is therefore invalid and unenforceable;

15       3.    The denial of ExxonMobil's Project application constitutes an

16  unconstitutional exercise of police power under the California Constitution and is therefore

17  invalid and unenforceable;

18  C.    Award ExxonMobil damages for just compensation and interest thereon, according

19  to proof, for the lost value of its property;

20  D.    Award ExxonMobil its reasonable attorneys' fees and costs; and

21  E.    Award ExxonMobil such other and further relief as the Court deems just and

22  proper.

23  Dated:  May 11, 2022                    Respectfully submitted,

24

25                                         By:    _/s/ Dawn Sestito_

26                                         Dawn Sestito
                                           Attorneys for Petitioner and Plaintiff
27                                         Exxon Mobil Corporation

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Bryan Anderson, am SYU Asset Manager of Exxon Mobil Corporation ("ExxonMobil"), and I am authorized to execute this Verification on behalf of ExxonMobil. I have read the foregoing **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I have executed this Verification on this 9 day of May, 2022, in Santa Barbara, California.

Bryan Anderson