LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
MARGARET M. HALL (Bar No. 293699)
mhall@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel. (805) 963-1622 / Fax. (805) 962-3152
*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Surfrider Foundation*

 JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
ELIZABETH JONES (Bar No. 326118)
ljones@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Tel. (510) 844-7100/ Fax. (510) 844-7150
*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION, | Case No. 2:22-cv-03225(DMG MRWx) |
| Petitioner/Plaintiff, | |
| v. | **DECLARATION OF LINDA KROP IN SUPPORT OF MOTION TO INTERVENE** |
| SANTA BARBARA COUNTY BOARD OF SUPERVISORS, | |
| Respondent/Defendant, | Hon. Dolly Gee |
| and | |
| ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SURFRIDER FOUNDATION, CENTER FOR BIOLOGICAL DIVERSITY, and WISHTOYO FOUNDATION, | Hearing: October 21, 2022 Time: 9:30 a.m. Place: Courtroom 8C, 350 West 1st Street, Los Angeles |
| Proposed Defendant-Intervenors. | |

Declaration in Support of Motion to Intervene                    1

I, Linda Krop, hereby declare the following:

1.      I am Chief Counsel for the Environmental Defense Center ("EDC").  My business address and phone number are 906 Garden Street, Santa Barbara, CA 93101, (805) 963-1622.

2.      In my capacity as EDC Chief Counsel I have the primary responsibility for the proposed intervention of EDC's clients: EDC, Get Oil Out! ("GOO!"), Santa Barbara County Action Network ("SBCAN"), Sierra Club, and Surfrider Foundation. I have personal knowledge of the following facts and if called as a witness, would testify to these facts under oath.

3.      I have been a member of the EDC since the 1980s, when I served as a law clerk, volunteer, and eventually a part-time employee. I was hired as a staff attorney at EDC in 1989, and promoted to Chief Counsel in 1999. I have served as Chief Counsel continuously since 1999.

4.      EDC is a non-profit public interest environmental law firm that was founded in 1977 to protect and enhance the local environment through education, advocacy, and legal action. EDC's program areas include the Santa Barbara Channel, clean water, open spaces and wildlife, and climate and energy projects. EDC's service area includes Ventura, Santa Barbara, and San Luis Obispo Counties.

5.      EDC was formed in the wake of the devastating 1969 oil spill off the coast of Santa Barbara. On the morning of January 28, 1969, while the Union Oil crew on Platform A was retrieving a drill pipe from the bottom of an oil well five miles offshore from Summerland, the well blew out, causing one of the largest environmental disasters in U.S. history. By the time it was over, more than four million gallons of oil were released, fouling thirty-five miles of coastline, killing as many as 15,000 seabirds, and poisoning dolphins, seals, and sea lions.

6.      The devastating images and painfully slow recovery led to the passage of numerous laws, including the Clean Water Act, Endangered Species

Declaration in Support of Motion to Intervene                                        2

Act, National Environmental Policy Act, and the California Coastal Act. Community leaders in Santa Barbara realized that for the promise of these new laws to be fulfilled, there needed to be an organization on the ground, utilizing these new tools to ensure nothing like this could ever happen again here. In 1977, the doors were opened at EDC, providing the people of the south-central coast an environmental watchdog, an advocate, and a legal voice to protect our coastal and marine resources.

7.     Since that time, EDC has represented more than 130 different nonprofit organizations, retired forty offshore oil leases, prevented new oil and development projects, and stopped multiple efforts to import liquefied natural gas.  EDC was instrumental in opposing dangerous oil transportation projects, including a proposal to transport crude oil by rail which was denied by the County of San Luis Obispo on October 5, 2016. More recently, EDC has led the fight to ensure that offshore fracking and acidizing in federal waters off the California coast is fully examined under environmental protection laws, resulting in the recent Ninth Circuit opinion, *Environmental Defense Center v. Bureau of Ocean Energy Management. See generally* 36 F.4th 850 (9th Cir. 2022).

8.     EDC played a very active role after the Plains All American pipeline rupture in May 2015, working to ensure community access to information; proper response, cleanup, and restoration; and advocacy to ensure more safeguards are taken going forward. We also responded to ExxonMobil's June 4, 2015, application to the County of Santa Barbara Planning and Development Department for an emergency permit to transport crude oil by truck. EDC submitted a letter on June 5, 2015, to the Department, urging the County to reject ExxonMobil's request and citing the risks of trucking oil on the proposed route. The County denied the application on June 9, 2015, on the grounds that (1) there was no evidence that a defined emergency existed; (2) ExxonMobil should pursue the "customary procedures for permit processing"; (3) the application was

inconsistent with the County's Comprehensive Plan; and (4) trucking of oil was not within the parameters of the Governor's Executive Order regarding the Plains pipeline spill.

9.      On September 22, 2017, ExxonMobil submitted an application for the Interim Trucking for Santa Ynez Unit Phased Restart Project ("the Project"). In its application, ExxonMobil proposed to restart its three offshore platforms, process the oil and gas at the onshore Las Flores Canyon processing plant, and then truck the oil to refineries outside the County via Highway 101 and State Route 166. Because ExxonMobil's existing Development Plan only allowed transportation out of the County by pipeline, ExxonMobil sought a revision to the Plan. The application requested authorization to transport more than 11,000 barrels per day. Up to seventy tanker truck trips would be allowed per day, for a total of 140 one-way truck trips. Each truck would carry approximately 6,720 gallons of processed crude oil. Two routes were proposed: one to Santa Maria via Highway 101, and one to Pentland via Highway 101 and State Route 166. The Project would allow ExxonMobil to truck 470,400 gallons of oil per day for seven years, or until a pipeline is available.

10.      The County prepared a Draft Supplemental Environmental Impact Report ("SEIR") in response to ExxonMobil's application. The SEIR was required because ExxonMobil sought a substantial change from its existing Development Plan and the environmental review that accompanied such Plan in the 1980s. The Draft SEIR was released for public review and comment on April 12, 2019. The Draft SEIR concluded that the Project would result in Class I impacts (significant and unmitigable) to biological, cultural, and water resources due to the likelihood of oil spills. EDC submitted an extensive comment letter on behalf of EDC, GOO!, and SBCAN. Sierra Club and Surfrider Foundation signed onto a group letter as well. The letters identified impacts that were omitted or understated in the Draft SEIR, including impacts related to public safety,

biological and cultural resources, offshore operations and oil spills, and climate change. The Proposed Final SEIR was released on July 30, 2020. The Final SEIR identified the same Class I impacts as the Draft SEIR.

11.     The Project was set to go before the Santa Barbara County Planning Commission ("Planning Commission") on September 2, 2020. On August 12, 2020, the Planning and Development Department published a staff report, recommending that the Planning Commission approve the application, but with two modifications: (1) truck trips would be prohibited during rainy periods; and (2) trucks would not be allowed on Highway 166 due to concerns about air pollution, oil spills, and safety concerns. The staff report recommended allowing ExxonMobil to truck oil only to the Phillips Santa Maria pump station. However, the hearing was cancelled when Phillips announced its intention to close the Santa Maria pump station at the end of 2022 as part of its plans to terminate its Santa Maria Refinery and reconfigure its San Francisco Refinery to handle renewable fuels.

12.     On August 16, 2021, the County issued a Proposed Revised Final SEIR to address the planned shutdown of the Santa Maria pump station. The Planning Commission hearing was scheduled for September 29, 2021. The Planning and Development Department issued a new staff report recommending approval of the application, including trucking along both Highway 101 (to Santa Maria) and Route 166 (to Pentland). On September 24, 2021, EDC submitted a group letter signed by thirty-five organizations, including proposed Intervenors, urging the Commission to recommend denial of ExxonMobil's application. On September 27, 2021, EDC submitted a detailed comment letter on behalf of GOO!, SBCAN, and EDC, requesting that the Planning Commission recommend denial of the proposed Project based on the significant risks and impacts that would result. In preparing for the hearing, EDC hired interns to conduct extensive research on the history of oil tanker truck accidents since 2000 along the proposed

routes as well as in the County and the State. EDC's research identified at least fourteen oil tanker truck accidents in Santa Barbara County since 2007, eight of which occurred along the proposed route. Six of the accidents on the proposed route occurred within the previous six years. These accidents resulted in deaths, serious injuries, oil spills, explosions, fires, and severe local ecological impacts. One recent accident caused a spill of 6,000 gallons into the Cuyama River, just upstream of a reservoir. Another accident caused the closure of Highway 101 for nineteen hours during the Thomas Fire evacuation. EDC met with Planning Commissioners prior to the hearing to express the concerns of EDC and our clients. EDC also informed our members by sending information and action alerts via email and social media. Ultimately, the Planning Commission recommended that the Board of Supervisors should deny the Project. The Commission found that the significant and unmitigable impacts of the Project were not outweighed by Project benefits as required by the California Environmental Quality Act ("CEQA"). The Commission also found that the Project did not comply with the County's ordinances (the Land Use Development Code and Coastal Zoning Ordinance) requiring that (1) streets and highways must be adequate to carry the type and quantity of traffic proposed by the Project; and (2) the Project must not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and must not be incompatible with the surrounding area. On November 3, 2022, the Commission voted to approve recommended findings of denial.

13.     The Board of Supervisors hearing was scheduled for March 8, 2022. On March 4, 2022, EDC sent the Board of Supervisors a comment letter on behalf of EDC, GOO!, and SBCAN, detailing the risks of approving the Project. The letter reiterated the evidence EDC collected regarding oil tanker truck accidents. We also commented on the findings, to make sure they reflected the evidence submitted at the hearings. In addition, EDC submitted a group letter on behalf of

forty-nine environmental organizations (including Proposed Intervenors) urging the County to deny the Project. EDC again alerted our members via action alerts, emails, and social media. In addition, EDC staff met with some of the Supervisors prior to the hearing to explain our concerns. At the hearing I testified about the risks of oil spills due to the significant and unavoidable risk of traffic accidents. EDC Senior Attorney Maggie Hall testified at the same meeting as to why the EIR was inadequate—because it failed to assess the impacts of the whole project, used a misleading environmental setting, and because ExxonMobil did not have an existing right to operate without further discretionary approvals. EDC Environmental Analyst Brian Trautwein pointed out that the EIR omitted information regarding impacts to biological resources. EDC law clerk Emily Luster testified against the alleged benefits of the Project. EDC intern Kela Megorden presented evidence regarding safety impacts and showed a map depicting the history of accidents along the proposed trucking route. All of the Proposed Intervenors testified at the hearing, including testimony involving a video showing the risks of accidents and oil spills along the proposed route. At the conclusion of the hearing, the Board voted to deny the application, based on the risk of oil spills, environmental impacts air pollution, and safety concerns. The Board noted that the closure of the Santa Maria pump station at the end of 2022 would increase truck trip distance and related risks and impacts. In its findings, the Board specifically relied upon evidence submitted by EDC and our clients.

14.    EDC has more than 2,000 members, many of whom live, work, travel, and recreate on or near ExxonMobil's proposed trucking route. EDC's members have a direct interest in the protection of the biological, cultural, aesthetic, educational, and academic resources along Highway 101 and Route 166. The proposed trucking route runs along and crosses many watersheds and important habitats. The route also runs through many communities that rely on

the roads as their only vehicular access. If the Project is approved, EDC's members' ability to enjoy the natural, aesthetic, cultural, scenic, educational, and research-based resources will be impaired by harm caused by oil spills and fires. EDC's members will also be directly impacted by the risk of accidents and road closures on Highway 101 and Route 166.

15.     In addition to my role as Chief Counsel of EDC, I have a personal interest in ExxonMobil's proposed Project. I regularly drive along the proposed trucking route on Highway 101 and often spend time along the Gaviota Coast for recreation, wildlife viewing, enjoying the scenery, and bringing visitors. I value the recreational, educational, cultural, aesthetic, and biological significance of this stretch of the Santa Barbara County coast. I am also very concerned about the risks of accidents on Highway 101, especially in the Gaviota area where the Highway has sharp curves and windy conditions.

16.     I supervised EDC's interns' research regarding oil tanker truck accidents along the proposed route, as well as in the County and State. I reviewed many of the accident reports regarding oil tanker truck accidents along ExxonMobil's proposed route. I also participated in conversations with representatives of the Santa Barbara County Fire Department, during which such representatives expressed their concerns about safety along the route, especially Route 166. They noted the unsafe conditions, accident history, and difficulty responding to accidents.

17.     I visited Refugio State Beach Park on May 19, 2015, the day of the Plains All American pipeline spill. I witnessed the devastating effects of the oil spill on the beach, wildlife, and the ocean environment. I am concerned about the effect of another oil spill along our coast or any of the watersheds that would be impacted by a spill from an oil tanker truck along Highway 101 or Route 166.

18.     I believe that EDC's clients' and my direct interests in opposing ExxonMobil's trucking proposal will be best represented if our clients are

Declaration in Support of Motion to Intervene                    8

allowed to intervene in this lawsuit. A court order upholding Santa Barbara County's denial of ExxonMobil's Project will ensure the safety of its residents and the protection of the environment, and will make me feel personally much safer and able to continue my enjoyment of the Gaviota coast. If the County's decision is not upheld, I will be put at considerable risk from traffic accidents and oil spills, which will decrease my use and enjoyment of the area.

19.    Attached as **Exhibit 1** is a true and correct copy of the EDC, GOO!, and SBCAN comment letter, excluding attachments to the letter, that I caused to be submitted to the Board of Supervisors on March 4, 2022.

20.    Attached as **Exhibit 2** is a true and correct copy of a letter from fifty organizations, including EDC, GOO!, SBCAN, Sierra Club, Surfrider Foundation, Center for Biological Diversity, and Wishtoyo Foundation that I caused to be submitted to the Board of Supervisors on March 4, 2022.

21.    Attached as **Exhibit 3** is a true and correct copy of a letter signed by Lisa Plowman, Director of Planning and Development at Santa Barbara County, dated March 16, 2022, containing Attachment A-the Board of Supervisors' Findings for Denial ("Action Letter"). I received this Action Letter by email from Errin Briggs, Supervising Planner, Santa Barbara County Planning & Development, on March 22, 2022.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Santa Barbara, California, on August 25, 2022.



Linda Krop

# Exhibit 1

Declaration of Linda Krop

Case No. 2:22-cv-03225-DMG (MRWx)
*ExxonMobil v. Santa Barbara Board of Supervisors*



**environmental**
DEFENSE CENTER

March 4, 2022

Joan Hartmann, Chair
Santa Barbara County Board of Supervisors
105 East Anapamu Street
Santa Barbara, CA 93101
*By email to sbcob@co.santa-barbara.ca.us*

  **Re:  ExxonMobil Interim Trucking for Santa Ynez Unit Phased Restart Project -
     OPPOSE**

Dear Chair Hartmann and Supervisors:

  On behalf of Get Oil Out! ("GOO!"), Santa Barbara County Action Network
("SBCAN"), and the Environmental Defense Center ("EDC"), we urge you to **DENY**
ExxonMobil's proposal to restart its three platforms offshore Gaviota and truck its oil along
Highway 101 and Route 166. This proposal will put our entire community at risk from offshore
and onshore oil spills, accidents, air and water pollution, and climate change. We support the
Planning Commission's recommendation for denial because ExxonMobil's proposal will cause
significant and unavoidable impacts, and the application is inconsistent with County policies
pertaining to oil transportation and community welfare.

  GOO! was formed in the wake of the 1969 Santa Barbara Oil Spill and continues to work
to protect California from further oil and gas development and exploitation. SBCAN is a
countywide grassroots organization that works to promote social and economic justice, to
preserve our environmental and agricultural resources, and to create sustainable communities.
EDC is a nonprofit public interest law firm that protects and enhances the local environment
through education, advocacy, and legal action. EDC and our clients have members who live,
visit, work, and recreate in the area and would be affected by ExxonMobil's proposal to resume
offshore oil and gas production and truck its oil to refineries outside the County.

  ExxonMobil's Interim Trucking for SYU Phased Restart project ("Project") should be
denied for the following reasons:

- The Final Supplemental Environmental Impact Report ("FSEIR") is deficient;
- The Project will result in Class I significant and unmitigable impacts;

- The Project would lead to decades of fossil fuel production and exacerbate climate change at a time when we already face a climate crisis;
- Restart of the SYU platforms and Las Flores Canyon processing facility ("LFC") will put the County's coast and marine environment at risk of another massive oil spill;
- Trucking crude oil along the Gaviota Coast and Route 166 will result in significant and unavoidable safety and environmental risks.

For these reasons, we support the Planning Commission recommendation for denial of ExxonMobil's application. As stated in the proposed findings, the Project should be denied because (1) the Class I significant and unavoidable impacts are not outweighed by benefits, and therefore the County cannot make a Statement of Overriding Considerations; and (2) the Project is inconsistent with Land Use Development Code ("LUDC") and Coastal Zoning Ordinance ("CZO") requirements for Development Plans due to the fact that (a) the risk of tanker truck accidents would be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and would not be compatible with the surrounding area, and (b) streets and highways are not adequate or designed to carry the type and quantity of traffic proposed by ExxonMobil.[1] ***The findings, however, should be modified to acknowledge that impacts regarding traffic safety are not mitigable, as demonstrated by the evidence in the record and the Planning Commission Staff Report dated August 12, 2020.***[2]

The proposed Project would allow at least ***173,740 full truck trips*** over a seven-year period; these trucks will carry more than ***one billion gallons of crude oil***. A total of ***347,480 one-way trips*** would be allowed, creating an unacceptable safety risk along highways that are already dangerous and abut many sensitive resources. The restart of the platforms and LFC will generate ***more than 317,000 metric tons of carbon emissions per year***, the equivalent of about 69,000 cars per year. Our County already faces the devastating effects of increasing climate change, including more destructive wildfires, droughts, sea level rise, and more.

When this proposal was first presented to the Planning Commission, County planners recommended against allowing oil tanker trucks on Route 166.[3] Trucking along Highway 101 should also be denied because of the significant risk of an accident and oil spill along the scenic Gaviota Coast, across numerous coastal watersheds and next to the Pacific Ocean, next to several public beaches and parks, and through the dangerous Gaviota curve and tunnel. A spill along this route would have a devastating effect on sensitive ecological, cultural, and recreational resources.

Now is not the time to turn the clock back and return to our old ways of relying on fossil fuels to meet our energy needs. The County of Santa Barbara is moving towards a clean energy

---

[1] Pub. Res. Code § 21081(b); CEQA Guidelines §§ 15043(b), 15092(b)(2)(B), 15093.
[2] See attached revised findings (Attachment A). The fact that the proposed FSEIR identified traffic safety impacts as mitigable is of no weight because the EIR was not certified, and the evidence supports a contrary determination. See discussion in Section I.C. below.
[3] Santa Barbara County Planning Commission Staff Report for ExxonMobil Interim Trucking for Santa Ynez Unit Phased Project, prepared for September 2, 2020, hearing, and released for public review on August 12, 2020; see also FSEIR at 4.3-56.

future by adopting renewable energy targets and joining the Central Coast Community Energy program. Allowing ExxonMobil to resume oil production off our coast will lead to decades of fossil fuel production that we cannot afford.

## I.    **The Project Should be Denied.**

As recommended by the Planning Commission, the Board should deny the proposed Project due to the unavoidable and unacceptable impacts, and the inconsistencies with the County's land use policies.

### A.    **The Project will Result in Unacceptable Impacts.**

The Class I impacts to water, biological, marine, and cultural resources identified in the FSEIR warrant denial of the proposed Project. As demonstrated by the recent accident history along the proposed route, there is no way to prevent injury, death, and severe environmental damage over the life of the Project.

In addition, impacts to air quality and climate change should be considered Class I impacts because the Project will exceed the County's thresholds and the proposed mitigation measures are illusory and deferred. The FSEIR lacks any evidentiary support for the conclusion that impacts will be less than significant.

Finally, the climate change and other impacts caused by restarting offshore oil development are contrary to the interests of our County. We cannot endure decades more of fossil fuel development, risks of offshore and coastal oil spills, and pollution.

### B.    **The Statement of Overriding Considerations is Speculative and Insufficient to Justify Approval of ExxonMobil's Dangerous Project.**

The proposed Statement of Overriding Considerations is not supported by evidence and does not outweigh the Class I impacts from the Project.

The first overriding consideration listed in the findings is that the Project will "Return locally produced oil to California refineries and supports California energy independence." (Attachment A – Findings at A-8). Without any evidentiary support, the finding states that "other sources of crude, likely from foreign sources, replaced this supply in the California market" and the Project "will likely displace some imported foreign crude…" (*Id.*) There is absolutely no evidence in the record that the small amount of oil produced from the SYU project was replaced by foreign sources, or that approving this one Project will somehow affect the global oil market. Findings must be based on evidence and cannot rely on conjecture. *Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515. The second consideration essentially repeats the baseless assertion that the Project will provide oil that will not come from foreign nations. The 28,000 barrels of oil that ExxonMobil was producing in

2015 amounts to less than 1% of oil produced in the State of California.[4] There is no evidence that this small amount of oil will lead to importation of more foreign oil.

The third overriding consideration is based on the previous assumption that bringing oil from the SYU to the Santa Maria Pump Station ("SMPS") would displace oil coming from the east, due to capacity constraints. (Attachment A – Findings at A-9) This consideration is no longer valid, however, now that the SMPS is not a viable destination. Oil will no longer come from the SYU or the east because the SMPS will shut down at the end of 2022.

The fourth overriding consideration relies on the claim that the Project will "restore production of lower carbon intensity crude oil for processing in California refineries." (*Id.*) Production of crude oil results in an impact, not a benefit; just because the carbon intensity may be less than another source of oil does not obviate the fact that the Project will allow an increase in production of oil and thus an increase in GHG emissions.

The fifth overriding consideration is the most ludicrous. This consideration is based on the restoration of Coastal Resources Mitigation Funds to the County. (Attachment A – Findings at A-9, 10) These funds, however, are *mitigation* for unavoidable impacts of offshore oil and gas development. Mitigation reduces an impact, but does not create a *benefit*, which is the requirement for a statement of overriding considerations. CEQA Guidelines §15093(a).

The remaining overriding considerations address employment and revenue that are not essentially tied to this particular Project. Prior to the 2015 shutdown, ExxonMobil's property taxes comprised less than 0.5% of the County's property tax revenue.[5] The production level from the proposed Project would be much less than prior to the shutdown (11,200 bpd versus 27,500 bpd), so the contribution to the County's property taxes will be even less. As many or more jobs can be created by renewable energy projects.

As such, the proposed overriding considerations are either completely unsubstantiated, do not represent benefits, or are insufficient to outweigh the significant and unavoidable risks and impacts of the proposed Project.

### C.      The Project is Inconsistent with the LUDC and CZO.

As set forth in the proposed findings, the Project is inconsistent with LUDC Sections 35.82.080.E.1(c) & (e) and CZO Section 35-174.7.1(c) & (e) due to the risks of accidents along the proposed route. These risks are not mitigable, as evidenced by the recent history of accidents discussed along Highway 101 and Route 166 depicted on this map, which identifies eight oil

---

[4] The San Diego Union-Tribune, *California's ranking as an oil-producing state is slipping*, July 12, 2018, showing that oil production in the state was 173 million barrels in 2017. Available at
https://www.sandiegouniontribune.com/business/energy-green/sd-fi-california-crudeoil-20180711-story.html
[5] Property Tax Highlights, County of Santa Barbara, Fiscal Year July 1, 2013, to June 30, 2014. ExxonMobil's share of the County's property taxes was 0.42%. Attachment I.

tanker truck accidents that occurred on the proposed route since 2007, including five deaths and over 13,000 gallons of oil spilled.



Figure 2-4    Proposed Truck Routes to Receiving Facilities

The proposed findings incorrectly identify these impacts as significant but mitigable. This conclusion is based on serious flaws in the analysis of traffic safety impacts in the FSEIR. For example, the FSEIR arbitrarily limits the accident data on the proposed route to the years 2012-2016, failing to include the data from the most recent and relevant accidents. (FSEIR at 4.3-49) For purposes of these comments, we focus on accidents in California, in Santa Barbara County, and along the proposed route.

Out of eighty-seven major tanker truck crashes we identified in California from 2000 to the present, more than 100,000 gallons of fuel have been spilled.[6] These crashes occurred on thirty-three different California freeways throughout the state. The resulting environmental damage from these accidents include fires resulting in home evacuations,[7] burning of storm drains in the Los Angeles River,[8] oil migrating through storm drains into the San Diego River

---

[6] See Attachment B.
[7] Lloyd, J., Guinyard, T., *Oil Tanker Crash: "Everything It Touched Was on Fire"* (Oct. 28, 2013), available at: https://www.nbclosangeles.com/news/local/710-Freeway-Tanker-Crash-Fire-229522351.html.
[8] Carino, M. M., Mendelson, A.

and adjoining shorelines,[9] burning of hundreds of acres in the Rose Fire,[10] disintegration of the roadway,[11] creek cleanups,[12] harmed wildlife,[13] soil contamination,[14] as well as drinking water contamination.[15]

Accidents also impact public safety and can result in death, injury, destruction of vehicles, and lengthy road closures. Since 2000, oil tanker truck accidents in California resulted in at least twenty-eight deaths and over fifty-nine recorded injuries. In addition, the duration of cleanup efforts ranged from a few hours to the majority of the day,[16] to multiple days, with some cleanup and re-construction requiring months.[17]

The increase in trucks on freeways is not only dangerous, but costly. Studies found that the average cost of truck-related collisions is $7 million.[18] Until the oil company's insurance covers the costs, the economic burden falls on California taxpayers.[19]

Within Santa Barbara County, we identified at least fourteen tanker truck accidents since 2007, *eight of which occurred along the proposed route*:

- On April 9, 2000, a truck driver fell asleep at the wheel on the US 101 between Carpinteria and Ventura. The resulting accident caused a fuel spill of 4,700 gallons and injured the driver. The cleanup of the spill and the debris from the accident rerouted traffic in both directions along that section of Highway 101. Fuel spilling from this tanker truck entered a culvert leading to tide pools below. This impacted seabirds and marine life nearby.[20]

---

[9] Mogharabi, N., *U.S. EPA Reaches Settlement on Tanker Truck Oil Spill in San Diego*, (Jun. 07, 2017) available at: https://www.epa.gov/newsreleases/us-epa-reaches-settlement-tanker-truck-oil-spill-san-diego.

[10] BakersfieldNow staff, *Big rigs crash on I-5, snarling traffic and sparking grass fire* (Aug. 10, 2017), available at: https://bakersfieldnow.com/news/local/chp-southbound-i-5-at-grapevine-road-closed-after-crash-fire.

[11] Magnoli, G., *Caltrans Repaves Section of Highway 101 Near Goleta After Tanker-Truck Crash, Gasoline Spill* (Dec. 15, 2017) Available at: https://www.noozhawk.com/article/oil_tanker_truck_crash_highway_101_goleta_spill; see also SBC NFIRS Reports (Dec. 15, 2017), and Cal OES Hazardous Materials Spill Report (Dec. 15, 2017).

[12] McDonald, I., Wong, L. *Two Killed in Head-On Collision, Tanker Explosion on HWY 20 in Sierra* (Feb. 1, 2018) available at: https://fox40.com/2018/01/31/two-killed-in-head-on-collision-tanker-explosion-on-hwy-20-in-sierra/.

[13] California Department of Fish and Wildlife, Office of Spill Prevention and Response, SCAT Survey data, Cuyama River Incident, March 25-April 4, 2020.

[14] Wong, L., *Crews Rush to Clean Up Jet Fuel Following Deadly Tanker Crash near Dutch Flat* (Jan. 14, 2019), available at: https://fox40.com/2019/01/14/one-dead-in-tanker-truck-crash-along-i-80-near-dutch-flat/.

[15] Miles, A., *Driver Killed after Tanker Truck Explodes in Atwater* (May 23, 2017), available at: https://fox40.com/2017/05/23/caltrans-tanker-truck-explosion-near-highway-99-in-atwater-roads-closed/.

