DAWN SESTITO (S.B. #214011)
dsestito@omm.com
JUSTINE M. DANIELS (S.B. #241180)
jdaniels@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071-2899
Telephone:  +1 213 430 6000
Facsimile:   +1 213 430 6407

JACOB P. DUGINSKI (S.B. #316091)
jduginski@bdlaw.com
JAMES M. AUSLANDER (*pro hac vice*)
jauslander@bdlaw.com
BEVERIDGE & DIAMOND P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone:  +1 415 262 4000

Attorneys for Petitioner and Plaintiff
Exxon Mobil Corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>            Petitioner and<br>            Plaintiff,<br><br>    v.<br><br>SANTA BARBARA COUNTY<br>BOARD OF SUPERVISORS,<br><br>            Respondent and<br>            Defendant.<br><br>    and<br><br>ENVIRONMENTAL DEFENSE<br>CENTER, GET OIL OUT!,<br>SANTA BARBARA COUNTY<br>ACTION NETWORK, SIERRA<br>CLUB, SURFRIDER FOUNDATION,<br>CENTER FOR BIOLOGICAL<br>DIVERSITY, and WISHTOYO<br>FOUNDATION,<br><br>            Intervenors. | Case No. 2:22-cv-03225-DMG (MRWx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER/PLAINTIFF EXXON MOBIL CORPORATION'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO RESPONDENT/DEFENDANT'S AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT ON FIRST CAUSE OF ACTION FOR WRIT OF ADMINISTRATIVE MANDATE**<br><br>**Judge**:  Hon. Dolly M. Gee<br>**Hearing**:  June 16, 2023<br>**Time**:  2:00 p.m.<br>**Courtroom**: 8C |

1

**TABLE OF CONTENTS**

2

Page

3   INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

    A.   ExxonMobil's Santa Ynez Unit Has Operated Safely and Complied with Strict Environmental Regulations for More Than 30 Years. ............................................................................................ 3

    B.   SYU's Development Plan and Long-Standing County Policy Recognize That ExxonMobil Must Have Market Access. .................. 5

    C.   The Record Contains All the Evidence and Findings Necessary to Approve the Project. ................................................................. 6

    D.   The Board of Supervisors Disregarded the Evidence in the Record Supporting the Project's Approval. ....................................... 10

    E.   The Board's Denial Substantially Affects ExxonMobil's Fundamental Vested Right to Restart and Operate SYU ................... 13

LEGAL STANDARD .................................................................................. 13

ARGUMENT ............................................................................................... 15

I.    The Independent-Judgment Test Applies Because the Denial Substantially Affects ExxonMobil's Fundamental Vested Right to Restart and Operate SYU. ................................................................. 15

II.   The Weight of the Evidence Compels Approval of the Project. ................... 18

    A.   The Streets and Highways Are Adequate and Properly Designed to Carry the Type and Quantity of Traffic Generated by the Project. ...................................................................................... 20

    B.   The Project Will Not Be Detrimental to the Comfort, Convenience, General Welfare, Health, and Safety of the Neighborhood and Will Not Be Incompatible with the Surrounding Area. ............................................................................. 24

    C.   The Project's Benefits Outweigh Its Risks. .......................................... 27

III.  The Board's Findings Are Not Supported by Substantial Evidence............ 32

IV.  The Board's Decision Is Inconsistent with County Policy and Law, and It Constitutes an Ultra Vires *De Facto* Ban on Trucking Oil. ...................... 35

CONCLUSION............................................................................................. 39

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.*,
228 Cal.App.3d 1548 (1991).................................................................14

*Ass'n for Prot. etc. Values v. City of Ukiah*,
2 Cal.App.4th 720 (1991).................................................................33

*Bank of Am. v. State Water Res. Control Bd.*,
42 Cal.App.3d 198 (1974).................................................................14, 33

*Banker's Hill, Hillcrest, Park Wt. Cmty.. Pres. Grp. v. City of San Diego*,
139 Cal.App.4th 249 (2006).................................................................33

*Bixby v. Pierno*,
4 Cal.3d 130 (1971).................................................................14, 19

*Breneric Assocs. v. City of Del Mar*,
69 Cal.App.4th 166 (1998).................................................................14

*Cty. of San Diego v. Assessment Appeals Bd. No. 2*,
148 Cal.App.3d 548 (1983).................................................................15

*Drummey v. State Bd. of Funeral Directors*,
13 Cal.2d 75 (1939).................................................................19

*Gabric v. City of Rancho Palos Verdes*,
73 Cal.App.3d 183 (Ct. App. 1977).................................................................38

*Gentry v. City of Murrieta*,
36 Cal.App.4th 1359, *as modified on denial of reh'g* (Aug. 17, 1995).................33

*Goat Hill Tavern v. City of Costa Mesa*,
6 Cal.App.4th 1519 (1992).................................................................passim

*Harrington v. City of Davis*,
16 Cal.App.5th 420 (Ct. App. 2017).................................................................37

*Hope v. Cal. Youth Auth.*,
134 Cal.App.4th 577 (2005).................................................................15

*Jones v. City of Orange Cove*,
454 F.App'x. 601 (9th Cir. 2011).................................................................37

*Lucas Valley Homeowners Ass'n. v. Cty. of Marin*,
233 Cal.App.3d 130 (1991).................................................................32

*Occidental Eng'g Co. v. INS*,
753 F.2d 766 (9th Cir. 1985).................................................................13

*The Termo Co. v. Luther*,
169 Cal.App.4th 394 (2008).................................................................16, 17

*Topanga Assn. for a Scenic Cmty. v. Cty. of Los Angeles*,
11 Cal.3d 506 (1974).................................................................14, 34

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

**Other Authorities**

Cal. Civ. Proc. Code § 1094.5 ........................................................................14, 20, 32

CZO § 35-154.5(i) ...................................................................................................passim

CZO § 35-174.7.1 .........................................................................................9, 19, 24

LUDC § 35.52.060.B.10.b..........................................................................................passim

LUDC § 35.82.080.E.1 .................................................................................9, 19, 24

**INTRODUCTION**

For over three decades, ExxonMobil's Santa Ynez Unit ("SYU") brought local, low-carbon oil to California, quality jobs to the citizens of Santa Barbara, and millions of dollars in annual tax revenues to the County. Consistent with local regulations, SYU's oil was transported to refineries through two pipelines— formerly owned by Plains Pipeline, L.P. ("Plains"). In May 2015, one of those pipelines ruptured, and Plains shut down both. Permit applications to replace the pipelines or add safety valves to the existing pipelines are pending. In the meantime, SYU has been shut in and cannot restart without a means to transport its oil to the market.

There is a ready answer to this dilemma: temporarily trucking SYU's oil for up to seven years or until a pipeline becomes available, whichever period is shortest. This solution is contemplated by Santa Barbara's own Land Use Plan— which states that "[t]he County *should assure* that producers have access to competitive markets"—and codified in local laws that allow for other forms of oil transportation until a pipeline is available and if all environmental impacts are mitigated to the "*maximum extent feasible*." ExxonMobil's temporary trucking permit application (the "Project") met these and all other applicable criteria required by local law.

Nevertheless, the Board of Supervisors voted 3-2 to deny the Project, forcing SYU's facilities to remain shuttered indefinitely. The Board did so under manufactured pretenses divorced from the specific Project application and against the advice of the County's own Planning & Development Staff ("Staff"), who spent years analyzing all of the potential risks and benefits of allowing ExxonMobil to transport oil by truck and thus to reopen SYU.

Based on its extensive review of the record—which included the accident data and other evidence on which the Board should have ultimately relied—Staff concluded that the Project complied with the County's Land Use and Development

Code ("LUDC") and Coastal Zoning Ordinance ("CZO").  Specifically, Staff found that the Project cumulatively added *just nine trucks per day* to County roads and highways.  All the Project's potential environmental impacts, except one, were "*less than significant*" with the proposed mitigation measures in place.  And the odds of the one significant impact—an accident resulting in an oil spill—were vanishingly small, amounting to risking a single five-gallon-or-more release in the course of *17 years*.

The Board ignored thousands of pages of evidence and analysis from Staff and state agencies, which supported Staff's findings that the Project met all the necessary requirements.  It also refused to acknowledge the clear benefits of replacing foreign-produced crude with cleaner domestic oil, and thumbed its nose at the return of hundreds of local jobs and millions of dollars in lost taxes.  Instead of approving the Project, as County Staff recommended, the Board rejected it—and in doing so, openly admitted its animus toward trucking, the oil industry in general, and ExxonMobil in particular.

The Court cannot let this decision stand.  Through its denial, the Board committed a prejudicial abuse of discretion in three ways.  *First*, the denial effectively revokes ExxonMobil's undisputed, fundamental vested right to restart and operate SYU.  The Board has made that right meaningless by preventing ExxonMobil from transporting oil out of the facility.  *Second*, the Board abused its discretion by disregarding the overwhelming evidence that the Project should be approved.  *Finally*, the Board failed to proceed in the manner required by law, setting aside County laws that authorize oil transportation by means other than pipeline and imposing its own piecemeal *de facto* ban on trucking crude oil, not only in the County but also to the region and beyond.

ExxonMobil respectfully requests that the Court grant summary judgment on its First Cause of Action for Writ of Administrative Mandate, setting aside the Board's denial of the Project and ordering the Board to reconsider the Project

consistent with the Court's opinion.

## STATEMENT OF FACTS

**A.    ExxonMobil's Santa Ynez Unit Has Operated Safely and Complied with Strict Environmental Regulations for More Than 30 Years.**

ExxonMobil owns and operates SYU, an oil-production facility consisting of three offshore platforms called Hondo, Harmony, and Heritage and an onshore processing center located in Las Flores Canyon ("LFC") that processes the crude oil produced by the platforms.  37-AR-014848, 014850.  The platforms are located on submerged lands leased for decades from the United States in federal waters off the coast of Santa Barbara County.  SYU operates pursuant to the September 1986 County Development Plan (87-DP-32cz) (the "Development Plan").  37-AR-014848.

