LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
MARGARET M. HALL (Bar No. 293699)
mhall@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel. (805) 963-1622 / Fax. (805) 962-3152
*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Surfrider Foundation*

JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
ELIZABETH JONES (Bar No. 326118)
ljones@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Tel. (510) 844-7100 / Fax. (510) 844-7150
*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>Petitioner/Plaintiff,<br><br>v.<br><br>SANTA BARBARA COUNTY BOARD OF SUPERVISORS,<br><br>Respondent/Defendant,<br><br>and<br><br>ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SURFRIDER FOUNDATION, CENTER FOR BIOLOGICAL DIVERSITY, and WISHTOYO FOUNDATION,<br><br>Defendant/Intervenors. | Case No. 2:22-cv-03225-DMG (MRWx)<br><br>**INTERVENORS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PETITIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Dolly Gee<br><br>Hearing: June 16, 2023<br>Time: 2:00 p.m.<br>Place: Courtroom 8C<br>350 West 1st Street, Los Angeles |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ....................................................................................... 1

STANDARD OF REVIEW .......................................................................... 2

ARGUMENT ............................................................................................... 8

    I.    The Board's Findings for Denial Were Supported by
          Substantial Evidence. ...................................................... 8

    II.   The Board Properly Exercised Its Discretion to Decide
          Whether to Allow Oil to Be Transported by a Mode
          Other Than Pipeline .................................................... 16

CONCLUSION .......................................................................................... 17

1

# TABLE OF AUTHORITIES

2

3      **Cases**

4      *Acad. of Our Lady of Peace v. City of San Diego*,

5          835 F. Supp. 2d 895 (S.D. Cal. 2011) ...................................................................5

6      *Alpha Nu Assn. of Theta Xi v. Univ. of S. Cal.*,

7          62 Cal. App. 5th 383 (2021) .................................................................................7

8      *Amerco Real Estate Co. v. City of W. Sacramento*,

9          224 Cal. App. 4th 778 (2014) ...............................................................................5

10     *Ass'n for Prot. etc. Values v. City of Ukiah*,

11         2 Cal. App. 4th 720 (1991) .................................................................................10

12     *Avco Cmty. Devs., Inc. v. S. Coast Reg'l Comm'n*,

13         17 Cal. 3d. 785 (1976) .........................................................................................4

14     *Banker's Hill, Hillcrest, Park W. Cmty. Pres. Grp. v. City of San Diego*,

15         139 Cal. App. 4th 249 (2006) .............................................................................10

16     *Bixby v. Pierno*,

17         4 Cal. 3d 130 (1971) ............................................................................................3

18     *Breakzone Billiards v. City of Torrance*,

19         81 Cal. App. 4th 1205 (2000) ...............................................................................8

20     *Ct. House Plaza Co. v. City of Palo Alto*,

21         117 Cal. App. 3d 871 (1981) ................................................................................4

22     *Desmond v. Cnty. of Contra Costa*,

23         21 Cal. App. 4th 330 (1993) .................................................................................8

24     *E&B Nat. Res. Mgmt. Corp. v. Cty. of Alameda*, No. 18-cv-05857-YGR,

           2020 U.S. Dist. LEXIS 100210 (N.D. Cal. June 8, 2020) ....................................7

25     *E.W.A.P., Inc., v. City of Los Angeles*,

26         56 Cal. App. 4th 310 (1997) .................................................................................5

27     *Gabric v. City of Rancho Palos Verdes*,

28         73 Cal. App. 3d 183 (1977) ................................................................................15

*Goat Hill Tavern v. City of Costa Mesa*,
   6 Cal. App. 4th 1519 (1992)....................................................................6

*Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*,
   202 Cal. App. 4th 404 (2011)....................................................................7

*Harrington v. City of Davis*,
   16 Cal. App. 5th 420 (2017)....................................................................14

*Hermosa Beach Stop Oil Coal. v. City of Hermosa Beach*,
   86 Cal. App. 4th 534 (2001)....................................................................4

*JMS Air Conditioning & Appliance Serv., Inc. v. Santa Monica Cmty. Coll. Dist.*,
   30 Cal. App. 5th 945 (2018)....................................................................5

*Jones v. City of Orange Cove*,
   454 F. App'x 601 (9th Cir. 2011)..........................................................14

*Lagrutta v. City Council*,
   9 Cal. App. 3d 890 (1970)....................................................................12

*Leonoff v. Monterey Cnty. Bd. of Supervisors*,
   222 Cal. App. 3d 1337 (1990)................................................................10

*Metro. Outdoor Advert. Corp. v. City of Santa Ana*,
   23 Cal. App. 4th 1401 (1994)....................................................................7

*Russ Bldg. P'ship v. City and Cnty. of San Francisco*,
   44 Cal. 3d 839 (1988)....................................................................4

*Saad v. City of Berkeley*,
   24 Cal. App. 4th 1206 (1994)....................................................................8