[16] Rossmann, R. Highway 1 near coast open to one-way traffic after tanker crash, fuel spill. (Aug 16, 2017). Available at: https://www.pressdemocrat.com/news/7314498-181/highway-1-closed-due-to

[17] Carino, M. M., Mendelson, A.

[18] Carino, M. M., Mendelson, A.

[19] Bergman, B. Who pays for the damage from the I-5 and 2 Freeway tanker crash in Los Angeles? Taxpayers, for now. (July 15, 2013). Available at: https://www.scpr.org/news/2013/07/15/38199/who-pays-for-the-damage-from-the-i-5-and-2-freeway/

[20] Cooper, Katie. (April 2000). "Truck Crash Spills Fuel Into Ocean, Tide Pools." Los Angeles Times. Accessed from: https://www.latimes.com/archives/la-xpm-2000-apr-10-me-18080-story.html

- On July 13, 2007, two tanker trucks were involved in a collision along **Route 166** in Cuyama. One of the tankers involved rolled onto its side, causing a rupture in the tank. This accident resulted in 500 gallons of spilled petroleum and a fatality.[21]

- On March 10, 2012, along **Highway 101** near Buellton, a driver lost control of a tanker truck which then rolled and became engulfed in flames. This accident resulted in a fatality and both directions of Highway 101 were temporarily closed down and cars were rerouted.[22]

- A driver on Highway 101 near Carpinteria lost control of a vehicle on March 7, 2013, and collided with a fuel tanker. This accident was possibly the result of weather and wet roads. One northbound lane of U.S. 101 was closed for around an hour.[23]

- On September 13, 2016, 150-200 gallons of crude oil spilled onto the roadway after a crude oil tanker truck crossed the double yellow lines and collided with other semi-tractor-trailers, resulting in a small fire and an injury. **Route 166** near New Cuyama was shut down as the scene was responded to.[24]  The accident resulted in a fire as well.[25]

- The next year on March 30, on **Route166** near New Cuyama, a vehicle collided with a semi-truck carrying crude oil. The tanker was hauling 8,500 gallons of crude oil and while no leak was reported, both drivers were offered medical assistance. The driver of the smaller vehicle was trapped in their car and after being extricated, was transported to Santa Barbara Cottage Hospital.[26]

- On December 15, 2017, a gasoline tanker truck collided with a sedan on Highway 101 near the Turnpike exit. The collision overturned the tanker truck, blocking several lanes. Approximately 5,000 gallons of spilled fuel was recovered from the roadways. The gasoline spill disintegrated parts of the roadways which required re-paving. The driver of the sedan sustained minor injured and was treated at the scene, but the tanker driver was uninjured. Due to the damage to the roadway, Highway 101

---

[21] Governor's Office Emergency Services. (2007). Hazardous Materials Spill Report.
[22] https://account.sanluisobispo.com/paywall/subscriber-only?resume=39197301&intcid=ab_archive
[23] Nelson, M. (March 2013). "Unlicensed Driver Collides With Fuel Tanker on Highway 101 in Carpinteria." Noozhawk. Accessed from:
https://www.noozhawk.com/article/030713_unlicensed_driver_collides_fuel_tanker_highway
[24] Bolton, T. (September 2016). "Driver Killed in Big-Rig Crash on Highway 166 Near New Cuyama." Noozhawk. Accessed from:
https://www.noozhawk.com/article/1_reported_dead_in_big_rig_crash_on_highway_166_roadway_closed
[25] Bolton, T. Driver Killed in Big-Rig Crash on Highway 166 Near New Cuyama. (September 13, 2016). Available at: https://www.noozhawk.com/article/1_reported_dead_in_big_rig_crash_on_highway_166_roadway_closed.
[26] SB County Fire Department Report. (March 2017). NFIRS-1 Basic.

was closed for nineteen during the evacuation for the Thomas Fire and impeded such emergency efforts.[27]

- The following year, in 2018, another sedan collided with a crude oil tanker truck along **Route 166** near Hubbard Avenue in the Cuyama Valley. This accident, occurring on May 20, left both passengers of the Honda SUV dead and the truck driver critically injured and helicoptered to the nearest Santa Barbara hospital. Highway 166 was, again, closed for recovery of the wreckage.[28]

- That same year, on September 30, a tanker overturned on Highway 1 west of Orcutt, closing a section of the Highway between Clark Avenue and Black Road. The reason for the overturning is unknown but reports suggest there was a possibility of brake-checking by another vehicle. There was no fuel leak from the truck although emergency dispatch was investigating a leak they assumed to be coming from the tanker.[29]

- Later that year, **Route 166** was closed for several hours after a Ford F-250 drifted into westbound lanes and crossed paths with a crude oil tanker truck near the 7700 block of the Highway, east of Santa Maria. The head on collision led to a fire and the woman driving the Ford truck was pronounced dead at the scene. Upon recovery of the accident, Highway 166 was closed for hours during cleanup and an unknown amount of oil was spilled on to the highway and into the nearby dirt. [30]

- On March 21, 2020, a tanker overturned down an embankment along **Route 166**, near Mile Marker 29. 6,000 gallons of crude oil spilled from the truck into the Cuyama River, requiring containment and a major cleanup.[31] The Cuyama River feeds into the Twitchell Reservoir. Oil covered the left bank of the River, formed pools in eddies, and covered riparian and coastal sage scrub flora.[32] In addition to oil coating nearby

---

[27] Magnoli, G. (December 2017). "Caltrans Repaves Section of Highway 101 Near Goleta After Tanker-Truck Crash, Gasoline Spill." Noozhawk. Accessed from:
https://www.noozhawk.com/article/oil_tanker_truck_crash_highway_101_goleta_spill

[28] Scully, J. (May 2018). "2 Dead, 1 Critically Injured in Highway 166 Crash in New Cuyama." Noozhawk. Accessed from: https://www.noozhawk.com/article/two_people_killed_in_highway_166_crash_in_new_cuyama

[29] Scully, J. (September 2018). "Overturned Tanker Truck Leads to Highway 1 Closure West of Orcutt." Noozhawk-Local News.
https://www.noozhawk.com/article/overturned_tanker_truck_leads_to_highway_1_closure_west_of_orcutt

[30] Scully, J. (December 2018). "Woman Killed in Fiery Head-On Crash on Highway 166 East of Santa Maria." Noozhawk. Accessed from:
https://www.noozhawk.com/article/woman_killed_in_fiery_crash_on_highway_166_northeast_of_santa_maria

[31] Department of California Highway Patrol Traffic Crash Report. (March 2020)
See also Schlepp, T. "Driver of oil tanker that spilled thousands of gallons of oil in Cuyama River facing criminal charges." Keyt News. Accessed from: https://keyt.com/news/2021/03/19/driver-of-oil-tanker-that-spilled-thousand-of-gallons-of-oil-in-cuyama-river-facing-criminal-charges/

[32] California Department of Fish and Wildlife, Office of Spill Prevention and Response, SCAT Survey data, Cuyama River Incident, March 25-April 4, 2020.

vegetation, the Cuyama River oil spill harmed the threatened California red legged frog, several amphibian species, and birds.[33]

- On April 16, 2020, a fuel tanker crashed into a guardrail and center divider on **Highway 101** near Arroyo Hondo Bridge. The tanker spilled sixteen gallons of fuel, which was cleaned and did not pose an immediate threat to the environment but demonstrated the possible risk of trucking In this area. The location of this accident was above a creek ecosystem supporting many species of wildlife. The spill had the potential to harm this creek if it had been any larger or more invasive. Southbound lanes of Highway 101 were closed for multiple hours in order to mitigate this spill.[34]

- Again, the next year, on February 2, an overturned tanker on Highway 101 near Carpinteria closed the freeway for hours.[35]

- On October 11, 2021, an accident near Dominion Road and Orcutt Garey Road resulted in one injury and extreme damage to the nearby environment. According to the CHP report, this single vehicle accident was the result of possible speeding and impaired visibility. The tanker truck was left on its side off the road, spilling one gallon of crude oil and 100 gallons of diesel fuel.[36] This accident started a fire which spread to a nearby eucalyptus grove, ultimately burning one quarter of an acre of trees.[37]

A majority of these accidents within the County occurred along the exact route proposed for ExxonMobil's trucking plans. These accidents reflect the dangers along the proposed route. Introducing more frequent oil tanker trucks along these highways poses a serious threat to other drivers, wildlife, and agriculture, as well as nearby rivers and reservoirs.

In particular, the proximity of Route 166 to the Cuyama River poses great concern for oil spill impacts. In addition, the highway is narrow and windy, only providing a small shoulder for emergency and clean-up vehicles. To make matters worse, cell coverage is spotty along this highway, making reporting and response more challenging.

---

[33] California Department of Fish and Wildlife, Office of Spill Prevention and Response, SCAT Survey data, Cuyama River Incident, March 25-April 4, 2020.
[34] Magnoli, G. (April 2020). "Southbound Highway 101 Reopened After Tanker Truck Crash on Gaviota Coast." Noozhawk. Accessed from:
https://www.noozhawk.com/article/caltrans_closes_southbound_highway_101_gaviota_truck_crash
[35] Buttitta, J. (February 2021). "Overturned big rig snarls traffic on HWY 101 in Carpinteria." Keyt News. Accessed from: https://keyt.com/news/traffic/2021/02/02/traffic-alert-overturned-tanker-truck-blocking-101-in-carp-morning-commute-slowed/
[36] Department of California Highway Patrol, Traffic Crash Report. (October 2021).
[37] Dominion SBC Fire Incident Report. (October 2021). Major Incident Report. See also, KSBY Staff. (October 2021). "Crash involving oil tanker truck sparks fire east of Santa Maria." KSBY. Accessed from: https://www.ksby.com/news/local-news/crash-involving-oil-tanker-truck-sparks-fire-east-of-santa-maria



Figure 26. Cuyama River spill. (Source: OSPR, March 25, 2020.)



Figure 27. Cuyama River spill. (Source: SBC Fire, March 21, 2020)

Trucking on Highway 101 also poses significant risks. The route includes the dangerous Gaviota Tunnel and winding, narrow Gaviota Tunnel. These areas experience rockslides, strong gusty winds, and are prone to accidents. During an interview, Greg Nuckols, the Fire Captain of the SBC Fire Department's Inspection Services Division Oil and Gas, highlighted the multiple reasons for the increased risk of transporting oil through this area. First, there is poor cell reception traveling through the narrow passage. This would make a 911 call difficult for the tanker truck driver or other witnesses. Second, due to Highway 101's proximity to the coast, any oil spilled into the culvert would flow to the ocean. Third, there is already a high rate of vehicle accidents in the area due to the strong winds, windy roads, and drivers' failure to reduce their speed. Adding 70 oil tankers in both directions inevitably increases this accident risk. Last, some sections of the Highway traveling to Santa Maria have no shoulder, making it difficult for

emergency response equipment. Mr. Nuckols compared the area to the Cuyama River accident cite, noting many similarities that contribute to increased risk of spill, poor cell service, and a difficult clean up.[38] Like the Cuyama River accident, the Gaviota Pass contains similar sensitive environment and topography as well as being adjacent to a creek.

This evidence of existing oil tanker accidents supports the claim that the risk of trucking is significant ***and unavoidable***. The determination in the FSEIR that such impacts are mitigable is not supported by the evidence.  In addition, the conclusion in the FSEIR that, with mitigation, the annual probability of an oil spill during trucking operations to Pentland would be once in seventeen years is flawed, unsupported by the evidence, and woefully misleading. (FSEIR at 4.3-56) In fact, in the last fifteen years, there have been eight accidents along this route, ***six of which occurred in the last six years***.

Prohibiting truck trips during rainy periods will not avoid or substantially reduce accident risk and impacts. Very few of the accidents that we identified in California occurred within a 24-hour timeframe of rain.[39] Of those occurring in Santa Barbara County, only two accidents occurred within a 24-hour timeframe of rain: a 2013 accident involving "wet roads" and a 2020 accident on a day where 0.01 inches of precipitation were recorded.[40] Accordingly, rain is an insignificant impact in the majority of the tanker truck accidents in Santa Barbara County.

Although there is no evidence that prohibiting trucking during rainy day periods will reduce the risk of an accident, the FSEIR states that this alternative would reduce the likelihood of a spill impacting waterways because "it would be less likely that the spilled oil would be transported via the rainwater into nearby creeks and other drainages." (FSEIR at 5-29). However, as noted above, the data reveals that many oil spills impact waterways, and nearly all of these spills occurred on non-rainy days. Therefore, prohibiting trucking during rainy periods will have negligible impact on stemming accidents that affect waterways. The FSEIR agrees that even under this alternative, impacts to sensitive resources from spills will remain a Class I impact. (FSEIR at 5-30)

In conclusion, the FSEIR fails to adequately analyze the risks that would result from the proposed Project. The proposed mitigation measures will not avoid or sufficiently reduce the collision risk identified in the FSEIR. As such, ***traffic safety impacts will remain significant (Class I).***

## II.    The FSEIR Cannot be Certified.

The most egregious defect in the FSEIR is the failure to include impacts caused by the restart of the SYU platforms and LFC facility. The FSEIR omits this analysis on the grounds that ExxonMobil can restart these facilities at any time, without discretionary approval by the County. (FSEIR at 3-659 – 60) This statement is incorrect. If that were the case, this application

---

[38] Pers. Com. Greg Nuckols, Santa Barbara County Fire Dept. (August 12, 2020).
[39] See Attachment E.
[40] *Id.*

would not be before the Commission. In fact, the approved 1987 Development Plan only authorizes operations of the LFC (which is under the County's land use jurisdiction) if the oil is transported from the facility by pipeline. That is why ExxonMobil seeks a Revised Development Plan to allow trucking and restart of the platforms.

In addition, the FSEIR also fails to identify many sensitive habitats, biological resources, and species that would be impacted by an oil spill. The FSEIR understates the risks and impacts of accidents and spills. The FSEIR also fails to offer feasible, effective mitigation measures for impacts related to climate change, air pollution, and biological and cultural resources. Finally, the FSEIR fails to acknowledge the Project's inconsistencies with many County policies.

> **A.** **The FSEIR Is Incomplete and Inaccurate Because it Does Not Analyze the Impacts of Resumed Operations at the SYU Platforms and LFC Facility as Part of the Proposed Project.**

The FSEIR fails to address "the whole of an action." In this case, the proposed Project includes restarting production at the SYU platforms and LFC facilities, yet the FSEIR fails to analyze the direct impacts of these actions, as required by the California Environmental Quality Act ("CEQA").

> 1.   CEQA Requires that an EIR Must Analyze the Whole of an Action.

The FSEIR must analyze the impacts from "the whole of an action," including both trucking and restart of SYU production. *See* CEQA Guidelines § 15003(h); *id.* at § 15378(a) ("'Project' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following….[including] An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."). As the court in *County of Ventura v. City of Moorpark* stated:

> [W]here two activities are "part of a coordinated endeavor" (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1228, 66 Cal.Rptr.3d 645 (*Tuolumne CCRG*) ), "among the 'various steps which taken together obtain an objective' " (*id.* at p. 1226, 66 Cal.Rptr.3d 645), or otherwise "related to each other" (*Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726, 117 Cal.Rptr. 96), they constitute a single project for purposes of CEQA. It is only "where the second activity is independent of, and not a contemplated future part of, the first activity, [that] the two activities may be reviewed separately." (*Sierra Club*, at p. 699, 27 Cal.Rptr.3d 223.)

(2018) 24 Cal.App.5th 377, 385.

Conversely, if an EIR fails to address the "true scope of the project," it is "inadequate as a matter of law." *RiverWatch v. Olivenhain Mun. Water Dist.* (2009) 170 Cal. App. 4th 1186,

1201 (quoting *City of Santee v. Cty. of San Diego* (1989) 214 Cal. App. 3d 1438, 1454–55); *see also County of Inyo v. City of Los Angeles* (1977) 71 Cal. App. 3d 185, 192 ("Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost…"); *Los Angeles Department of Water and Power v. County of Inyo* (Cal. Ct. App., Aug. 17, 2021, No. F081389) 2021 WL 3629227, at *9 ("CEQA's requirements cannot be avoided by chopping a large project with significant adverse consequences into many little ones."). Failing to disclose the full scope of a project's impacts "frustrates one of the core goals of CEQA" by keeping "important ramifications of the proposed project remained hidden from view." *Santiago Cty. Water Dist. v. Cty. of Orange* (1981) 118 Cal. App. 3d 818, 830. Here, the FSEIR must completely evaluate and disclose all Project impacts, rather than only address certain aspects of the Project.

2.     The FSEIR Improperly Excludes Material Parts of the Project.

The FSEIR is deficient for failing to consider the impacts associated with the restart of the SYU platforms and LFC processing facility. The very Project name demonstrates that the purpose of the Project is to allow ExxonMobil to restart production from the SYU platforms, which have been shut down since the 2015 Refugio oil spill. If ExxonMobil is allowed to restart production, a whole host of activities–and related impacts–will ensue, as explained below.

a.     Resuming Production of the SYU Facilities is Part of the Project's Purpose.

It is abundantly clear that ExxonMobil seeks to resume production from its platforms offshore Santa Barbara County. Trucking is simply the means to allow such production to occur. The FSEIR, Application, Notice of Preparation ("NOP"), and other evidence demonstrate that the genuine purpose of the Project is resumed production.

As clearly stated in the FSEIR: "The proposed Project would allow for the *phased restart* of the SYU facilities, *which consist of three offshore platforms and an onshore processing facility*." (FSEIR at ES-1) (emphasis added) The proposed Project description states that ExxonMobil "is proposing the Interim Trucking for SYU Phased Restart Project to take a phased approach to *restarting offshore oil production at the SYU* by initiating interim trucking of limited crude oil production until a pipeline becomes available to transport crude oil to a refinery destination." (FSEIR at 2-1) (emphasis added) The Project objectives likewise focus on resuming production at the SYU. These include: 1) transport oil in order to "increase[e] *production-related* tax revenue and bring[] back local jobs;" 2) "Restore a portion of *SYU wells* and equipment to a desired *state of operation* to best maintain facility integrity during an unknown pipeline restoration period;" 3) "Re-establish *SYU production*...;" 4) "Leverage experiences gained from the phased *restart program to facilitate a smooth full production* restart when a pipeline transport option becomes available;" and 5) "Increase energy supply via *restart of a local petroleum* resource which would serve to reduce demand for imported oil and reduced risk of marine tanker spills." (FSEIR at 2-4 – 2-5) (emphasis added)

Additionally, ExxonMobil "is proposing the Interim Trucking for the SYU Phased Restart Project to take a phased approach to restarting offshore oil production at the SYU facilities by initiating interim trucking of limited crude oil production until a pipeline alternative becomes available to transport crude oil to refinery destinations." (FSEIR at ES-1) "Production from the SYU facilities during trucking operations would be about 11,200 barrels per day of oil while the SMPS is operational. Once the SMPS is shutdown, production would be limited to about 10,880 barrels per day (68 trucks per day)…" (FSEIR at 2-10) The FSEIR identifies personnel needs as including both onshore and offshore workers, with a total of between 200 and 300 workers. (FSEIR at 2-14)

In the discussion of alternatives, the FSEIR notes that "[p]roduced crude oil from the SYU would be processed primarily into gasoline, diesel fuel and aviation fuel, which are all types of transportation fuels." (FSEIR at 2-25) Renewable energy sources were summarily rejected because of the amount of land that would be required to match the production from the Project. (FSEIR at 2-25 – 2-26) Under the No Project Alternative, "construction and operations of the proposed interim trucking project would not occur, and the LFC and SYU facilities would not restart oil and gas production and processing operations until a pipeline becomes available to transport the crude oil." (FSEIR at 2-28) Accordingly, the No Project Alternative differs from the proposed Project not just in eliminating trucking, but also preventing production and processing from the SYU platforms and the LFC processing facility.

The impact analysis also acknowledges that the Project includes the restart of the SYU platforms. The FSEIR acknowledges that "[t]he proposed Project would allow the SYU facilities to restart, which would result in a return of local crude oil supplies in California. The proposed Project would allow for the production of 11,200 barrels per day of crude oil that would be supplied to local California refineries." (FSEIR at 4.2-27) The analysis of growth inducement also points to the additional economic growth that would result from the restart of the platforms and LFC facilities. (FSEIR at 6-3)

Likewise, ExxonMobil's application describes the Project as "[i]nitiate a phased restart of SYU production through use of interim trucking to transport SYU processed crude oil (product) from LFC to locations with existing unloading facilities until a pipeline transport option is available" and "Enable limited SYU production…" (Application Attachment A.3 – SYU Interim Trucking Description at pp. 3, 4.) The application further states, "As part of the interim trucking, SYU will begin production from the platforms and processing at the onshore facilities." (*Id*. at p. 7; *see also* Application Attachment A.4 – SYU LFC Interim Trucking Justification at p. 1 ("ExxonMobil Production Company…is submitting the LFC interim trucking application to allow production operations to re-start at the Santa Ynez Unit…") and p. 4 ("ExxonMobil plans to re-start the SYU facilities…"))

Moreover, the NOP states that the purpose of the Project is "to resume offshore oil and gas production at the SYU, conduct a phased restart of the LFC Facility and initiate the interim trucking of limited crude oil production as an interim solution until a pipeline alternative becomes available to transport crude oil to a refinery destination." (NOP at 1)

In addition, on April 4, 2019, the Santa Barbara Independent published an article that included interviews of four ExxonMobil employees that were affected by the shutdown of SYU production following the 2015 oil spill. According to the article, the employees all seek a return to their jobs at the SYU and view ExxonMobil's trucking application as their "best hope" to get back to work there. One worker said "he's keeping a close eye on the status of the trucking permit. 'I'm getting a lot of contact from the guys out there,' he said. 'I'd really love to get back to that plant and get it going again.'" Another employee was offered the opportunity to return to work at the LFC "in anticipation of the restart. But they couldn't guarantee it'd be a permanent position. It was all contingent on the trucking permit." A third worker is hoping to get back to California and has been "carefully tracking the trucking permit process." The fourth worker has a temporary job maintaining one of the SYU platforms, but his job "is temporary, unless ExxonMobil can secure the trucking permit. 'We really want to get this permit,' he said of coworkers in a similar boat."[41] ExxonMobil workers, contractors, and service providers testified in force at the DSEIR hearing on May 6, 2019, that they want ExxonMobil to be able to resume production from the SYU platforms and processing at the LFC facility. Their testimony provides further evidence that the primary purpose of the application is to resume production.

In sum, it is clear that the Project includes both the restart of the SYU platforms and LFC processing facility as well as the proposed interim trucking.  However, none of the impacts from resuming production are analyzed, or identified as direct impacts, in the FSEIR.

> b.    *The FSEIR is Deficient Because it Improperly Narrows the Scope
> of Analysis of the Project's True Impacts.*

Even though the Project clearly encompasses resumed oil production, the FSEIR fails to analyze the myriad impacts associated with such activities, in violation of CEQA.  These impacts include those from drilling, production, fracking, acidizing, transportation to shore, processing at the LFC, transportation of crude oil to refineries and then to market, and the ultimate consumption of oil and gas—all of which threaten local communities and the environment.

There is no question that oil drilling and production in the sensitive Santa Barbara Channel poses significant threats to the local environment. The Santa Barbara Channel region contains the Channel Islands National Marine Sanctuary, Channel Islands National Park, and many Marine Protected Areas ("MPAs"). Numerous threatened and endangered species reside in the Channel on a seasonal or residence basis, including blue, fin, and humpback whales, and the southern sea otter. As the 1969 Santa Barbara oil spill so vividly demonstrated, the impacts from offshore drilling in this region can be catastrophic.  *California v. Norton*, 311 F.3d 1162, 1166 (9th Cir. 2002) (describing the events of the oil spill, "[t]he flow continued at thousands of gallons per hour for more than a week, spreading a tar-black patch seaward over eight hundred square miles of ocean . . . The cleanup efforts proved largely ineffective against the mass of oil, and thousands of sea birds were killed along with seals and other marine mammals."); *see also id.* at 1176–77 (noting potential effects of oil and gas production in this region, including on the Channel Islands National Marine Sanctuary).  Oil production at the SYU platforms will affect

---

[41] See Attachment C.

these same ecological resources, and will rely on infrastructure that is aging, outdated, and therefore prone to accident—threatening the region with an increased risk of another catastrophic oil spill or other disaster.

Moreover, offshore production relies upon extensive infrastructure to transport, process, store, and refine the oil and gas and bring it to market. These activities (such as trucking), like operations at the platforms themselves, are known to result in accidents caused by human error, weather events, mechanical and other equipment failures, and other incidents that can result in spills of oil and other hazardous substances to the surrounding marine and terrestrial environment. For example, Plains All American pipeline 901, which released approximately 450,000 gallons of crude oil along the California coast, was transporting oil from platforms including from the SYU.

Additionally, unconventional drilling methods, including fracking and acidizing, have been previously used on the SYU platforms and only intensify environmental impacts. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1157 (N.D. Cal. 2013) (concluding that recent fracking practices present new and significant impacts, requiring further environmental analysis).  In fact, the federal government agency Bureau of Ocean Energy Management ("BOEM") has concluded in a Biological Assessment that the use of well stimulation treatments is "likely to adversely affect" the California Least Tern, Southern Sea Otter, and Western Snowy Plover and its critical habitat.[42]  Moreover, a lawsuit filed by EDC along with Santa Barbara Channelkeeper on November 11, 2016, in federal District Court resulted in the court finding that these practices may affect roughly twenty-five threatened and endangered species that are present in this region.[43]

ExxonMobil intervened as a party in that litigation and submitted declarations to the court that make clear its plans and intentions to use well stimulation techniques offshore California: "In order to re-start production, ExxonMobil anticipates that it will require the use of certain acid well stimulation treatments at one or more wells. Moreover, ExxonMobil will require acid well stimulation treatments to drill and complete new wells, and recomplete existing wells, at SYU." [44] It further stated, "[T]he requested relief could restrict ExxonMobil's ability to restart oil production at the Heritage, Hondo, and Harmony Platforms. It would also *severely restrict* ExxonMobil's plans to further develop its existing Pacific OCS leases."[45]

---

[42] BOEM, Cover Letter and Biological Assessment to U.S. Fish and Wildlife Service, *Consultation Under Section 7 of the Endangered Species Act, Outer Continental Shelf Oil and Gas Development and Production Activities in the Southern California Planning Area, Santa Barbara, Ventura and Los Angeles Counties*, March 2017.
[43] *EDC v. BOEM*, Order Denying Motion to Dismiss, U.S. District Court for the Central District of California, Case No. 2:16-cv-08418-PSG-FFM, at p. 12 (July 14, 2017) ("Plaintiffs have also shown that WSTs 'may affect' twenty-five threatened or endangered species, and the Biological Assessments that Defendants submitted to the services confirm as much.").
[44] *EDC v. BOEM*, Declaration of Ken Dowd in Support of ExxonMobil Corporation's Motion for Leave to Intervene, U.S. District Court for the Central District of California, Case No. 2:16-cv-08418-PSG-FFM, at p. 4 (February 8, 2017).
[45] *Id.* at p. 5 (emphasis added).

Moreover, these practices involve significant data gaps concerning the toxicity of chemicals used and their impact on the environment, species, and human health.  A report by the California Council on Science and Technology ("CCST") addressing the impacts of these practices concluded that "only incomplete information and data exist," and "[f]ew scientific studies of the health and environmental impacts of well stimulation have been conducted to date, and the ones that have been done focus on other parts of the country."[46] As many as 100 chemicals used in WSTs have "completely unknown materials"—which demonstrates that these practices pose unique and unknown risks.[47] The report also notes that the environmental characteristics of many chemicals used in hydraulic fracturing "remain unknown," such that "[w]e lack information to determine if these chemicals would present a threat to human health or the environment if released to groundwater or other environmental media."[48] Moreover, the "toxicity and biodegradability of more than half the chemicals used in hydraulic fracturing remains uninvestigated, unmeasured, and unknown. Basic information about how these chemicals would move through the environment does not exist." [49]  Failing to include these practices as part of the Project continues to leave us in the dark with respect to their many adverse impacts.