SYU has a long history of environmental compliance and safety. ExxonMobil built LFC and started transporting SYU's oil to third-party refineries via pipeline to address the concerns of the County and the environmental community.[1]  37-AR-014850.  SYU produced nearly 600 million barrels of oil over thirty years without incident and received 14 federal safety awards.  1-AR-000146. When fully operational, SYU employed hundreds of workers and paid millions of dollars in taxes to the County.  37-AR-014639.

Between 1993 and 2015, oil processed at LFC was transported to refineries through a pipeline system, consisting of Lines 901 and 903, which was then owned and operated by Plains.[2]  37-AR-014580.  On May 19, 2015, Line 901 ruptured—

---

[1] Prior to the construction of LFC, ExxonMobil transported SYU's crude oil from its offshore platforms via marine tankers.  As required by the Development Plan, ExxonMobil decommissioned its then-existing offshore storage and treatment vessels previously used to load oil onto the tankers, stopped its marine tankering operations, and switched to transportation via pipeline.  37-AR-014679, 014850. With no pipeline available and the Board refusing to adhere to County policy and local laws authorizing alternative means of transportation, ExxonMobil has no current ability to produce from the wells.

[2] On March 13, 2023, the Planning and Development Director approved the permit transferring ownership of Lines 901 and 903 (now called the Las Flores Pipeline System) from Plains to Pacific Pipeline Company ("PPC"), a wholly owned

through no fault of ExxonMobil—and Plains shut down both pipelines. *Id.*
ExxonMobil shut down SYU production in June 2015 and implemented
preservation plans for the facilities. 37-AR-014581. In February 2016,
ExxonMobil received an emergency permit allowing the company to de-inventory
approximately 400,000 barrels of crude oil via approximately 2,500 trucks. *Id.*; 60-
AR-026412; 65-AR-029887. The trips—totaling over 350,000 miles—were safely
completed without incident. 60-AR-0264120.

In August 2017, Plains submitted an application to replace Lines 901 and
903. 37-AR-014582. Nearly six years later, the application is still being processed
by the County. *Id.* If approved, a replacement pipeline would take four to seven
years to complete. *Id.* In December 2021, Plains submitted a separate
application—now being pursued by PPC—seeking to install 16 new safety valves
on Lines 901 and 903. That application, if approved, would ensure compliance
with Assembly Bill 864 (2015), which requires that operators install the best
available technology on existing pipelines in the Coastal Zone to reduce the volume
of potential release. The replacement pipeline application is still in the midst of the
environmental impact review process, and the valve application has received
opposition from anti-oil advocates.

Since the SYU shut-in, ExxonMobil has continued to maintain, inspect, and
monitor the SYU platforms and facilities to ensure their integrity. 37-AR-014581.
Each year, the company spends tens of millions of dollars to maintain the facilities
and pays the County more than $1 million in taxes. 37-AR-014639. And, while
ExxonMobil has the undisputed right to restart production at SYU at any time (37-
AR-014573, 014810), the exercise of that right is illusory so long as ExxonMobil
has no way to transport the oil from LFC to market.

---

subsidiary of Mobil Pacific Pipeline Company, which is a subsidiary of
ExxonMobil. Various groups have appealed the Director's transfer approval.

**B.    SYU's Development Plan and Long-Standing County Policy Recognize That ExxonMobil Must Have Market Access.**

Both the Development Plan and County policy recognize ExxonMobil's right to use other means to transport its oil if a pipeline is not available.  Under the Development Plan, SYU's oil "shall be transported from the facility and the County by pipeline in a manner consistent with Santa Barbara Local Coastal Plan Policy 6-8."  37-AR-014821.  Subsection (d) of that policy states, "[u]ntil pipelines become available…other modes of oil transportation are allowed."  RJN Ex. A at 70.  The Development Plan *also* provides that "[t]ransportation by a mode other than pipeline may be permitted only in accordance with [CZO] Section 35-154.5(i)..."  37-AR-014821–22.  Like Subsection (d), this CZO Section authorizes oil transportation, by a means other than a pipeline, if no pipeline is available.[3]   RJN Ex. B at 9-6–7.  Indeed, since 1984, the Coastal Land Use Plan has provided that:

> **Oil transportation is one of the key issues associated with oil development in Santa Barbara County** . . . **The County *should assure* that producers have access to competitive markets**, however, the County need not provide unlimited flexibility to all producers.  **Since pipelines are not yet in place** and may not be constructed to all refining centers, **other methods of oil transportation are *needed*** for production that precedes pipeline construction and operation and **for refining centers not served by pipeline.**

RJN Ex. A at 66–67 (emphasis added).

Consistent with Santa Barbara's plan, policy, and local law—because a pipeline was not available—on September 22, 2017, ExxonMobil applied to the County to allow for temporary trucking from LFC to local refining facilities.  37-AR-014567.[4]  This phased plan was designed to ensure a safe and environmentally

---

[3] LUDC Section 35.52.060.B.10.b includes similar provisions permitting oil to be transported by means other than pipeline.  RJN Ex. C at 5-13.

[4] Documents within the administrative record refer to the initial application as the "Proposed Project."  In August of 2020, Phillips 66 announced that it would close SMPS in 2023.  Accordingly, the Project was revised to reduce production from 11,000 to 10,880 barrels per day.  37-AR-014855–57.  The Project underwent other modifications, including the addition of numerous mitigation measures, discussed herein.  The Board considered this "Modified Project."

1   responsible restart to SYU operations, restoring hundreds of jobs to the County and
2   locally produced oil to California.  37-AR-014807.

3        Under the Project, experienced drivers—subject to strict protocols and using
4   trucks equipped with up-to-date safety systems—would transport approximately
5   11,000 barrels of crude oil each day from LFC to either the Phillips 66 Santa Maria
6   Pump Station ("SMPS"), located outside the City of Santa Maria, or to the Pentland
7   Terminal ("Pentland"), located in Kern County.  37-AR-014737, 014742, 014823,
8   014841.  This volume equates to a little over one-third (39%) of the oil production
9   rate of SYU prior to its shut-in.  37-AR-014579, 014639, 014765, 014805.
10  Transportation would occur seven days a week; no more than 70 trucks within a 24-
11  hour period would commute between SYU and the designated refinery.  37-AR-
12  014805.  The Project would continue for up to seven years, or until a pipeline
13  became available, whichever is shorter.  37-AR-014802.

14  **C.  The Record Contains All the Evidence and Findings Necessary to Approve the Project.**

16       The County prepared a Supplemental Environmental Impact Report ("SEIR")
17  under the California Environmental Quality Act ("CEQA") as part of the permitting
18  process.[5]  37-AR-014804.  The Revised Final SEIR,[6] released in August 2021
19  ("Final SEIR"), consisted of three separate volumes—containing more than 3,000
20  pages—that evaluated every relevant aspect of the Project, including its objectives,
21  ten possible alternatives, related environmental impacts, and mitigation measures to
22  address those impacts.  37-AR-014787, 014846–47; 41-AR-017851.  On September
23  8, 2021, Staff released a report (the "Staff Report") recommending approval of the

24

25  [5] An SEIR enables responsible agencies to review and evaluate detailed information
    about a project's environmental effects, ways to minimize the significant
26  environmental effects, and reasonable alternatives to the project.  37-AR-014802.

27  [6] Two SEIRs were prepared related to ExxonMobil's trucking application.  The first
    was completed in July 2020.  Staff prepared a revised SEIR to address changes
28  resulting from the closure of SMPS during the lifetime of the Project, requiring that
    all oil subsequently be transported to Pentland.  37-AR-014845–46.

-6-

Project as modified by the combination of two project alternatives and proposed implementation of the various mitigation measures discussed in the Final SEIR. 37-AR-014567–69.  With these modifications, Staff determined that each of the findings necessary for approval were satisfied.

**Mitigation of Unavoidable Impacts to the Maximum Extent Feasible (37-AR-014630–33)**:  The Final SEIR identified *only one* unavoidable Class I impact: the risk of an accidental oil spill from trucking.  37-AR-014812.  Staff recommended, and ExxonMobil accepted, multiple robust mitigation measures identified in the Final SEIR that would reduce the likelihood of a truck accident on the proposed routes by 33%.  38-AR-015032.  The mitigation measures included, among other things:

- Implementing a plan on truck operation safety to minimize the potential of an accident and spill;
- Updating the existing SYU prevention and emergency response plans;
- Ensuring that all third-party trucking companies would be financially responsible for the costs of a cleanup should a spill occur;
- Ensuring each trucking company had an oil spill contingency plan; and
- Funding the County Fire Department's purchase of equipment for use in the event of a spill.  38-AR-015028–32.

With those and other proposed mitigation measures in place, Staff projected the likelihood of an accident resulting in an oil spill to be *one in every 52 years* for trucks traveling to SMPS and *one in every 17 years* for those going to Pentland. 38-AR-015022.  While the risk of an accident and spill would still exist, Staff found that these measures mitigated the risk to the "maximum extent feasible."  37-AR-014588.

**Mitigation of All Other Impacts to the Point of Insignificance (37-AR-014633–35)**:  The Final SEIR identified a number of Class II significant environmental impacts, including traffic and circulation.  37-AR-014586–87.  To

address those concerns, Staff considered two mitigation measures:  (1) prohibiting truck travel during peak morning and evening hours and (2) preventing trucks from travelling on particular roadways during school bussing hours and restricting the speed limit for trucks driving on those roadways.  38-AR-015106, 015113.  Implementation of these mitigation measures reduced the risk to "less than significant."  37-AR-014586.[7]

**Project Alternatives and Mitigation Measures Not Feasible (37-AR-014635–36)**:  Staff considered ten Project alternatives but ultimately determined that only two met the objectives of the Project and were environmentally superior to the others.  In its Report, Staff proposed adoption of a "No Trucking During Rainy Periods" alternative, which was aimed at reducing the probability of a trucking accident and the severity of an oil spill.  Staff also recommended adopting a "Trucking to SMPS Only" alternative that would require ExxonMobil to send trucks exclusively to SMPS while it was still operating, and then to transition trucking to Pentland only after SMPS was shut down.  37-AR-014571.  Doing so was expected to reduce the likelihood of an accident and spill due to the shorter routes being travelled.