*Smith v. Cnty. of Los Angeles*,
   211 Cal. App. 3d 188 (1989)..............................................................5, 8

*The Termo Co. v. Luther*,
   169 Cal. App. 4th 394 (2008)..............................................................6, 7

*Topanga Ass'n for a Scenic Cmty. v. Cnty. of Los Angeles*,
   11 Cal. 3d 506 (1974)....................................................................8

*Whaler's Village Club v. Cal. Coastal Comm'n*,
173 Cal. App. 3d 240 (1985) ...................................................................4

**Statutes**

Cal. Code of Civ. Proc. § 1094.5(c) .................................................3, 16

Cal. Gov't Code § 14 .........................................................................17

Cal. Pub. Res. Code § 21061 ..............................................................9

**Regulations**

Cal. Code Regs. tit. 14, § 15093(b) .................................................1, 16

Cal. Code Regs. tit. 14, § 15126.2 .......................................................9

Cal. Code Regs. tit. 14, § 15270(a) .................................................2, 15

**Other Authorities**

Coastal Land Use Policy 6-8(d) .........................................................16

CZO § 35-154.5(i) .............................................................................16

CZO § 35-174.7.1(c) ................................................................... 15, 17

CZO § 35-174.7.1(e) ................................................................... 15, 17

LUDC § 35.52.060.B.10(b) ...............................................................17

LUDC § 35.82.080.E.1(c) ........................................................... 15, 17

LUDC § 35.82.080.E.1(e) ........................................................... 15, 17

**INTRODUCTION**

The issues before the Court in the writ proceeding are simple: were the Santa Barbara County Board of Supervisors' findings in support of its denial of ExxonMobil's application to truck oil on County and state roads supported by substantial evidence; did the Board prejudicially abuse its discretion and act in an arbitrary, capricious, and unlawful manner in excess of its jurisdiction in denying the Project; and did the Board's denial violate County policies and ordinances. *See* Joint Rep., Dkt. No. 16 at 4. Although ExxonMobil already agreed that the appropriate standard of review for the Court's determination is whether substantial evidence supports the Board's findings, Petitioner now asserts that the Court should invoke the independent judgment standard. Dkt. No. 44-1 at 13–18. Contrary to ExxonMobil's claims, the very rare, "extreme" situations where courts apply the independent judgment standard to agency land use decisions like this one are not present here.

In deciding whether to allow ExxonMobil to revise its Development Plan, the County was required to exercise its discretion and determine if the trucking proposal would be consistent with all County policies and ordinances. In this case, the Board properly found, based on the evidence presented, that trucking oil on Highway 101 and Route 166 would result in a significant risk of accidents and oil spills that could not be mitigated or avoided. This risk resulted in the Board finding that the proposed Project was inconsistent with County ordinances protecting public health, safety, and welfare.

The Court need not reach the other issues raised by ExxonMobil in its Motion—whether the Board's Statement of Overriding Considerations was supported by the evidence and whether the Project was consistent with the County's oil transportation policies. First, a Statement of Overriding Considerations is only relevant if a project is *approved* despite its significant and unavoidable impacts. Cal. Code Regs. tit. 14, § 15093(b). Because the Board

1

denied ExxonMobil's Project, the California Environmental Policy Act ("CEQA") does not apply. *Id.*, § 15270(a). Second, because the Board found that the Project violated the County's Land Use and Development Code ("LUDC") and Coastal Zoning Ordinance ("CZO"), it had no reason to consider whether the proposal was consistent with the County's oil transportation policies or any other policies for that matter. Once the Board found that the Project violated County policies protecting public safety and the environment, it was prohibited from approving the requested Development Plan revision.

Finally, even if the Court were to invoke an independent judgment standard of review, the weight of the evidence in the record clearly supports the Board's decision and findings. The record is replete with evidence—including reports, data, letters, and testimony—demonstrating the unacceptable risks of accidents and spills. This evidence incorporated information from various local and state agencies describing multiple recent oil tanker truck accidents along the proposed route that caused deaths, injuries, oil spills, fires, explosions, and road closures. This evidence was amplified by personal accounts of unsafe conditions from members of the public who live or drive along the proposed trucking route. Taken as a whole, the evidence presented to the Board showed that concerns about public safety and environmental risks were real, significant, and founded in fact, and overwhelmingly supported the Board's findings of denial.

## STANDARD OF REVIEW

ExxonMobil has asserted for the first time in its Memorandum of Points and Authorities in support of its Motion for Summary Judgment that the "independent judgment" or "weight of the evidence" standard applies to the Court's review of the pending cross-motions for summary judgment, arguing the County's decision affects a fundamental vested right to restart and operate in the Santa Ynez Unit ("SYU"). Dkt. No. 44-1 at 2, 13–18.