As explained in detail below, some of the impacts of resuming production are improperly included in the cumulative impacts analysis. (FSEIR at 3-2 – 3, identifying SYU Operations as a cumulative project) This characterization grossly understates the actual impacts of the Project. For example, greenhouse gas ("GHG") emissions from production are anticipated to be 307,212 $CO_2$e/year. (FSEIR at 4.2-29) This only underscores how significant the true impacts of the Project will be. These are *direct* impacts of the Project and must be treated as such, in order to comply with CEQA.

Accordingly, the FSEIR's failure to assess impacts from the whole project makes it impossible for the public and decision makers to "intelligently" weigh the true environmental consequences of the proposed action. CEQA Guidelines § 15151. Courts have consistently struck down EIRs that, like the FSEIR in this case, improperly narrow the scope of environmental review under CEQA. *See, e.g.*, *RiverWatch,* 170 Cal. App. 4th at 1204–05 (ruling that an EIR was deficient because it omitted analysis of impacts from trucking water to a landfill, which was properly "*part of the whole action*" and would involve construction of an asphalt road and concrete loading pad, as well as impacts from the long-term trucking operations) (emphasis in original); *Santiago Cty.*, 118 Cal. App. 3d at 829–31 (holding that an EIR for mining operations was inadequate because the project description omitted construction of water delivery facilities that were an integral part of the project).

The County should also refer to the November 2014 Final Environmental Impact Report for the Venoco Revised PRC 421 Recommissioning Project ("Venoco FEIR") prepared by the

---

[46] California Council on Science and Technology, *An Independent Scientific Assessment of Well Stimulation in California, Potential Environmental Impacts of Hydraulic Fracturing and Acid Stimulations*, Volume II, July 2015 at p. 6.
[47] *Id.* at p. 81.
[48] *Id.* at p. 16.
[49] *Id.*

California State Lands Commission ("CSLC").  There, Venoco submitted an application "to return PRC 421 to oil production from an existing shoreline well (Well 421-2) that has been shut-in since 1994." (Venoco FEIR at 1-2; *see also* Venoco FEIR at 2-6 ("The CSLC is considering whether to approve Venoco's application to return PRC 421 to production after ongoing production was shut-in in 1994.")) The FEIR in that case included resuming production as part of the project and attempted to analyze such impacts.  For example, the impacts analysis regarding air quality included assessment of "operational emissions." (Venoco FEIR at 4-137) The FEIR estimated that "approximately 402,000 barrels would be produced over the Project lifetime" and assessed $CO_2$ emission factors based on that estimate. (Venoco FEIR at 4-139; *id.* at 4-140 ("[E]nd uses of the estimated total oil produced from the Project (402,000 barrels) could potentially produce a total of approximately 190,545 tons (0.17 $MMTCO_2e$).")

Therefore, the FSEIR is deficient because it fails to assess the full impacts from restarting the SYU and LFC facilities, in violation of CEQA.

> c.       *The Responses to Comments Incorrectly Assert that the SYU Facilities' Impacts Do Not Need to be Analyzed in the FSEIR.*

The FSEIR's Responses to Comments ("RTCs") acknowledge that "implementation of crude oil trucking from the LFC facility would necessitate the resumption of SYU production." (FSEIR 3-661) However, it characterizes operations at the SYU facilities as not part of the Project.

 First, it points to the 1984 and 1986 EIRs to claim such impacts have been analyzed. (FSEIR at 3-661) At the same time, the RTCs acknowledge that an SEIR must provide "the information necessary to make the previous EIR adequate for the project as revised," citing to CEQA Guidelines § 15163(b). The FSEIR in this case fails to do so. Here, the old EIRs contain outdated information, do not address trucking impacts, and do not address current operations and impacts, including impacts caused by fracking. The old EIRs also do not include current information regarding the risks and impacts of oil spills, climate change, and other consequences of fossil fuel production and consumption. In addition, the 1984 EIR analysis was based on a project life of twenty-five to thirty-five years, a time period that is now expired.[50]

In addition, the RTCs incorrectly state that restart of the SYU facilities is "not part of the proposed Trucking Project" under CEQA Guidelines section 15378(a) and (c) because such restart does not require County discretionary approval. (FSEIR at 3-662) However, ExxonMobil does not currently have the ability to restart the SYU facilities under its County-issued Development Plan 87-DP-32cz. Such approval was conditioned specifically on the use of a pipeline for transportation. The FSEIR states that "[t]he Applicant is asking Santa Barbara County for a revision to Development Plan 87-DP-32cz, which covers operations of the existing SYU facilities." (FSEIR at 1-1) Such revision would be unnecessary if Exxon had a pre-existing right to operate. Therefore, there is a discretionary County approval required for operation of the

---

[50] Final Environmental Impact Statement/Report for Santa Ynez Unit, Las Flores Canyon Development and Production Plan, MMS-YN-EIS-84-001, SCH #83030805, SLC EIR-348, SBC #83-EIR-22 (June 1984) at ES-1.

LFC facility. The County cannot rely on this argument to avoid analyzing the *whole* of this Project—which includes platform restart.

Therefore, by failing to analyze resuming production at the SYU platforms and LFC facility—which is part of the whole Project—the FSEIR cannot properly inform decision making and meet the requirements of CEQA.

### B.    The Project Objectives are too Narrow, Thereby Impermissibly Constraining the Range of Alternatives.

An EIR must include a statement of objectives that includes "the underlying purpose of the project" and will "help the lead agency develop a reasonable range of alternatives." CEQA Guidelines § 15124(b). If the project objective is "impermissibly truncated," the range of alternatives will be too narrowly constrained. *Cty of Inyo*, 71 Cal.App.3d at 201.

The FSEIR identifies the Project objectives as follows:

- Temporarily transport limited SYU crude oil production while a pipeline transport option is unavailable, enhancing the ExxonMobil's positive community impact in the region, e.g., increasing production-related tax revenue and bringing back local jobs.
- Restore a portion of SYU wells and equipment to a desired state of operation to best maintain facility integrity during an unknown pipeline restoration period.
- Re-establish SYU production in a safe and environmentally responsible manner. Apply experiences from past SYU operations and previous, successful de-inventory trucking project.
- Leverage experiences gained from the phased restart program to facilitate a smooth full production restart when a pipeline transport option becomes available.
- Increase energy supply via restart of a local petroleum resource which would serve to reduce demand for imported oil and reduced risk of marine tanker spills.

(FSEIR at 2-4 – 2-5)

The clear objective of the Project, as stated in multiple sources, is to allow ExxonMobil to resume its production of oil and gas from the SYU. The underlying purpose of such production is to provide an energy supply. As such, the FSEIR must evaluate alternatives that are capable of meeting this purpose and objective without resorting to risky, polluting fossil fuel production and trucking.

According to the California Supreme Court, "[t]he core of an EIR is the mitigation and alternatives sections." *Citizens of Goleta Valley v. Bd. of Supervisors* (1990) 52 Cal. 3d 553, 564. The purpose of an EIR is to identify ways in which the significant environmental impacts of a project can be minimized or avoided. *Id.* at 565. This discussion helps agencies fulfill the substantive mandate of CEQA that projects not be approved if there are feasible alternatives that can avoid or substantially lessen potential impacts. Pub. Res. Code § 21002. An EIR provides the

information to enable an agency to comply with this requirement. Pub. Res. Code § 21002.1. Accordingly, an EIR "shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." CEQA Guidelines § 15126.6(a).

To do so, an EIR must "focus on alternatives to the project or its location which are capable of avoiding or substantially lessening any significant effects of the project, even if these alternatives would impede to some degree the attainment of the project objectives or would be more costly." CEQA Guidelines §15126.6(b). "The issue is not whether the alternative is less profitable than the project as proposed, but whether the reduced profitability of the alternative is 'sufficiently severe as to render it impractical to proceed with the project.'" *Save Round Valley All. v. Cty. of Inyo* (2007) 157 Cal. App. 4th 1437, 1461, *citing Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal. App. 3d 1167, 1181.

The alternatives evaluated in the FSEIR do not represent an adequate range of options that will feasibly meet the Project's underlying objective – providing California with energy - while substantially reducing the Project's impacts.  Instead, the alternatives are mere variations of virtually the same Project Description – that is, all alternatives rely on restarting SYU production, processing the oil and gas at the LFC facility, and trucking the oil to the SMPS and/or PPT.

None of the alternatives avoid or reduce the Project's Class I impacts, and in fact all alternatives increase impacts in some respects. To make matters worse, the FSEIR summarily rejects clean energy alternatives without full analysis. This omission deprives the County of any options to avoid or reduce the Project's unavoidably significant impacts on the environment.

        1.     <u>The Alternatives Considered in the FSEIR are not Feasible and/or do not Avoid or Substantially Lessen Project Impacts.</u>

An EIR must evaluate alternatives that are feasible and will avoid or substantially lessen the significant effects of the project. CEQA Guidelines § 15126.6(a). The alternatives considered in the FSEIR – the Reduced Trucking Alternative, No Trucking During Rainy Periods Alternative, and the Trucking to the Santa Maria Pump Station Alternative – are either infeasible or fail to avoid or substantially lessen the Project's significant impacts. As such, they do not comply with CEQA and do not offer any options for the County to avoid or substantially lessen Project impacts.

The **Reduced Trucking Alternative** is comprised of a minor reduction in the number of truck trips per day, from seventy round trips to fifty round trips. (FSEIR at 2-28) However, this reduction is not feasible because lowering the level of production (e.g., to 57-63 trucks per day) resulted in "several operational issues associated with the low flow-rates of produced fluids coming from the SYU platforms." (FSEIR at 2-29) For example, the lower emulsion flow rates compromised the cogeneration and leak detection systems. (*Id.*) In addition, reduced flow rates "would result in exceedances of the air permit for the gas turbine." (*Id.*) The FSEIR determined

that limiting the Project to fifty trucks per day "would be below the minimum level of 30,000 barrels per day that the Applicant has determined is required to safely operate its facilities." (FSEIR at 2-30)

In addition, this alternative would not avoid or substantially lessen Project impacts. In fact, this alternative would result in the same Class I impacts as the proposed Project. (FSEIR at 5-14)  However, this alternative would also *increase* impacts.  First, the alternative would increase carbon monoxide emissions and result in exceedances of the SBCAPCD permitted limits.  (FSEIR at 5-4[51])  Second, the reduced emulsion flow rate would increase the potential for corrosion in the pipeline from the platforms to the LFC facilities, which would result in an increased risk of an oil spill. (FSEIR at 5-13 - 14) Third, the reduced flow rate would reduce the effectiveness of the pigging operations, which would increase the risk of a spill. (FSEIR at 5-14) Fourth, the reduced flow rate would also compromise the leak detection system, exacerbating the risk and extent of a spill.  (*Id.*) These risks not only render this alternative infeasible, but also inappropriate given the substantial increase in impacts.

The **No Trucking During Rainy Day Periods Alternative** would not reduce the number of truck trips, because if trucks are prohibited on a rainy day the number is allowed to increase on non-rainy days. (FSEIR at 2-31) This increase in peak truck trips would exceed the threshold for operational related emissions for the Pentland Terminal route. (FSEIR at 5-21)

As noted in the FSEIR, there is no data to determine whether this alternative would reduce the probability of a spill (FSEIR at 5-25). The FSEIR, however, states that in the event of a spill, it would be less likely that the spill would impact waterways "since it would be less likely that the spilled oil would be transported via the rainwater into nearby creeks and other drainages." (FSEIR at 5-29) This statement is not supported by any evidence. One only need consider the March 21, 2020, tanker truck accident on Route 166 to see the fallacy of this conclusory statement. There was no rain on that date, and yet the oil easily spilled into the Cuyama River.

In addition, by increasing the potential number of peak trips per day, this alternative will increase safety impacts, especially on Route 166. In sum, this alternative would not avoid or substantially lessen any Project impacts, and would increase impacts to safety and air quality due to the increase in peak daily truck trips.

Finally, the **Trucking to the Santa Maria Pump Station Only Alternative** is no longer feasible because the SMPS will shut down in 2023. (FSER at 2-31) As such, this alternative should have been eliminated from consideration in the FSEIR.

---

[51] The FSEIR downplays this impact be combining the increase in cogeneration system gas turbine emissions with the rest of the emissions from the proposed Project.  (FSEIR at 5-4) The permit from the SBCAPCD, however, is specific to the cogeneration power plant (*id*). The existing permit allows up to 29.1 ppmv, whereas the Reduced Trucking Alternative would generate in excess of 35 ppmv. (*Id.*)

In addition, this alternative would not reduce the number of trucks or Class I impacts. (FSEIR at 5-35) If anything, this alternative would i*ncrease* impacts if the SMPS is shut down temporarily, because additional truck trips would be allowed to make up for the shortfall.

Accordingly, the FSEIR is woefully inadequate because it does not evaluate *any* feasible alternatives that would avoid or substantially lessen the significant impacts of the proposed Project. The Reduced Trucking Alternative and Trucking to the Santa Maria Pump Station Only Alternatives are not feasible. The No Trucking During Rainy Periods Alternative would not reduce impacts, and in fact would increase impacts on "make-up" days when daily trips would increase.

2.      The FSEIR Improperly Rejects Clean Energy Alternatives.

The FSEIR is deficient because feasible alternatives that can provide California with cleaner sources of energy were summarily rejected and omitted from the analysis. Because the underlying purpose of the Project is to provide energy, the FSEIR must analyze alternatives that can provide energy with less environmental impact, e.g., by producing renewable energy sources.

According to the FSEIR, the Renewable Energy Sources alternative was rejected because the Project would provide oil and gas for cars, as well as other vehicles and equipment, whereas solar and wind projects provide energy for the electrical grid.  (FSEIR at 2-25 - 26)  The FSEIR acknowledges that "some of this electrical energy could be used as a transportation fuel to power electric vehicles." (FSEIR at 2-26) This is particularly true in California, where the State has a goal of achieving five million electric vehicles by 2030.[52] In 2018, the State Legislature passed a bill establishing a Zero-Emission Assurance Project.[53] The private sector is making exponential inroads in this market, as evidenced by the success of electric vehicle companies such as Tesla.[54] Electrify America, a Volkswagen subsidiary, announced that it will spend $200 million on an electric vehicle plan in California.[55] Accordingly, electricity from renewable energy can meet the Project's objective of providing energy to the State.

The FSEIR states that a substantial amount of land would be necessary to produce the same amount of energy from renewable sources such as solar or wind. (FSEIR at 2-26) The report predicts that it would take 6,650 acres of land to produce the equivalent amount (793 MW) of solar energy. The FSEIR then misleadingly relies on the fact that the County's Land Use and Development Code ("LUDC") currently only allows utility-scale solar photovoltaic facilities in the Cuyama Valley Rural Region to conclude that insufficient lands are available. As the

---

[52] Executive Order B-48-18.
[53] AB 193, codified as Health and Safety Code Section 44274.9.
[54] Julie Pyper, *US Electric Vehicle Sales Increased by 81% in 2018* (January 7, 2019), available at: https://www.greentechmedia.com/articles/read/us-electric-vehicle-sales-increase-by-81-in-2018#gs.3AQYOJkL.
[55] *Electrify America Announces Second $200 Million Zero Emission Vehicle Investment Plan for California* (October 3, 2018), available at: https://www.prnewswire.com/news-releases/electrify-america-announces-second-200-million-zero-emission-vehicle-investment-plan-for-california-300724080.html.

FSEIR notes, however, the County is in the process of updated its LUDC and General Plan to expand the geographic scope of such facilities.

The FSEIR states that the County's Strategic Energy Plan identified potential capacity for solar facilities on agricultural lands between 193 and 513 MW. What the FSEIR fails to disclose, however, is that the County approved development of a Utility-Scale Comprehensive Plan and Ordinance Amendments on July 13, 2021.[56] This plan will consider utility-scale solar on lands designated Agriculture I, Agriculture II,  Public Utilities, Industrial, and Professional and Institutional. As such, the potential land space available for solar development will be much broader than just agricultural lands. In addition, distributed solar at homes, schools, parking lots, and businesses can provide electricity for vehicles. Although the FSEIR mentioned Urban Capacity solar, it does not quantify the potential energy generation from such sources. (FSEIR at 2-26)

The FSEIR also summarily dismisses wind energy as an alternative, again on the grounds that a substantial amount of land would be required. (FSEIR at 2-26) The FSEIR states that Las Flores Canyon is not a potential site but does not explain why. Although the FSEIR states that potential onshore wind turbine sites would have a generating capacity of only 21-42 MW, the information is not provided to substantiate such a claim. Moreover, offshore wind projects are now being considered and may provide an alternative, renewable source of energy.[57]

The FSEIR concludes by stating that the underlying purpose of the Project is to res-establish crude oil production from the SYU facilities. (FSEIR at 2-26) However, as noted above, the underlying purpose is much broader than that; rather, it is to generate energy. Restarting the SYU facilities and trucking crude oil is the proposed method of achieving this underlying purpose. Because the FSEIR relies on an improperly narrow objective, it limits the range of options available to meet the stated energy need. Instead, the FSEIR dismisses all alternatives, including the Renewable Energy Sources alternative, that would achieve the Project objective of providing energy while avoiding or minimizing the Project's significant impacts.

The FSEIR is deficient because it fails to include alternatives that can provide energy for the State while avoiding or substantially lessening the significant impacts of the Project, and because it fails to include an adequate range of alternatives. The FSEIR must be revised to include clean energy alternatives that would avoid the risks and impacts that would be caused by the Project.

### C.    The Environmental Setting is Misleading and Inadequate under CEQA.

The FSEIR should use a baseline that reflects the physical conditions as they existed *at the time* the notice of preparation was published. CEQA Guidelines § 15125(a)(1). In this case,

---

[56] https://santabarbara.legistar.com/LegislationDetail.aspx?ID=5024752&GUID=0C5A4289-EA9C-4611-88F7-79BE26E4ABCB&Options=&Search

[57] 83 FR 53096 (October 19, 2018) and 86 FR 40869 (July 29, 2021), describing an offshore wind Call Area near Morro Bay.

that means the shutdown status of the SYU platforms and LFC processing facility, not historic conditions from 2012 to 2014.

.

1.    CEQA Provides for a Baseline of Existing Physical Conditions Unless an Alternative Baseline Is Necessary to Accurately Assess Impacts.

The environmental setting in an EIR "will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." CEQA Guideline § 15125(a). The CEQA Guidelines specify the standard timing for when the physical conditions are assessed: "Generally, the lead agency should describe physical environmental conditions as they exist *at the time the notice of preparation is published*, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective." CEQA Guideline § 15125(a)(1) (emphasis added). There are narrow circumstances in which it may be appropriate for an agency to depart from the normal environmental setting when doing so in fact provides for more accurate analysis. The CEQA Guidelines state: "Where existing conditions change or fluctuate over time, and where necessary to provide *the most accurate picture practically possible* of the project's impacts, a lead agency may define existing conditions by referencing historic conditions, or conditions expected when the project becomes operational, or both, that are supported with substantial evidence." *Id.* (emphasis added).

An accurate environmental setting is critical to "the fundamental goal of an EIR" which is to "to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment." *Neighbors for Smart Rail v. Exposition Metro Line Constr. Auth.* (2013) 57 Cal. 4th 439, 447;  *see also* CEQA Guideline § 15125(a) ("The purpose of this requirement is to give the public and decision makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts."). Accordingly, as the California Supreme Court has held, an agency cannot set a baseline on "hypothetical" or permitted conditions and thus compare a project to what "*could* happen, rather than to what was actually happening." *Communities for a Better Env't v. S. Coast Air Quality Mgmt. Dist.* (2010) 48 Cal. 4th 310, 322 (emphasis in original) (holding that the baseline for a proposed modification of a petroleum refinery should have been based on actual existing conditions, not permitted conditions); *see also Citizens for E. Shore Parks v. State Lands Com.* (2011) 202 Cal. App. 4th 549, 560, *as modified on denial of reh'g* (Jan. 27, 2012) (holding that it was appropriate for the State Lands Commission to use a baseline that included existing operations at a marine terminal because that was "what was actually happening"); *Friends of the Eel River v. Sonoma Cty. Water Agency* (2003) 108 Cal. App. 4th 859, 875, *as modified on denial of reh'g* (June 13, 2003) (holding that a baseline for a water withdrawal project was inadequate and failed to "set the stage" for accurate impacts analysis where it omitted discussion of certain existing conditions including water diversions and their impacts on species).  Basing analysis on "hypothetical" conditions "results in 'illusory' comparisons that 'can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts,' a result at direct odds with CEQA's intent." *Communities for a Better Env't*, 48 Cal. 4th at 322 (internal citation omitted).

2. <u>The FSEIR Improperly Uses an Environmental Setting Based on Historic
Conditions.</u>

Here, the FSEIR departs from the general rule under CEQA and uses a baseline of "the physical environmental conditions as of 2018, with an operational baseline of the average of the last full three years of SYU facility operations prior to the shut-in (2012-2014)." (FSEIR at 4-4; *see also* FSEIR at 4.1-1 ("For the proposed Project, the environmental setting and baseline conditions reflect the emissions associated with a three year operational average (2012-2014) of the SYU facilities, including LFC operations, prior to the Plains All American Pipeline incident in May 2015 which led to the subsequent shut-in of the SYU facilities.")  Under this baseline, the average production rate was roughly 28,400 barrels per day of crude oil. (FSEIR at 4-4) The FSEIR provides several reasons for not using the existing physical conditions as the baseline, all of which are based on incorrect factual assertions and misapplication of the law.

First, the FSEIR improperly relies on the assertion that ExxonMobil has an existing right to operate the SYU facilities as a reason to alter the baseline. (FSEIR at 4-4) (claiming that "[a]djustment of the baseline" to include historic operations is appropriate because the SYU facilities are "permitted to operate, and have all the necessary entitlements for operation…") (*See also* FSEIR at 8-4 ("ExxonMobil maintains the ability to restart the SYU facilities at any time without discretionary approval by a County decision maker." ) In the Responses to Comments, the FSEIR states that "[f]or the proposed Project, the Applicant has an entitlement to operate the SYU, including their existing platforms and onshore facilities, but is not currently doing so; the Applicant has indicated an intent to do so in the future when a mode of crude oil transportation becomes available." (FSEIR at 3-659) The FSEIR claims that "[t]hese facts take the project out of the 'normal' situation and allow for consideration of other facts to support the Lead Agency's baseline determination." (*Id.*) However, these statements are false.  As explained above, ExxonMobil does not have an entitlement to operate the SYU because its existing Development Plan is premised on having a pipeline available.  *See* CONDITIONS OF APPROVAL – ExxonMobil Santa Ynez Unit Expansion Project, 87-DP-32cz (Modified on July 25, 2001), Condition VI-I, Oil Transportation ("All oil processed by ExxonMobil's oil treatment facility shall be transported from the facility and the County by pipeline in a manner consistent with Santa Barbara County Local Coastal Plan Policy 6-8.") Furthermore, even if ExxonMobil did retain such entitlement, CEQA does not provide an exemption to the normal baseline rule based on an entitlement to operate, alone. Instead, deviating from the standard rule is only appropriate where necessary to paint the most accurate picture practically possible of the Project's impacts. CEQA Guideline § 15125(a)(1).  As explained more fully below, here, the most accurate baseline is that of the existing physical conditions.

Second, the FSEIR points to the 1984 and 1986 EIRs to claim that impacts have been previously analyzed. (FSEIR at 8-4) The Responses to Comments likewise point to this analysis. (FSEIR at 3-659) However, as explained above, the old EIRs are inadequate to cover the impacts associated with restarting the SYU facilities because they do not address all Project impacts. Nor did these EIRs evaluate trucking as an alternative mode of transportation.

Third, the FSEIR attempts to frame the shut down and restart of the SYU facilities as already accounted for in the historic baseline because certain routine shutdowns for inspection and maintenance were part of normal, past operations in 2012 to 2014. (FSEIR at 4-4) ("[T]he restart of the SYU facilities are part of the normal operating process for the SYU facilities and would be considered part of the 2012-2014 baseline."); (FSEIR at 3-661) ("The shutdown and restart of the SYU facilities are allowed as part of the operating permits issued by SBCAPCD.") However, such shutdowns only lasted "up to four weeks in length" and have occurred "at least every three years." (FSEIR at 4-4) These routine, brief instances cannot be compared to the six-plus years of indefinite shutdown, which is the current physical condition of the platforms.

Fourth, the FSEIR asserts that this baseline will "allow for a straightforward assessment of the proposed crude oil trucking impact, and to avoid confusing the impacts of the proposed Project with the permitted operations of the existing SYU facilities." (FSEIR at 8-4) However, rather than avoid confusion, the historic baseline does the opposite. This baseline distorts the analysis of environmental impacts of the Project, which properly includes resuming oil production. For example, under the FSEIR, the "[b]aseline GHG emissions data reflect the operation of the SYU facilities prior to the shut-in in May 2015" (FSEIR at 4.2-7) and thus only focuses on GHGs from mobile sources while overlooking that GHG emissions from the SYU facilities are currently zero.  In addition, entire categories of impacts are omitted from analysis, for example, impacts from drilling, production, transportation of oil to shore, and ultimate consumption. In particular, the FSEIR omits impacts to the sensitive marine environment from offshore oil production, including conventional drilling and advanced well stimulation techniques such as fracking and acidizing. Instead, the FSEIR should address what the Project would actually do (resume operations) in comparison to what is happening *now* (nothing).

In the Responses to Comments, the FSEIR cites *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708 to justify the baseline. However, that case does not support use of the historic baseline for this Project. The *Association of Irritated Residents* case involved a very different set of facts. Most significantly, the refinery was free to resume production of existing operations without any discretionary approvals (unlike here, as explained above). The approval that was at issue involved refinery expansion. *Id.* at 721. There, refinery operations had ceased from December 2008 to June 2011 due to the bankruptcy of the owner, and some mode of operations occurred after that time. The NOP in that case was published in 2013 and the EIR used a baseline of 2007 historic conditions. Specifically, "[a]s a result of financial issues unrelated to the refinery [the owner of the refinery] declared bankruptcy on December 21, 2008, and, a week later, the refinery was shut down." *Id.* at 720. The refinery was purchased by a new owner in June 2010 and "[t]welve months later [the new owner] resumed some refining operations, processing gas oil transported via rail and truck from its refinery located in Paramount, California."  *Id.* Finally, "[w]hen the Paramount refinery suspended production, the refinery in Bakersfield stopped its refining operations, but continued other operations and activities. Those continuing activities included managing inventory, blending and marketing fuels, and functioning as a terminal for crude oil and finished petroleum products." *Id.*

The court concluded that substantial evidence supported the County's decision to use a baseline that included the operating refinery for four reasons:

> First, the evidence establishes that refinery operations of up to 70,000 barrels per day have been approved by the issuance of permits or other entitlements that are still in effect. Second, information in the EIR, including table 3-3, shows the refinery actually processed crude oil and other hydrocarbons until the bankruptcy filing of Flying J and its subsidiary in December 2008, and the processing of other hydrocarbons (i.e., gas oil) resumed in 2011 and continued in 2012. Third, as demonstrated by table 3-4 in the EIR, the refinery operations have been subject to prior environmental reviews under CEQA. Fourth, the processing of crude oil at the refinery could begin again without the approval of the project currently being proposed by Alon USA.

*Association of Irritated Residents,* 17 Cal.App.5th at 728–29. As such, the historic operations could be resumed at any time, without new approvals; the only reason new approvals were sought was to allow the proposed modifications and expansion.

The Responses to Comments claim these facts support the baseline for this Project, stating the following:

> 1) The SYU facilities are permitted to operate and can resume operation at any time without another discretionary approval.
> 2) The Draft SEIR used historical SYU operations that were actually achieved and that were lower than the peak historical levels and well less than the permitted levels.
> 3) The SYU operations previously underwent CEQA review—the argument about old EIRs.
> 4) The operational years used conservative estimated impacts (i.e., the baseline is not inflated by choosing years in the far-flung past that would have resulted in a higher baseline).