**Statement of Overriding Considerations (37-AR-014636–40)**:  Because a Class I risk was identified for the Project, Staff prepared a Statement of Overriding Considerations for the Board to adopt.  37-AR-014584.  The statement identified a number of benefits related to the Project, including: (1) returning locally produced and supplied oil with lower carbon intensity; (2) restoring local jobs and expenditures at local businesses; and (3) increasing County revenues through taxes and mitigation funding.  37-AR-014636–40.  Staff determined that these benefits outweighed the risk that an oil spill would occur, warranting approval of the Project.  37-AR-014636.

---

[7] The Project's various mitigation measures also reduced the other Class II impacts—including air quality and greenhouse gases—to "less than significant." 37-AR-014813–14.

**Compliance with LUDC Section 35.82.080.E.1 and CZO Section 35-174.7.1 (37-AR-014640–48)**:  These sections provide identical required findings that must be made for the initial approval or modification of a development plan. Staff found that the Project met them all.  37-AR-014640–48.

- *The Project site is adequate*.  Facilities at LFC, SMPS, and Pentland could accommodate the Project and containment structures were in place to address any spills at those locations.  37-AR-014595–615, 014852–61.

- *The Project mitigates all adverse impacts to the maximum extent feasible.*  As discussed above, the Project's mitigation measures reduced the risk of oil spills to the maximum extent feasible and all other impacts were less than significant.  37-AR-014584–88, 014823–40.

- *The streets and highways are adequate for the Project.*  Cumulatively, the Project would add only nine trucks per day to existing traffic. Mitigation measures prohibited transport during peak traffic hours.  The impact on traffic would be less than significant.  No improvements to the streets or highways was required.  37-AR-014641–42, 014645–46; 38-AR-015090–126.

- *Public services are adequate for the Project.*  Existing fire protection equipment at LFC and practices along with County fire protection services were adequate for the project.  And no additional public services would be required.  37-AR-014642, 014646; 38-AR-015197.

- *The Project will not be detrimental to the general welfare, health, or safety of the impacted neighborhoods and surrounding areas.*  Impacts on air quality would be below County thresholds.  The Project included numerous mitigation measures designed to significantly reduce the impact on traffic and the risk of accidents.  Indeed, the risk of accidents resulting in fatalities and injuries was within acceptable thresholds for the County. 37-AR-014642–43, 014646–47.

- ***The Project complies with all applicable requirements of the County's Development Code and Comprehensive Plan.*** The Project conformed with the County's Comprehensive Plan, applicable Coastal Land Use Plan policies and standards, and zoning ordinances. 37-AR-014643, 014647; 38-AR-015060–85.
- ***The Project is compatible with designated rural areas.*** The Final SEIR did not identify any land use or aesthetic impacts from the Project. 37-AR-014643–44, 014647–48.
- ***There are no conflicts with easements or public use.*** There are no public easements on or through LFC and public access to local roads and highways would not be affected. 37-AR-014644, 014648.

**The Use of a Pipeline to Transport Crude Oil Is Not Feasible under LUDC Section 35.52.060.B.10.b and CZO Section 35-154.5(i) (37-AR-014648–51)**: The LUDC and CZO both contain provisions contemplating that crude oil may be transported by a means other than pipeline if, *inter alia*, there is no pipeline available and environmental impacts are "mitigated to the maximum extent feasible." RJN Exs. B–C. Staff determined that SYU lacks access to a pipeline and the Project met the mitigation standard. It likewise found that the Project met these regulations' other required criteria. 37-AR-014619–21, 014624–27.

**D.    The Board of Supervisors Disregarded the Evidence in the Record Supporting the Project's Approval.**

Following the completion and publication of the Staff Report, the Planning Commission held a public hearing on the Project on September 29, 2021, during which proponents and opponents of the Project provided comments and opinion. 60-AR-026388. The Planning Commission then continued the hearing to November 3, 2021 and instructed Staff to return with recommended Findings for Denial. 60-AR-026385–86; 37-AR-14779–84. At the continued hearing in November, the Planning Commission voted 3-2 to recommend that the Board deny

-10-

the Project.  60-AR-026364–65, 026369.

On March 8, 2022, the Board held a public hearing on the Project.  The Board's responsibility was to determine whether it could make the necessary findings to support approval of the Project.  In light of County's mandate to provide oil producers with access to the market and based on the information in the Final SEIR and Staff Report, Project approval was the only reasonable conclusion.  But the Board generally ignored local law and Staff's well-developed and studied findings.

Comments from the Board members who voted against the Project show that they were not making a determination on this specific permit but instead were using it as a vehicle to legislate the future of the oil industry in Santa Barbara County:

*Vice Chair Das Williams:*

> **I've spent most of my life as a foot soldier for the local environmental movement,** I'll say that it took decades of negotiation, fighting, public hearings to get to the point where most of the oil in the County was -- **most of the volume was pipelined.**…
>
> **I find it sad that through the negligence of another oil company** that that balance or that sort of piece was ruptured and now **we fight over the future after that pipeline rupture**.
>
> **I hope for the day that**, the industry transforms enough to bridge the gap…I hope **there's solar panels at Las Flores Canyon**, and I hope for the day **when ExxonMobil is making money in renewable energy** in our community.  But the day isn't today.  1-AR-000158–60.

*Supervisor Gregg Hart:*

> **We must reduce our dependence on fossil fuels to achieve true energy independence.**  Our County and the world have faced oil shocks in the past.  The OPEC oil embargo in the '70s, the Iranian Revolution, the Iran-Iraq War.  **The policy mistake we made each time oil supplies were interrupted by events was not taking advantage of those crises to advance renewable energy supplies.**
>
> **We can't make this mistake again**…While our decision today is limited in scope to the temporary trucking program that would allow the Santa Ynez Unit to restart operations before the reconstruction of the pipeline **I believe that our community wants to send a clear message that we are unwilling to risk damage to our environment in exchange for short term corporate profits**, uncertain local jobs, and modest tax revenue.  1-AR-000170–71.

-11-

*Chair Joan Hartmann:*

> **We often talk about the transition to renewable energy and it's always way out there, but once it starts happening, it starts happening quickly.**  One of my favorite images is of 1900 in New York on Fifth Avenue where there's 50 horses and one car.  Thirteen years later in 1913, there's 40 cars and one horse-drawn carriage.  Once change starts, it can really happen quickly, and I believe that's going to be the case with our transition to renewable energy.

> So we can think about it in terms of just the trucking.  I do believe, however, that we need to think about this more broadly and we do have discretion about the baseline.  **The baseline in my view is current conditions and the current conditions are that we are in a climate crisis** and the GHGs from this, it could offset the trucking, although only one-tenth of it would be local, but **the facility itself is the largest greenhouse gas emitter in our County.**

> **And then the burning of the fossil fuels itself, that is not mitigated for either.  So is this really the direction to go when we are facing a climate crisis?**  I just, for my way of thinking, that is just not the case.  1-AR-000182.

Following the hearing, the Board voted 3-2 to deny the Project (the "Denial") and adopted the Findings for Denial Staff prepared at the direction of the Planning Commission, with minor revisions.  1-AR-000010–13.  The Board concluded that the Project was exempt from environmental review under CEQA because the Project was being denied and that even if it were to approve the Project, it could not make the required Statement of Overriding Considerations under CEQA.  1-AR-000010–11.  It also concluded that it could not make the following administrative findings:  (1) that streets and highways will be/are adequate and properly designed to carry the type and quantity of traffic generated by the proposed use; and (2) that the Project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area.  1-AR-000011–12.  Those findings were not specific to the Project—beyond that it would add trucks to the roads.  Rather, the Board relied on comments from public and anti-oil advocates—including the Intervenors—to identify existing behavior of other drivers, accident rates, and past oil tanker accidents to serve as the basis for its Denial.  1-AR-000012.

**E.    The Board's Denial Substantially Affects ExxonMobil's Fundamental Vested Right to Restart and Operate SYU.**

ExxonMobil has a vested right to restart and operate SYU at any time without the County's permission.  37-AR-014573.  ExxonMobil has spent decades and invested substantial resources creating, operating, and maintaining the facility.  *See* 37-AR-014848–50.  This includes not only the investments made to develop the offshore facilities but also the costs associated with obtaining the Development Plan, expanding SYU to incorporate LFC, and now maintaining the facilities while they remain shut-in.  *See* 37-AR-014850–51.  ExxonMobil did so in reliance on the fact that SYU would continue to operate and have access to the market, as contemplated by both the Development Plan and Santa Barbara policy and local law.  37-AR-014821–22; RJN Exs. A–C.  ExxonMobil did not and could not expect that the Board—contrary to County policy and law—would use the Project as a means to legislate a ban on any future oil trucking projects.

The wells beneath the offshore platforms still maintain significant reserves that could provide a cleaner oil source for Californians.  *See* 37-AR-014637–38; 66-AR-030668.  Approval of the trucking project would enable ExxonMobil to start up its oil production and processing at 39% of its pre-closure baseline capacity.  37-AR-014579, 014639, 014765, 014805.  The Board's Denial substantially affects ExxonMobil's right to restart and operate SYU because ExxonMobil currently has no way of transporting its oil to market.