As an initial matter, while ExxonMobil contends Intervenors "merely presume" the substantial evidence standard applies (Dkt. No. 44-1 at 16), Intervenors' singular focus on the substantial evidence standard aligns with the Joint Report of Parties. Dkt. No. 16 at 4 (defining "legal issues" for the writ of administrative mandate as including "[w]hether the Board's denial of the Project was supported by substantial evidence, Cal. Code of Civ. Proc. § 1094.5(c)").

Most importantly, it is the substantial evidence standard of review—not the rarely applied independent judgment standard—that is the appropriate standard. This approach is the almost universally applied standard of review for land use decisions challenged by administrative mandamus. There is no reason to take the extraordinary step of applying the less deferential independent judgment test.

In *Bixby v. Pierno*, 4 Cal. 3d 130 (1971), a case cited by ExxonMobil that cuts directly against its position, the court declined to apply the independent judgment standard and explained the standard of review inquiry as follows:

> [T]he courts in this case-by-case analysis consider the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, whether it is possessed by, and vested in, the individual *or merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency*. If, however, the right has been acquired by the individual, and if the right is fundamental, the courts have held the loss of it is sufficiently vital to the individual to compel a full and independent review. The abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction.

*Bixby*, 4 Cal. 3d at 144 (emphasis added) (ultimately applying the substantial evidence test to uphold a decision of the Commissioner of Corporations). ExxonMobil acknowledges in its Petition that "[t]he Permit Application *seeks* authorization to amend SYU's Final Development Plan 87-DP-32cz (the

3

1   "Development Plan"), allowing ExxonMobil to temporarily truck SYU's crude

2   oil . . . ." Dkt. No. 1 at 3, ¶ 8 (emphasis added).

3          ExxonMobil's existing permits *do not confer* a preexisting or fundamental

4   vested right *to transport oil to market by truck*. The County's approval of

5   ExxonMobil's Development Plan for the SYU in the 1980s was expressly

6   conditioned on the requirement that "[a]ll oil processed by ExxonMobil's oil

7   treatment facility shall be transported from the facility and the County by pipeline

8   in a manner consistent with Santa Barbara County Local Coastal Plan Policy 6-8."

9   AR 30865. As noted in the March 8, 2022 Board of Supervisors Hearing Agenda

10  Letter, "Exxon's existing permit for its Las Flores Canyon facility specifically

11  states that transportation of oil will only be done by pipeline unless the entitlement

12  is revised. That is why a permit revision is necessary." AR 14547.[1] Consequently,

13  as in *Bixby*, this Court should apply the substantial evidence standard.

---

[1] Intervenors note that throughout its brief, ExxonMobil confuses and conflates the use of the term "fundamental vested right" with "traditional" vested rights, seemingly attempting to shoehorn aspects of its fourth and sixth causes of action concerning unconstitutional takings into this brief. "The term 'vested' in the sense of 'fundamental vested rights' to determine the scope of judicial review . . . is not synonymous with its use in the 'vested rights' doctrine relating to land use and development." *Whaler's Village Club v. Cal. Coastal Comm'n*, 173 Cal. App. 3d 240, 252 (1985) (citation omitted). Unlike a fundamental vested right, a "traditional" vested right in the land use context is premised on estoppel and requires the business to show it "has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government." *Avco Cmty. Devs., Inc. v. S. Coast Reg'l Comm'n*, 17 Cal. 3d. 785, 791 (1976). Vested rights are "no greater than those specifically granted by the [permits themselves]." *Russ Bldg. P'ship v. City and Cnty. of San Francisco*, 44 Cal. 3d 839, 854 (1988) (alteration in original) (quoting trial court); *see also Hermosa Beach Stop Oil Coal. v. City of Hermosa Beach*, 86 Cal. App. 4th 534, 552–553 (2001) (finding no vested right to drill without required Coastal Commission and local building permits); *Ct. House Plaza Co. v. City of Palo Alto*, 117 Cal. App. 3d 871, 885 (1981) (city not estopped from denying Phase 2 permits after appellant expended $450,000 to modify a parking garage in anticipation of receiving those permits).

4

Since *Bixby*, courts have made clear that "[c]ases involving abuse of discretion charges in the area of land use regulation do not involve fundamental vested rights." *Acad. of Our Lady of Peace v. City of San Diego*, 835 F. Supp. 2d 895, 903 (S.D. Cal. 2011) (citation omitted). They have repeatedly declined to apply the independent judgment standard to land use cases like this one for that reason. *See, e.g.*, *Smith v. Cnty. of Los Angeles*, 211 Cal. App. 3d 188, 199–200 (1989) (reviewing cases in the land use decision context and concluding the "vast majority of cases considering an allegation of fundamental vested right requiring exercise of independent judgment have rejected it.").