(FSEIR at 3-660)

However, all of these facts stand in sharp contrast to the proposed Project. First, ExxonMobil does not have an existing entitlement to operate because its development plan is contingent on pipeline transportation, as explained above. Second, the SYU facilities have been completely shut down and thus have not involved sporadic operations. The shutdown was not for routine, planned maintenance. Third, the prior environmental reviews do not address the impacts of the Project, as explained above, and finally, the Project cannot occur without approval of the Project. Therefore, this is not a situation where historic operations would provide a more realistic view of the Project impacts. The fact that ExxonMobil requires approval of the Project in order to resume operations marks a critical distinction. *See also North County Advocates v. City of Carlsbad* (2015) 241 Cal.App.4th 94 (finding that in the context of assessing traffic impacts of a shopping center renovation, where the store had a history of being periodically occupied, that a historic conditions baseline was appropriate where "it was based on recent historical use and was

consistent with [project applicant's] right to fully occupy the [retail] space *without further discretionary approvals*.") (emphasis added).

Instead, the "most accurate picture practically possible" of the Project's impacts requires use of current physical conditions as the baseline. CEQA Guidelines § 15125(a)(1). This is not a situation that warrants departure from that CEQA's standard baseline requirement.  The guiding principle under CEQA baseline adequacy is that the baseline must not mislead or misinform the public. However, using the historic baseline excludes impacts from resuming production and prejudices the ability of the public and decisionmakers to ascertain the true impacts of the proposed Project. Assuming operations will be in the range of 2012 to 2014 is purely "hypothetical." *Communities for a Better Env't*, 48 Cal. 4th at 322.  This is also not a situation in which the agency can use an environmental setting based on an average of years of operations due to industry fluctuation because the shutdown is a static condition that has been in existence for over six years and cannot change without this approval. *San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal. App. 4th 202, 216 (upholding an agency's use of an environmental setting based on a five-year average of annual mining volumes where the agency determined that to be "a better indicator of existing mining conditions" than the single year the NOP was published).

The only adequate baseline in this case must reflect the existing shutdown condition of the SYU facilities. As the FSEIR acknowledges, the May 19, 2015, pipeline rupture resulted in the shutdown of the pipeline system and offshore platforms. After the rupture, production was maintained for two days, then curtailed, and by June 17, 2015 "all wells on the platforms were shut in." (FSEIR at 2-3). Thus, at the time the NOP was prepared for this Project, in 2018, the SYU facilities were offline and had been for almost four years.  This shutdown status of the platforms and processing facility constitutes the proper environmental setting in this case, and use of this baseline is "necessary to prevent misinforming or misleading the public and decision makers." *See Neighbors for Smart Rail*, 57 Cal. 4th at 448.  To do otherwise will mislead the public and decision makers into thinking that ExxonMobil can restart the platforms and LFC facility without approval of the proposed Project. That is simply not the case. ExxonMobil cannot restart the platforms without new environmental review and revision to its approved FDP.

In contrast, Venoco's production at PRC 421 was shut down in 1994 following an oil pipeline leak, and an EIR was prepared to resume operations. The FEIR for the project appropriately included a baseline that reflected the shut-down status of operations. (Venoco FEIR at 1-10) ("Existing baseline conditions for Venoco's proposed Project include: Venoco's lease being in full force and effect; existing Project infrastructure as recently modified; and *no production* from PRC 421 since 1994, other than depressurization activities in 2001 to relieve well-head pressure. Potential impacts of recommissioning PRC 421 are generally analyzed in the context of *environmental conditions existing at the time the NOP was released* for the Project (March 2013).") (emphasis added)  This example illustrates correct use of the existing physical conditions as the baseline in a similar context in which oil production had been shut down due to a spill.

Therefore, the Project's baseline is misleading and improper under CEQA.

**D.      The Cumulative Scenario and Analysis in the FSEIR is Incomplete and Misleading.**

An EIR must evaluate the cumulative impacts of a proposed project. CEQA defines cumulative impacts as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." CEQA Guidelines § 15355.  "Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.  *Id*. at § 15355(b).  When assessing cumulative impacts, an EIR must consider "closely related past, present, and reasonably foreseeable probable future projects. *Id*., see also Pub. Res. Code § 21083(b)(2).  In order to assure an adequate evaluation of cumulative impacts, an EIR must either include a list of "past, present, and probable future projects producing related or cumulative impacts, including, if necessary, those projects outside the control of the agency," or a summary of projections contained in a local, regional, or statewide plan. CEQA Guidelines § 15130(b)(1).

The FSEIR is deficient because (1) it improperly includes the SYU and LFC operations as cumulative projects; (2) it omits other oil and gas projects in the County; and (3) it downplays the significance of cumulative impacts by focusing on the Project's contribution to such impacts, rather than informing the public and decision makers regarding the combined impact of the Project along with other projects and activities.

1.      The FSEIR Incorrectly Identifies the Restart of the SYU Platforms as a Cumulative Project.

The FSEIR states that the restart of SYU operations would contribute to the cumulative effects of the proposed Project. (FSEIR at 3-2 – 3-3) As discussed above, this statement directly conflicts with the fact that the proposed Project itself involves the restart and operations of the SYU and LFC facilities. (See Project Description, FSEIR at 2-1, 2-4 – 2-5) Accordingly, it is inappropriate for the FSEIR to consider restart of SYU and LFC operations as a cumulative impact.

2.      The FSEIR Omits Several Other Oil and Gas Production Projects.

The Cumulative Scenario only considers projects that would add to impacts from crude oil trucking. (FSEIR at 3-4; see also Responses to Comments, FSEIR at 3-666 "Many of these existing facilities…do not transport oil via truck.") In limiting the scope of cumulative projects, the FSEIR changes the name of the Project from "ExxonMobil Interim Trucking for Santa Ynez Unit (SYU) Phased Restart Project" to the "Proposed Trucking Project." (*Id*.)  The FSEIR also omits oil and gas projects in Northern Santa Barbara County because "the only impacts from the proposed Project that would occur in Northern Santa Barbara County are related to the mobile sources used for the proposed trucking operations (i.e., the crude oil tanker trucks)." (*Id*.)

The proposed Project, however, would also generate impacts related to resumption of offshore oil and gas production and impacts to climate change. The FSEIR is deficient because it omits reference to these other oil and gas projects in the region. Some of these projects include

B.E. Conway, Freeport McMoran, Golden Gate Oil, HDT, HVI Cat Canyon (formerly Greka), KORE Energy, Off Broadway Minerals, PCEC, PRE Resources, Pyramid Oil, RMR, Sentinel Peak, Sierra Resources, So. Cal. Gas, Temblor, Towne Exploration, Vaquero Energy, and Vintage Petroleum, and the other platforms in the Santa Barbara Channel region and related infrastructure.[58] These projects contribute to air and climate change impacts, as well as risk of upset and more.

3.      The FSEIR Focuses on the Project's Incremental Contribution, Rather than the Collectively Cumulative Impacts.

The FSEIR mischaracterizes the purpose of the cumulative impact analysis by stating that it is "to determine if a project's incremental contribution to a significant cumulative effect is considerable." (FSEIR at 3-666) If that were the case, there would be no need to consider any cumulative effects unless a project's impact were itself significant. That is indeed the approach taken in the FSEIR.[59] Such approach, however, defies the purpose of the cumulative impact analysis, which is to look at the combined, or collective, impact of a project in combination with other projects – even if the proposed project's impact alone would be insignificant. Otherwise, the collective impact will never be fully understood or addressed.

**E.**     **The FSEIR Fails to Adequately Disclose the Risk of Oil Tanker Truck Accidents.**

As discussed above, the conclusion in the FSEIR that safety impacts can be mitigated is contrary to the evidence. No matter what technology or training is required, accidents will occur. In fact, many of the accidents involving tanker trucks are caused by drivers of other vehicles, unanticipated conditions or obstructions along roadways, or other unforeseen circumstances.

In addition, the estimated crash and spill rate of one in fifty-two years for trucks going to Santa Maria, and one in seventeen years for trucks going to Pentland (FSEIR at 4.3-56) fails to consider the actual accident rate along these highways, which includes at least two accidents in the last ten years for trucks going to Santa Maria, and at least six accidents in fifteen years for trucks along Route 166.

**F.**     **The FSEIR Fails to Fully Disclose the Environmental Impacts Caused by Accidents.**

The FSEIR acknowledges that oil spills and fires associated with trucking are Class I (significant and unavoidable) impacts to biological, water, cultural, and marine resources.

---

[58] Santa Barbara County, *Board of Supervisors Agenda Letter: Briefing on Oil and Gas Development in Santa Barbara County and Compliance Status of Oil and Gas Operations in Santa Barbara County* (February 12, 2019)

[59] See, for example, FSEIR at 3-667: "Since the proposed Project would be required to mitigate the GHG emissions, the Project's contribution to cumulative impacts would be less than significant." Under CEQA, the FSEIR should disclose the combined GHG emissions from the multiple projects in the areas, and determine whether the collective impact would be significant.

(FSEIR at 4.3-56) Even oil spill response and cleanup operations cause impacts to biological and cultural resources. (See, e.g., FSEIR at 4.3-57)

As noted above, the FSEIR does not include spills at the SYU or LFC as project-related impacts. The failure to analyze the SYU restart results in a horrific omission of potential impacts caused by offshore oil and gas production and onshore processing. The FSEIR fails to describe the potential for accidents, leaks, spills, and dangerous gas releases. These impacts are not merely theoretical. Our County recently experienced a major oil spill in 2015 (carrying oil from the SYU), and a gas leak from the LFC facility several years ago – both of which caused substantial environmental and public health harm.  The FSEIR also fails to adequately analyze and disclose hazardous materials and risk of upset impacts along the trucking routes as discussed below.

The FSEIR also fails to disclose the full potential impact of the Project by ignoring the potential impacts to biological resources from fires caused by accidents (thereby excluding a substantial area that would be affected by an incident), excluding fuel spills from the analysis, omitting critical information from the environmental setting, improperly restricting the potential extent of a spill, and focusing on a maximum spill from one truckload.

1. <u>The FSEIR Fails to Adequately Assess and Disclose the Direct and Indirect Impacts of Tanker Accident Induced Wildfires on Biological Resources Along the Haul Routes.</u>

The FSEIR does not sufficiently assess and disclose the direct and indirect biological impacts of wildfires caused by tanker accidents along the haul routes. Tanker accidents involving oil spills can cause fires and explosions. "When a tanker truck driver gets in a crash, the likelihood of a fire is greatly increased due to the highly flammable materials the truck is carrying."[60]

On October 11, 2021, at 4:25 am, a "fully loaded," speeding crude oil tanker struck a downed tree during foggy conditions, veered off Dominion Road, "overturned," spilled "approximately 100 gallons of diesel fuel," and sparked a vegetation fire in dense eucalyptus trees.[61] (Figure 1) Luckily the humidity was high and there were no significant winds at the time of the accident so the Santa Barbara County Fire Department extinguished the fire before it spread beyond a quarter acre.[62] The trucking routes pass through and adjacent to high, very high, and extreme fire hazard areas.[63] (Figures 2 and 3) Wildfires in the Project region can spread

---

[60] Brauns Law, *Why Catastrophic Tanker Truck Crashes Are So Dangerous,* available at https://braunslaw.com/library/dangers-of-deadly-tanker-truck-accidents/ (August 20, 2021).
[61] CHP, *Traffic Crash Coding, Local Report Number 9750-2021-10433* at 2 and 5 (October 11, 2021); *See also* Santa Barbara County Fire Department, *Major Incident Report, Dominion Incident* at 2 - 3 (October 11, 2021).
[62] *Id.*
[63] Santa Barbara County Office of Emergency Management, *2017 Santa Barbara County Multi-Jurisdictional Hazard Mitigation Plan*, Figures 5.5 at 5-11 and 5-10 at 5-18 available at http://www.countyofsb.org/ceo/asset.c/3416 (2017).

much more rapidly and further than oil spills, as rapidly as two miles in twenty minutes, well beyond the insufficient half mile "area of influence."[64] (FSEIR at 8-13)



Figure 1. Dominion Incident sparked by crude oil tanker. Santa Barbara County Fire Department. October 11, 2021.



Figure 2. Santa Barbara County Fire Hazard Severity Zones. Santa Barbara County Office of Emergency Management ("OEM"). 2017 Multi-Hazard Mitigation Plan. Parepared by SB County Fire Department. March 23, 2016.

---

[64] Wikipedia, *Painted Cave Fire*, available at https://en.wikipedia.org/wiki/Painted_Cave_Fire (August 20, 2021) ("Wikipedia (2021)").



Figure 3. Santa Barbara County Location and Extent: Fire Threat. Santa Barbara County OEM. 2017 Multi-Hazard Mitigation Plan. Figure 5-10. February 23, 2016.

Impact RISK-3 is supposed to assess the effects of oil spills and wildfires along the haul routes; however, the Impact RISK-3 discussion focuses almost exclusively on oil spills. The FSEIR includes two short contradictory statements about wildfires along the trucking routes. The FEIR finds on one hand that tanker-caused wildfire impacts would be significant and unavoidable:

"Oil spills and fires associated with the trucking of oil could impact sensitive resources including biological… resources… along the trucking route." (FSEIR at 4.3-56)  "Should an oil spill occur that results in a fire or the contamination of waterways, there could be a reduction in species' breeding success (e.g., nesting birds), causing regional effects and potential long-term consequences" resulting in a significant unavoidable "Class I" impact. (FSEIR at 4.3-56 - 57)

On the other hand, the FSEIR finds the impacts of tanker-caused wildfires less than significant:

The crude oil trucking operations have the potential to create a fire in the event of an accident. The County has fire stations located along each of the proposed truck route (sic) which would be capable of responding to a truck accident[4]. As discussed in Section 4.3, Hazardous Materials and Risk of Upset, the risk of a fire from a crude oil tanker truck was found to be less than significant. Therefore, impacts to wildfires from a truck accident would be less than significant. (FSEIR at 6-15).

Section 4.3 classifies the risk of oil spills and fires associates with trucking crude oil as a Class I significant and unavoidable impact. However, the FSEIR does not explain these contradictory findings.

FSEIR Section 4.3 mentions the impacts of fire at the LFC facility on "brush" and the "nearby watershed" (FSEIR at 4.3-4), and considers the effects of tanker-caused pool fires, flash fires, and vapor fires on the public. (FSEIR at 4.3-49 – 4.3-50) However, the FSEIR does not adequately disclose the direct effects of tanker-caused wildfires on biological resources. It omits impacts of wildfire caused by trucking on rare vegetation communities, special-status plant and animal species, wildlife habitats, and wildlife foraging, movement, migration, cover, and roosting along the haul routes. (FSEIR at 4.3-57)

The FSEIR also omits all indirect impacts of wildfire on biological resources. For example, debris flows following the Thomas Fire are believed to have eliminated endangered southern California steelhead (*Oncorhynchus mykiss*) from at least two waterways in Santa Barbara County.[65] "Zero *O. mykiss* were observed in these streams during the habitat and barrier assessments conducted for this report. It is unlikely San Ysidro Creek and Carpinteria Creek continue to support a resident *O. mykiss* population at this time considering the numerous negative impacts on stream habitat conditions from persistent drought, wildfire, and subsequent sediment influxes."[66] Another local study found that, "stream biological communities usually change radically with postfire floods," and the indirect impacts of fires include "fish kills."[67]  The FSEIR also omits indirect biological resources effects of tanker-caused wildfires on other special-status species such as federally threatened California red-legged frog (*Rana draytonii*), and California Species of Special Concern western pond turtle (*Emys marmorata pallida*), California newt (*Taricha torosa*), and two-striped garter snake (*Thamnopsis hamondii*). These species would be significantly impacted by sediment- and ash-laden runoff, other water quality effects, flooding, debris flows, and loss of pool habitats.[68]

Underscoring the FSEIR's inadequate analysis of biological resource impacts resulting from tanker-caused wildfires, Impact RISK-3's concluding statement omits the impacts of tanker-caused wildfires on biological resources, finding only that, "the impacts to onshore biological and water resources, in the event an *oil spill* affecting

[65] Horgan, Casey, Michael Morales, Kyle Evans, Sam Bankston, Teagan Partin, and Katie Carmody, Pacific States Marine Fisheries Commission and CDFW, *Assessment of Steelhead Habitat and Migration Barriers within Watersheds Impacted by the Thomas, Whitter, and Topanga Wildfires* (September 10, 2019).
[66] *Id*. at 107.
[67] Bixby, Rebecca J., Scott D. Cooper, Robert E. Gresswell, Lee E. Brown, Clifford N. Dahm, and Kathleen A. Dwire, *Fire Effects on Aquatic Ecosystems: An Assessment of the Current State of the Science,* Freshwater Science, The Society for Freshwater Science at 1344, available at
https://www.fs.fed.us/rm/pubs_journals/2015/rmrs_2015_bixby_r001.pdf (September 2015) ("Bixby, *et al* (2015)").
[68] Max Kalber, Goleta Watershed Program Intern, EDC, and Brian Trautwein, Environmental Analyst and Watershed Program Coordinator, EDC, *Goleta Watersheds and Wildland-Urban Interfaces: Enhancing Fire Safety and Riparian Forest Health* at 13-21 available at https://www.environmentaldefensecenter.org/wp-content/uploads/2021/08/EDC_2021_FireSafety_RiparianHealthReport_2021_08_11.pdf
(August 2021) (EDC (2021)"); *See also* Bixby *et al* (2015).

these resources, would be significant and unavoidable." (FSEIR at 4.3-59) (emphasis added) Based on the contradictory statements regarding the significance of tanker-induced wildfire impacts, the brief, incomplete, and inadequate mention of direct biological impacts, and omission of indirect biological impacts resulting from tanker-caused wildfires, the FSEIR clearly fails to adequately consider the biological impacts of tanker-caused wildfires.

Similarly, the discussions of Impact RISK-3 in the Alternatives Section focus solely on oil spill impacts and omit the biological resources effects of tanker-caused wildfires, reflecting the FSEIR's flawed assessment of tanker-caused wildfire impacts. (FSEIR at 5-13, 5-29 – 5-30, 5-44 – 5-45, 5-50, and 5-52) The FSEIR's discussion of fires in the Land Use and Policy Consistency Section 4.4 is limited to the LFC facility and also omits tanker-caused wildfires along the haul route. (FSEIR at 4.4-25 and 4.4-41) The cumulative biological resource impacts of tanker-caused wildfires on the trucking route are also omitted from the FSEIR. (FSEIR at 4.3-72) Omission of the impacts of tanker-caused wildfires on biological resources from the FSEIR's cumulative risk of upset, land use and policy consistency, and alternatives' analyses, and the inadequate two sentence discussion under Impact RISK-3, represent a significant deficiency in the FSEIR. This deficiency is even more glaring given the location of the routes in high, very high, and extreme fire hazard areas. (Figures 2 and 3) Wildfire impacts are heightened due to the presence of sensitive biological resources, including special-status species and vegetation communities and the spread of wildfires up to two miles in twenty minutes. (See Figures 6 – 19)

The tanker-caused wildfire impacts are further exacerbated by climate change-related warming which is increasing at a rate faster than previously modeled.[69] The FSEIR notes that "climate variability" and "warmer and drier conditions allow fire to spread rapidly, making containment more difficult." (FSEIR at 4.2-4) However, the FSEIR's Risk of Upset Section 4.3 omits a necessary discussion of how climate change intensifies the threat of tanker-caused wildfires on biological resources.[70]

The FSEIR's omission of indirect biological impacts, and insufficient two sentence description of direct biological impacts resulting from tanker-caused wildfires along the haul routes, leads to insufficient mitigation measures for tanker-caused

---

[69] International Panel on Climate Change, *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [Masson-Delmotte, V., P. Zhai, A. Pirani, S. L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M. I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J. B. R. Matthews, T. K. Maycock, T. Waterfield, O. Yelekçi, R. Yu and B. Zhou (eds.)], Cambridge University Press. In Press available at https://www.ipcc.ch/report/ar6/wg1/#FullReport (August 2021).

[70] *Id.*; *See also* Kendra Pierre-Louis, and Nadja Popovich, *Climate Change Is Fueling Wildfires Nationwide, New Report Warns*, New York Times available at https://www.nytimes.com/interactive/2018/11/27/climate/wildfire-global-warming.html (November 27, 2018); *See also* Bixby *et al* (2015) at 1342; *See also* Williams, A. P., Abatzoglou, J. T., Gershunov, A., Guzman-Morales, J., Bishop, D. A., Balch, J. K., & Lettenmaier, D. P. *Observed impacts of anthropogenic climate change on wildfire in California.* Earth's Future, 7, 892– 910. https://doi.org/10.1029/2019EF001210 (2019); *See also* EDC (2021) at 13 - 21.

wildfires along the haul routes. Mitigation Measure RISK-2 focuses on the LFC and SYU and omits the haul routes. Measures RISK-3, RISK-4, RISK-5, and RISK-6 are designed to mitigate oil spill impacts but do not mitigate impacts of wildfires. Mitigation Measure RISK-1 is the only measure related to the impacts of tanker-caused wildfires.

Measure RISK-1 is inadequate to reduce the impacts of tanker accidents, spills, and fires to less than significant as noted in the FSEIR. (FSEIR at 4.3-62 – 4.3-64) In addition, requirements of Measure RISK-1 are unenforceable. The Measure requires "extensive training" in defensive driving, but the term "extensive" is not defined or quantified. (FSEIR at 4.3-62) The Measure defers other requirements without adequate standards to ensure success. For example, the Measure states that "Drivers shall be trained on … local traffic concerns and hazards" but fails to state which if any local concerns or hazards will be included in the training. (*Id.*) Measure RISK-1 requires the training of drivers "to use dedicated routes." (*Id.*) However, the FSEIR does not state whether drivers would be able to use alternative routes during unusual circumstances, such as accidents, floods, or fires that will periodically close Highway 101 and/or Route 166. In addition, Measure RISK-1 states that, "Truck carriers shall be required to complete a Crude Oil - Motor Carrier Safety Survey" but does not set forth the survey questions for the public and decision-makers to evaluate the effectiveness of the survey in preventing accidents, spills, and fires. (FSEIR at 4.3-63)

Finally, the FSEIR states, "All projects within fire hazard areas which have the potential for the risk of fire must have a Fire Protection Plan, which is submitted to the County Fire Department and Planning and Development Department for approval." The FSEIR discloses such a plan for the LFC facility but discloses no such plan for the trucking routes. (FSEIR at 4.3-72)

In sum, the FSEIR fails to adequately analyze, disclose, and mitigate the direct, indirect, and cumulative effects of tanker caused wildfires on biological resources because:

- The half mile area of influence is too small to capture tanker-caused wildfire effects which can range to over two miles from points of origin within twenty minutes;
- The FSEIR only discloses haul route wildfire effects on breeding success and nesting birds, omitting foraging, wildlife movement, migration, cover, sensitive plant species, and rare vegetation communities (FSEIR at 4.3-57);
- The FSEIR omits the indirect effects of tanker-caused wildfire on creeks, aquatic and amphibious species, and habitats resulting from post-wildfire runoff, debris flows, water quality impacts, and flooding;
- The cumulative effects discussion omits tanker-caused wildfires (FSEIR at 4.3-72);

- The FSEIR's discussion of impacts to biological resources does not consider the heightened tanker-caused wildfire risk due to climate change;[71] and
- Mitigation measures to substantially lessen the biological effects of tanker-caused wildfires are lacking.

Finally, the FSEIR fails to disclose the potential fire and explosion risk associated with the Gas Company's large diameter high-pressure gas line present in Gaviota State Park near Highway 101. (Figures 4 and 5)  A tanker accident sparking a wildfire in this heavily wooded area may pose a risk where the gas line is above ground. (*Id.*)  Such a scenario could exacerbate wildfire, public safety, and biological resources risks posed by the Project.



Figure 4. The Gas Company high-pressure gas line in dense vegetation adjacent to Ortega Trail in Gaviota State Park. Brian Trautwein. September 14, 2021.

---

[71] The FSEIR at 4.2-4 notes that climate change increases wildfire risks but then fails to apply this relevant information in its discussion of tanker-caused wildfire impacts on biological resources.



Figure 5. This exposed segment of The Gas Company high-pressure gas line is located in dense vegetation approximately five hundred feet from Highway 101. Google Earth. February 27, 2021.

2.      <u>The FSEIR Does not Sufficiently Address the Impacts of Fuel Spills along the Trucking Routes.</u>

The FSEIR omits the impacts of diesel fuel spills resulting from tanker truck accidents along the trucking routes. Diesel spills have the potential to occur during both legs of each round trip (i.e., 136 trips per day to and from the Pentland Terminal). Each truck would have diesel fuel tanks with a capacity of between approximately 125 and 300 gallons.[72] Special-status species, sensitive habitats, and rare vegetation communities occur along the trucking routes as discussed below. In the event of tanker truck accidents, even if no crude oil spills, diesel fuel, radiator fluid, and other automotive fluids could spill and enter creeks, sensitive habitats, or rare vegetation communities, and could threaten special-status species. The FSEIR is deficient for omitting the biological impacts of diesel fuel and automotive fluid spills.

3.      <u>The Hazardous Materials and Risk of Upset Section's Environmental Setting Omits Information Regarding Special-status Plant and Animal Species, Vegetation Communities, and Sensitive Habitats Which May be Harmed by the Project.</u>

The FSEIR's discussion of the biological resources baseline is insufficient.  The discussion is limited to available data derived from "the database query." (FSEIR at 4.3-15) The databases queried, however, provide incomplete information about the species present along the haul route.  Therefore, the FSEIR provides only an estimate of the biological baseline. In fact, the FSEIR states, "It is possible that additional sensitive biological resources that are not currently identified in the various databases used in this study could be present along various sections of the proposed truck routes." (FSEIR at 4.3-14) These additional resources are omitted

---

[72] Staff Writer, Reference Website, *How Many Gallons Does a Semi Truck Hold?* available at <u>https://www.reference.com/world-view/many-gallons-semi-truck-hold-bbf037d6669bd7b0</u> (April 5, 2020).

due to the FSEIR's reliance on incomplete databases and due to the lack of biological surveys along the route.

>   a.   *The One-half Mile Area of Influence is Insufficient to Capture Biological Resources at Risk Due to Project Impacts.*

In Response to Comment EDC-37, "Section 4.3.1.4 Biological Resources along the Trucking Routes has been edited to increase the area of influence to include a ½ mile on either side of the proposed haul route." (FSEIR at 3-671) However, given the omission of proper biological surveys in this half mile area as discussed below, the FSEIR environmental baseline is incomplete and deficient.  It relies on databases which include only those species previously reported rather than all special-status species and habitats present.

In addition, a half mile is insufficient because spills entering rivers or creeks can spread at least two miles, such as the March 21, 2020, spill into the Cuyama River. (FSEIR Figure 4.3-2 at 4.3-10; *See also* FSEIR at 4.3-9) Had the same spill occurred near other creeks or rivers flowing perpendicular to the route (e.g., Suey Creek, Santa Ynez River, or Santa Maria River), the oil could travel well beyond the half mile area.

The FSEIR fails to analyze impacts to biological resources in rivers and creeks beyond a half mile downstream from the route.  The FSEIR states:

>   Should an oil spill occur that enters a perennial stream or major drainage, there could be impacts to water quality and the aquatic habitat. Some of the creeks that could be affected by an oil spill flow into major waterways such as the Santa Ynez River, Cuyama River, Santa Maria River, and Twitchell Reservoir. If the oil spill occurred during the periods when these creeks were flowing, it is possible that oil could enter these major waterways and impact biological and water resources. Spills that enter these types of waterways could spread into sensitive habitats and could substantially degrade their value, with potential long-term impacts to biological resources. (FSEIR at 4.3-57)

However, because it omits the biological resources in and along waterways beyond a half mile from the route, the FSEIR omits impacts to the waterways' biological resources located over a half mile downstream from the route.  The FSEIR is flawed for omitting baseline biological resources beyond a half mile of the route and failing to analyze impacts to those resources in locations where spilled oil could travel beyond the half mile distance used in the FEIR's deficient biological resource impact analysis.