## LEGAL STANDARD

In a challenge to the final decision of a California administrative agency, the standard for review is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).  "Summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770.  A determination amounts to

-13-

an abuse of discretion and thus violates California law when: (1) the agency failed
to proceed in the manner required by law; (2) the decision is not supported by the
findings; or (3) the findings are not supported by the evidence. Cal. Civ. Proc.
Code § 1094.5(b).

"If an administrative decision substantially affects a fundamental vested
right, the trial court must exercise its independent judgment on the evidence and
find an abuse of discretion if the findings are not supported by the weight of the
evidence." *Goat Hill Tavern v. City of Costa Mesa*, 6 Cal.App.4th 1519, 1525
(1992). Whether the administrative decision "substantially affects a fundamental
vested right must be decided on a case-by-case basis." *Id.* at 1526 (quoting *301
Ocean Ave. Corp. v. Santa Monica Rent Control Bd.*, 228 Cal.App.3d 1548, 1556
(1991)).[8] As the California Supreme Court explained in *Bixby v. Pierno*:

> **By carefully scrutinizing administrative decisions which
> substantially affect vested, fundamental rights, the courts of
> California have undertaken to protect such rights** . . . from
> untoward intrusions by the massive apparatus of government. If the
> decision of an administrative agency will substantially affect such a
> right, **the trial court not only examines the administrative record
> for errors of law but also exercises its independent judgment upon
> the evidence disclosed in a limited trial de novo**.

4 Cal.3d 130, 143 (1971) (emphasis added) (footnotes omitted).

Where no fundamental vested right is implicated, abuse of discretion is
established if the findings are not supported by substantial evidence in light of the
whole record. Cal. Civ. Proc. Code § 1094.5(c). For evidence to be "substantial,"
it "must be of ponderable legal significance . . . reasonable in nature, credible, and
of solid value; it must actually be 'substantial' proof of the essentials which the law
requires in a particular case." *Bank of Am. v. State Water Res. Control Bd.*, 42
Cal.App.3d 198, 213 (1974). "Substantial" refers to the quality, not the quantity, of

---

[8] The Board's Motion cites and discusses *Topanga Ass'n for a Scenic Cmty. v. Cty.
of Los Angeles* and *Breneric Assocs. v. City of Del Mar* in connection with its
discussion of the independent judgment test. *See* Bd. Mot at 9. But, both of these
cases analyze the facts under the substantial evidence standard. *See Topanga Ass'n*,
11 Cal.3d 506, 514 (1974); *Breneric*, 69 Cal.App.4th 166, 175 (1998).

the evidence. *Hope v. Cal. Youth Auth.*, 134 Cal.App.4th 577, 589 (2005). The evidence is not viewed in isolation; the Court must consider both supporting and contrary evidence to fairly estimate its worth. *Cty. of San Diego v. Assessment Appeals Bd. No. 2*, 148 Cal.App.3d 548, 555 (1983).

**ARGUMENT**

**I.    The Independent-Judgment Test Applies Because the Denial Substantially Affects ExxonMobil's Fundamental Vested Right to Restart and Operate SYU.**

So long as ExxonMobil cannot transport oil from SYU to market, that facility is effectively useless and its rights are abrogated. Though the Board makes only passing references to the independent-judgment standard and Intervenors all but ignore it, this test applies because the Denial substantially affects Exxon's undisputed, fundamental vested right to restart and operate SYU. *See* Bd. Mot. at 10; *see also* 37-AR-014573. ExxonMobil operated SYU for over three decades, performed substantial work, and made significant investments in the facility over that time. *See* 37-AR-014848–51. The Denial effectively stripped ExxonMobil's vested rights for the foreseeable future and threatens SYU's continued existence.

*Goat Hill Tavern*—the leading case prescribing independent-judgment review in the land-use context—is instructive. 6 Cal.App.4th 1519. There, the City of Costa Mesa refused to renew a temporary conditional use permit ("CUP"), with the "avowed purpose and result" to shut the tavern down. *Id.* at 1528. The tavern had operated continuously since 1955. *Id.* at 1522. The plaintiff purchased the tavern in 1984 and spent approximately $1.75 million refurbishing it. *Id.* at 1523. He expanded the property to add a game room in 1988 and eventually received a six-month CUP for that space. The city renewed the CUP twice, though the record indicates that the owner was not always timely in seeking renewals. After the tavern's request for a third renewal was denied, the owner initiated suit seeking a writ of administrative mandamus. *Id.* at 1525. The trial court—applying the independent-judgment test—concluded that the city's denial was erroneous and

-15-

granted the writ.  *Id*.  The Court of Appeal affirmed, finding that the plaintiff had more than "a purely economic privilege," as the city suggested, but instead had "*the right to continue operating an established business* in which he has made a *substantial investment*."  *Id*. at 1529 (emphasis added).  The court found the City's decision to deny renewal of the CUP had the effect of destroying a business that had "operated legally for 35 years," an action that "implicate[d] a fundamental vested right of the property owner."  *Id*. at 1531.

Similarly, the California Court of Appeal in *The Termo Co. v. Luther*, 169 Cal.App.4th 394 (2008), held that an administrative decision that threatened the existence of an oil-drilling business affected the owner's fundamental vested right to continued operations.  In *Termo*, the owner and operator of 28 idled oil wells was ordered by the Director of Conservation to plug and abandon the wells.  *Id*. at 407– 08.  Termo filed a petition for administrative mandamus to set aside the order, arguing the Director had acted beyond his jurisdiction and the order was unreasonable and unsupported by the evidence.  *Id*. at 401.  The trial court, applying the substantial-evidence test, denied the petition.  *Id*. at 404.  The Court of Appeal reversed the decision, finding the independent-judgment standard instead applied.  *Id*. at 413.  It considered how the order to plug and abandon the wells "would have the effect not only of shutting down a business that has been in existence for 20 years or more, but also of terminating the right to produce oil—an extraordinarily valuable resource, especially in the current economic era."  *Id*. at 407.  It concluded "that the right to extract oil is vested" and that the right was "fundamental considering its potentially massive economic aspect and its considerable effect in human terms."  *Id*. at 407–08.

Here, the Board and Intervenors erroneously assert that the substantial-evidence standard applies.  Bd. Mot. at 10–11; Intvs. Mot. at 10.  While the Intervenors merely presume that standard applies, the Board asserts three reasons to apply it here:  (1) that ExxonMobil's permit—the Development Plan—and vested

-16-

1  rights do not include "transport[ation] of crude oil by truck"; (2) that Plains, not the

2  Board, interfered with ExxonMobil's ability to produce oil; and (3) that any harm is

3  purely economic.  Bd. Mot. at 10–11.  These arguments fail in light of *Goat Hill*

4  *Tavern*, *Termo*, and the unique facts of this case.

5       Neither the existence of a permit to truck crude oil nor the initial cause of

6  SYU's shut-in determines whether ExxonMobil's undisputed, vested right to

7  operate and restart SYU has been affected or the applicable standard of review.

8  What matters is that—just as in *Goat Hill Tavern* and *Termo*—a government

9  entity's decision has effectively prevented a long-standing business from

10  continuing to operate.  *Goat Hill Tavern*, 6 Cal.App.4th at 1529–30; *Termo*, 169

11  Cal.App.4th at 408.  In *Goat Hill Tavern*, the court applied the independent-

12  judgment test and reversed the denial of the renewal application even though the

13  tavern's CUP had expired.  6 Cal.App.4th at 1529–30.  And the *Termo* court's

14  decision is even more telling.  There, the 28 oil wells at issue had been idle for

15  years, and the Director argued that the owner had no vested right because "no

16  license or permit granting a right to operate the…oil wells has been issued."

17  *Termo*, 169 Cal.App.4th at 408; *compare with* Intvs. Mot. at 17 n.8.  The court

18  rejected that argument, applied the independent-judgement standard, and reversed

19  the order, finding:

20      [T]he Supervisor, through his regulatory authority, is eliminating the
right of the owners of the wells to bring them back on line, to operate

21  them, and to extract oil.  **To argue that the issuance of a license or
permit per se is outcome determinative is to elevate form over**

22  **substance.  We are talking about government permission of one
sort or another to carry on a business, and here, to produce oil.**

23

24  *Termo*, 169 Cal.App.4th at 408.  The same is true here.  The Board and Intervenors

25  do not and cannot reasonably dispute that the Denial substantially affects

26  ExxonMobil's ability to restart and operate SYU.

27      While ExxonMobil retains the right to drill for oil, that right means nothing if

28  ExxonMobil cannot transport that oil to refineries for processing and distribution to

the market for sale.  To state the obvious, selling oil is the purpose of drilling operations.  And SYU has finite storage capacity, so the facility cannot operate if the oil it collects has nowhere to go.  The Denial prevents SYU from transporting oil to market because there is no pipeline currently available and no certainty that the Board will ever approve one.  37-AR-014648–49.[9]

The Court should find that ExxonMobil's undisputed, fundamental vested right to operate SYU is substantially affected by the Board's Denial and should apply the independent-judgment test in its review of that decision.

## II.   The Weight of the Evidence Compels Approval of the Project.

The Board did not deny the Project because the Project failed to address environmental concerns or comply with state and local laws—the Project did all of those things.  Rather, the record shows the Board's Denial was an arbitrary, politically motivated decision that did not take into account the ample evidence supporting approval presented by Staff.  The independent-judgment standard protects vested rights against exactly this kind of capricious decision:

> **Legislative agencies**, with varying qualifications, **work in a field peculiarly exposed to political demands.**  Some may be expert and impartial, others subservient.  It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence.  But **to say that their findings of fact may be made conclusive where constitutional rights** or liberty and **property are involved, although the evidence clearly establishes that the findings are wrong and** constitutional rights have been invaded, **is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards.**  That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded.