The substantial evidence test applies even if the challenged decision has serious financial implications for the applicant. As the *Smith* court explained, "[m]ost denials of a land use application involve some economic hardship to the applicant, yet this alone provides no basis for the extraordinary application of the independent judgment test." *Id.* at 200. More recent cases concur. As the court summarized in *E.W.A.P., Inc., v. City of Los Angeles*, 56 Cal. App. 4th 310, 325 (1997), "administrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests, rather than on fundamental vested rights." *See also JMS Air Conditioning & Appliance Serv., Inc. v. Santa Monica Cmty. Coll. Dist.*, 30 Cal. App. 5th 945, 960 (2018) ("Courts have rarely viewed purely economic interests, such as the right to profit under a particular business venture, as a fundamental vested right. . . . Purely financial effects will only affect 'fundamental' rights in extreme, unique situations." (citations omitted)); *Amerco Real Estate Co. v. City of W. Sacramento*, 224 Cal. App. 4th 778, 782–785 (2014) (distinguishing the limited cases where courts have used independent judgment because businesses would be "leveled" by the decision).

The rare circumstances in which a court has applied the less deferential independent judgment standard to land use application decisions are not before this

1    Court. The two cherry-picked cases on which ExxonMobil exclusively relies to

2    argue the independent judgment test is appropriate in this case, *Goat Hill* and

3    *Termo* (Dkt. No. 44-1 at 15–18), stand in stark contrast to the facts here and

4    support application of the usual substantial evidence standard.

5            In the first, *Goat Hill Tavern v. City of Costa Mesa*, 6 Cal. App. 4th 1519,

6    1527 (1992), the court emphasized that "courts have rarely upheld the application

7    of the independent judgment test to land use decisions." However, it was

8    persuaded that the heightened standard of review was appropriate in that case

9    based on the "unique facts presented." *Id.* at 1529. Those unique facts included that

10   the effect of the city's decision interfered with an approved preexisting use of the

11   property and would "shut down Goat Hill Tavern," *id*. at 1528, which had been in

12   continuous operation since 1955, *id.* at 1522. The court took pains to distinguish

13   these facts from other cases where the heightened standard of review did not apply

14   because, for example, the actions implicated "purely economic interests" and lost

15   profits and "because there were no contentions, nor evidence, that the actions

16   would force the companies out of business or cause them to lose their property."

17   *Id.* at 1526–28.

18           In addition, the tavern had expanded operations "*at the city's behest*," *id.* at

19   1529 (emphasis added), and the tavern owner would not have done so if they knew

20   that building the expansion would prevent them from continuing to operate their

21   business, *id.* at 1529 n.4, 1531 n.5. Further, the decision in *Goat Hill* turned on a

22   city's *renewal* of a conditional use permit, which the tavern reasonably may have

23   believed was not required because the City of Costa Mesa had a practice of

24   allowing businesses to operate with expired permits. *Id.* at 1530. By contrast,

25   ExxonMobil is seeking a new, discretionary permit to perform an entirely new

26   activity—trucking oil on local roads.

27           ExxonMobil's reliance on *The Termo Co. v. Luther*, 169 Cal. App. 4th 394

28   (2008), is similarly misplaced. *Termo* involved an agency's affirmative order

6

requiring a small oil company to take action to plug and abandon twenty-eight oil wells, which would have had the effect of "shutting down a business." *Termo*, 169 Cal. App. 4th at 407. Conversely, denying ExxonMobil's request to truck oil on California highways does not compel ExxonMobil to abandon and decommission the SYU and certainly will not shutter the highly profitable multinational corporation. The County merely denied ExxonMobil's application for a discretionary permit to truck oil—a decision that does not affect the company's existing permit, which states that ExxonMobil may operate the SYU if it transports its oil by pipeline. AR 30865; *see also* AR 14548 (Plains Pipeline has in fact submitted an application to construct a replacement pipeline).

As discussed *supra*, state and federal courts do not find a fundamental vested right merely because a decision results in economic impacts to the applicant. *See Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 202 Cal. App. 4th 404, 417 (2011) (declining to follow *Termo* because "there is nothing in the administrative record to indicate that Hardesty will be driven out of business."); *Metro. Outdoor Advert. Corp. v. City of Santa Ana*, 23 Cal. App. 4th 1401, 1404 (1994) (rejecting an advertising company's reliance on *Goat Hill* because a billboard being taken down was only "one of [the company's] many" billboards and there was "no assertion the sign's removal would destroy or even significantly injure" the company's overall business); *E&B Nat. Res. Mgmt. Corp. v. Cty. of Alameda*, No. 18-cv-05857-YGR, 2020 U.S. Dist. LEXIS 100210, at *15 (N.D. Cal. June 8, 2020) (considering a county's denial of a permit renewal to continue oil drilling operations, the court concluded "Plaintiffs have not . . . proffered any evidence that the County's prior denial of the CUP renewal itself would have destroyed or even significantly impacted its overall business."); *Alpha Nu Assn. of Theta Xi v. Univ. of S. Cal.*, 62 Cal. App. 5th 383, 410 (2021) (where decision would inflict loss of revenue but not drive an entity out of business, the court concluded "[s]uch a run-of-the-mill economic impact does not establish that the

suspension will substantially affect a vested fundamental right." (citations

omitted)).