Furthermore, a half mile area is inadequate due to the potential for wildfire spread from a tanker accident. Wildfires can travel miles in just a few hours.[73] "Less than 20 minutes later, the

---

[73] Judith Dale, *Wildfires in Santa Barbara County, 2008 to 2015* available at https://lompocrecord.com/lifestyles/columnist/judith-dale-wildfires-in-santa-barbara-county-2008-to-2015/article_c082070f-7f7a-5a87-b8ff-ceb4357c21e5.html (October 24, 2020); *See also* Wikipedia, *Thomas Fire*

fire had traveled over 2 miles (3.2 km)."[74] Several special-status plant species absent within a half mile occur within ten kilometers and would be at risk due to tanker-caused wildfires. (See Figures 6 – 17)  The FSEIR must consider the sensitive biological resources threatened by wildfires sparked by tanker accidents, including a reasonable area of influence of at least two miles from points of origin along the trucking routes.

> b.   *Addition of Several Omitted Species Does Not Render the FSEIR Biological Baseline Adequate for the Purposes of Environmental Review.*

The Response to Comment EDC-37 notes that, "The biological resources section has been edited to include information along the haul route, including species and habitats, provided in the comments." (FSEIR at 3-671) While the addition of some of the omitted species and habitats is an improvement, the species and habitats provided in the comments were merely examples of omissions identified by EDC's research. A substantial number of species are still omitted. The lead agency must ensure that proper surveys are undertaken to document special-status species, sensitive habitats, and rare vegetation communities which are threatened by spills and wildfires caused by tanker accidents. Without surveys for sensitive biological resources along the routes, it is impossible for the FSEIR to identify and disclose impacts to those resources.  As a result, the FSEIR's analysis is systemically flawed as discussed below.

> c.   *The FSEIR Improperly Omits Protocol-level and Focused Surveys for Special-status Species.*

Protocol-level and focused surveys[75] for special-status species and sensitive natural communities were not conducted for the FSEIR, leading to significant omissions of biological resources impacted by the Project. Such surveys are necessary to document the locations of special-status species and communities to inform the FSEIR's evaluation of biological impacts. In scoping comments on the Bureau of Land Management's ("BLM") Supplemental Environmental Impact Statement ("EIS") for hydraulic fracturing on oil and gas leases, the Santa Barbara County Planning and Development Department ("P&D") asserted that protocol-level surveys for special-status plant and wildlife species were required to inform the Draft EIS' impact analysis. The P&D Director wrote to BLM that, "In order to fully disclose the Project's

---

available at
https://en.wikipedia.org/wiki/Thomas_Fire#:~:text=It%20burned%20approximately%20281%1C893%20acres,Calif ornia%20history%20at%20the%20time.&text=By%20January%202%2C%202018%2C%20the,over%20104%2C60 7%20residents%20to%20evacuate (April 7, 2021); *See also* Robert Bernstein, Santa Barbara EdHat, *Painted Cave Fire 30th Anniversary* available at https://www.edhat.com/news/painted-cave-fire-30th-anniversary (June 27, 2020); *See also* Wikipedia (2021).
[74] Wikipedia (2021).
[75] Protocol-level surveys involve species-specific methodologies which have been approved by the California Department of Fish and Wildlife ("CDFW") and the U.S. Fish and Wildlife Service ("USFWS"). *See e.g.*, CDFW Survey Monitoring Protocols Guidelines available at https://wildlife.ca.gov/Conservation/Survey-Protocols (August 20, 2021); *See also* California Natural Resources Agency Department of Fish and Wildlife, *Protocols for Surveying and Evaluating Impacts to Special Status Native Plant Populations and Sensitive Natural Communities, State of California* (March 20, 2018).

potentially significant impacts on biological resources as required by NEPA, the EIS must… Conduct Protocol-level Surveys for Special-status Plant and Animal Species Prior to release of the EIS."[76] The Director informed BLM that, "Reconnaissance-level surveys are inadequate to establish the biological baseline for the EIS."[77] However, contravening its comments regarding the scope of the BLM's EIS, the County did not undertake protocol-level (or even reconnaissance-level[78]) surveys for the FSEIR.  It is inappropriate for the County to tell BLM that protocol-level surveys are needed for BLM's Draft EIS, but to find that protocol-level surveys are not necessary for the County's FSEIR.  Therefore, without conducting field surveys, including protocol-level and focused surveys to identify the locations of special-status species and sensitive vegetation communities, the FSEIR fails to properly describe the Project's environmental baseline conditions and is substantively flawed.

> i.   The FSEIR Improperly Relies on the CDFW's Natural Diversity Database ("CNDDB") and U.S. Geological Survey's Biodiversity Information Serving Our Nation ("BISON") Instead of Conducting Protocol-level Surveys for Special-status Plant and Animal Species.

The FSEIR relies on the CNDDB and BISON to inform the Project's baseline with respect to the presence of special-status plant and animal species. (FSEIR at 4.3-14 - 15 and Figures 4.3-4 and 4.3-5 at FSEIR 4.3-17 - 18) While the CNDDB is a useful tool, it includes only species occurrences which have been reported to CDFW. CNDDB is not intended to set forth complete information regarding the presence of special-status species to describe existing conditions in EIRs. Biological surveys and field verification are necessary "obligations" to document all special-status species. The CNDDB includes the following disclaimer language:

> We work very hard to keep the CNDDB and the Spotted Owl Database as current and up-to-date as possible given our capabilities and resources.  However, *we cannot and do not portray the CNDDB as an exhaustive and comprehensive inventory of all rare species and natural communities statewide.  Field verification for the presence or absence of sensitive species will always be an important obligation of our customers*.[79]  (*Emphasis added*.)

However, the County has not undertaken field verification surveys for the FSEIR.

---

[76] Letter from Dianne Black, Director, P&D, to Bureau of Land Management Bakersfield Field Office Re: Scoping Comments for the Bakersfield RMP Hydraulic Fracturing Analysis Project at p. 3. (September 7, 2018)  (Attachment D.)

[77] *Id*.

[78] Reconnaissance-level surveys involve biologists walking a site and recording species observed and do not entail more detailed, species-specific focused and protocol-level survey methods approved by state and federal resource agencies.

[79] California Department of Fish and Wildlife, *California Natural Diversity Database*. https://www.wildlife.ca.gov/Data/CNDDB/About (August 26, 2021).

Similarly, BISON data is not intended to be comprehensive and does not guarantee that special-status species not included in BISON are absent:

> BISON does not include observations of the absence of species (or species absence data). And *the absence of georeferenced or non-georeferenced species occurrence (presence) data in BISON does not prove or indicate the absence of that species…* In order for species absence data to be useful, detailed information about the sampling methods used to collect the data must be known and incorporated into any interpretation of the data in a statistically defensible way.[80] (*Emphasis added.*)

BLM Biologist and Information Scientist Annie Simpson emphasizes the need to conduct field surveys to supplement BISON data, stating:

> While BISON is intended to be as complete a database as possible (including all species in the US, its territories, and Canada), no species mapping application can ever be considered complete. Species are constantly being discovered and renamed. Areas that have received less scientific examination due to a number of factors (including difficult access) will have many species that are absent or underrepresented. Species that are less charismatic, very small, and/or with difficult taxonomy are also absent or underrepresented from BISON but may actually occur there.

> … it is recommended that, when assessing impacts of a development project in a specific area, field surveys should supplement the data in BISON. It is also recommended, because the current iteration of BISON at https://bison.usgs.gov reflects data collected only through mid-2017, that other biodiversity datasets, such as GBIF (https://www.gbif.org) and locally collected datasets, if available, be consulted for supplementary information. And, if your study is seeking absence data, BISON does not offer that kind of information because of the difficulty in standardizing absence data.[81]

> ii.     BISON and CNDDB Omit Two Rare Species Documented During Assessment and Cleanup of the 2020 Cuyama River Oil Tanker Spill.

As an example of the limited utility of CNDDB and BISON to gauge oil spill and wildfire impacts on special-status species, FSEIR Figure 4.3-2 depicts the location of the 2020 oil tanker accident and crude oil spill in the Cuyama River. (FSEIR at 4.3-10) Table 4.3-5 lists oiled California Species of Special Concern western pond turtle and federally threatened California red-legged frog at the spill location. (FSEIR at 4.3-13) However, neither Figure 4.3-6

---

[80] United States Geological Survey, BISON Website available at https://bison.usgs.gov/#help (August 24, 2021).
[81] Email from Annie Simpson, Biologist and Information Scientist, BLM, to Brian Trautwein, Environmental Analyst / Watershed Program Coordinator, EDC (August 26, 2021).

(CNDDB Wildlife Occurrences within ½ mile of the Trucking Routes) or Figure 4.3-7 (BISON Federal and State Listed Wildlife Occurrences within ½ mile of the Trucking Routes) show these species as present at the location of the 2020 spill.[82] The omission of these occurrences from CNDDB and BISON demonstrates the limitations of these databases, thereby highlighting the need for surveys and field verification to establish an adequate baseline for the FSEIR.

Similarly, as discussed in more detail below, CNDDB, BISON, and the FSEIR omit arroyo chub which is a California species of special concern occurring in Gaviota Creek, the Santa Ynez River, the Santa Maria River, and the Cuyama River. Field surveys would have readily identified this species to inform the FSEIR's analysis, but were not undertaken.

Therefore, the FSEIR cannot rely on CNDDB and BISON without the necessary focused and protocol-level surveys to inform the FSEIR's environmental setting. Without such surveys, the FSEIR remains incomplete and deficient with respect to the presence and absence of special-status plant and animal species in the Project vicinity.

       iii.    The BISON Data Adds Little New Information Not Included in CNDDB and Does Not Replace the Need to Conduct Field Surveys.

The BISON database overlaps substantially with the CNDDB database. Comparing Figures 4.3-3 and 4.3-4, half of the data in BISON is already captured in CNDDB.[83] The BISON Botanical Occurrences Dataset provides only six unique data points not contained in the CNDDB database, compared to CNDDB's forty-seven datapoints. The addition of the BISON dataset does not cure the substantial deficiency caused by reliance on CNDDB in lieu of protocol-level and focused plant surveys along the haul routes where oil spills and wildfires would threaten rare plant resources. Absent such surveys, the FSEIR remains substantively deficient.

       iv.    The FSEIR's Omission of Protocol-level and Focused Surveys Does Not Adhere to the County's Guidelines for Preparing EIRs.

The County's CEQA Thresholds and Guidelines Manual describes how EIRs should be prepared to properly evaluate and classify environmental impacts. The Manual directs the preparation of biological surveys for EIRs on projects which may harm sensitive plant or wildlife species. "The biological survey could be completed as part of an EIR or it could be used to develop a Mitigated Negative Declaration as provided for by CEQA Section 15070."[84] The FSEIR finds that, "As required by the Santa Barbara County Environmental Thresholds and

---

[82] California red-legged frog is mapped in BISON (FSEIR Figure 4.3-7) as occurring in the Cuyama River approximately five miles downstream from the spill location mapped in Figure 4.3-2.

[83] Six of twelve unique data points in BISON are disclosed in CNDDB. Occurrence of a species is considered unique in this analysis if it is greater than one mile away from the nearest occurrence of that species.

[84] Santa Barbara County CEQA Thresholds and Guidelines Manual, Biological Resources Appendix A at A-5. (Revised January 2021) ("Santa Barbara County (2021)").

[84] Id. at A-5.

Guidelines Manual, it is appropriate to conduct a biological survey if adequate information for the impact is lacking." (FSEIR at 3-671) However, Appendix A of the Guidelines Manual, *Section B, Biological Survey Guidelines #3, Guidelines for Preparation of Biological Survey Reports (a), When to conduct a biological survey* states in full:

> It is appropriate to conduct a biological field survey to determine if, or the extent to which, sensitive plants or animals or a habitat of concern will be affected by a proposed project when: (1) Based upon an initial biological assessment, it appears that the project may damage potential special status plant or animal habitats; (2) Special status species have historically been identified on the project site and adequate information for impact assessment is lacking; or (3) No initial biological assessment by the Planning and Development Department biologist has been conducted and it is not known which habitats or the quality of habitats exist on the site, nor what the potential impacts of the project may be.[85]

Given that (1) there may be damage to potential special-status plant and animal species, and (2) special status species have been identified along the haul route but adequate information, i.e., distributions and locations within the area of influence along the haul routes is lacking,[86] it is appropriate and necessary to conduct a biological survey within the area of influence along the haul routes.[87]

First, data points along the haul routes are limited to where rare species have been reported and do not reflect the actual distributions of the rare species along the entire haul routes. For example, Figures 4.3-6 and 4.3-7 omit California red-legged frogs and western pond turtles previously identified at the 2020 oil tanker spill in the Cuyama River. Protocol-level surveys would have documented the species in this location.

Second, while the area of influence is currently proposed as one-half mile on either side of the haul routes, the CNDDB and BISON data points are all located adjacent to the haul routes and do not extend outward one-half mile. Furthermore, wildfires can easily spread over two miles from ignition sources along the haul routes, but as evidenced by Figures 4.3-4 – 4.3-7, data is limited to immediately adjacent to the haul routes and is otherwise lacking within a two-mile radius of the haul routes. Therefore, it appears that "that the project may damage potential special status plant or animal habitats," and "special status species have historically been identified on the project site and adequate information for impact assessment is lacking"[88] beyond the area immediately adjacent to the haul routes.

---

[85] *Id.* at A-7.
[86] As discussed above CNDDB and BISON provide limited datasets of species that have been identified where surveyed and reported at specific locations along portions of the routes, but field verification is necessary to ascertain the species' distributions along the route.
[87] Santa Barbara County (2021) at A-5 – A-7.
[88] *Id.* at A-7.

The FSEIR discloses only those special-status plants and animals at the Project site which were identified and reported to CNDDB and BISON. Information in the FSEIR is limited to available data and is merely an estimate of the biological baseline. The FSEIR states, "It is possible that additional sensitive biological resources that are not currently identified in the various databases used in this study could be present along various sections of the proposed truck routes." (FSEIR at 4.3-14) Given that some special-status species are known to occur adjacent to the haul routes based on limited databases but that the full extent of the species' distributions are not well-established, and that other sensitive biological resources are likely to occur along the routes, the County's Guidelines for preparing EIRs require biological surveys to identify special-status species threatened by the Project.

The Manual provides specific direction for conducting biological surveys, including qualifications for biologists to conduct field surveys, timing of surveys, and methods. For example, the County's CEQA Guidelines direct biological surveys to "be conducted using systematic field techniques in all habitats of the site to ensure a reasonably thorough coverage of potential impact areas."[89] The County's Manual also requires "a detailed description of the survey methodology," "the names of field investigators," and "the dates and times of field visits."[90] However, the FSEIR does not disclose survey methods, the names of field investigators, or the dates and times of field visits because none were undertaken. The FSEIR instead relies on limited available data.

The Guidelines describe the necessary timing of field surveys to document certain special-status plants and animals that may only be identifiable during narrow windows. "Investigations should be conducted at the proper season and time of day when special status species are both evident and identifiable. Field surveys should be scheduled to coincide with known flowering periods, and/or during periods of phenological development that are necessary to identify plants of concern, and during periods critical to the species such as nesting for birds or larval development for amphibians."[91] However, surveys were not scheduled for times when special-status species are identifiable because no surveys were undertaken. The lack of focused and protocol-level biological surveys to inform the FSEIR's biological resources baseline is inconsistent with the Manual and underscores a major deficiency in the FSEIR.

> d.   *The FSEIR Omits Twelve Special-status Plant Species Which Could be Impacted by the Project.*

The FSEIR's omission of protocol-level and focused field verification surveys and its reliance on CNDDB and BISON to identify special-status species results in the omission of several special-status plant species from the FSEIR's discussion in Section 4.3.1.4.

---

[89] *Id.* at A-8.
[90] *Id.* at A-8 – A-9.
[91] *Id.* at A-7.

The following special-status plants have been documented in the Project vicinity and could occur within the area of influence[92] but were omitted from the FSEIR:

| Common Name | Scientific Name | Status[93] |
|---|---|---|
| Red sand verbena[94] | *Abronia maritima* | CPRR 4.2 |
| Southern tarplant[95] | *Centromadia parryi* ssp. *Australis* | CRPR 1B.1 |
| Seaside bird's beak[96] | *Cordylanthus rigidus* ssp. *Littoralis* | CE/1B.1 |
| California saw-grass[97] | *Cladium californicum* | CRPR 2B.2 |
| Paniculate tarplant[98] | *Deinandra paniculate* | CRPR 4.2 |
| Saints' daisy[99] | *Erigeron sanctarum* | CRPR 4.2 |
| Southern California walnut[100] | *Juglans californica* | CRPR 4.2 |
| California prickly phlox[101] | *Leptodactylon californicum* | CRPR 4.2 |
| So. curly-leaved monardella[102] | *Monardella sinuata ssp. Sinuate* | CRPR 1B.2 |
| Curly-leaved monardella[103] | *Monardella undulata* | CRPR 1B.2 |

[92] Species occur within one half mile to four miles of Highway 101 haul route and may be impacted by wildfires sparked by tanker accident on haul routes.

[93] CRPR = California Rare Plant Rank as designated by CDFW and California Native Plant Society; CT = California Threatened Species; CE = California Endangered; FC = Federal Candidate Species; FE = Federal Endangered.

[94] CalFlora Website, *Red Sand Verbena Webpage* available at https://www.calflora.org/entry/observ.html?track=m&srch=t&cols=0,3,61,35,37,13,54,32,41&lpcli=t&taxon=Abronia+maritima&chk=t&cch=t&inat=r&cc=SBA (Figure 6) (August 23, 2021).

[95] CalFlora Website, *Southern Tarplant Webpage* available at https://www.calflora.org/app/taxon?crn=8895 (Figure 7) (August 24, 2021).

[96] Santa Barbara County (2018) at 4.6-11. See also CalFlora Website for mapped occurrences near Project Site (Figure 8).

[97] Santa Barbara County Planning and Development Department, Final EIR for ERG West Cat Canyon Revitalization Plan at 4.3-20 (February 2019) ("Santa Barbara County (2019)"); *See also e.g.*, CalFlora Website (Figure 9) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Cladium+californicum&chk=t&cch=t&inat=r&cc=SBA

[98] Santa Barbara County (2019) at 4.3-21; *See also* CalFlora Website (Figure 10) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Deinandra+paniculata&chk=t&cch=t&inat=r&cc=SBA

[99] Santa Barbara County (2019) at 4.3-21; *See also* CalFlora Website (Figure 11) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Erigeron+sanctarum&chk=t&cch=t&inat=r&cc=SBA

[100] Santa Barbara County (2019) at 4.3-22; *See also* CalFlora Website (Figure 12) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Juglans+californica&chk=t&cch=t&inat=r&cc=SBA

[101] Santa Barbara County (2019) at 4.3-22; *See also* CalFlora Website (Figure 13) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Leptodactylon+californicum&chk=t&cch=t&inat=r&cc=SBA

[102] Santa Barbara County (2019) at 4.3-22; *See also* CalFlora Website (Figure 14) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Monardella+sinuata+ssp.+sinuata&chk=t&cch=t&inat=r&cc=SBA

| Desert almond[104] | *Prunus fasciculata* | CRPR 4.3 |
| Ojai fritillary[105] | *Fritillaria ojaiensis* | CRPR 1B.2 |



Figure 6. Red sand verbena (*Abronia maritima*) Occurrences. CalFlora. August 23, 2021.



Figure 7. Southern tarplant (*Centromadia parryi ssp. Australis*) Occurrences. CalFlora. August 23, 2021.

---

[103] Santa Barbara County (2019) at 4.3-23; *See also* CalFlora Website (Figure 15) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Monardella+undulata&chk=t&cch=t&inat=r&cc=SBA

[104] Santa Barbara County (2019) at 4.3-23; *See also* CalFlora Website (Figure 16) for mapped occurrences near Project site:
https://www.calflora.org/entry/observ.html?track=m#srch=t&lpcli=t&taxon=Prunus+fasciculata&chk=t&cch=t&inat=r&cc=SBA

[105] Santa Barbara County (2019) at 4.3-21; *See also* Santa Barbara County (2016) at 4.6-11; *See also* CalFlora Website, *Ojai fritillary Webpage* https://www.calflora.org/app/taxon?crn=3638 (Figure 17) (August 24, 2021).



Figure 8. Seaside bird's beak (*Cordylanthus rigidus ssp. Littoralis*) Occurrences. CalFlora. August 23, 2021.



Figure 9. California sawgrass (*Cladium californicum*) Occurrences. CalFlora. August 23, 2021.



Figure 10. Paniculate tarplant (*Deinandra paniculate*). Occurrences. CalFlora. August 23, 2021.



Figure 11. Saint's daisy (*Erigonium sanctum*). Occurrences. CalFlora. August 23, 2021.



Figure 12. California walnut (*Juglans californica*). Occurrences. August 23, 2021.



Figure 13. California prickly phlox (*Leptodactylon californicum*). Occurrences. CalFlora. August 23, 2021.



Figure 14. Southern curly-leaved monardella (*Monardella sinuata* app. *sinuata*). Occurrences. CalFlora. August 23, 2021.



Figure 15. Curly-leaved monadella (*Monardella undulata*). Occurrences. CalFlora. August 23, 2021.



Figure 16. Desert almond (*Prunus fasciculata*). CalFlora. Occurrences. August 23, 2021.



Figure 17. Ojai fritillary (*Fritillaria ojaiensis*). Occurrences. CalFlora. August 23, 2021.

The FSEIR is inadequate because it omits the twelve rare plant species listed above. These species would be at risk due to oil spills and/or wildfires caused by the Project.

> e.     *The FSEIR Omits Arroyo Chub, a California Species of Special Concern Occurring in Gaviota Creek, Santa Ynez River, Santa Maria River, and Cuyama River Adjacent to Highway 101 and Route 166.*

The FSEIR's description of the Onshore Biological Resources Along Trucking Routes omits the arroyo chub (*Gila orcutti*), a California Species of Special Concern occurring in creeks and rivers along the trucking routes.[106] (FSEIR Table 4.3-7 at 4.3-19; *See also* FSEIR Figures 4.3-6 and 4.3-7 at 4.3-22 and 4.3-23) (Figure 18) The FSEIR purports to include "animal species of special concern to the CDFW" but omits this species. (FSEIR at 4.3-15)  While "populations exist outside the native range and are regarded as generally more secure," arroyo chub is a Species of Special Concern that occurs in Gaviota Creek, the Santa Ynez River, the Santa Maria River, and the Cuyama River.[107]  The Gaviota Creek pool pictured below currently supports arroyo chub within 105 feet from Highway 101. (Figure 19) Arroyo chub also occur in Gaviota Creek less than 100 feet from Highway 101.[108]

The FSEIR omits the Project's significant unavoidable impacts to arroyo chub.  Spills of crude oil, diesel fuel, radiator fluid, brake fluid, or other automotive fluids from tanker truck accidents pose a significant risk to this species in creeks and rivers along the Project routes. Arroyo chub is also highly susceptible to debris flows caused by fires sparked by tanker accidents on Highway 101 and Route 166:

> Hot brush fires are increasingly common within the range of arroyo chubs. While direct effects of fire on chubs are few, fires followed by heavy rain can create debris flows that can reduce chub populations and temporarily degrade habitats. While chubs are adapted to such conditions, increased frequency of severe fires that entirely eliminate large areas of decadent chaparral vegetation, leaving denuded steep slopes of highly friable soils, increases risk of harmful debris flows.[109]

---

[106] Ronnie Glick and Mary Sanvictores, California Department of Parks and Recreation ("CDPR"), *Gaviota Creek Fish Passage Enhancement Initial Study and Project Description* at 7 available at https://ecoatlas.org/upfiles/4269/Gaviota%20Creek%20Fish%20Passage%20Proposal.pdf (June 10, 1999) ("CDPR (1999)"); *See also* Lawrence E. Hunt, Hunt and Associates Biological Consulting Services, *Results Of Special-Status Surveys for Plants And Wildlife, Bosio/Cavaletto Ranches, Fish Passage Improvement Project, San Jose Creek, Goleta, Santa Barbara County, California* (September 8, 2017); *See also* California Department of Fish and Wildlife, *Arroyo Chubb, Gila orcutti (Eigenmann and Eigenmann)* at 2 available at FileHandler.ashx (ca.gov) (September 15, 2021) ("CDFW (2021)").
[107] CDFW (2021) at 1 - 2; *See also* CDPR (1999).
[108] Brian Trautwein. Environmental Analyst / Watershed Program Coordinator, EDC, personal observation (September 14, 2021).
[109] CDFW (2021) at 4.

The FSEIR is substantively deficient for omitting arroyo chub from the environmental baseline and impact analysis in Section 4.3.

Figure 18. Arroyo chub (*Gila orcutti*) in Gaviota Creek at Ortega Trail and Highway 101, Gaviota State Park. Brian Trautwein, EDC. September 14, 2021.



Figure 19. Location Map. Arroyo chub (*Gila Orcutti*) in Gaviota Creek. Google Earth. February 27, 2021.

f.      *The FSEIR fails to Adequately Describe Impacts to at Least Eight Special-status Mammal Species Which Could be Harmed by the Project.*

FSEIR Table 4.3-7 lists "other bat species" which may occur within areas impacted by oil spills and wildfires caused by tanker accidents, but fails to identify the bat species and their habitats where impacts could be significant. At least eight special-status bat species are omitted from the FSEIR including:

- Pallid bat (*Antrozous pallidus*)                      CSSC, WBWG
- Western mastiff bat (*Eumops perotis californicus*)[110]        CSSC, WBWG
- Silver haired bat (*Lasionycteris noctivagans*)          WBWG
- Western red bat (*Lasiurus blossevillii*)                 CSSC, WBWG
- Hoary bat (*Lasiurus cinereus*)                         WBWG
- Fringed myotis (*Myotis thysanodes*)                    WBWG
- Long-legged myotis (*Myotis volans*)                    WBWG
- Yuma myotis (*Myotis yumanensis*)                       WBWG

(FSEIR at 4.3-21)



Figure 20. Pallid bat distribution. Western Bat Working Group. http://www.wbwg.org. August 26, 2021.

---

[110] California Department of Fish and Wildlife, California Interagency Wildlife Task Group, California Wildlife Habitat Relationships System available at https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=2357 (August 25, 2021).



Figure 21. Hoary Bat Distribution. Montana Field Guide. 2007.



Figure 22. Fringed Myotis Distribution. Montana Field Guide. 2007.



Figure 23. Yuma Myotis Distribution. Montana Field Guide. 2007.

The FSEIR is deficient for omitting these rare wildlife species which could be impacted by oil spills and wildfires stemming from accidents along Highway 101.

g.      *The FSEIR Omits Biologically Sensitive Areas.*

i.      The FSEIR Omits Several Wetlands and Riparian Areas Located Along the Primary Trucking Route.

The FSEIR fails to disclose numerous wetlands and riparian areas located along the trucking route between Las Flores Canyon and Gaviota Creek within Santa Barbara County. FSEIR Figure 4.3-10 maps and Table 4.3-8 lists eleven "perennial streams, major drainages, and other water bodies" along the trucking route between and including Las Flores Canyon and Gaviota Creek. However, Figure 4.3-10 excludes approximately thirty of forty-one wetlands and riparian habitats mapped in this area as part of the 2016 Gaviota Coast Plan ("GCP") Final EIR.[111] (FSEIR Figure 4.3-10 at 4.3-29 and Table 4.3-8 at 4.3-28) The FSEIR mentions that there are "numerous smaller intermittent and ephemeral drainages" but does not disclose their locations, vegetation communities, or special-status species. The FSEIR is thus substantively deficient for not disclosing all forty-one wetlands and riparian within the area of influence between the LFC facility and Gaviota Creek.

---

[111] Santa Barbara County (2016) Figure 4.6-3a Existing Wetland and Riparian Areas at 4.6-17. Figure 4.6-3a derives information regarding wetlands and riparian areas from the National Wetlands Inventory.