---

[9] There are no other methods—besides trucking—for ExxonMobil to transport its oil.  The Final SEIR, which includes an analysis of Project alternatives, rejected the possibility of alternative modes of SYU crude oil transport.  In considering transport via marine barge, County Staff determined that the use of a marine barge "would increase the likelihood of a spill impacting the marine environment" and "[a]s such, risk of upset impacts would be substantially greater for marine transport than the proposed Project."  37-AR-014870–71.  County Staff also dismissed transport via railway because this alternative required building a rail spur to allow loading of tank cars with oil, for which there was insufficient space.  37-AR-014871.

*Bixby*, 4 Cal.3d at 138 (quoting *Drummey v. State Bd. of Funeral Directors*, 13 Cal.2d 75, 85 (1939)).

The Board's duty was to evaluate whether the Project complied with CEQA and local laws, including the LUDC and CZO, and make findings regarding the relevant provisions implicated by the Project. The Project, as modified, mitigated all potential adverse impacts, except for one, to "*less than significant*" levels. And the one unavoidable, significant risk—oil spills—was "*mitigated to the maximum extent feasible*." *See generally* 37-AR-014584–90. Nothing more is required by County law or policy, and following the detailed analysis and recommendations of its expert Staff, the Board could and should have approved the Project.

Disregarding its duty and Staff's findings, the Board instead relied heavily on speculative public comments and inapt evidence presented by Intervenors to justify their shared aims of banning oil and wholly replacing it with alternative energy sources. The Board attempted to justify this by claiming that it was unable to make two of the required findings:

- Streets and highways will be/are adequate and properly designed to carry the type and quantity of traffic generated by the proposed use. LUDC § 35.82.080.E.1(c); CZO § 35-174.7.1(c).

- The project will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area. LUDC § 35.82.080.E.1(e); CZO § 35-174.7.1 .

1-AR-000011–13. But the Board based its denial on *existing* driver behavior and accident rates on certain portions of Highway 101 and State Route 166, thereby ignoring the Staff Report and Final SEIR. *See id.* Those documents included an abundance of evidence that addressed these concerns, which the Board either failed to consider or dismissed out of hand. In doing so, the Board abused its discretion. *See City of Carmel-By-The-Sea v. Monterey Cty. Bd. of Supervisors*, 71 Cal.App.3d

84, 94 (1977) ("While an EIR does not require a public agency to act in any particular manner, it constitutes evidence which must be considered by the public agency along with other evidence which may be presented to the agency.").

The Board also asserted that it could not make findings in support of the Statement of Overriding Considerations because there was not substantial evidence that the Project's benefits outweighed the significant impacts on the environment. 1-AR-000010–11. But the Board's own conclusory, speculative rationales for rejecting the identified benefits demonstrate that it did not adequately weigh the evidence provided by Staff and ExxonMobil on these issues.

Where, as here, a fundamental vested right exists, the Court must exercise its independent judgment in reviewing the record to assess whether the findings are supported by the weight of the evidence. Cal. Civ. Proc. Code § 1094.5(c); *Bixby*, 4 Cal.3d at 144 ("…the courts have held the loss of [a fundamental, vested right] is sufficiently vital to the individual to compel a full and independent review. The abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction."). As demonstrated below, the Board's findings are not supported by substantial evidence, let alone the weight of the evidence in the record. The Court should order that the Denial be set aside and that the Board reconsider the Project consistent with the Court's findings, all requirements of CEQA, and all other applicable state and local policies, laws, ordinances, and regulations.

**A.     The Streets and Highways Are Adequate and Properly Designed to Carry the Type and Quantity of Traffic Generated by the Project.**

The evidence in the Staff Report and Final SEIR demonstrates that the County's streets and highways can accommodate the additional traffic the Project would generate. 37-AR-014641–42, 014645–46; 38-AR-015087–126. Even after SMPS's closure, the Project would add only about nine truck trips per day, which Staff found "would be *less than one truck per hour.*" 38-AR-015121, 37-AR-

-20-

014589–90.  And the Final SEIR found that the Project's impact on traffic and truck accidents would be "less than significant":

> **The proposed Project's contribution to cumulative traffic impacts along State Route 166 would be *less than significant*. … [And that] cumulative oil truck accidents along State Route 166 would be *less than significant*.** Implementation of the Applicant-proposed avoidance and minimization measures, as well as mitigation measure RISK-2 *would reduce the likelihood of an accident by about 33%*, and would further reduce the Project's contribution to cumulative safety risk along State Route 166.

38-AR-015122 (emphasis added); *see also* 38-AR-015018–20; 37-AR-014587. Similarly, the traffic analysis prepared by the County's traffic consultant and the opinion of the California Department of Transportation ("Caltrans")—the department tasked to ensure safety of the state's roads and highways—all demonstrate that the Project would not exceed any safety or capacity thresholds. 38-AR-015090–126; 40-AR-017639–75.  This includes the risks of accidents resulting in fatalities or injuries.



Figure 4.3-13    Risk Profiles for Crude Oil Transportation from LFC to the Pentland Terminal

Source: ExxonMobil TQRA 2020

EXXONMOBIL'S CROSS-MOTION AND OPPOSITION TO SUMMARY JUDGMENT MOTIONS

1   37-AR-015020, 015010–13.

2       The Board summarily reached the opposite conclusion.  Without identifying

3   any issues specific to the Project—beyond that it would add trucks to the roads—

4   the Board found that it could not approve the Project in light of behavior of other

5   drivers, accident rates, and past oil tanker accidents, none which involved

6   ExxonMobil.  1-AR-000012; *see also* Bd. Mot. at 11–16; Intvs. Mot. at 11–13.  In

7   so finding, the Board abused its discretion, ignoring the relevant evidence it

8   received and was required to consider in analyzing whether the Project, including

9   its mitigation measures and compliance with the relevant codes and ordinances.

10   *Carmel*, 71 Cal.App.3d at 94.

11       The Final SEIR discussed the rate of accidents on State Route 166 between

12   the Highway 101 interchange and the State Route 33 South Junction, which were

13   found to be "slightly higher" than the statewide average.  38-AR-015122.  Caltrans

14   data showed that 175 accidents on Route 166 within three years would be

15   considered statistically significant.  *Id.*  The actual number of accidents along that

16   route in the last three years observed was 167.  *Id.*  Because the expected number of

17   potentially additional accidents related to ExxonMobil's Project was estimated to

18   be 4.35 accidents over three years—bringing the total number of accidents to

19   171.35—Staff concluded that Project's cumulative effect on accidents along State

20   Route 166 would be less than significant.  *Id.*

21       The Final SEIR collected baseline traffic volumes along the proposed routes

22   from numerous sources, including Caltrans, and assessed peak hours of travel and

23   collision data.  38-AR-015090–97, 015108–10.  Two Class II risks were identified

24   related to transportation and circulation:

25       1.  Operational traffic trips could increase the volume to capacity (V/C) ratio

26         or [level of service] for relevant roadway segments and intersections; and

27       2.  Project-related trucks could create a traffic safety hazard.

28   38-AR-015103, 015107.  The Project's mitigation measures reduced these Class II

-22-

risks to "less than significant" levels.  To address concerns about increased truck traffic at two key intersections on the proposed route, Mitigation Measure TR-1 restricted ExxonMobil from trucking on the Highway 101 Northbound Ramp/State Route 166 intersection during morning peak hours, 5:30-6:30 a.m., and on the Highway 101 Southbound Ramp/State Route 166 intersection between 4:00-5:00 p.m.  38-AR-015106.

Regarding traffic safety, the Final SEIR focused on potential safety concerns to pedestrians, bicyclists, and school children of trucks traveling along Calle Real between LFC and Refugio Road due to the lack of road shoulders.  A viewpoint analysis was prepared along various points of Calle Real to assess a truck driver's viewing distance and ability to see pedestrians and bicyclists.  38-AR-015112.  The analysis considered trucks traveling at speeds between 30-55 miles per hour and determined that trucks travelling at 55 miles per hour could create significant safety concerns for this public traffic if not mitigated.  *Id.*  Thus, Mitigation Measure TR-3 required that trucks traveling on Calle Real drive a maximum of 35 miles per hour, or 30 miles per hour in rain.  38-AR-015113.  Mitigation Measure TR-2 restricted the use of Calle Real by ExxonMobil's trucks during peak school bussing hours, 7:45-8:30 a.m. and 2:55-3:40 p.m.  *Id.*  ExxonMobil would also trim vegetation along Calle Real to help improve visibility for all drivers.  38-AR-015056.

The Board asserts that the Court should accept its decision because its analysis "went beyond Staff's assessment that the Modified Project did not require that physical improvement be made to the streets and highways that the tanker trucks would use."[10]  Bd. Mot. at 14.  Not so.  The Final SEIR and Staff Report analyzed the *same* accident evidence the Board relied on, as well as extensive traffic and safety data and the various mitigation measures.  Both found the proposed mitigation measures reduced the two Class II transportation and

---

[10] The descriptions of the "streets and highways" in the preceding paragraphs of the Board's brief are supported by a citation to the Final SEIR, which shows that the "details" in fact *were* part of Staff's analysis.  *See* Bd. Mot. at 12–14.

1    circulation risks to "less than significant."  37-AR-014634–35.

2        **B.    The Project Will Not Be Detrimental to the Comfort, Convenience, General Welfare, Health, and Safety of the Neighborhood and Will Not Be Incompatible with the Surrounding Area.**

3

4        The evidence in the Staff Report and Final SEIR also demonstrates that the

5    Project would not be detrimental to the Santa Barbara community or incompatible

6    with the surrounding area.  Both reports found that the Project was "consistent" or

7    "in compliance" with all applicable County plans and policies.  37-AR-014595–

8    627; 38-AR-015060–85.  As to the findings required by LUDC Section

9    35.82.080.E.1(e) and CZO Section 35-174.7.1(e) , Staff recommended that the

10   Board find "that the proposed construction and operation of the project will not be

11   detrimental to the health, safety, and general welfare of the neighborhood and will

12   not be incompatible with the surrounding area."  37-AR-014643.  The Board, again,

13   rejected this proposed finding based on the behavior of other drivers, accident rates,

14   and past oil tanker accidents that did *not* involve ExxonMobil.  1-AR-000012–13.