In sum, the fact-specific outcomes of *Goat Hill* and *Termo* are outliers, and

the substantial evidence test is appropriately applied in this case, where the

interests are purely economic, no existing permit to truck oil has been abrogated or

extinguished, and denial of ExxonMobil's application to temporarily truck oil will

not shut down the corporation.

## ARGUMENT

### I.   The Board's Findings for Denial Were Supported by Substantial Evidence.

ExxonMobil misconstrues the substantial evidence standard of review. In

applying the substantial evidence standard, courts "must resolve reasonable doubts

in favor of the administrative findings and decision." *Topanga Ass'n for a Scenic

Cmty.* v. *Cnty. of Los Angeles*, 11 Cal. 3d 506, 514 (1974). A court "must deny the

writ if there is any substantial evidence in the record to support the findings."

*Breakzone Billiards v. City of Torrance*, 81 Cal. App. 4th 1205, 1244 (2000)

(citing *Smith*, 211 Cal. App. 3d at 198–199). An agency's decision to deny a

project "must be upheld" if even *one finding* is supported by substantial evidence.

*Desmond v. Cnty. of Contra Costa*, 21 Cal. App. 4th 330, 336–37 (1993); *see also

Saad v. City of Berkeley*, 24 Cal. App. 4th 1206, 1213–14, 1216 (1994). Therefore,

the issue in this case is whether any credible evidence supports at least one of the

Board's findings, not whether there is any evidence to the contrary.

Intervenors' Opening Brief cited the voluminous evidence in support of the

Board's findings for denial. ExxonMobil attempts to distract the Court from this

evidence by misrepresenting facts and ignoring key pieces of evidence. First,

ExxonMobil inexplicably states that its Project would only add nine truck trips per

day, Dkt. No. 44–1 at 20, when the application itself requests approval for up to

seventy round trips, or 140 one-way trips, per day. AR 29891. The County was

8

obligated to review the impacts that will likely be caused by the proposed Project. Cal. Pub. Res. Code § 21061; Cal. Code Regs. tit. 14, § 15126.2. As such, this is the Project that was analyzed in the EIR. AR 26857–58. Speculation about changes in regional oil tanker truck operations cannot substitute for the required analysis of the impacts of the proposed Project.

Second, ExxonMobil disregards extensive evidence in the record that documents the risks and impacts of oil tanker truck accidents. This evidence is not speculative; rather, it includes evidence submitted by the Environmental Defense Center incorporating information from the Santa Barbara County Fire Department, California Highway Patrol, Governor's Office of Emergency Services, and California Office of Spill Prevention and Response. AR 867–74, 945–96. Although some of the evidence in the record relates to risks of oil tanker truck accidents more broadly, the main source of evidence in support of the Board's findings was information showing that there were eight major oil tanker truck accidents along the proposed route in the last fifteen years, six of which occurred in the last six years. AR 868–72. These accidents resulted in deaths, injuries, fires, oil spills, explosions, and road closures. *Id*. Many of the accidents were caused by external factors, such as other drivers or hazardous road conditions. *Id*. None of the accidents occurred during rain events. *Id*., AR 874. Accordingly, proposed mitigation measures and alternatives prohibiting truck trips on rainy days and relying on driver training, equipment, tracking, and inspections will not avoid or substantially lessen the risk of an accident.

In addition, the Board heard from residents and drivers in the area who were personally familiar with the dangerous road conditions on both Highway 101, especially around the Gaviota area, and Route 166. AR 114, 125, 132–34, 13699, 14319, 14356, 14359, 23391–92. Members of the public identified known risks to drivers and passengers, schools, businesses, a health clinic, library, park, and offices for the fire and sheriff departments. AR 133, 23391.

ExxonMobil argues that the Court should not rely on "anecdotal evidence from non-experts—comments and information presented by the public"—claiming it "do[es] not constitute substantial evidence." Dkt. No. 44–1 at 33 (quoting *Banker's Hill, Hillcrest, Park W. Cmty. Pres. Grp. v. City of San Diego*, 139 Cal. App. 4th 249, 274 (2006)). In *Banker's Hill*, the court acknowledged that public testimony regarding traffic safety impacts may be considered as substantial evidence. *Banker's Hill*, 139 Cal. App. 4th at 274 (quoting *Leonoff v. Monterey Cnty. Bd. of Supervisors*, 222 Cal. App. 3d 1337, 1351–52 (1990) (additional citation omitted)). The court found, however, that the observations presented in that case were not supported by the facts, which showed a dearth of actual police department accident reports. *Banker's Hill,* 139 Cal. App. at 274–75. In this case, Intervenors and other members of the public provided the necessary "factual foundation" to substantiate their concerns, including references to numerous agency accident reports and media articles confirming the occurrence of multiple oil tanker truck accidents along the proposed route, as well as in the county and state. *See, e.g*., AR 867–874, 945–96. Thus, Intervenors and other Project opponents produced factual evidence, not the type of "unsubstantiated opinions" that were rejected in *Banker's Hill* and *Association for Protection etc. Values v. City of Ukiah*, 2 Cal. App. 4th 720, 736 (1991). Contrary to ExxonMobil's assertion, this information is substantiated, is credible, and supported the Board's findings that roads and highways were not adequate to accommodate the proposed oil trucking traffic, and that the Project threatened neighborhood compatibility and public health, safety, and welfare.