The FSEIR relies on the National Wetlands Inventory ("NWI"). However, the NWI does not replace the need to conduct wetland delineations to properly define the baseline for the FSEIR.  The NWI includes "no attempt to define the limits of proprietary jurisdiction of any Federal, State, or local government, or to establish the geographical scope of the regulatory programs of government agencies."[112] The NWI includes the following disclaimer: "Persons intending to engage in activities involving modifications within or adjacent to wetland areas should seek the advice of appropriate federal, state, or local agencies concerning specified agency regulatory programs and proprietary jurisdictions that may affect such activities."[113] Therefore, while the NWI serves as a starting point for identifying jurisdictional wetlands (i.e., Army Corps of Engineers, Coastal Commission jurisdiction) it does not supplant the need to delineate wetlands to establish an adequate baseline for the FSEIR.

    ii.   The FSEIR Omits Named Streams Along the Proposed Highway 101 and Route 166 Trucking Routes.

The FSEIR purports to have added "stream names identified in the comments… to Table 4.3-8." (FSEIR at 3-673) However, it still omits at least two named creeks along the Route 166 route in Santa Barbara and San Luis Obispo Counties:

- Green Canyon Creek[114]
- Taylor Canyon Creek[115]

In addition, the route crosses over or within five hundred feet of unnamed springs in northern Santa Barbara County, including a mapped spring located five miles west by northwest of the town of New Cuyama.[116] Springs are uniquely valuable environmental features given the arid conditions and dearth of water sources for wildlife in the Cuyama Valley. These creeks and springs would be harmed by tanker accidents in their vicinity. In addition, a tanker-caused wildfire would cause indirect biological impacts, including sedimentation and water quality impacts in the creeks and springs. Therefore, these creeks and springs must be disclosed to establish an adequate baseline for the FSEIR.

Additional named creeks are omitted from the Highway 101 route west of the LFC facility, including:

- Canada de la Huerta

---

[112] US Fish and Wildlife Service, National Wetlands Inventory Website Frequently Asked Questions Webpage, https://www.fws.gov/wetlands/FAQs.html (August 23, 2021).
[113] *Id.*
[114] Department of Conservation, Division of Land Resource Protection, *Santa Barbara County Important Farmland 2016 Map* ftp://ftp.consrv.ca.gov/pub/dlrp/FMMP/pdf/2016/sba16.pdf (January 2018) ("Department of Conservation (2018)").
[115] Department of Conservation, Division of Land Resource Protection, *San Luis Obispo County Important Farmland 2016 Map* (February 2018). ftp://ftp.consrv.ca.gov/pub/dlrp/FMMP/pdf/2016/slo16.pdf
[116] Department of Conservation (2018).

- Canada de las Zorrillas and
- Canada Alcatraz.[117]

Each of these creeks contains oak riparian woodland vegetation community which constitute a distinct Environmentally Sensitive Habitat Area ("ESHA").[118] A spill or fire from a tanker accident in these areas would cause substantial biological direct and indirect impacts in these ESHAs. The FSEIR is deficient for not disclosing all named creeks and mapped springs which could be harmed by the Project along the trucking route.

iii.     The FSEIR Omits the Presence and Locations of ESHAs.

The FSEIR states, "A new figure (Figure 4.3-9) has been added to Section 4.3.1.4 to more clearly depict Critical Habitat and other Environmentally Sensitive Habitat Types." (FSEIR at 3-672) However, the FSEIR omits numerous types of ESHAs and does not map the locations of many ESHAs it does disclose. FSEIR page 4.3-25 cites to the GCP stating, "Gaviota area, the transportation route crosses 10 features labeled as ESHA, the majority of which are drainages within the Coastal Zone (See Figure 4.3-9)." However, the FSEIR makes two significant mistakes regarding identification of ESHA: (1) there are substantially more than ten ESHAs identified in the GCP along the trucking route in the Gaviota area, and (2) the FSEIR Figure 4.3-9 is limited to ESHAs which the route crosses and fails to disclose other nearby ESHAs that would be impacted by spills or wildfires. In addition, Figure 4.3-9 only maps riparian ESHAs and critical habitats for federally listed species. The FSEIR does not map or disclose the locations of most ESHAs,[119] including ESHAs near Highway 101 on the Gaviota Coast. Such unmapped GCP ESHAs include, but are not limited to, "rare and endangered species habitats, wetlands, streams, near shore reefs, tide pools, offshore rocks, … kelp beds, harbor seal rookeries and hauling out grounds, and seabird roosting and nesting areas." (FSEIR at 4.3-25)

The FSEIR also fails to disclose and map numerous native plant community ESHAs. The FSEIR identifies several sensitive plant communities which qualify as ESHA:

> … several plant communities identified as Natural Communities of Concern by the CDFW, as well as other natural habitats protected by agencies including Santa Barbara and San Luis Obispo Counties are present along the route. Riparian and aquatic habitats associated with streams and other wetland or riverine habitats crossed by or adjacent to the proposed trucking route are likely to support a diversity of common and special status birds, fish, amphibian, and invertebrate species. Several Natural Communities of Concern were identified, or are likely to be present along the route including, but not limited to: Southern coast live oak

---

[117] Santa Barbara County (2016) Figure 4.6-1a at 4.6-5.

[118] *Id.*

[119] Environmentally Sensitive Habitat Area is defined in the County Land Use Development Code at 11-21 as, "An area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem, and that could be easily disturbed or degraded by human activities and developments."

riparian forest; southern cottonwood willow riparian forest; South Coast riparian scrub; willow-dominated thickets; Southern vernal pools; valley needlegrass grassland; and valley saltbush scrub (CDFW 2019). (FSEIR at 4.3-25)

However, the FSEIR does not disclose the locations of several of these communities, including vernal pools, valley needlegrass grasslands, and valley saltbush scrub, as well as others identified in the GCP FEIR. For example, Table 4.6-1 of the GCP FEIR lists numerous ESHAs present in the GCP area which could be impacted by tanker spills and wildfires, but which are not mapped in the FSEIR, and most of which are not even listed in the FSEIR:

- Valley oak woodland (*Quercus lobata* Woodland Alliance)                          G3; S3
- Coast live oak woodlands (*Quercus agrifolia* Woodland Alliance)                  G5; S4
- California bay forest (*Umbellularia californica* Forest Alliance)                G4; S3
- Giant coreopsis scrub (*Coreopsis gigantean* Shrubland Alliance)                  G3; S3
- Bush monkeyflower scrub (*Diplacus aurantiacus* Shrubland Alliance)               G3; S3
- California brittle bush scrub (*Encelia californica* Shrubland Alliance)          G4; S3
- Sawtooth goldenbush scrub (*Hazardia squarrosa* Shrubland Alliance)               G3; S3
- Silver dune lupine-mock heather scrub (*Lupinus chamissonis-Ericameria ericoides* Shrubland Alliance)                                                                 G3; S3
- Lemonade berry scrub (*Rhus integrifolia* Shrubland Alliance)                     G3; S3
- White sage scrub (*Salvia apiana* Shrubland Alliance)                             G4; S3
- Dune mat (*Abronia latifolia-Ambrosia chamissonis* Herbaceous Alliance)           G3; S3
- Western rush marshes (*Juncus patens* Provisional Herbaceous Alliance)            G4; S4
- Giant wild rye grassland (*Leymus* (=*Elymus condensatus*) Herbaceous Alliance)   G3; S3
- Creeping rye grass turfs (*Leymus* (=*Elymus triticoides*) Herbaceous Alliance)   G4; S3
- Foothill needle grass grassland (*Nassella* (=*Stipa lepida*) Provisional Herbaceous Alliance)                                                                        G3; S3
- Purple needle grass grassland (*Nassella* (=*Stipa pulchra*) Herbaceous Alliance) G4; S3
- Meadow barley grassland (*Hordeum brachyantherum*) Herbaceous Alliance            G4; S3[120]

The GCP designates other native plant communities as ESHA but does not map all of them. These communities could be significantly harmed by wildfires caused by tanker accidents but are omitted from the FSEIR. For example, the GCP designates native chaparral and coastal scrub habitats as ESHA:

Native Chaparral and Coastal Scrub Habitats that are part of a large, contiguous area of native habitat, or rare Native Chaparral, Coastal Bluff Scrub, and Coastal Scrub Habitat.[121]

---

[120] Santa Barbara County (2016) at 4.6-22 and 4.6-12.
[121] Santa Barbara County Planning and Development Department, GCP Policy NS-4 (Coastal) at 2-17 (November 7, 2018) ("Santa Barbara County (2018)").

The FSEIR is substantively flawed because it purports to identify ESHAs along the haul routes but omits many types of ESHA. It also fails to describe the locations or map most of the ESHAs. These omissions underscore the importance of conducting focused and protocol-level surveys and including all ESHAs which may be harmed by oil spills or wildfires associated with trucking crude oil on the haul routes.

iv.    The FSEIR Omits Protected Trees Which Would be Threatened by the Project's Oil Spills and Wildfires.

Several species of native and nonnative trees are listed as Protected Trees in the GCP:

Policy NS-12: Protected Trees. (COASTAL) Existing trees shall be preserved to the maximum extent feasible, prioritizing "protected trees." Protected trees are defined for the purpose of this policy as mature native or roosting/nesting trees that do not pose a threat to health and safety. Protected trees include, but are not limited to:

- Oak (*Quercus agrifolia*)
- Sycamore (*Platanus racemosa*)
- Willow (*Salix* spp.)
- Maple (*Acer macrophyllum*).
- California Bay Laurel (*Umbellularia californica*)
- Cottonwood (*Populus* spp.)
- White Alder (*Alnus rhombifolia*)
- California Walnut (*Juglans californica*)
- Any tree serving as known or discovered raptor nesting and/or raptor roosting sites.
- Any trees serving as Monarch butterfly habitat, including aggregation sites.[122]

The FSEIR is deficient because it does not acknowledge, list, or map Protected Trees which could be substantially harmed by oil spills or wildfires originating along the trucking routes.

By omitting many special-status terrestrial and freshwater plant and animal species, sensitive habitats, and rare vegetation communities, the FSEIR fails to adequately apprise decisionmakers and the public regarding the full array of potential biological impacts from the proposed Project.

These omissions will also render the Oil Spill Contingency Plan deficient because the Plan will not include all potentially affected species, habitats, and ecologically important features.

---

[122] Santa Barbara County (2018) Policy NS-12 at 2-19.

4.      The FSEIR Understates the Potential Impacts of Oil Spills and Fires on Biological, Water, Cultural, and Marine Resources.

The FSEIR states that the "maximum spill from a truck would be about 160 barrels (6,720 gallons)," implying that this amount of spilled oil would be the maximum that would occur as a result of the proposed Project. (FSEIR at 4.3-57) However, the Project does not propose one truckload of crude oil. Instead, the Project proposes seventy truckloads of oil per day to Santa Maria (so long as the SMPS is available) and sixty-eight truckloads per day to Pentland. Just focusing on Pentland, the Project would allow 173,740 full truck trips over a seven-year period. With each truck carrying 6,720 gallons, that results in a total of 1,167,532,800 gallons of oil being transported on Highway 101 and Route 166 for the life of the Project.

It is certainly possible that more than one truck accident will occur due to this Project. According to the Figure 24 (below), there have been five tanker truck accidents along the route within the last seven years. Accordingly, the FSEIR should disclose that more than one truckload may spill, increasing the potential impacts.

5.      The FSEIR Fails to Identify Offshore Resources that Would be Adversely Impacted by Resumed Production from the SYU Platforms.

The SYU platforms are located in the Santa Barbara Channel, a region that includes ecological areas known for their global significance in part due to the Channel's location at the confluence of two major ocean currents. This results in high biodiversity, which includes hundreds of species that are not found anywhere else on the planet.[123] For this reason, in 1980 Congress established the Channel Islands National Park ("CINP") and Channel Islands Marine Sanctuary ("CINMS") offshore Santa Barbara County.[124] A 2005 Biogeographic Assessment of the CINMS and surrounding area emphasized the linkages between the CINMS and other areas of Southern California. The study notes the ecological significance of the region given that the overlap of "oceanographic processes in the region foster the transport of materials, such as nutrients and fish and invertebrate larvae, between the marine (islands) and coastal habitats and are primary food sources that support biological communities," which also coincides with abundance of species.[125]

---

[123] See, for example, Brian Segee & Elise O'Dea, *Dirty Water: Fracking Offshore California*, (2013), Available at http://www.environmentaldefensecenter.org/wp-content/uploads/2015/03/DirtyWater.pdf
[124] http://channelislands.noaa.gov/; http://www.nps.gov/chis/index.htm. For a detailed discussion of the biological and geographic attributes of the Santa Barbara Channel region, see NOAA's *A Biogeographic Assessment of the Channel Islands National Marine Sanctuary: A Review of Boundary Expansion Concepts for NOAA's National Marine Sanctuary Program*, NOAA Technical Memorandum NOS NCCOS 21, November 2005. Available at: https://repository.library.noaa.gov/view/noaa/2161.
[125] *A Biogeographic Assessment of the Channel Islands National Marine Sanctuary: A Review of Boundary Expansion Concepts for NOAA's National Marine Sanctuary Program*, NOAA Technical Memorandum NOS NCCOS 21, November 2005. Available at: https://repository.library.noaa.gov/view/noaa/2161.  (Attachment E.)

The CINMS and the State of California designated several MPAs around the Channel Islands,[126] followed by the protection of many more MPAs along the mainland coast of California.[127] A federal ecological preserve also exists offshore near the City of Santa Barbara.[128]

A National Park Service study completed in 2004 found that the Gaviota Coast area adjacent to the Santa Barbara Channel is "one of the rarest global biomes" and is "one of only five such locations in the world" in terms of its natural resources.[129] The study determined that the Gaviota Coast meets *all* four criteria utilized to evaluate the national significance of an area. Specifically, the study concluded that:

- The Gaviota Coast area possesses exceptional natural resources, including rare and endangered habitats, an estimated 1,400 species, and the "largest continuous stretch of rural coastal land in southern California and the healthiest remaining coastal ecosystem."

- The area also possesses exceptional cultural resources, including "some of the oldest and best-preserved Native America archeological sites in California spanning over 10,000 years," the historic Juan Bautista de Anza trail, and several nationally recognized historic sites.

- The area offers superlative opportunities for public enjoyment and scientific study.

- The area retains a high degree of integrity as a true, accurate, and relatively unspoiled example of a resource.[130]

The Santa Barbara Channel is home to several species that are listed under the Endangered Species Act ("ESA," 16 U.S.C. §§1531 *et seq.*) as threatened, endangered, candidate, or proposed, as well as species protected under the Marine Mammal Protection Act ("MMPA," 16 U.S.C. §§1361 *et seq.*). These species, such as blue whale, southern sea otter, black abalone, western snowy plover, tidewater goby, and many others, could be impacted by oil and gas development, including restarting the SYU platforms. In addition, this region includes critical habitat for multiple listed species.[131] For example, critical habitat for the endangered black abalone and western snowy plover includes locations on the mainland and Channel

---

[126] http://channelislands.noaa.gov/marineres/welcome.html.

[127] http://www.dfg.ca.gov/marine/mpa/.

[128] http://www.boem.gov/uploadedFiles/BOEM/Oil_and_Gas_Energy_Program/Leasing/Regional_Leasing/Pacific_Region/Leasing/santa-barbara-map.pdf.

[129] National Park Service, U.S. Department of the Interior. *Gaviota Coast Draft Feasibility Study & Environmental Assessment*. April 2003. See pp. 48-49. Attachment F.

[130] *Id*.

[131] NOAA Fisheries, Science and Data, West Coast Region. Accessed May 13, 2019. https://www.fisheries.noaa.gov/resources/data-and-maps?title=critical%20habitat&combine=All&field_species_vocab_target_id=region%5B1000001126%5D=1000001126&sort_by=created&0=1000001126&webdam_inserts=&1=1000001126&page=0

Islands.[132,133] These species and habitats are part of what makes this region unique and worthy of the multiple protections it has been awarded by federal and state agencies.[134,135]

The above described environmental setting has experienced significant impacts from oil development in the Santa Barbara Channel, including fracking, drilling activities, discharges, and oil spills.

In addition to the direct environmental risks, increased fossil fuel production and consumption will result in untenable climate change impacts.  Climate change will add stressors to the marine environment, including warmer water temperatures, ocean acidification, and disruptions of ecosystems.

The Santa Barbara Channel is also home to highly productive fisheries that provide benefits to our local communities and economies, including fishing, tourism, and recreation.  The Channel's National Park, Marine Sanctuary, as well as federal and state MPAs, are large economic drivers for coastal states that offer visitor opportunities for non-consumptive activities, such as sailing, whale watching, kayaking, diving, surfing, and sightseeing, and support businesses such as hotels, restaurants, and transportation, to name a few.  In addition, Native American tribes, such as the Chumash, use tomols to cross the Santa Barbara Channel to reach the Channel Islands and use the ocean for subsistence fishing.[136]  The potential environmental impacts of restarting the SYU platforms, such as unintended spills or pollutants, will threaten these uses.

Santa Barbara County has experienced our share of oil spills, starting with the infamous 1969 oil spill, and continuing with the 1994 Ellwood pipeline spill, 1997 Platform Irene pipeline spill, and the more recent 2015 Plains All American pipeline spill. These spills kill marine mammals, fish, birds, and other sea life; destroy marine and coastal habitats; harm endangered and threatened species; shut down commercial and recreational fishing; devastate tourism and recreation; and pose environmental and public health risks. The full impact of an offshore oil spill is never known because most of the oil is not recovered and remains in the marine environment for decades.

---

[132] Federal Register. 2011. Endangered and threatened wildlife and plants: final rulemaking to designate Critical habitat for black abalone. 76 Federal Register 208. (27 October 2011), pp. 66806 -66804. Available at: https://www.westcoast.fisheries.noaa.gov/publications/protected_species/other/abalone_species/Black%20Abalone %20critical%20habitat/76fr66806_2011_blackabalone_ch_fr.pdf

[133] Federal Register. 2012. Endangered and threatened wildlife and plants; revised designation of Critical Habitat for the Pacific Coast population of the western snowy plover; Final Rule. 77 Federal Register 118. (19 June 2012), pp 36728-36869. Available at: https://www.govinfo.gov/content/pkg/FR-2012-06-19/pdf/2012-13886.pdf

[134] A more detailed list of endangered species in California can be found via the US FWS: https://ecos.fws.gov/ecp0/reports/species-listed-by-state-report?state=CA&status=listed

[135] A more detailed list of endangered species on the West coast can be found via NOAA: https://www.fisheries.noaa.gov/species-directory?species_title=&field_species_categories_vocab_target_id=All&field_region_vocab_target_id=100000112 6

[136] https://www.nps.gov/chis/learn/historyculture/tomolcrossing.htm.

The 2015 Refugio Oil Spill on the Gaviota Coast impacted the marine environment as well as coastal areas from Santa Barbara County to Orange County and the Channel Islands. Many species were impacted, including birds (e.g., brown pelican, snowy plover), marine mammals (e.g., California sea lion, long-beaked common dolphin), fishes (e.g., surf perch), and marine invertebrates (e.g., spiny lobster).[137] Key fishing areas were closed from Cañada de Alegria to Coal Oil Point up to six miles offshore, and two popular state beach parks, Refugio and El Capitan, were closed during a busy holiday weekend, and remained closed for over a month. Six class action lawsuits were filed in response to the spill on behalf of members of the fishing and tourism industries, platform workers, and property owners.[138] Any spill resulting from restarting the SYU platforms would likely result in similar (if not greater) impacts.

In sum, the FSEIR is deficient because it fails to adequately assess the significant threats to resources, both on- and offshore, that would result from the proposed Project.

### G.    The FSEIR Fails to Disclose All Air Quality Impacts.

The FSEIR fails to disclose impacts from all aspects of the proposed Project, including the restart of the SYU platforms and LFC processing facility.  The impact analysis also suffers from the improper baseline, incomplete cumulative project list, and inadequate mitigation measures.

As discussed above, the FSEIR must disclose emissions from the restart of the SYU and LFC operations, in addition to the proposed trucking operations. The baseline against which Project emissions are analyzed must reflect the existing physical conditions – in other words, the lack of operations at the SYU platforms and LFC processing facility.  Instead, the FSEIR compares Project emissions to prior operations and concludes that Project emissions will be less than the baseline. (FSEIR at 4.1-32) This conclusion is misleading, as it informs the decisionmakers and public that resuming production from the SYU platforms would not cause any impacts to air quality, when in fact such activity will significantly affect existing air quality. These operations will result in substantial emissions of criteria pollutants, toxic air pollutants, and GHGs.

In fact, the FSEIR shows that the Project emissions will exceed County thresholds. According to the FSEIR, the threshold in the County's New Source Review Rule is 55 lbs/day for ROC, NOx, and SOx, and 80 lbs/day for PM.  (FSEIR at 4.1-19) Table 4.1-19 shows that the emissions for the SYU restart and trucking operations amount to 1,506 lbs/day for ROC, 907 lbs/day for NOx, 262 lbs/day for SOx, 273 lbs/day for $PM_{10}$, and 234 lbs/day for $PM_{2.5}$. (FSEIR at 4.1-32)  Each of these totals is exponentially greater than the County's significance threshold.

---

[137] Refugio Beach Oil Spill Final Damage and Restoration Plan/Environmental Assessment (June 2021); available at https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=193144&inline.
[138] *See* Consolidated Complaint, *Stace Cheverez v. Plains All American Pipeline, LP*, 2:15-cv-04113 (C.D. Cal. Dec. 15, 2015).

Despite these significant exceedances of air quality thresholds, the FSEIR concludes that the impact will be below baseline (thus insignificant). As discussed above, the baseline against which Project impacts must be evaluated is the current physical condition of the facilities. Restarting the platforms will increase, not decrease, emissions in comparison to the baseline. The Project will result in ROC emissions more than *twenty-seven times* the significance threshold, NOx emissions more than *sixteen times* the threshold, SOx emissions almost *five times* the threshold, and PM emissions approximately *three times* the threshold. The FSEIR does not propose any mitigation for these emissions, which means that the Project will result in Class I impacts to public health and the environment.

Even limiting review to the trucking portion of the Project, the FSEIR shows that trucking to Pentland will exceed County thresholds for NOx, ***more than doubling*** the allowed mobile source emissions threshold. (FSEIR at 4.1-25, Table 4.1-14.) Nevertheless, the FSEIR concludes that the impact will be less than significant with mitigation. The mitigation, however, is illusory and inadequate because it defers the preparation of a Trucking Emissions Management Plan. (FSEIR at 4.1-25 – 26: Mitigation Measure AQ-1) Although some options are provided, the FSEIR does not analyze which options are feasible, how effective they would be, and what the level of residual emissions would be. Nor is there a requirement to incorporate any specific mitigation measure(s). As such, there is no evidence to support the conclusion that NOx-related air quality impacts will be mitigated to less than significant. CEQA requires that proposed mitigation must be certain, feasible, and enforceable. Pub. Res. Code § 21081.6(b); CEQA Guidelines § 15126.4(a)(2); *Federation of Hillside and Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1261-62. Proposed Mitigation Measure AQ-1 fails to meet this requirement or ensure adequate mitigation.

The FSEIR must also analyze the life cycle impacts of the Project, including impacts caused by refining, transporting, storing, and consuming the oil and gas produced and trucked from the SYU.

Finally, as discussed above, the list of cumulative projects and analysis of cumulative impacts is incomplete. In addition, the FSEIR assumes that all other projects would mitigate emissions to meet applicable thresholds, without any supporting evidence. (FSEIR at 4.1-33) The FSEIR must be revised to provide a complete and accurate description and analysis of all potential cumulative air quality impacts. Such analysis must also analyze whether there is any evidence that such impacts would be mitigated by specific, feasible, and enforceable mitigation measures.

## H.     Climate Change is a Significant Cumulative Impact That Must be Thoroughly Disclosed in the FSEIR.

In 2010, the CEQA Guidelines were updated to ensure that lead agencies analyze "the reasonably foreseeable incremental contribution of the project's emissions to the effects of climate change. A project's incremental contribution may be cumulatively considerable even it if appears relatively small compared to stateside, national or global emissions." CEQA Guidelines § 15064.4(b). Lead agencies "shall make a good-faith effort, based to the extent possible on

scientific and factual data to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project." CEQA Guidelines § 15064.4(a).

As with any fossil fuel development project, one of most troubling impacts is the exacerbation of already unsustainable climate change. The proposed restart of the SYU and LFC facilities will generate the majority of the GHG emissions from the Project, however, the FSEIR improperly considers these emissions to be part of the baseline. This error grossly understates the magnitude of GHG emissions from the Project and the resulting effect on climate change. The FSEIR fails to acknowledge that if the Project is denied, these emissions will not occur. In addition, as a result of this omission, the FSEIR does not require any mitigation of these emissions, which will contribute to an unsustainable threat to our climate. Finally, the FSEIR defers mitigation of the emissions that will result from the trucking portion of the Project, which is contrary to the requirement of CEQA that mitigation measures be known, certain, feasible, and enforceable.

1.     The 2021 Report by the Intergovernmental Panel on Climate Change Confirms the Dire Need to Address Climate Change Immediately.

The United Nation's Intergovernmental Panel on Climate Change ("IPCC") released its most recent report in August of 2021. This report outlines the significance of anthropogenic climate change and the many ways it will continue to impact the environment. This report reiterates the "unequivocal" evidence that human activities have influenced climate change. (SPM[139]-5) Global temperatures have risen, global precipitation has likely increased, ocean temperature and sea level have risen, and climate zones have been altered. The report also covers the potential climate futures, while considering a decrease in emissions of greenhouse gases, and assesses long-term risk.

*a.     Current State of the Climate*

Assessment Report 6 (AR6) incorporates newer data and extends warming timelines beyond the previous reports. The findings strongly caution the irreversibility and immediacy of environmental impacts as a result of human activity. The report discloses that levels of carbon dioxide ($CO_2$) have reached an annual average of 410ppm, increasing consistently since 2011. (SPM-5) The language utilized in this report suggest that human-influence on climate change is unmistakable and undeniable. In 2019, carbon dioxide levels surpassed any level in the previous two million years, while methane and nitrous oxide surpassed any concentration in the previous 800,000 years. (SPM-9)

The new report contains updated evidence and scientifically based measurements of changes to the climate from "paleoclimate archives." (SPM-5) This updated research reinforces previous claims that changes to the climate are significant and result from human activity. Since 1750, concentrations of carbon dioxide and other greenhouse gases have exceeded historical levels. Human activities have influenced climate change, and warming of the climate, unlike any

---

[139] SPM stands for Summary for Policymakers.

rate of change studied in the past thousands of years. (SPM-7) From the year 2000-2020, global mean surface temperature was almost 1ºC higher than the global surface temperature from 1850-1900. (SPM-5) AR6 estimates from 1850-1900 to 2010-2019, the total global surface temperature increased by 1.07ºC. The main driver of this warming is GHGs.

In the previous ten years, Artic Sea Ice has diminished to reach its lowest levels. The recent report describes the retreating of these ice caps as "unprecedented." (SPM-9) Additionally, global sea level has risen at an exponentially faster rate, since 1900, than in the previous 3,000 years. (SPM-9) Furthermore, open ocean pH has reached levels inconsistent with natural changes in the past two million years. (SPM-9)

b.      *Weather Patterns and Climate Extremes*

Assessment Report 6 states that "it is *virtually certain* that hot extremes (including heatwaves) have become more frequent and more intense across most land regions since the 1950s, while cold extremes (including cold waves) have become less frequent and less severe, with *high confidence* that human-induced climate change is the main driver of these changes." (SPM-10) (emphasis in original).