15   That evidence was not specific to the Project and is not a valid basis for denial.  *See*

16   *Goat Hill Tavern,* 6 Cal.App.4th at 1531 (upholding reversal of permit renewal

17   because "[t]here was no showing to distinguish complaints about Goat Hill Tavern

18   from other possible causes . . . and the homeless who frequent the area.").

19       As discussed above, the record evidence shows that the risk that a Project

20   truck would be involved in an accident is "less than significant."  *See supra* § II.A.

21   And, as the Board's and Intervenors' evidence shows, there are already a number of

22   trucks transporting oil on the impacted roads.  So for the purposes of evaluating the

23   Project, the question should not be "when, such accidents and an oil spill will

24   occur" (Bd. Mot. at 17) but *if* trucks carrying SYU oil materially contribute to this

25   existing risk.  The evidence shows that while trucking oil has significant risks that

26   cannot be fully mitigated (38-AR-015032), the probability that the Project will

27   increase these risks is low.  38-AR-015022.

28       To evaluate risks posed by the Project, the Court should consider the

-24-

Project's mitigation measures—measures that the Board ignored.  Because the risk of an oil spill is, by definition, an identified Class I risk of the Project, ExxonMobil and Staff worked closely to refine the Project to mitigate that risk to the maximum extent feasible.  The measures were extensive.

*The Truck Hazard Mitigation Plan (Mitigation Measure RISK-1)* sought to address truck operation safety to minimize the potential for an accident and spill. 38-AR-015028.  Under this plan, ExxonMobil agreed to implement various requirements that would ensure the drivers and the trucks themselves were safe, including requiring that:

- All drivers would have at least two years of experience driving hazardous materials and undergo extensive training covering defensive driving, emergency response, trucking routes, loading and transportation procedures, local traffic concerns and hazards, driver safety, and driver courtesy.  *Id.*

- All trucks would be from 2017 or newer and be equipped with speed monitoring and limiting systems, roll stability control systems, electronic driver vehicle inspection report systems, and dual-sided dashboard cameras.  38-AR-015028–29.

- ExxonMobil would use an integrated satellite system to track and map locations, speeds, and other parameters and measure compliance with speed limits, acceleration, and deceleration for trucks in specific areas and/or at specific times of day.  38-AR-015028.

- Every truck would go through a safety and operability inspection, following state and federal truck standards, before being loaded and departing from LFC, with any truck that receives an unsatisfactory inspection losing permission to transport crude oil from LFC until the issue has been corrected.  38-AR-015029.

Collectively, these measures would help ensure even safer conditions along the

-25-

proposed roads for both the truck drivers and public commuters, mitigating against the likely causes of accidents that the Board and Intervenors identify.  For instance, the requirement that drivers undergo extensive training covering defensive driving and knowledge of the trucking routes addresses the concerns about aggressive drivers and road conditions, including blind portions of the highway.  *See* Bd. Mot. at 14; Intvs. Mot. at 11–12.  The use of recently manufactured trucks—with sophisticated features such as roll stability control systems and dual-sided dashboard cameras—similarly helps to ensure that potential accidents caused by reckless drivers can be minimized, if not prevented.

ExxonMobil also agreed to modify the Project to prohibit trucking when at least 1/2-inch of rain was forecasted over a 24-hour period.  37-AR-014877.  This would help to protect sensitive biological, cultural, and water resources from oil runoff through drainage and stormwater systems during periods of heavy rain, and it might also further reduce the likelihood of accidents.[11]

In addition to the Truck Hazard Mitigation Plan and rain restrictions, ExxonMobil also agreed to adopt measures to respond to any oil spills involving a truck utilized for the Project:

- ***SYU Emergency Response Plans (Mitigation Measure RISK-2):***  ExxonMobil would update its onshore and offshore facility emergency response plans to add truck loading and operations, as well as improve the response plans for oil spills at the facilities.  38-AR-015029.

- ***Trucking Company Financial Responsibility (Mitigation Measure RISK-3):***  All trucking companies selected for the Project would be capable of covering at least $5 million for the cost of an oil-spill cleanup.  38-AR-015030.

- ***Oil Spill Contingency Plan (Mitigation Measure RISK-4):***  All trucking

---

[11] ExxonMobil also agreed to only truck to SMPS while that refinery remained open.  37-AR-014592, 014878.  However, the Board's delay of the Project effectively moots this condition because SMPS is scheduled to close this year.

EXXONMOBIL'S CROSS-MOTION AND OPPOSITION TO SUMMARY JUDGMENT MOTIONS

companies for the Project would be required to develop a contingency plan related to the routes that would:  (1) include contact information for the various state and county departments to call in the event of a spill; (2) describe measures to reduce or mitigate the potential of an accident, such as procedures for inspecting and maintaining the trucks; (3) document training to be provided to all trucking company personnel, including on oil-spill emergency responses; and (4) conduct annual exercises covering how to make notifications about a spill and discussing the approach to a spill and the management team's roles and responsibilities.  38-AR-015030–31.

- ***Funding Response Equipment for the County Fire Department (Mitigation Measure RISKS 5-6):***  ExxonMobil would pay up to $25,000 for an oil-response trailer and up to $8,000 for an unmanned aerial vehicle for the County Fire Department to use in the event of a spill.  38-AR-015032.

As required by County law, these measures mitigated the risk of oil spills to the maximum extent feasible, lowering the probability of a spill of five gallons or more to *one every 17 years* for trucks going to Pentland.[12]  38-AR-015022.

### C.     The Project's Benefits Outweigh Its Risks.

As Staff found, the Project would produce numerous benefits that more than make up for the mitigated risk of oil spills.  That is why Staff concluded that the Project warranted approval and prepared a Statement of Overriding Considerations that the Board would ultimately need to adopt to approve the Project.  Ample evidence exists in the record to support that finding.[13]

---

[12] Five gallons or more is the Federal reporting minimum.  37-AR-014585.

[13] Oddly, the Board's Denial began with a discussion rejecting the Staff's proposed Statement of Overriding Considerations despite that its findings rendered that CEQA exercise gratuitous.

**Locally produced and supplied oil with a lower carbon intensity.** Even though ExxonMobil's Project was designed as a phased restart that would enable SYU to produce up to 39% of its baseline capacity, the Project would transport approximately four million barrels of oil production per year. 37-AR-014858. This amount of oil could produce 78 million gallons of gasoline and an additional 58 million gallons of diesel, with the rest available for use to manufacture lubricants and asphalt. 37-AR-014337; 38-AR-014963.

Staff found that over 70% of the oil coming to California to meet the state's needs was from outside the state and primarily being delivered via tanker ships, which emit large amounts of greenhouse gas emissions as a result of the distances traveled. 37-AR-014637. The Final SEIR showed that California has become increasingly reliant on foreign crude oil, with 57.5% of the state's supply coming from foreign sources in 2017—up from 25.7% in 2000. 38-AR-014963. And in 2019, those statistics increased further, with 58% of the oil supplied to California refineries coming from foreign sources. 37-AR-014637. Because U.S. oil production is subject to more stringent environmental standards, the oil produced at SYU has a lower carbon intensity than foreign-produced oil and would result in lower greenhouse gas emissions, which is a benefit felt globally. 37-AR-014337, 014637–38; 38-AR-014910–11, 014942–43, 014963. Staff recognized that ExxonMobil's Project could help reduce the County's reliance on foreign oil consumption. 37-AR-014637–38.

The Board dismissed these benefits, concluding that the Project would have a "de minimis impact" on local oil demand and use. 1-AR-000010. But the Board should have considered how even a "modest" four million barrel contribution to the state's oil market—particularly of less carbon-intensive oil—could help support the state's energy independence. *See* 37-AR-014637.

//

//

EXXONMOBIL'S CROSS-MOTION AND OPPOSITION TO SUMMARY JUDGMENT MOTIONS

1         The Board also determined that the Project would be "detrimental to the
2    environment generally" and that "transportation by truck is not the appropriate way
3    to transport [oil] based on the environmental and safety impacts to the County."  1-
4    AR-000010–11.  But these tendered reasons have nothing to do with this Project or
5    the ample evidence compiled by Staff and focus instead on vague environmental
6    concerns that cannot serve as the basis for the Board's Denial.  Indeed, the Board's
7    Denial is not only improper but also hypocritical:  by denying the Project in the
8    name of protecting the environment, the Board actually promotes environmental
9    degradation, depriving the community of oil that is cleaner than that produced by
10   foreign sources.  Again, the Project would cumulatively add only nine truck trips
11   per day, and the likelihood of an accident and oil spill along the proposed trucking
12   route to Pentland was one in 17 years.  Even in the unlikely event of a spill, it
13   would be even more unlikely that the environment would be "generally" harmed
14   given the proposed mitigation measures, some of which were specifically designed
15   to ensure that a response to a spill was dealt with in a time-sensitive and efficient
16   manner.  The Board ignored all this and instead focused on global climate concerns
17   and oil-trucking issues that are not specific to the Project.

18       **Bringing back jobs and expenditures at local businesses.**  Prior to SYU's
19   shut-in, ExxonMobil spent "nearly $34 million directly in [the] County for
20   employee wages and to local businesses for goods and services."  1-AR-000073.
21   The Project was expected to add up to 250 employees and contractors for both
22   onshore and offshore operations, up to 30 new construction jobs, and full-time truck
23   drivers.  1-AR-000073, 000148, 000162; 37-AR-014639–40, 014861, 014884.
24   Staff anticipated that, in turn, these jobs would increase spending in the community
25   on food, recreation, education, and healthcare.  37-AR-014639.  Indeed,
26   ExxonMobil submitted evidence showing that in 2014, there were over $33 million
27   in expenditures for SYU employee salaries and benefits to County businesses and
28   local government, including over $1.8 million spent at local restaurants and hotels

1   and on catering." 37 AR 014338.