Instead of accepting the facts, ExxonMobil relies on information from the uncertified Environmental Impact Report ("EIR"). In contrast to the specific evidence regarding oil tanker truck accidents relied upon by the Board, the EIR instead analyzed data regarding the "overall truck accident rate" from 2012 to 2016. AR 27064. The Board properly invoked its discretion to base its decision on

information specific to the proposed route, the safety considerations on the route, and the history of accidents, especially oil tanker truck accidents.

The deficiencies in the EIR regarding safety impacts are readily apparent. For example, the EIR determined that the probability of an accident causing a spill of five gallons or more is once in fifty-two years for trucks traveling to the Santa Maria Pump Station ("SMPS"), and once in seventeen years for trucks traveling to Pentland. AR 27071. This determination grossly understated the *actual* accident data, which showed that on July 13, 2007, a tanker truck accident on Route 166 spilled 500 gallons; on March 10, 2012, an accident on Highway 101 near Buellton spilled 8,500 gallons; on September 13, 2016, an accident on Route 166 spilled 150–200 gallons; on December 12, 2018, an accident on Route 166 spilled 300 gallons; and on March 20, 2020, an accident on Route 166 spilled 4,500 gallons. AR 870–72, 26632. Accordingly, there were at least five accidents that resulted in spills over five gallons in a thirteen-year period, or an average of one such accident every two and a half years. Notably, the EIR concluded that even with the proposed mitigation measures, the risk of an accident causing an oil spill was significant and unavoidable. AR 14823–28.

In addition to relying on the uncertified EIR, ExxonMobil points to the 2021 Planning Commission staff report, which recommended approval of the Project. In doing so, ExxonMobil conveniently ignores the *original* Planning Commission staff report and recommendation, prepared for the September 2, 2020, hearing, which recommended *against* allowing tanker trucks on Route 166. AR 26641. The original staff report pointed out that disallowing trucking to Pentland would "reduce the likelihood of accidents resulting in spills due to fewer miles traveled." AR 26660; *see also* AR 26655, 26661. Although the staff changed their recommendation when Phillips 66 announced its intention to shut down the SMPS, the Planning Commission and Board retained discretion to consider all evidence submitted and to base their findings of denial on such evidence. Importantly, the

1   issue before this Court is whether the *Board's* findings, not the staff's revised

2   recommendations, are supported by the evidence. *See, e.g.*, *Lagrutta v. City*

3   *Council*, 9 Cal. App. 3d 890, 895–96 (1970) (city council not bound by decision of

4   planning commission).

5       The Board based its decision and findings on evidence demonstrating the

6   safety risks associated with ExxonMobil's proposal. In its brief, ExxonMobil

7   singles out concerns expressed by some Supervisors about the impacts of oil and

8   gas development. However, the Board's decision to deny the Project was clearly

9   based on concerns about the risk of accidents and oil spills. The findings are

10  singularly focused on the Board's concerns about the impacts of the proposed

11  trucking on safety and the environment. Throughout the findings, the Board cites

12  evidence of accident risks on Calle Real, Highway 101, and Route 166 within the

13  Project area. AR 12–13. The findings also cite to concerns about accidents leading

14  to oil spills, citing a recent oil tanker truck accident on Route 166 "where a tanker

15  truck overturned down an embankment causing 6,600 gallons of crude oil to spill

16  into the Cuyama River, ten miles upstream from Twitchell Dam and reservoir." *Id*.

17      The Supervisors' comments at the hearing demonstrate that their primary

18  motivation for denying the Project was concern over the risks and impacts of oil

19  trucking. For example, Supervisor Williams began the Board's deliberations by

20  stating that "I cannot see how the safety impacts are mitigable." AR 156. He noted

21  that he represents the Cuyama area and expressed concerns about accidents on

22  Route 166, explaining that even with training for oil tanker truck drivers, the

23  conditions on that roadway are dangerous and it is not possible "to stop the

24  craziness of people trying to pass them." AR 157. He expressed concern about

25  potential loss of life from the increased risk of accidents. *Id*. He said that "it's not a

26  question of, um, if, but it's a question of when those accidents, um, and a spill will

27  occur." AR 158. Supervisor Williams noted that with the closure of the SMPS, the

28  Project "puts many trucks on the road driving very far, causing environmental

impacts the entire route." *Id*. He concluded by saying that "at the end of the day, it rests on the fact that we can't, um – that the safety impacts are significant and unmitigable of the trucking itself." AR 160.