Human influence is also certain to have impacted marine heat waves, agricultural and ecological droughts, fires, compound flooding as well as changes to precipitation levels. (SPM-11) For example, an increase of precipitation, as well as the intensification of precipitation, has been observed to be impacted by human-induced climate change. (SPM-10) Additionally, although previous declines in monsoon precipitation resulted from the cooling influence of more prevalent aerosol emissions, recent increases of GHG emissions have reversed this effect and have increased global land monsoon precipitation levels. (SPM-10)

c.      *Fossil Fuels and Emissions*

Human impact on global temperature rise and an increase of greenhouse gases in the atmosphere are heavily influenced by the burning of fossil fuels. Within the past decade, 86% of total carbon dioxide emissions resulted from fossil fuels. (TS[140]-46) Fossil fuel production is one of the most responsible sectors for contributing to overall warming. As GHG emissions and climate warming increase, impact-drivers will continue to worsen. While many effects of these emissions, such as melting glaciers, are irreversible, there is agency to respond prior to the development of larger impacts and a worsening of the current climate. (SPM-28)

d.      *Climate Future*

The 2021 IPCC Report was the first to assess future impacts and changes to surface temperature, sea level rise, and ocean warming utilizing "multi-model projections with observational constraints based on past simulated warming, as well as the AR6 assessment of climate sensitivity." (SPM-15) It is reported that the effects of climate change will continue to

---

[140] TS stands for Technical Summary.

expand and grow larger with future increased warming. For example, global average surface temperature and ocean temperature will continue to warm and climate patterns, such as the intensity and frequency of precipitation, will become consistently more extreme. (SPM-20) Many effects of climate change are irreversible, for example sea level rise is committed to continuing for centuries. This is consistent with previous warming periods. (SPM-28)

Global average temperature has reached 1.09 degrees Celsius and AR6 reports that without dramatic decreases in reliance on fossil fuels, as well as other activities which result in emissions of greenhouse gases, warming will increase beyond 1.5ºC and 2ºC. As stated in a Washington Post article summarizing this report, in order to maintain warming of 1.5ºC, emissions must be cut to "net-zero" by 2050.[141] Decisions regarding cutting emissions must be made *immediately* and serious reduction plans must be met.

> e.      *Risk Assessment and Limiting Future Climate Change*

With increased global warming, all regions are expected to experience projected increases in climate variability and extreme weather patterns. (SPM-33) Beyond 1.5ºC of warming, the compounding predications of change, including droughts and precipitation, are projected to increase. If emission predictions exceed their likely ranges, so will the global and regional changes will also exceed their likely ranges. (SPM-35)

AR6 supports the AR5 finding that there is a "near-linear relationship" between rising global anthropogenic carbon dioxide emission rates and climate change. (SPM-36) The report indicates that, "Each 1000 $GtCO_2$ of cumulative $CO_2$ emissions is assessed to *likely* cause a 0.27°C to 0.63°C increase in global surface temperature with a best estimate of 0.45°C." (SPM-36) (emphasis in original) Additionally, even with the lowest GHG emission plans, there is not enough sufficient evidence to support drastic improvements in air quality and other effects of climate change. Although, futures with decreases in GHG emissions are estimated to contribute less to anthropogenic warming and therefore lead to smaller changes to climate impact-drivers. (SPM-41) Meaning, adjustments to emission rates and decreases of GHG emission ultimately result in the slowing of climate change and the worsening of impact-drivers.

In summary, the recent IPCC report continues to examine the detrimental impact of human-induced climate change on natural environmental processes. Carbon dioxide emissions are the result of human activities, such as the burning of fossil fuels, and contribute largely to global average surface temperature increasing, as well as influences on sea level and ocean temperature. The findings presented in AR6, are consistent with previous reports on climate change but additionally focus on the indubitability of evidence pointing towards the effects of climate change on severe weather patterns and other climate impact-drivers, as well as their connection to human activity.

---

[141] Root, T. Five key excerpts from the United Nations' climate change report. Washington Post. (August 10, 2021). Available at: https://www.washingtonpost.com/climate-environment/2021/08/10/ipcc-report-un-takeaways/

2.      GHG Emissions from Operation of the SYU and LFC must be Considered Part of the Project.

Climate change is one of the most concerning effects of the proposed Project. As noted in the FSEIR, restarting the SYU and LFC facilities will generate more than 300,000 $MTCO_2e$/year. (FSEIR at 4.2-29) And yet, as discussed above, these impacts are not evaluated as Project impacts because the FSEIR erroneously considers resumed operations of the SYU and LFC as part of the baseline. Instead, GHG emissions from the SYU and LFC are only considered in the context of cumulative impacts. (FSEIR at 4.2-20) However, as we have explained, ExxonMobil does not currently have permission to operate these facilities, and cannot operate them unless this Project is approved. Accordingly, emissions from the SYU and LFC should be included in the Project analysis, bringing the total GHG emissions from the Project to at least 317,043 $MTCO_2e$/year. (FSEIR at 4.2-29[142]) These emissions are the equivalent to emissions from approximately 69,000 cars.[143]

By limiting the scope of the Project, the FSEIR only considers emissions from the trucking operations. On that basis, the FSEIR concludes that total Project emissions will amount to 9,831 $MTCO_2e$ for the first year, and 9,291 $MTCO_2e$ for subsequent years. (FSEIR at 4.2-22) By restricting the scope of review, the FSEIR discloses *only 3%* of actual Project-related GHG emissions. As such, more than 97% of Project emissions will not be mitigated.

3.      The FSEIR Should Invoke a Zero Emission Threshold in Assessing Climate Change Impacts.

Given the dire state of global climate change, it is important that the County not allow *any* increase in current GHG levels. In 2015, the County of Santa Barbara adopted a significance threshold for GHG emissions of 1,000 $MTCO_2e$ per year. However, since 2015, global climate change has increased, and we have learned that scientists' predictions understated the potential emission levels and impacts.[144] As noted above, the information presented in the 2021 IPCC report demands immediate action to decrease GHG emissions. More recently, scientists from NOAA announced that 2021 was the sixth hottest year on record, with 2020 being the hottest year,[145] and a report was published demonstrating that the world's oceans reached their hottest levels on record in 2021.[146] In addition, a NOAA-led report disclosed that global, national, and

---

[142] It is not clear if the FSEIR considered the increase in GHG emissions that may occur during start-up operations.
[143] A typical passenger vehicle emits approximately 4.6 metric tons of carbon dioxide per year. See Greenhouse Gas Emission from a Typical Passenger Vehicle, U.S. Environmental Protection Agency, Office of Transportation and Air Quality, EPA-420-F-18-008 (March 2018), p. 2.
[144] Attachment G.
[145] "2021 was world's 6th-warmest year on record." https://www.noaa.gov/news/2021-was-worlds-6th-warmest-year-on-record. (January 13, 2022)
[146] Cheng, Lijing, et. al. *Another Record: Ocean Warming Continues through 2021 despite La Nina Conditions*. Advances in Atmospheric Sciences, Vol. 39, March 2022, 373-385.

regional sea levels are rising faster than predicted, and that sea levels along U.S. coastlines will rise by ten to twelve inches by 2050.[147]

This new information demonstrates that prior predictions and thresholds for new GHG emissions were inadequate. Hence, we urge the County to apply a zero emission threshold to ensure that all GHG emissions (direct and indirect) from the proposed project will be mitigated. Any new contribution of GHG emissions to the atmosphere is simply unacceptable.

A zero emission threshold is supported by the California Air Pollution Control Officer's Association ("CAPCOA"), which stated:

> The scientific community overwhelmingly agrees that the earth's climate is becoming warmer, and that human activity is playing a role in climate change. Unlike other environmental impacts, climate change is a global phenomenon in that all GHG emissions generated throughout the earth contribute to it. Consequently, both large and small GHG generators cause the impact. While it may be true that many GHG sources are individually too small to make any noticeable difference to climate change, it is also true that the countless small sources around the globe combine to produce a very substantial portion of total GHG emissions.
>
> A zero threshold approach is based on a belief that, 1) all GHG emissions contribute to global climate change and could be considered significant, and 2) not controlling emissions from smaller sources would be neglecting a major portion of the GHG inventory.
>
> CEQA explicitly gives lead agencies the authority to choose thresholds of significance. CEQA defers to lead agency discretion when choosing thresholds. Consequently, a zero emission threshold has merits.[148]

The State Lands Commission has used a zero emission threshold for GHG emissions in its environmental review for the Lease 421 Project and Ellwood Marine Terminal Project.[149] EDC and our clients urge the County to utilize the same threshold in its review of this Project.

---

[147] Sweet, W.V., et al.. *Global and Regional Sea Level Rise Scenarios for the United States.* NOAA Technical Report NOS 01. National Oceanic and Atmospheric Administration, National Ocean Service, Silver Spring, MD, 111 pp. https://oceanservice.noaa.gov/hazards/sealevelrise/noaa-nostechrpt01-global-regional-SLR-scenarios-US.pdf.

[148] CAPCOA, *CEQA and Climate Change*, p. 27.  (January 2008)

[149] Venoco Revised PRC 421 Recommissioning Project Final Environmental Impact Report, California State Clearinghouse (SCH) No. 2005061013, CSLC EIR Number 732, January 2014; Venoco Ellwood Marine Terminal Lease Renewal Project Final Environmental Impact Report, California State Clearinghouse (SCH) No. 2004071075, CSLC EIR No. 743, April 30, 2009. This threshold was also used in the Commission's Draft EIR for Venoco's South Ellwood Full Field Development Project.

4.    The FSEIR Must Analyze Direct, Indirect, and Cumulative GHG Emissions and Their Effect on Climate Change.

The FSEIR differentiates direct, indirect, and cumulative effects from the proposed Project. The FSEIR identifies direct emissions as those that are generated by the mobile sources associated with trucking and modifications to the LFC facilities. (FSEIR at 4.2-21) The FSEIR identifies indirect emissions as including those that are caused by providing the Project with electricity. (FSEIR at 4.2-21 - 22)

The discussion of direct impacts is impermissibly constrained because it excludes certain aspects of the Project. More importantly, emissions from production at the SYU platforms and processing at the LFC facility should also be included in the discussion of direct impacts. Instead, these impacts are considered in the discussion of cumulative activities. (FSEIR at 4.28 – 30) Even so, however, the FSEIR asserts that such impacts would be less than significant because production would be less than previous levels. (FSEIR at 4.2-28)

By not including SYU and LFC-related emissions in the Project description, and comparing such expected emissions to pre-spill levels of production, the FSEIR fails to apprise the public and decision-makers of the true impact of the Project, which is the generation of 317,043 MTCO$_2$e/year (not 9,831 MTCO$_2$e/year).

In addition, the FSEIR fails to disclose the GHG emissions that have been  associated with fracking and acidizing at the platforms (FSEIR at 3-670).[150,151] These types of enhanced oil recovery operations increase GHG emissions.[152]

Additionally, GHG emissions increase as oil fields are depleted. A recent Nature Climate Change article determined that production from depleted fields "requires increased energy expenditures in drilling, oil recovery, and oil processing."[153] Specifically, the decline in natural reservoir pressure requires more energy to produce the oil. In addition, increased water

---

[150] See APDs for Platform Harmony (Well HA-20, issued August 23, 2013, revised November 22, 2013; Well HA-21, issued December 13, 2013, revised January 25, 2014; Well HA-30, issued February 10, 2014; Well HA-23, issued April 1, 2014; Well HA-28, issued July 15, 2014) and Platform Heritage (Well HE-33, issued April 1, 2013, revised June 13 and July 16, 2013).  See APMs for Platform Harmony (HA-14, issued May 31, 2013; HA-25, issued May 31, 2013, revised July 12 and August 28, 2013; HA-26, issued November 7, 2013; HA-20, issued December 3, 2013, revised March 18, 2014; HA-21, issued February 5, 2014, revised April 17, May 22, and June 20, 2014; HA-30, issued March 25, 2014, revised April 14, 2014), Platform Heritage (HE-33, issued August 1, 2013, revised August 15, 2013), and Platform Hondo (Well H-6, issued January 13, 2014; Well H-40, issued February 7, 2014; Well H-24, issued February 20, 2014, Well H-39, issued February 20, 2014).
[151] Declaration of Ken Dowd in Support of Exxon Mobil Corporation's Motion for Leave to Intervene, *Environmental Defense Center v. Santa Barbara Channelkeeper*, Case No. 2:16-cv-08418-PSG-FFMx, filed February 8, 2017: "In order to re-start production [of the SYU platforms], ExxonMobil anticipates that it will require the use of certain acid well stimulation treatments at one or more wells.  Moreover, ExxonMobil will require acid well stimulation treatments to drill and complete new wells, and recomplete existing wells, at SYU." (Attachment H.)
[152] Mohammed S. Masnadi and Adam R. Brandt, *Climate impacts of oil extraction increase significantly with oilfield age.*  Nature Climate Change, Vol. 7, pp. 551-557 (August 2017).
[153] *Id.*

production results in more mass lifted and handled per unit of oil produced, which increases GHG emissions. As noted in the article, the analysis of increasing GHG intensities for older oilfields is necessary "so that investors, policymakers, industry, and other stakeholders can adequate[ly] compare crudes and assess their climate consequences both *before development decisions are made*."[154] Platform Hondo was constructed in 1976 and has been operating for more than forty years. (FSEIR at 2-1) Platforms Heritage and Harmony have been operating for more than twenty-five years.  (FSEIR at 2-3) The 1987 Development Plan for the SYU platforms allowed for production of 140,000 bpd. (FSEIR at 4-3) By 2014, production was down to 29,572 bpd.  (FSEIR at 4-4.) The FSEIR must analyze the increase in GHG emissions attributed to the declining state of the oilfield.

Indirect impacts should include life cycle emissions, including end use emissions, because they are "caused by the project and are later in time…, but are still reasonably eventually be used by consumers. Although the FSEIR includes a discussion of end use emissions, the discussion is improperly relegated to a separate section of the report.  These impacts must be analyzed as indirect effects of the proposed Project. *See Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003) (Environmental Impact Statement was required to consider reasonably foreseeable effects from increased coal consumption); *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) (EIS must consider "downstream" impacts, including from consumption, from natural gas pipelines that will bring natural gas to power plants); *Western Organization of Resource Councils v. BLM*, 2018 WL 1475470 (D. Mont. March 26, 2018) (agencies must address downstream combustion impacts associated with coal as well as oil and gas); *Wilderness Workshop v. US BLM*, 342 F. Supp. 3d 1145 (D. Colo. 2018) (EIS failed to consider downstream combustion impacts); *San Juan Citizens Alliance v. BLM & Forest Service*, 326 F. Supp.3d 1227 (D.N.M. 2018) (Environmental Assessment for oil and gas leases on Forest Service found inadequate for failure to quantify/evaluate indirect impacts of downstream GHG emissions (consumption).[155]

The FSEIR states that end use emissions will be the same, whether the oil is transported from the LFC by truck or pipeline (FSEIR at 3-670); but this statement misses the point, which is that oil is not being transported via either mode today, and it won't be transported (or produced) without approval of this Project. Hence, end use emissions are an indirect effect of this proposal.

     5.     <u>The Proposed Mitigation is Inadequate to Avoid or Substantially Lessen the Project's Impacts on the Climate</u>.

First, the mitigation measures do not address all Project-related emissions, as explained above. Instead, they only address 3% of the emissions.

Second, the FSEIR violates the requirement that mitigation measures must be "fully enforceable through permit conditions, agreements, or other measures." Pub. Res. Code §

---

[154] *Id.* (emphasis added)
[155] California courts often look to NEPA cases as "strongly persuasive" authorities in interpreting CEQA requirements.  *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 86, fn. 21.

21081.6(b); CEQA Guidelines § 15126.4(a)(2); *Federation of Hillside and Canyon Associations*, 83 Cal.App.4th at 1261-62. The FSEIR does not include any specific mitigation measures to reduce GHG emissions. Instead, the FSEIR allows ExxonMobil to prepare a future GHG Reduction and Reporting Plan that will describe how GHG emissions will be reduced or offset. (FSEIR at 4.2-22 - 24) Such reductions or offsets could come from reductions onsite, reductions generated elsewhere in the County, offsets through various state and national programs, or reductions created through a cap-and-trade program. There is absolutely no analysis in the FSEIR regarding specific reductions that can be monitored or enforced, nor any analysis regarding the feasibility or availability of any of these potential measures.

The FSEIR's deferral of mitigation violates CEQA. CEQA Guidelines § 15126.4(a)(1)(B). In *Golden Door Properties LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 506, the court rejected a similar deferral of deferred mitigation. The court held that reliance on offsets created by CARB-approved registries, the American Carbon Registry, Climate Action Reserve, and Verified Carbon Standard (as in this case) do not necessarily assure adequate mitigation. *Id*. at 511-12. In addition, the court noted that nothing would prevent an applicant from obtaining up to 100 percent of its GHG emission reductions through offsets anywhere. *Id*. at 513. Similarly here, there is nothing that limits the source of offsets and no means to know if such offsets will actually mitigate the Project's impacts. Finally, in *Golden Door*, the court rejected similar deferral of mitigation where the measure provided a generalized goal (in that case, net zero GHG emissions), but then allowed staff to determine "whether any particular offset program is acceptable on unidentified and subjective criteria." *Id*. at 520. The court found that the proposed mitigation measure lacked objective standards for determining whether proposed offsets are available or financially feasible. *Id*. at 520-21. Simply requiring that offsets be "real, permanent, verifiable, enforceable, and additional" is not sufficient. *Id*. at 521.

Other courts have similarly rejected reliance on future GHG mitigation plans, even if specific goals or targets are identified. See *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 91-97 (requirement that Chevron develop a GHG mitigation plan was rejected; court held that formulation of mitigation plans must occur *before* a project is approved); *Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152, 1170 (court rejected proposed mitigation measures because "there is no evidence in the record that the above-referenced mitigation measures will make any contribution to achieving GHG emissions reductions…."); *Cleveland National Forest Foundation v. San Diego Ass'n. of Governments* (2017) 17 Cal.App.5th 413, 431-34 (EIR that relied on future plans failed to adequately address mitigation for transportation plan's GHG emissions impacts).

Given the lack of any actual proposed reductions or offsets, the proposed mitigation is illusory and unenforceable. As such, the GHG emissions from the proposed Project will be significant and are not mitigated (Class I).

6.    The FSEIR Incorrectly Finds that Cumulative Climate Change Effects will
be Insignificant.

The FSEIR identifies cumulative GHG emissions based on data published in the
County's ECAP (which excludes stationary sources) and from stationary sources in the County
APCD's jurisdiction. (FSEIR at 4.2-28) Such emissions add up to approximately 1.5MMTCO2e.
The FSEIR, however, considers this massive amount of GHG emissions to not be a significant
cumulative impact, because the FSEIR erroneously considers only the Project's contribution to
such cumulative emissions. (*Id.*) In doing so, the FSEIR fails to consider the cumulative effect of
combining the Project's emissions with other related projects. A cumulative effect occurs when
the "*incremental effects* of an individual project are significant when viewed in connection with
the effects of past projects, the effects of other current projects, and the effects of probably future
projects." CEQA Guidelines § 15065(a)(3) (emphasis added); see also § 15355(b). "Cumulative
impacts can result from *individually minor* but collectively significant projects taking place over
a period of time." CEQA Guidelines § 15355(b) (emphasis added). The FSEIR violates CEQA
because it focuses on the Project's impacts, rather than the combined impacts of the Project and
other projects contributing to the same impact.

Moreover, as noted above, the FSEIR improperly identifies emissions from the SYU and
LFC components of the Project as cumulative, rather than Project, impacts. (FSEIR at 4.2-28 –
30) Even at that, the FSEIR does not offer any mitigation of such impacts because the report
states that such emissions would be less than pre-shutdown emissions. (FSEIR at 4.2-28) This
omission results in more than 300,000 MTCO2e/year of GHG emissions that are not mitigated.

I.    **The FSEIR Does Not Accurately Disclose the Project's Land Use and Policy
Consistency Impacts.**

The FSEIR analyzes the Project's consistency with the County's LCP, CZO,
Comprehensive Plan, and LUDC.  The FSEIR, however, fails to identify several inconsistencies
with relevant policies.

1.    The Project is Inconsistent with the LUDC and CZO.

As determined by the Planning Commission, the Project is inconsistent with LUDC and
CZO requirements for safe highways and roads, and protections for neighborhoods,
communities, and public safety. These inconsistencies were not identified in the FSEIR.

2.    The Project is Inconsistent with the LCP.

The proposed Project is inconsistent with policies of the LCP that protect coastal
resources. As noted in the FSEIR, the Project will result in Class I significant and unmitigated
impacts to biological, water, marine, and cultural resources. Accordingly, the Project is
inconsistent with policies protecting environmentally sensitive habitats (Policy 2-11), water
quality (Policy 3-19), coastal dune habitats (Policy 9-2), wetlands (Policy 9-14), native
grasslands (Policy 9-18), vernal pools (Policy 9-21), and marine mammals (Policy 9-25).

The FSEIR concludes that impacts to environmentally sensitive habitats, coastal dune habitats, wetlands, native grasslands, vernal pools, and marine mammal rookeries will not be significant because the policy analysis is limited to the development of the truck loading facilities. (FSEIR at 4.4-18, 4.4-21 - 22) This limited analysis is contrary to the intent of Policy 2-11, Policy 9-2, Policy 9-14, Policy 9-18, Policy 9-21, and Policy 9-25, which is to protect habitats from projects such as this one.

The FSEIR notes that oil spills from the proposed trucking will negatively affect streams and other waterways. Despite the fact that the FSEIR finds oil spill impacts to cause a Class I impact to water resources, the report finds that such impacts are nevertheless consistent with Policy 3-19, which requires protection of coastal waters. (FSEIR at 4.4-19) This finding is not supported by the facts or analysis in the FSEIR.

The Project emanates within the Gaviota Coast Plan planning area. The Project's Class I impacts to biological, water, and cultural resources are inconsistent with Gaviota Coast Plan policies protecting natural resources (Policies NS-2, NS-6, NS-7, NS-9, NS-12) and cultural resources (Policies CS-1, CS-2). The Gaviota Coast Plan also includes policies protecting the rural, scenic nature of the coast and Highway 101 corridor. Additionally, the Gaviota Coast Plan includes policies promoting a shift to renewable energy.

Policy 6-8 requires transportation of oil by pipeline unless a pipeline is unavailable or does not have adequate capacity. Plains submitted an application to replace Lines 901 and 903, which could transport the same oil to the same destinations. The application was deemed complete on April 20, 2018, and the scoping period for the EIR concluded in mid-March 2019. The Draft EIR will be available this year.

3.   The CZO does not Require Approval of Trucking.

The County and the State have had longstanding requirements for oil transportation by pipeline due to the decreased risks and scale of an oil spill, air pollution, and GHG emissions. As set forth in CZO Section 35-154.5(i), crude oil shall be transported from local processing facilities by pipeline. Although the County "may" permit a mode of transportation other than pipeline, the County is not *required* to approve an alternative mode of transportation.

In this case, the unavoidable risk of accidents and oil spills identified in the FSEIR warrants denial of the request for an exception to the County's oil transportation requirements. As recommended in the July 22, 2020, Planning Commission staff report, trucks should not be allowed on Route 166. (2020 staff report at 22 – 23) The current staff report reiterates that trucking along Route 166 increases the risk of an oil spill entering a waterway. (2021 staff report at 27)

Nor should trucking be allowed on Highway 101. The FSEIR finds that trucking on both Highway 101 and Route 166 will cause unavoidable risks and impacts. As noted above, there

have been six major tanker truck accidents along this route within the past several years, including five in less than the seven-year timeframe for this Project.

Even if the County wanted to consider an alternative mode of transportation, the required findings cannot be made.[156] The County cannot approve ExxonMobil's trucking proposal because impacts are not mitigated to the maximum extent feasible, and there is no evidence that a pipeline will not be available within a reasonable period of time.

> 4.    The Project is Inconsistent with the Comprehensive Plan.

The FSEIR identifies a Class I impact to biological, water, and cultural resources due to the risk of an oil spill. Accordingly, the Project is inconsistent with Land Use Element  Hillside and Watershed Protection Policy 7. (FSEIR at 4.4-31)

> 5.    The Project is Inconsistent with LUDC Oil Transportation Requirements.

The Project is inconsistent with LUDC Section 435.52.060(10), which requires that oil be transported by pipeline unless pipeline transportation is infeasible, and impacts are mitigated to the maximum extent feasible. As discussed above, the County is processing the Plains application and has not made a determination regarding its feasibility.  Additionally, the proposed Project will result in many impacts that are not adequately mitigated.

The FSEIR must be revised to note the Project's inconsistencies with local policies and ordinances, and to disclose the Project's Class I Land Use impacts.

## II.   Conclusion

For the foregoing reasons, the Board of Supervisors should uphold the Planning Commission recommendation and **DENY** ExxonMobil's application to restart oil production in the Santa Barbara Channel and truck its oil on Highway 101 and Route 166. The risks and impacts to our communities, the environment, and public safety are simply too great.

Thank you for your consideration.

Sincerely,

Linda Krop, Chief Counsel

Maggie Hall, Senior Attorney

---

[156] The findings are only relevant if the County chooses to approve an alternative mode of transportation.

Brian Trautwein, Environmental Analyst

**Attachments**

A – Revised Findings

B – *Tanker Truck Accidents*, California, Environmental Defense Center, March 4, 2022

C – "Displaced Exxon Workers Hope Trucking Permit Brings Them Home," Santa Barbara Independent, April 4, 2019

D – Letter from Dianne Black, Director, P&D, to Bureau of Land Management Bakersfield Field Office Re: Scoping Comments for the Bakersfield RMP Hydraulic Fracturing Analysis Project, September 7, 2018

E - *A Biogeographic Assessment of the Channel Islands National Marine Sanctuary: A Review of Boundary Expansion Concepts for NOAA's National Marine Sanctuary Program*, NOAA Technical Memorandum NOS NCCOS 21, November 2005

F – *Gaviota Coast Feasibility Study* (Chapter 3: Significance), National Park Service, March 9, 2004

G – Climate Change Impacts, January 8, 2021

H – Declaration of Ken Dowd, ExxonMobil, February 8, 2017

I – Santa Barbara County Property Tax Assessments, 2013-2014

# Exhibit 2

Declaration of Linda Krop

Case No. 2:22-cv-03225-DMG (MRWx)
*ExxonMobil v. Santa Barbara Board of Supervisors*



March 4, 2022

Ms. Joan Hartmann, Chair
Santa Barbara County Board of Supervisors
105 East Anapamu Street
Santa Barbara, CA 93101
*sbcob@countyofsb.org*

Re:   **ExxonMobil Interim Trucking for the Santa Ynez Unit Phased Restart Project - OPPOSE**

Dear Chair Hartmann and Board Members:

On behalf of our thousands of members and supporters, we urge you to **DENY** ExxonMobil's proposal to restart its three platforms offshore Gaviota and truck its oil along Highway 101 and Route 166. This proposal will put our entire community at risk from offshore and onshore oil spills, accidents, air and water pollution, and climate change. The Planning Commission correctly noted that the risk of oil spills and tanker truck accidents is simply unacceptable and inconsistent with the County's Land Use Development Code and Coastal Zoning Ordinance.

ExxonMobil's proposal is contrary to the interests of the County and its residents. First, allowing ExxonMobil to produce oil and gas will exacerbate the current climate crisis. According to the Final Supplemental Environmental Impact Report ("FSEIR"), the project –

March 4, 2022
ExxonMobil Interim Trucking for SYU Phased Restart - OPPOSE
Page 2 of 4

including restart of the platforms and associated facilities – will generate ***317,043 MTCO₂e/year***.[1] Santa Barbara County already faces the devastating effects of unsustainable carbon emissions, as experienced through more destructive wildfires, droughts, sea level rise, and more. We simply cannot continue producing and consuming fossil fuels. Instead, we need to transition to clean sources of energy.

Second, allowing ExxonMobil to restart the Santa Ynez Unit platforms and Las Flores Canyon processing plant will generate a host of other unacceptable risks and impacts, including the threat of another major oil spill, as well as impacts to air and water quality, marine wildlife, onshore natural and cultural resources, birds, fishing, recreation, and public safety. These platforms are aging and have been used for acidizing, which exacerbates the potential risks and impacts from the proposed project. The proposed FSEIR is deficient for omitting these activities and impacts from analysis and disclosure.