2          Many community members and local organizations submitted comments

3   expressing their support for the Project and explaining how increases in jobs would

4   benefit the County.  For example, the Santa Barbara South Coast Chamber of

5   Commerce noted "[b]ringing well-paying jobs to [the] county has always been a top

6   priority" and restarting SYU "would allow a significant number of employees and

7   contract personnel to return to their homes, restart their lives in the community, and

8   spend local dollars in local businesses."  1-AR-000236.  Similarly, the California

9   Hispanic Chambers of Commerce—which represents over 800,000 Hispanic state

10  business owners—stated that the Project was "vital for every working family in the

11  Santa Barbara region" and that its approval would "bring back local jobs and tax

12  revenues for Santa Barbara schools and emergency services."  1-AR-000230.  And

13  SYU's Superintendent reminded the Board that the more than 150 employees he

14  had to lay off following the pipeline rupture "aren't just numbers" but people with

15  families, who are suffering and desire to return to work.  1-AR-000093–94.

16         The Board brushed all this aside and, instead, quibbled over the security and

17  quality of the jobs (1-AR-000010), relying on comments from the USCB

18  Environmental Affairs Board that sowed distrust of ExxonMobil.  Supervisor Hart,

19  for example, discussed ExxonMobil temporarily suspending 401k matching

20  contributions and its plan to lay off 15% of its global workforce by the end of 2022.

21  1-AR-000167–68.  She made these comments without explanation or evidence

22  connecting these unrelated events to the Project or the jobs and economic activity

23  the trucking Project and restarting SYU will bring to the County.

24         Similarly, and again without providing any factual basis, the Board

25  concluded that the economic benefits of the Project would be "substantially less"

26  than those of the County's hospitality industry, which is purportedly threatened by

27  the *status quo* "possibility of oil spills."  1-AR-000011.  This unfounded finding

28  ignores the fact that the Project creates jobs, and those workers could become

-30-

1   patrons of that industry.  In any event, evidence shows that the Project poses a low

2   risk of oil spills along the proposed routes, a majority of which are nowhere near

3   the tourist attractions of the Santa Barbara coastline.

4          **Increasing funding to the County through additional tax revenue and**

5   **coastal mitigation funds**.  When SYU was fully operational, ExxonMobil

6   contributed $4.2 million in County property taxes each year and was required to

7   contribute $231,600 annually to the Coastal Resources Mitigation Fund ("CRMF"),

8   which funds projects that enhance affected coastal resources.  37-AR-014638–39.

9   Since the shut-in, ExxonMobil's tax payments have decreased to between $1

10  million and $1.7 million annually, and its funding to CRMF fell to $104,500 a year.

11  37-AR-014639.  If ExxonMobil's trucking Project were approved, its taxes would

12  increase by $1.24 million each year, and CRMF would benefit from ExxonMobil's

13  additional $127,100 in annual funding.  *Id*.  The Santa Barbara County Deputy

14  Sheriffs' Association submitted a written comment, noting that "when it comes to

15  making sure law enforcement has the resources it needs to respond, every dollar

16  counts…Restoring SYU to full production would inject millions of dollars into the

17  local economy, which will have a positive impact on public safety resources."  1-

18  AR-000232.

19         A comment the Board received suggested that it should ignore the taxes that

20  the Project would contribute because the County receives greater taxes from the

21  Ritz Carlton Baccara Hotel, which could be impacted in the event of a spill.  *See* 1-

22  AR-000167.  But that impact remains *regardless* of whether ExxonMobil is

23  trucking or not, as there currently *are* other, unrelated trucks on the road

24  transporting oil and gas in the County.  The Board simply turned its back on the

25  notion that "every dollar counts" and prepared Findings for Denial that are *silent*

26  about the additional tax revenue and additional CRMF funding that the County

27  would receive if the Project were approved.  There is no discussion about how that

28  funding could be used or how it compares to the money flowing to the County from

1   other taxpayers.

2       The Board had more than enough evidence before it to find that the benefits

3   of the Project outweighed its risks.  But it instead chose to dismiss relevant

4   information about the advantages the Project would bring to the County.

5   **III.    The Board's Findings Are Not Supported by Substantial Evidence.**

6       Even if the Court were to determine that the substantial-evidence test applies

7   rather than the independent-judgment test, the Court should set aside the Denial

8   because the Board's findings are not supported by substantial evidence in light of

9   the whole record.  Cal. Civ. Proc. Code § 1094.5(c) .  "The 'in light of the whole

10  record' language means that the court reviewing the agency's decision cannot just

11  isolate the evidence supporting the findings and call it a day, thereby disregarding

12  other relevant evidence in the record."  *Lucas Valley Homeowners Ass'n v. Cty. of*

13  *Marin*, 233 Cal.App.3d 130, 141–42 (1991).  "Rather, the court must consider all

14  relevant evidence, including evidence detracting from the decision, a task which

15  involves some weighing to fairly estimate the worth of the evidence."  *Id.* at 142.

16      The evidentiary record before the Board was substantial, encompassing

17  thousands of pages of information prepared and compiled over several years by

18  Staff, hired experts, and state agencies, as well as information submitted by public

19  organizations and interested individuals.  Yet the Findings for Denial show that the

20  Board paid attention only to a select subset of that information—existing driver

21  behavior and past accidents involving oil spills.

22      The Board's finding that the streets and highways are inadequate for the

23  Project illustrates its prejudicial approach to weighing the evidence in the record.

24  The Board focused on "traffic safety along Calle Real, Highway 101, and State

25  Route 166 due to the addition of tanker truck trips to and from [LFC] to Pentland

26  Terminal."  1-AR-000012; Bd. Mot. at 11–16; Intvs. Mot. at 10–14.  The traffic

27  analysis, statewide safety thresholds, and opinion of Caltrans and transportation

28  engineers found that the Project would not exceed any safety or capacity thresholds.

38-AR-015090–126; 40-AR-017639–75.  And the evidence showed that the Project's impact on the very roads at issue would be less than significant.  38-AR-015118–125; *see also* 38-AR-015018–20 (Tables 4.3-16 and Figures 4.3-12–13). This evidence reflects the collective experience and expertise of the entities tasked with making essential determinations about road and highway safety.  Even under the substantial-evidence standard, such filed expert evidence is "*entitled to great weight.*"  *Bank of Am.*, 42 Cal.App.3d at 212 (emphasis added).

The Denial identified no basis to cast this expert evidence aside and relied instead on anecdotal evidence from non-experts—comments and information presented by the public.  While "local residents may testify to their *observations* regarding existing traffic conditions, 'in the absence of specific factual foundation in the record, dire predictions by nonexperts *regarding the consequences of a project* do not constitute substantial evidence.'"  *Banker's Hill, Hillcrest, Park Wt. Cmty. Pres. Grp. v. City of San Diego*, 139 Cal.App.4th 249, 274 (2006) (citing *Gentry v. City of Murrieta*, 36 Cal.App.4th 1359, 1417, *as modified on denial of reh'g* (Aug. 17, 1995)).  Opponents of a project must provide evidence that it "*will produce a particular adverse effect.*"  *Id.* (citing *Ass'n for Prot. etc. Values v. City of Ukiah*, 2 Cal.App.4th 720, 736 (1991)).  Here, the evidence cited by the Board and Intervenors in support of the Board's findings (Bd. Mot. at 14–16; Intvs. Mot. at 11–14 ), while voluminous, falls well short of this standard and cannot overcome the convincing expert evidence in favor of approving the Project.

The evidence about the risk of accidents resulting in oil spills is equally flawed and likewise cannot be considered substantial in this context.  The record shows only that oil trucking accidents have happened in the past and may happen in the future.  It does not show that the Project will materially contribute to or increase this risk, and it ignores that any method of oil transportation—via pipeline, marine barge, railway, or truck—inevitably comes with the risk of a spill.  While Santa Barbara County prefers transportation via pipeline, the reality is that no pipeline is

1   currently available and "most of the producers in the county truck their oil to

2   market."  1-AR-000152.  And the County's own plan, policy, and local laws

3   contemplate that transporting oil via trucks may be necessary in certain situations

4   and permit trucking where—as here—adverse impacts are "mitigated to the

5   maximum extent feasible."  LUDC Section 35.52.060.B.10.b; CZO Section 35-

6   154.5(i).  There is no dispute that the Project's proposed mitigation measures did

7   so.  The Board's Finding for Denial needed to "bridge the analytic gap between the

8   raw evidence and the ultimate decision" to deny the Project.  *Topanga Ass'n for a*

9   *Scenic Cmty. v. Cty. of Los Angeles*, 11 Cal.3d 506, 515 (1974).  It did not.

10         The Board relied primarily on the history of accidents along State Route 166,

11   noting the dangers presented by *other drivers* and examples of vehicles trying to

12   pass others on two-lane roads.  1-AR-000012; Bd. Mot. at 14; Intvs. Mot. at 11.

13   But the record has little detail about these past accidents, making it impossible for

14   the Board to compare them to any potential accidents that could occur in spite of

15   the Project's numerous and extensive mitigation measures (*see supra* § II.A–B).

16   For instance, the September 27, 2021 letter submitted by the EDC refers to several

17   accidents that occurred along the proposed routes, but provides no information

18   about how fast the vehicles were driving, the experience of the truck driver, or the

19   physical status of the truck.  57-AR-025303–05, 025309–12.  These facts are all

20   relevant to the Board's ability to properly assess the proposed mitigation measures

21   put forth in ExxonMobil's Project.  The Board failed to explain how the cumulative

22   addition of nine trucks a day would substantially increase the risk of accidents

23   resulting in oil spills.  If anything, the evidence shows that the Project's mitigation

24   measures make it *safer* than other oil trucking in the County.  *See supra* § II.B.