Supervisor Hart also led with his concerns about accidents and the "potential for a significant and unavoidable impact to sensitive resources due to potential oil spills." AR 166. He cited the many accidents and spills, including the March 2020 tanker truck accident on Route 166. AR 167. He also noted the evidence of accidents along the route that was submitted by the Environmental Defense Center. *Id*. This evidence included data from the County Fire Department, California Highway Patrol, Governor's Office of Emergency Services, and California Office of Spill Prevention and Response. Supervisor Hart affirmed that "our decision today is limited in scope to the temporary trucking program that would allow the Santa Ynez Unit to restart operations . . . ." AR 170. He reminded the other Supervisors that "[w]hat we're doing is we're looking at this project and we're all, you know, making our judgement about the facts that are presented to us today." AR 178.

Finally, Chair Hartmann also began her comments by focusing on the risk of accidents. AR 180–81. She noted that although the EIR projected one accident every fifty-two years on Highway 101 and one accident every seventeen years on Route 166, "we have an actual history that says in Santa Barbara County, we had 14 trucking accidents in 15 years and eight along this route in 15 years. So trucking is inherently risky. And on the 166, it is absolutely uh tremendously risky." *Id*. She went on to state that "there's no question that the Route 166 is extremely dangerous. It's a two-road [sic] going each direction, very few pullouts, people impatient. And we heard from quite a few people in Cuyama who watch this everyday who can attest to the—the riskiness of that particular road. So we—we look at that narrowly, that risk." AR 181. She concluded by saying that "it's detrimental to the health and safety of the neighborhoods that this trucking would

13

go by, uh, and it's not compatible with the surrounding areas and the streets—particularly, 166, and also the 101 are not designed for this kind of traffic. We've already experienced it during a fire where we did have an accident with a truck. And it closed the freeway down, and that's—that's a very dangerous situation, so we're moving into a more vulnerable situation, and adding greater risk on to those roads that, in time of disaster, we really need to count on them being open." AR 182. Clearly, regardless of any broader views Supervisors may have expressed during the hearing, the Board based its findings of denial on specific concerns about accidents and public safety caused by the proposed trucking.

This fact is further confirmed by the Board's consideration of the findings themselves. In considering the proposed findings, the Board requested some clarifying changes, including a reference to public comments "which detail additional accident data and safety concerns." AR 187. Another addition included the finding that "[t]he project would create impacts regarding traffic safety along Calle Real Highway 101 and State Route 166 due to the addition of tanker truck trips to and from Las Flores Canyon to the Pentland Terminal. Existing driver behavior, which recent data shows an increase in traffic fatalities, is problematic." AR 190.

The cases ExxonMobil cites to support its claim of political motivation are completely irrelevant or misapplied. Dkt. No. 44–1 at 36–38. The first case it cites on this point, *Jones v. City of Orange Cove*, 454 F. App'x 601, 603 (9th Cir. 2011), did not even address the plaintiff's claim of political motivation. Although the opinion mentions that the plaintiff alleged that the city council's decision was politically motivated, the case focused on whether her petition for writ of prohibition should have been treated as a writ of administrative mandamus. *Id.* The court did not address the plaintiff's claim of political motivation. *See id.* In *Harrington v. City of Davis*, 16 Cal. App. 5th 420, 436 (2017), the court held that the plaintiff failed to demonstrate, based on evidence in the record, that the city

was influenced by "backroom dealings" and "political pressure." Similarly here, there is no evidence in the record that the Board's decision was the result of backroom dealings or political pressure.

Finally, ExxonMobil cites *Gabric v. City of Rancho Palos Verdes*, 73 Cal. App. 3d 183, 192 (1977), in support of its claim that the Board was trying to "legislate" a ban on oil development in the County. Dkt. No. 44–1 at 37–38. In that case, the court found that the City invoked the incorrect standard of review due to its interest in changing the City's height limit building ordinances. *Gabric*, 73 Cal. App. 3d at 191–92. In this case the Board properly conducted a quasi-judicial administrative proceeding to determine whether ExxonMobil's Project complied with County policies and ordinances. The Board relied on evidence demonstrating that the Project was inconsistent with the LUDC and CZO, and on that basis decided to deny the application. The Board's findings were based on the *existing* ordinances and evidence in the record.

In conclusion, it is clear that the Board very carefully limited its findings to the evidence of the significant risk of accidents and the infeasibility of avoiding such harm. Based on the evidence, the Board found the Project to be inconsistent with LUDC section 35.82.080.E.1(c) and (e) and CZO section 35-174.7.1(c) and (e).[2] Although the appropriate standard of review is whether the Board's findings

---

[2] As Intervenors note above and previously explained in their Memorandum of Points and Authorities (Dkt. No. 33), the Board's findings regarding the Statement of Overriding Considerations need not be addressed if the Court upholds the County's denial, because "CEQA does not apply to projects which a public agency rejects or disapproves." Intervenors' Mem. Supp. Summ. J, Dkt. No. 33 at 14 (quoting Cal. Code Regs. tit. 14, § 15270(a)). Even if the Court decides not to uphold the County's denial, the remedy would be to issue a writ directing the County to reconsider its decision. On remand, the Board would hold a new administrative review process and consider new findings. At that time, the Board may decide again to deny the project, in which case no Statement would be required. Even if the Board desires to approve a project on remand, it will need to

1  are supported by substantial evidence in the light of the whole record, even if the
2  Court were to invoke the independent judgment standard, the weight of the
3  evidence clearly supports the Board's findings and decision. Cal. Code of Civ.
4  Proc. § 1094.5(c).