Finally, ExxonMobil's proposal to truck crude oil will put our communities and environment at great risk of accidents and spills. The project will permit 173,740 full truck trips, as well as 347,480 one-way trips, along Highway 101 and Route 166. With each truck carrying 6,720 gallons, ***more than one billion gallons*** of crude oil could be transported over the life of the project.[2] The County has already experienced more than a dozen oil tanker truck accidents in the last fourteen years, including eight accidents along the proposed route.

The Planning Commission recommended denial of ExxonMobil's application, based on the project's significant and unavoidable impacts, and the fact that ExxonMobil's claim of benefits did not outweigh such impacts. The Commission also found that traffic safety impacts on Route 166 rendered the project inconsistent with the County's Land Use Development Code and Coastal Zoning Ordinance.[3]

Trucking along Highway 101 should also be denied because of the significant risk of an accident and oil spill along the scenic Gaviota Coast, across numerous coastal watersheds and

---

[1] Proposed FSEIR at 4.2-28, 29.  The FSEIR inappropriately considers emissions from the SYU restart as cumulative impacts. Such emissions, however, should be evaluated as part of the project, which is described as including the phased restart of the platforms.

[2] Sixty-eight trucks carrying 6,720 gallons per day results in 1,167,532,800 gallons of crude oil.

[3] The risks of oil trucking on Route 166 were acknowledged by County staff in August 2020, when the staff recommended against allowing trucking to the Plains Pentland Terminal. (*See* Santa Barbara County Planning Commission Staff Report for ExxonMobil Interim Trucking for Santa Ynez Unit Phased Restart Project, prepared for the September 2, 2020, hearing, and released for public review on August 12, 2020 ("2020 Staff Report").) The 2020 Staff Report noted that prohibiting trucking on Route 166 would substantially reduce impacts by avoiding trucking on a longer transportation route that abuts waterways, including the Cuyama River. (2020 Staff Report at 22) The Staff Report concluded that prohibiting trucks on Route 166 would "reduce the probability of an oil spill entering a waterway." (*Id.*) Prohibiting trucking on Route 166 would also avoid impacts to cultural resources. (*Id.* at 33) The September 8, 2021, Staff Report reiterated that "[t]he environmental advantage of this alternative is that it would substantially reduce the potential for trucks to go to the Pentland Terminal, which is a longer transportation route…By substantially limiting the number of trucks that could use State Route 166, this alternative would also reduce the probability of an oil spill entering a waterway." (2021 Staff Report at 27)

March 4, 2022
ExxonMobil Interim Trucking for SYU Phased Restart - OPPOSE
Page 3 of 4

next to the Pacific Ocean, and through the dangerous Gaviota curve and tunnel. These areas include important Indigenous lands and sensitive wildlife habitat. A spill along this route would have a devastating effect on sensitive cultural and ecological resources.

Now is not the time to turn the clock back and return to our old ways of relying on fossil fuels to meet our energy needs. The County of Santa Barbara is moving towards a clean energy future by adopting renewable energy targets and joining the Central Coast Community Energy program. Allowing ExxonMobil to resume oil production off our coast will lead to decades of fossil fuel production that we cannot afford.

For the foregoing reasons, we urge the Board to accept the Commission's recommendation for **denial** of ExxonMobil's proposal to restart the Santa Ynez Unit platforms and Las Flores Canyon processing facility, and to truck its oil through Santa Barbara County. Thank you for your consideration.

Linda Krop, Chief Counsel
Environmental Defense Center

Ken Hough, Executive Director
Santa Barbara County Action Network

Katie Davis, Chair
Sierra Club Los Padres Chapter

Kat Lane and Lily Ortiz, EAB Co-Chairs
UCSB Environmental Affairs Board

Ethan Estrada, Chair
UCSB Coastal Fund

Rebecca August, Director of Advocacy
Los Padres ForestWatch

Ted Morton, Executive Director
Santa Barbara Channelkeeper

Susan Jordan, Executive Director
California Coastal Protection Network

Andrew Christie, Director
Santa Lucia Chapter of the Sierra Club

George Relles, Convenor
The Goodland Coalition

Michael Lyons, President,
Get Oil Out!

Mariza Sullivan, Tribal Chair
Coastal Band of Chumash Nation

Doug Kern, Executive Director
Gaviota Coast Conservancy

Julie Teel Simmonds, Senior Attorney
Center for Biological Diversity

Vijaya Jammalamadaka, President
League of Women Voters, Santa Barbara

Marell Brooks, President
Citizens Planning Association

Bill Hickman, Southern California
Regional Manager, Surfrider Foundation

Dr. Mark Morey, Chair
Santa Barbara Chapter, Surfrider Foundation

Mike Wondolowski, President
Carpinteria Valley Association

Charisse Cordero, Member
Santa Barbara Standing Rock Coalition

March 4, 2022
ExxonMobil Interim Trucking for SYU Phased Restart - OPPOSE
Page 4 of 4

Marcos Vargas, Executive Director
Fund for Santa Barbara

Shannon Simpson, Executive Director
CFROG

Sigrid Wright, CEO/Executive Director
Community Environmental Council

Hillary Hauser, Executive Director
Heal the Ocean

Katherine Emery, PhD, Executive Director
Santa Barbara Audubon

Tomás Morales Rebecchi, Central Coast
Organizing Manager, Food & Water Watch

Elizabeth Mau, Co-Chair
UCSB Environmental Justice Alliance

Elvia Cruz, Co-Coordinator
Eco Vista

Doug Campbell, Executive Director
Coastal Ranches Conservancy

Ken Owen, Executive Director
Channel Islands Restoration

Janet Cobb, Executive Officer
California Wildlife Foundation/California Oaks

Dan McCarter, President
Santa Barbara Urban Creeks Council

Mary A. Ciesinski, Executive Director
Environmental Center of San Luis Obispo

Lindsay Johnson, Executive Director
Explore Ecology

Curtis Knight, Executive Director
CalTrout

Irene Cooke, Founding Member
Society of Fearless Grandmothers- SB

Esmeralda Quintero-Cubillan
UCSB Office of External VP for Statewide Affairs

Luke J. Swetland, President & CEO
SB Museum of Natural History & Sea Ctr

Erica Donnelly-Greenan, Executive Director
Save Our Shores

Miriam Gordon, Policy Director
UPSTREAM

Dianna Cohen, Chief Executive Officer
Plastic Pollution Coalition

Ruth Abbe, President
Zero Waste USA

Mati Waiya, Executive Director
Wishtoyo Chumash Foundation

Julie Anderson, Global Executive Director
Plastics Ocean International

Christopher Chin, Executive Director
The Center for Oceanic Awareness,
Research, and Education (COARE)

Anna Cummins, Co-Founder and
Deputy Director
The 5 Gyres Institute

Leslie Mintz Tamminen, Director
Seventh Generation Advisors

Emily Parker, Coastal and Marine Scientist
Heal the Bay

David Krueger, President
Northern California Recycling Association

Nancy Emerson, President
WE Watch

# Exhibit 3

Declaration of Linda Krop

Case No. 2:22-cv-03225-DMG (MRWx)
*ExxonMobil v. Santa Barbara Board of Supervisors*



# County of Santa Barbara
# Planning and Development

**Lisa Plowman, Director**
Jeff Wilson, Assistant Director

March 16, 2022

ExxonMobil Production Company
Bryan Anderson, SYU Asset Manager          BOARD OF SUPERVISORS
12000 Calle Real                           HEARING OF MARCH 8, 2022
Santa Barbara, CA 93117

### RE: ExxonMobil Interim Trucking for Santa Ynez Unit Phased Restart

Consider the Planning Commission's recommendation for denial of the ExxonMobil Interim Trucking for Santa Ynez Unit Phased Restart Project (Case No. 17RVP-00000-00081), Third and Fourth Districts, as follows:

a) Make the required findings for denial of the Modified Project, Case No. 17RVP-00000-00081;

b) Determine that denial of the Modified Project is exempt from the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15270(a) and approve the filing of a Notice of Exemption; and

c) Deny the Modified Project, Case No. 17RVP 00000 000081.

Dear Mr. Anderson:

At the Board of Supervisor's hearing of March 8, 2022, Supervisor Williams moved, seconded by Supervisor Hart and carried by a vote of 3 to 2 (Nelson and Lavignino no) to:

1. Make the required findings for denial of the Modified Project, Case No. 17RVP-00000-00081, included as Attachment A to the February 15, 2022 Board Letter;

2. Determine that denial of the Modified Project is exempt from CEQA pursuant to CEQA Guidelines Section 15270(a) and approve the filing of a Notice of Exemption; and

3. Deny the Modified Project, Case No. 17RVP 00000 000081.

### The Board of Supervisor's actions included the following revisions to the findings.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ◆ · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Krop Decl., Page 94
Exhibit 3

Board of Supervisors Hearing of March 8, 2022
ExxonMobil Interim Trucking for SYU Phased Restart
17RVP-00000-00081
Page 2

***Page A-1, Section 1.2, Statement of Overriding Considerations is revised:***

The Final SEIR (19EIR-00000-00001) and Final SEIR Revision Letter No. 1 identifies one significant and unavoidable impact to sensitive resources (biological, water, and cultural) due to potential oil spills. Several mitigation measures would serve to reduce these impacts, but even with the inclusion of these measures, the impacts cannot be reduced to less than significant levels. In order to approve a project with a significant and unavoidable impact, the decision-maker must make a statement of overriding considerations that the benefits of the project outweigh the unavoidable adverse environmental impacts.

A draft statement of overriding considerations was provided by staff to the Planning Commission for the hearing of September 30, 2021 which is included in the Board of Supervisors hearing packed dated February 8, 2022 as Attachment D. However, the Board of Supervisors finds that there is not substantial evidence in the record to support a determination that the benefits of the Project outweigh the project's significant and unmitigable impacts on the environment. For example, the amount of local oil this project would provide would only have a de minimus impact on domestic oil use and demand. Additionally, the Applicant did not present substantial evidence to support conclusory statements that the project would increase local jobs or expenditures at local businesses. Therefore, the Board of Supervisors is unable to make the finding that there is substantial evidence that benefits outweigh the significant and unavoidable impact of the project.

There is conflicting information submitted by public comment and the Applicant about the impact of the project on domestic oil use and demand. While there may be an increase in local jobs and local expenditures if the Project is approved, the Board has concluded that these benefits may not be as secure or as high quality as indicated by the applicant and they do not outweigh the unavoidable adverse environmental impacts of the Project. The Board finds that potential benefits of the Project do not outweigh the Project's significant local and regional environmental impacts because the Project will be detrimental to the environmental generally, and the County of Santa Barbara along the truck route will bear the brunt of environmental impacts, including potential significant impacts from spills and other localized air impacts.

Additionally, if all of the truck trips terminated at the Santa Maria Pump Station as previously-proposed, the total distance of the truck trips would be lower. But now, with the slated closure of the Santa Maria Pump Station in 2023, truck trips will shift to driving to Kern County for most of the duration of the Project. Not only does this minimize the previously-identified benefit that the project would reduce truck traffic eastbound from the Santa Maria Pump Station, it puts many trucks on the road, driving very far, and causing potential environmental impacts the entire route.

Production of local oil may have benefits above the importation of foreign oil; however, the transportation by truck is not the appropriate way to transport it based on the environmental and safety impacts to the County. The Board cannot find that the benefits of the project outweigh the significant environmental impacts.

The Applicant stated at the hearing that they will attempt to mitigate GHG locally, but that it is infeasible to locally mitigate GHG and in order to comply with the mitigation measures, ExxonMobil will need to also pursue non-local mitigation. The Project does not present local benefits sufficient to outweigh the local impacts of the project, in particular along the Project corridor.

The earlier versions of the proposed project mitigated GHG impacts to a much larger extent. But the slated retirement of the Santa Maria Pump Station (SMPS) changed that and Staff's original analyses and recommendation for approval was based on those earlier advantages. With the shortened time period during which trucking to SMPS can occur, before shifting to Kern, the Project no longer has the benefits of reducing traffic and further decreasing carbon impacts. The Project no longer reduces truck

Board of Supervisors Hearing of March 8, 2022
ExxonMobil Interim Trucking for SYU Phased Restart
17RVP-00000-00081
Page 3

trips and puts too many trucks on the road, causing potential environmental impacts along the entire route.

Additionally, the potential economic benefits of the Project are substantially less than those of the County's coastal hospitality industry, which is significantly threatened by the possibility of oil spills.

Pursuant to Public Resources Code Section 21081(b), and CEQA Guidelines Sections 15043, 15092 and 15093, because the Board of Supervisors cannot find that the specific overriding considerations of the project outweigh the significant effects on the environment, the Board of Supervisors is unable to make a finding of Overriding Considerations and thus cannot approve the project.

***Page A-3, Section 2.1(e), LUDC Development Plan Finding is revised:***

***The proposed Project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area.***

The project would create ~~significant but mitigable~~ impacts ~~(for CEQA significance of impact determinations)~~ regarding traffic safety along Calle Real, Highway 101, and State Route 166 due to the addition of tanker truck trips to and from Las Flores Canyon to the Pentland Terminal. Existing driver behavior, which recent data shows an increase in traffic fatalities is problematic. The Project would generate up to 78 daily round truck trips along Calle Real, Highway 101, and Highway 166 after the permanent closure of the Santa Maria Pump Station, expected for some time in 2023. Existing accident rates on certain segments of Highway 101 and State Route 166 within the project area are currently above the state average (see SEIR page 4.5-7), and the project would add an additional risk for accidents above these existing conditions (SEIR section 4.5 pages 20-22). Of particular concern to the Board of Supervisors is traffic safety along State Route 166, a narrow two-lane highway connecting the Central Coast to the southern San Joaquin Valley, with few turnouts and passing lanes. The risk of transporting oil by truck on State Route 166 was highlighted when Santa Barbara County experienced an accident on March 21, 2020 where a tanker truck overturned down an embankment causing 6,600 gallons of crude oil to spill into the Cuyama River, ten miles upstream from Twitchell Dam and reservoir. Additionally, the September 27, 2021 Environmental Defense Center comment letter to the Planning Commission, incorporated herein by reference, cites four recent tanker truck accidents on Highway 166 that either resulted in injuries or fatalities and/or in the release of the truck's crude oil contents (September 13, 2016, May 20, 2018, December 12, 2018 and March 21, 2020). The Board incorporates by reference all of the public comments submitted for the March 8, 2022 hearing, which detail additional accident data and safety concerns.

The Board of Supervisors finds this additional risk to traffic safety impedes their ability to find that the project meets the requirements of LUDC Sections 35.82.080.E.1(c & e) because of the increase of hazards on the route that would be detrimental to the general welfare, health, and safety of other users, even if considered "mitigable" for CEQA impact classification purposes.

Due to the impact of the project on the residents of the County and other users of the proposed route related to traffic safety, the Board of Supervisors finds that: 1) streets and highways are not adequate or properly designed to carry the type and quantity of traffic generated by the project; and 2) approval of the project would be detrimental to the comfort, convenience, general welfare, health and safety of the community. The Board of Supervisors therefore cannot make these findings.

***Page A-4, Section 2.2(e), Coastal Zoning Ordinance Development Plan Finding is revised:***

***The proposed Project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area.***

Board of Supervisors Hearing of March 8, 2022
ExxonMobil Interim Trucking for SYU Phased Restart
17RVP-00000-00081
Page 4

The project would create ~~significant but mitigable~~ impacts ~~(for CEQA significance of impact determinations)~~ regarding traffic safety along Calle Real, Highway 101, and State Route 166 due to the addition of tanker truck trips to and from Las Flores Canyon to the Pentland Terminal. <u>Existing driver behavior, which recent data shows an increase in traffic fatalities is problematic.</u> The Project would generate up to 78 daily round truck trips along Calle Real, Highway 101, and Highway 166 after the permanent closure of the Santa Maria Pump Station, expected for some time in 2023. Existing accident rates on certain segments of Highway 101 and State Route 166 within the project area are currently above the state average (see SEIR page 4.5-7), and the project would add an additional risk for accidents above these existing conditions (SEIR section 4.5 pages 20-22). Of particular concern to the Board of Supervisors is traffic safety along State Route 166, a narrow two-lane highway connecting the Central Coast to the southern San Joaquin Valley, with few turnouts and passing lanes. The risk of transporting oil by truck on State Route 166 was highlighted when Santa Barbara County experienced an accident on March 21, 2020 where a tanker truck overturned down an embankment causing 6,600 gallons of crude oil to spill into the Cuyama River, ten miles upstream from Twitchell Dam and reservoir. Additionally, the September 27, 2021 Environmental Defense Center comment letter to the Planning Commission, incorporated herein by reference, cites four recent tanker truck accidents on Highway 166 that either resulted in injuries or fatalities and/or in the release of the truck's crude oil contents (September 13, 2016, May 20, 2018, December 12, 2018 and March 21, 2020). <u>The Board incorporates by reference all of the public comments submitted for the March 8, 2022 hearing, which detail additional accident data and safety concerns.</u>

The Board of Supervisors finds this additional risk to traffic safety impedes their ability to find that the project meets the requirements of LUDC Sections 35.82.080.E.1(c & e) because of the increase of hazards on the route that would be detrimental to the general welfare, health, and safety of other users, even if considered "mitigable" for CEQA impact classification purposes.

Due to the impact of the project on the residents of the County and other users of the proposed route related to traffic safety, the Board of Supervisors finds that: 1) streets and highways are not adequate or properly designed to carry the type and quantity of traffic generated by the project; and 2) approval of the project would be detrimental to the comfort, convenience, general welfare, health and safety of the community. The Board of Supervisors therefore cannot make these findings.

***The attached findings reflect the Board of Supervisors actions of March 8, 2022.***

Sincerely,

*Lisa Plowman*

Lisa Plowman
Director, Planning & Development

cc:   Case File: 17RVP-00000-00081
      Owner: ExxonMobil Production Company, P.O. Box 30151, College Station, TX  77842
      Applicant: Bryan Anderson, ExxonMobil Production Company, 12000 Calle Real, Santa Barbara, CA  93117
      California Coastal Commission, 89 S. California Street, Suite 200, Ventura, CA 93001
      County Chief Appraiser
      APCD
      Joan Hartmann, Third District Supervisor

**Attachments:**

**Attachment A** – Findings for Denial

## ATTACHMENT A: FINDINGS FOR DENIAL

The Board of Supervisors adopts the following Findings for Denial of the ExxonMobil Modified Interim Trucking Project (17RVP-00000-00081, 19EIR-00000-00001).The following Findings for Denial reflect the independent judgment of the Board of Supervisors. Only findings that cannot be made are discussed below.

## 1.0   CEQA FINDINGS

### 1.1   CEQA EXEMPTION

The Board of Supervisors finds that denial of the proposed project (Case No. 17RVP-00000-00081) is exempt from environmental review under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines Section 15270.

### 1.2   STATEMENT OF OVERRIDING CONSIDERATIONS

The Final SEIR (19EIR-00000-00001) and Final SEIR Revision Letter No. 1 identifies one significant and unavoidable impact to sensitive resources (biological, water, and cultural) due to potential oil spills. Several mitigation measures would serve to reduce these impacts, but even with the inclusion of these measures, the impacts cannot be reduced to less than significant levels. In order to approve a project with a significant and unavoidable impact, the decision-maker must make a statement of overriding considerations that the benefits of the project outweigh the unavoidable adverse environmental impacts.

A draft statement of overriding considerations was provided by staff to the Planning Commission for the hearing of September 30, 2021 which is included in the Board of Supervisors hearing packed dated February 8, 2022 as Attachment D. However, the Board of Supervisors finds that there is not substantial evidence in the record to support a determination that the benefits of the Project outweigh the project's significant and unmitigable impacts on the environment. For example, the amount of local oil this project would provide would only have a de minimus impact on domestic oil use and demand. Additionally, the Applicant did not present substantial evidence to support conclusory statements that the project would increase local jobs or expenditures at local businesses. Therefore, the Board of Supervisors is unable to make the finding that there is substantial evidence that benefits outweigh the significant and unavoidable impact of the project.

There is conflicting information submitted by public comment and the Applicant about the impact of the project on domestic oil use and demand. While there may be an increase in local jobs and local expenditures if the Project is approved, the Board has concluded that these benefits may not be as secure or as high quality as indicated by the applicant and they do not outweigh the unavoidable adverse environmental impacts of the Project. The Board finds that potential benefits of the Project do not outweigh the Project's significant local and regional environmental impacts because the Project will be detrimental to the environmental generally, and the County of Santa Barbara along the truck route will bear the brunt of environmental impacts, including potentially significant impacts from spills and other localized air impacts.

Additionally, if all of the truck trips terminated at the Santa Maria Pump Station as previously-proposed, the total distance of the truck trips would be lower. But now, with the slated closure of the Santa Maria Pump Station in 2023, truck trips will shift to driving to Kern County for most of the duration of the Project. Not only does this minimize the previously-identified benefit that the project would reduce truck traffic eastbound from the Santa Maria Pump Station, it puts many trucks on the road, driving very far, and causing potential environmental impacts the entire route.

Production of local oil may have benefits above the importation of foreign oil; however, the transportation by truck is not the appropriate way to transport it based on the environmental and safety impacts to the County. The Board cannot find that the benefits of the project outweigh the significant environmental impacts.

The Applicant stated at the hearing that they will attempt to mitigate GHG locally, but that it is infeasible to locally mitigate GHG and in order to comply with the mitigation measures, ExxonMobil will need to also pursue non-local mitigation. The Project does not present local benefits sufficient to outweigh the local impacts of the project, in particular along the Project corridor.

The earlier versions of the proposed project mitigated GHG impacts to a much larger extent. But the slated retirement of the Santa Maria Pump Station (SMPS) changed that and Staff's original analyses and recommendation for approval was based on those earlier advantages. With the shortened time period during which trucking to SMPS can occur, before shifting to Kern, the Project no longer has the benefits of reducing traffic and further decreasing carbon impacts. The Project no longer reduces truck trips and, puts too many trucks on the road, causing potential environmental impacts along the entire route.

Additionally, the potential economic benefits of the Project are substantially less than those of the County's coastal hospitality industry, which is significantly threatened by the possibility of oil spills.

Pursuant to Public Resources Code Section 21081(b), and CEQA Guidelines Sections 15043, 15092 and 15093, because the Board of Supervisors cannot find that the specific overriding considerations of the project outweigh the significant effects on the environment, the Board of Supervisors is unable to make a finding of Overriding Considerations and thus cannot approve the project.

## 2.0    ADMINISTRATIVE FINDINGS

## 2.1    LUDC DEVELOPMENT PLAN FINDINGS

**Findings required for all Preliminary or Final Development Plans.** Section 35.82.080.E.1 of the County Land Use and Development Code requires that the review authority make all required findings as applicable for final development plans.

The Board of Supervisors finds that it cannot support findings 35.82.080.E.1(c & e) below based on the following:

b.    *Streets and highways will be adequate and properly designed to carry the type and quantity of traffic generated by the proposed use.*

e.   *The proposed project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area.*

The project would create impacts regarding traffic safety along Calle Real, Highway 101, and State Route 166 due to the addition of tanker truck trips to and from Las Flores Canyon to the Pentland Terminal. Existing driver behavior, which recent data shows an increase in traffic fatalities is problematic. The Project would generate up to 78 daily round truck trips along Calle Real, Highway 101, and Highway 166 after the permanent closure of the Santa Maria Pump Station, expected for some time in 2023. Existing accident rates on certain segments of Highway 101 and State Route 166 within the project area are currently above the state average (see SEIR page 4.5-7), and the project would add an additional risk for accidents above these existing conditions (SEIR section 4.5 pages 20-22). Of particular concern to the Board of Supervisors is traffic safety along State Route 166, a narrow two-lane highway connecting the Central Coast to the southern San Joaquin Valley, with few turnouts and passing lanes. The risk of transporting oil by truck on State Route 166 was highlighted when Santa Barbara County experienced an accident on March 21, 2020 where a tanker truck overturned down an embankment causing 6,600 gallons of crude oil to spill into the Cuyama River, ten miles upstream from Twitchell Dam and reservoir. Additionally, the September 27, 2021 Environmental Defense Center comment letter to the Planning Commission, incorporated herein by reference, cites four recent tanker truck accidents on Highway 166 that either resulted in injuries or fatalities and/or in the release of the truck's crude oil contents (September 13, 2016, May 20, 2018, December 12, 2018 and March 21, 2020). The Board incorporates by reference all of the public comments submitted for the March 8, 2022 hearing, which detail additional accident data and safety concerns.

The Board of Supervisors finds this additional risk to traffic safety impedes their ability to find that the project meets the requirements of LUDC Sections 35.82.080.E.1(c & e) because of the increase of hazards on the route that would be detrimental to the general welfare, health, and safety of other users, even if considered "mitigable" for CEQA impact classification purposes.

Due to the impact of the project on the residents of the County and other users of the proposed route related to traffic safety, the Board of Supervisors finds that: 1) streets and highways are not adequate or properly designed to carry the type and quantity of traffic generated by the project; and 2) approval of the project would be detrimental to the comfort, convenience, general welfare, health and safety of the community. The Board of Supervisors therefore cannot make these findings.

## 2.2   COASTAL ZONING ORDINANCE FINDINGS FOR DEVELOPMENT PLANS

**Findings required for all Preliminary and Final Development Plans.** Section 35-174.7.1 of the Article II Coastal Zoning Ordinance requires that the review authority make all required findings as applicable for preliminary and final development plans.

The Board of Supervisors finds that it cannot support finding 35-174.7.1(c & e) below based on the following:

**c.      *That streets and highways are adequate and properly designed to carry the type and quantity of traffic generated by the proposed use.***

**e.      *That the project will not be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and will not be incompatible with the surrounding area.***

The project would create impacts regarding traffic safety along Calle Real, Highway 101, and State Route 166 due to the addition of tanker truck trips to and from Las Flores Canyon to the Pentland Terminal. Exiting driver behavior, which recent data shows an increase in traffic fatalities is problematic. The Project would generate up to 78 daily round truck trips along Calle Real, Highway 101, and Highway 166 after the permanent closure of the Santa Maria Pump Station, expected for some time in 2023. Existing accident rates on certain segments of Highway 101 and State Route 166 within the project area are currently above the state average (see SEIR page 4.5-7), and the project would add an additional risk for accidents above these existing conditions (SEIR section 4.5 pages 20-22). Of particular concern to the Board of Supervisors is traffic safety along State Route 166, a narrow two-lane highway connecting the Central Coast to the southern San Joaquin Valley, with few turnouts and passing lanes. The risk of transporting oil by truck on State Route 166 was highlighted when Santa Barbara County experienced an accident on March 21, 2020 where a tanker truck overturned down an embankment causing 6,600 gallons of crude oil to spill into the Cuyama River, ten miles upstream from Twitchell Dam and reservoir. Additionally, the September 27, 2021 Environmental Defense Center comment letter to the Planning Commission, incorporated herein by reference, cites four recent tanker truck accidents on Highway 166 that either resulted in injuries or fatalities and/or in the release of the truck's crude oil contents (September 13, 2016, May 20, 2018, December 12, 2018 and March 21, 2020). The Board incorporates by reference all of the public comments submitted for the March 8, 2022 hearing, which detail additional accident data and safety concerns.

The Board of Supervisors finds this additional risk to traffic safety impedes their ability to find that the project meets the requirements of Article II Sections 35-174.7.1(c & e) because of the increase of hazards on the route that would be detrimental to the general welfare, health, and safety of other users, even if considered "mitigable" for CEQA impact classification purposes.

Due to the impact of the project on the residents of the County and other users of the proposed route related to traffic safety, the Board of Supervisors finds that: 1) streets and highways are not adequate or properly designed to carry the type and quantity of traffic generated by the project; and 2) approval of the project would be detrimental to the health, safety, comfort, convenience and general welfare of the community. The Board of Supervisors therefore cannot make these findings.