25   And, discussed above in Section II.C, while the record includes substantial

26   evidence supporting Staff's original Statement of Overriding Considerations, the

27   Board dismissed those benefits based on conjecture, false equivalencies, and

28   matters outside the purview of their review like the Projects purported impact on

-34-

1   the "environment generally," individual preferences for renewable energy, and the

2   desire to send a "clear message" to ExxonMobil.  *See also supra* SOF § D.

3   **IV.   The Board's Decision Is Inconsistent with County Policy and Law, and It Constitutes an Ultra Vires *De Facto* Ban on Trucking Oil.**

4

5        Recognizing that the industry must have a way of getting its products to

6   market, Santa Barbara policy, land use plan, and local laws consistently provide for

7   the possibility of transporting oil by means other than pipeline.  Again, the

8   County's Coastal Land Use Plan provides that the County "*should assure* that

9   producers have access to competitive markets…."  RJN Ex. A at 67 (emphasis

10  added); *see also id.* at 70.  And CZO Section 35-154.5(i) allows for exceptions to

11  the County's pipeline preference in specific circumstances:

12       Transportation by a mode other than pipeline may be permitted only:
         1) Within the limits of the permitted capacity of the alternative mode;
13       and 2) **When the environmental impacts of the alternative transportation mode are required to be mitigated to the maximum extent feasible**; and 3) When the **shipper has made a commitment to the use of a pipeline when operational** to the
14
         shipper's refining center of choice; and 4) When the County has
15       determined use of a **pipeline is not feasible by making one** of the
         following findings:
16

17       (a) A **pipeline** to the shippers' refining center of choice has
         inadequate capacity or is **unavailable within a reasonable period of
18       time** . . .

19  RJN Ex. B at 9-6 (emphasis added).  The Project meets all of the applicable criteria.

20        Similarly, LUDC Section 35.52.060.B.10.b permits transportation by a mode

21  other than pipeline "(1) [f]or that fraction of the oil that cannot feasibly be

22  transported by pipeline; and (2) [w]hen the environmental impacts of the alternative

23  transportation mode are required to be mitigated to the maximum extent feasible."

24  RJN Ex. C at 5-13.  The Project meets those criteria, too.

25        These provisions create a balance between the industry's need to bring its

26  products to market when a pipeline is unavailable and the County's interest in

27  protecting health and safety.  And they make sense given the importance of this

28  commodity.  Staff and supporting Board members recognized that oil cannot be

-35-

easily replaced and is still necessary for the foreseeable future, including the up-to-seven-year duration of the Project.  *See, e.g.*, 37-AR-014872–74 (explaining that crude oil "is different from electrical power that is generated by alternative energy sources such as wind and solar and provides energy to different end-users" and noting that planes, construction equipment, and heavy trucks do not currently have electric equivalents); 1-AR-000164 (Supervisor Lavagnino commenting that while there is a push for new green energy, the reality is "it's not there yet…we have to continue to produce fossil fuels as we transition.").

The Board's actions here impermissibly rewrote *sub silentio* the County policy and law to eliminate the possibility of trucking crude oil, thereby disrupting this careful balance.  Indeed, the County could only deny the Project by rewriting the rules because, as Staff found, the Project complied with every element of CZO 35-154.5(i) :  (1) trucking would be limited to the permitted capacity of 24,820-25,550 round-trip truck trips per year; (2) all Class Risks (I-III) would be mitigated as a result of ExxonMobil's agreement to accept the proposed mitigation measures; (3) ExxonMobil had requested that the trucking permit be limited to seven years or the restart of pipeline operations, whichever was sooner; and (4) even if the replacement pipeline was approved, it would likely not be available for four to seven years and there is no other pipeline available to transport ExxonMobil's crude oil from LFC.  37-AR-014622–27; *see also* 37-AR-014588, 014615–16, 014648–51; 38-AR-015064–66.  For the same reasons, the Project met both criteria for LUDC Section 35.52.060.B.10.b.  37-AR-014616, 014619–20; *see also* 37-AR-014588, 014615–16, 014648–49; 38-AR-015067–68.

The statements made by the opposing members of the Board show that their votes were improperly influenced by their policy motivations to push the oil industry out of Santa Barbara County.  Where an administrative body's decision is alleged to be politically motivated, courts may inquire into whether the hearing process was fair and whether that body abused its discretion.  *See Jones v. City of*

1    *Orange Cove*, 454 F.App'x 601, 603 (9th Cir. 2011) (considering whether the writ

2    "allege[d] that the City Council's decision was politically motivated, reasonably

3    prompting an inquiry into whether plaintiff's trial was fair and whether the City

4    Council abused its discretion"); *Harrington v. City of Davis*, 16 Cal.App.5th 420

5    (Ct. App. 2017) (finding that plaintiff failed to demonstrate that the city bent to

6    political pressure when approving a conditional use permit and indicating that such

7    evidence would have been relevant to the question of abuse of discretion).  The

8    Board abused its discretion here by elevating its political concerns over its duty to

9    make a decision on this single permit application.

10        For example, Supervisor Hart stated that "[w]e must reduce our dependence

11    on fossil fuels to achieve true energy independence.... I believe that our community

12    wants to send a clear message that we are unwilling to risk damage to our

13    environment in exchange for short-term corporate profits, uncertain local jobs, and

14    modest tax revenue." 1-AR-000170–71.  Vice Chair Williams expressed similar

15    sentiments, suggesting—contrary to long-standing County policy—that the County

16    has a *de facto* ban on transporting oil by truck:  "transportation by truck is not the

17    appropriate way to transport it." 1-AR-000158.  And Chair Hartmann emphasized

18    her desire to transition to renewable energy, saying that approving the trucking

19    permit is not "really the direction to go when we are facing a climate crisis[.]" 1-

20    AR-000182.

21        These statements show that the opposing members of the Board used

22    ExxonMobil's application as a means of prohibiting oil production and additional

23    oil transportation in the County.  But the Board lacks the authority to do so.  Its

24    duty was to assess ExxonMobil's application under the relevant policies, plans,

25    codes, and ordinances.  Instead, it chose to legislate under the table, impose its own

26    will, and ignore existing County policies—an abuse of its discretion.

27        In *Gabric v. City of Rancho Palos Verdes*, the Court of Appeal found the

28    City Council abused its discretion when it "confused legislative authority with

administrative duty" and proceeded in a manner inconsistent with the law.  73
Cal.App.3d 183, 192 (Ct. App. 1977).  There, the City denied the appellant's
building permit relying on an interim zoning ordinance, *not yet adopted* in the
general master plan at the time petitioner's application was submitted.  *Id.* at 188–
89.  The Court of Appeal found that the City's denial had nothing to do with the
permit's failure to meet the zoning or building requirements or comply with the
law, but was instead based on the City's "contemplating the future adoption of a
new zoning ordinance."  *Id.* at 190.  The City's decision to deny the permit was
"erroneously based on its authority to ordain laws, rather than adjudicate and order
an environmental impact statement, or to find that such a statement was properly
determined unnecessary."  *Id*. at 192.  The Board's denial here is no different—it
was a procedural failure focused not on the question of whether ExxonMobil met
the requirements for its trucking permit, but instead on an improper motivation to
*change* the laws and oust oil from the community.

The Board exceeded its authority and expressed its interest in putting a
referendum on oil production, transport, and use in the County in an effort to appeal
to concerns raised by local residents.  Supervisor Nelson, one of the Board
members in favor of the Project, indicated as much, asking for clarity from his
colleagues:

> [T]his project has this significant unavoidable impact [and] all oil
> projects are gonna have that.  **Is there any project that we, as a
> county, can accept that can mitigate that?**  Because I think that's a
> decision we need to be clear on.  **Because if this project can't do it,
> and future projects can't do it, we really should just be honest with
> our process here….**  [W]e should be honest with applicants and the
> public on what we're doing.

1-AR-000172 (emphasis added).

The administrative record warranted the Project's approval.  But the majority
of the Board chose instead to use ExxonMobil's application as an opportunity to
"send a clear message" that the County is looking towards a future in which the oil
industry no longer operates within its borders.  The Court should set aside the

-38-

1    Denial and order the Board to reconsider the Project in light of this opinion, all
2    requirements of CEQA, and all other applicable state and local policies, laws,
3    ordinances, and regulations.

4                                    **CONCLUSION**

5           For the foregoing reasons, ExxonMobil respectfully requests that this Court
6    grant summary judgment on its First Cause of Action for Petition for Writ of
7    Administrative Mandate, set aside the denial of ExxonMobil's trucking Project, and
8    order the Board to reconsider the Project in light of the Court's opinion and
9    judgment, all requirements of CEQA, and all other applicable state and local
10   policies, plans, laws, codes, ordinances, and regulations.

13   Dated:  March 30, 2023               Respectfully submitted,

15                                        By:   */s/ Dawn Sestito*
                                                Dawn Sestito

17                                        Attorneys for Petitioner and Plaintiff
                                          Exxon Mobil Corporation

1

## CERTIFICATE OF COMPLIANCE

2

3       The undersigned, counsel of record for Petitioner/Plaintiff Exxon Mobil

4   Corporation, certifies that this brief complies with the Court's March 3, 2023 Order

5   (Dkt No. 42), granting ExxonMobil up to 12,000 words or 40 pages for its Cross-

6   Motion and Opposition to Respondent/Defendant's and Intervenors' Motions for

7   Summary Judgment.

8

9       Dated:  March 30, 2023

10                                                    By:    /s/ Dawn Sestito
                                                             Dawn Sestito
11
                                                     Attorneys for Petitioner and Plaintiff
12                                                   Exxon Mobil Corporation

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28