5  **II.    The Board Properly Exercised Its Discretion to Decide Whether to Allow Oil to Be Transported by a Mode Other Than Pipeline.**
6

7          The County's policies and ordinances contain a clear preference for
8  transportation of crude oil to refineries by pipeline. AR 15054; *see also*
9  ExxonMobil Req. for Judicial Notice Ex. A, Dkt. No. 45–1 at 66 (Coastal Land
10 Use Plan, stating, "pipelines shall be the required mode of transportation because
11 they are less environmentally damaging than other modes of transportation.").
12 ExxonMobil quotes half of a sentence from the County's Coastal Land Use Plan,
13 noting that the Plan provides that the County "should assure that producers have
14 access to competitive markets . . . ." Dkt. No. 44–1 at 5. The rest of the sentence
15 states, "however, the County need not provide unlimited flexibility to all
16 producers." Dkt. No. 45–1 at 5. An alternative mode of transportation is allowed
17 only in very limited circumstances. The County retains the discretion to decide
18 whether to allow an alternative mode, even if a pipeline is not currently available.
19 *See* Dkt. No. 45–1 at 6 (pursuant to Coastal Land Use Policy 6-8(d), other modes
20 of oil transportation are "allowed," not mandated); Dkt. No. 45–2 at 5-6 (CZO
21 section 35-154.5(i) provides that transportation by a mode other than pipeline

22 ─────────────────────
23 consider the factual evidence presented during the administrative review process
   and determine whether the benefits of the proposal outweigh its significant and
24 unavoidable impacts. Cal. Code Regs. tit. 14, § 15093(b). Therefore,
   ExxonMobil's argument regarding a Statement is premature and should not be
25 addressed as part of this litigation. Even if this issue were timely and relevant, the
26 Court should uphold the Board's findings that any alleged benefits of the Project
   were outweighed by the risks and impacts. AR 10–11. This finding was supported
27 by ample evidence in the record. *See, e.g.*, AR 126, 22861–62, 23412–14, 23428–
28 35.

"may be permitted"); Dkt. No. 45–3 at 4 (other transportation modes "may be allowed" pursuant to LUDC section 35.52.060.B.10(b));[3] *see also* AR 15062, 15065–66, 15068.

In this case, the Board did not reach this issue because the Board found that the Project was inconsistent with the County's LUDC and CZO requirements that an application for a new or modified Development Plan must demonstrate that the project "will not be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area" and that roads are adequate to safely carry the resulting traffic. LUDC § 35.82.080.E.1(c) & (e); CZO § 35-174.7.1(c) & (e); AR 11–13. Because the Project was inconsistent with these requirements, it could not be approved regardless of the discretionary provisions of other policies or ordinances.

## CONCLUSION

For the foregoing reasons, the Court should uphold the Santa Barbara County Board of Supervisors' denial of ExxonMobil's dangerous temporary trucking scheme. If the Court finds that one of the Board's findings is supported by substantial evidence in the record, the decision must be affirmed.

Respectfully submitted this 1st day of May, 2023.

*/s/ Linda Krop*
LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
MARGARET M. HALL (Bar No. 293699)
mhall@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel. (805) 963-1622 / Fax. (805) 962-3152

---

[3] The term "'may' is permissive" and thus retains the agency's discretion. Cal. Gov't Code § 14.

*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Surfrider Foundation*

*/s/ Julie Teel Simmonds*
JULIE TEEL SIMMONDS (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
ELIZABETH JONES (Bar No. 326118)
ljones@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Tel. (510) 844-7100 / Fax. (510) 844-7150
*Attorneys for Center for Biological Diversity and Wishtoyo Foundation*

I, Julie Teel Simmonds, in accordance with Local Rule 5-4.3.4(a)(2)(i), attest that Linda Krop drafted and reviewed the pleading presented above, concurred in the content, and authorized the filing of this document bearing her signature with the Court.

*/s/ Julie Teel Simmonds*
JULIE TEEL SIMMONDS
*Attorney for Center for Biological Diversity and Wishtoyo Foundation*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 11-6.2, the undersigned, counsel of record for Intervenors, certifies that this brief contains 5,791 words, which complies with the word limit of Local Rule 11-6.1.

*/s/ Julie Teel Simmonds*
JULIE TEEL SIMMONDS
*Attorney for Center for Biological Diversity and Wishtoyo Foundation*