DAWN SESTITO (S.B. #214011)
dsestito@omm.com
JUSTINE M. DANIELS (S.B. #241180)
jdaniels@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071-2899
Telephone:  +1 213 430 6000
Facsimile:   +1 213 430 6407

JACOB P. DUGINSKI (S.B. #316091)
jduginski@bdlaw.com
JAMES M. AUSLANDER (*pro hac vice*)
jauslander@bdlaw.com
BEVERIDGE & DIAMOND P.C.
456 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone:  +1 415 262 4000

Attorneys for Petitioner and Plaintiff
Exxon Mobil Corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>SANTA BARBARA COUNTY BOARD OF SUPERVISORS,<br><br>Respondent and Defendant,<br><br>and<br><br>ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SURFRIDER FOUNDATION, CENTER FOR BIOLOGICAL DIVERSITY, and WISHTOYO FOUNDATION,<br><br>Intervenors. | Case No. 2:22-cv-03225-DMG (MRWx)<br><br>**PETITIONER/PLAINTIFF EXXON MOBIL CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO RESPONDENT/DEFENDANT'S AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT ON FIRST CAUSE OF ACTION FOR WRIT OF ADMINISTRATIVE MANDATE**<br><br>**Judge**:  Hon. Dolly M. Gee<br>**Hearing**:  June 16, 2023<br>**Time**:  2:00 p.m.<br>**Courtroom**:  8C |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 2

I.    Because the Board's Denial of the Trucking Permit Application Denies ExxonMobil's Fundamental Vested Right to Restart SYU, the Court Must Evaluate the Evidence Applying the Independent Judgment Test. ................................................................... 2

II.   Regardless of Which Standard the Court Applies, the Evidence Shows the Board Abused Its Discretion in Denying the Project. ......... 7

      A.   The Evidence Shows That the Project's Impact on the Streets and Highways Would Be *Less Than Significant* ........... 9

      B.   The Evidence Shows That the Project Would Not Be Detrimental to the Safety of Impacted Neighborhoods Because the Incremental Risk of Oil Spills Was Mitigated to the *Maximum Extent Feasible* and Falls Within the County's Risk Thresholds. .................................................... 11

      C.   The Evidence of Actual Accidents the Board and Intervenors Rely on Is Not an Appropriate Substitute for the Data Evaluated by County Staff. .................................... 14

      D.   The Board Abused Its Discretion by Applying Impossible-to-Meet Standards in Evaluating the Project's Overriding Considerations. ................................................. 16

III.  The Record Demonstrates That the Board Failed to Proceed in the Manner Required by Law. ..................................................... 18

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.*,
228 Cal.App.3d 1548 (1991) ................................................................. 3

*Amerco Real Est. Co. v. City of W. Sacramento*,
224 Cal.App.4th 778 (2014) .................................................................. 7

*Ass'n for Prot. etc. Values v. City of Ukiah*,
2 Cal.App.4th 720 (1991) .................................................................... 14

*Bank of Am. v. State Water Res. Control Bd.*,
42 Cal.App.3d 198 (1974) ................................................................... 14

*Banker's Hill, Hillcrest, Park W. Cmty. Pres. Grp. v. City of San Diego*,
139 Cal.App.4th 249 (2006) ............................................................. 8, 14

*Bixby v. Pierno*,
4 Cal.3d 130 (1971) .......................................................................... 4, 7

*Chalk v. U.S. District Court*,
840 F.2d 701 (9th Cir. 1988) .......................................................... 9, 16

*Gabric v. City of Rancho Palos Verdes*,
73 Cal.App.3d 183 (1977) ............................................................... 8, 19

*Goat Hill Tavern v. City of Costa Mesa*,
6 Cal.App.4th 1519 (1992) ................................................................... 5

*Harrison v. City of Davis*,
16 Cal.App.5th 420 (2017) .................................................................. 20

*Interstate Brands v. Unemployment Ins. Appeals Bd.*,
26 Cal.3d 770 (1980) ....................................................................... 4, 6

*JMS Air Conditioning & Appliance Serv., Inc. v. Santa Monica Cmty. Coll. Dist.*,
30 Cal.App.5th 945 (2018) ................................................................... 7

*Jones v. City of Orange Cove*,
454 F. App'x 601 (9th Cir. 2011) ......................................................... 20

*Lucas Valley Homeowners Ass'n v. Cnty. of Marin*,
233 Cal.App.3d 130 (1991) ................................................................... 8

*Martinez v. City of San Diego*,
4 Cal.Rptr.2d 753 (1992) .............................................................. passim

*Strumsky v. San Diego Cnty. Emps. Ret. Ass'n*,
11 Cal.3d 28 (1974) ............................................................................. 4

1

2

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

3

4

5

6

7

8

9

10

11

12

*The Termo Co. v. Luther*,
  169 Cal.App.4th 394 (2008).........................................................................4, 5

*Topanga Ass'n for a Scenic Cmty. v. Cnty. of Los Angeles*,
  11 Cal.3d 506 (1974)............................................................................8, 9, 15

**Statutes**

Cal. Civ. Proc. Code § 1094.5(c)............................................................7, 8, 13

Cal. Evid. Code § 310(a).....................................................................................13

CZO § 35-154.5(i) .......................................................................................11, 14

CZO § 35-174.7.1 ........................................................................................11, 14

LUDC § 35.52.060.B.10.b ...........................................................................11, 14

LUDC § 35.82.080.E.1 .................................................................................11, 14

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

ExxonMobil has an undisputed vested right to restart the Santa Ynez Unit. That right is hollow if ExxonMobil cannot get oil from SYU to market. For now, no pipeline is available, so trucking oil from the facility is the only option.

For nearly four years, ExxonMobil worked closely with County Staff to ensure that its application to truck oil from SYU to local refineries met—if not exceeded—all the County's requirements. The Project called for strict mitigation measures, including the use of new trucks equipped with advanced safety features, handled by experienced drivers with extensive training and familiarity with the proposed route. And the restart of SYU would have brought substantial benefits to the County including low-carbon domestic oil, jobs, and millions in tax dollars.

The extensive Final SEIR, prepared by experts in their respective fields, analyzed every aspect of the Project—including risk of oil spills and impacts on traffic—for compliance with applicable environmental laws, regulations, and risk thresholds. It found that all the Project's potential adverse impacts, save one, were *less than significant* with the mitigation measures in place. And that one unavoidable significant impact, the risk of an accidental oil spill from trucking, was mitigated to the *maximum extent feasible*. The Final SEIR estimated that, with the proposed mitigation measures, an oil spill might occur just *once in 17 years*. County Staff prepared a detailed report summarizing and further analyzing the Project for compliance. The Staff found that it complied with all relevant policies, and they recommended approval.

In short, the Board had everything it needed to approve the Project but rejected it. In doing so, the Board chose to brush aside the findings of its experts and the recommendations of its Staff to focus almost exclusively on inapposite evidence of accidents submitted by Intervenors. But that evidence says *nothing* about the Project or about the likelihood that trucks carrying oil from SYU with the mitigation measures would be involved in similar accidents. Apart from occurring

-1-

on the same routes, it lacks any connection to the Project and is silent on a host of factors—such as the qualifications of drivers or the quality of the trucks involved—that the Project's mitigation measures address. Lacking these details, Intervenors' accident evidence is not indicative of accidents that might occur under the Project and so cannot be grounds for the Board—or the Court—to find that the Project would be detrimental to the County or its citizens. That is not evidence—substantial or otherwise—that can support the Denial. If anything, the evidence shows that the Project's mitigation measures make it safer than other oil trucking in the County, which the County and Intervenors concede is widespread today.

That the Board abused its discretion by myopically focusing on Intervenors' evidence is not surprising. It provided the Board with a justification for the outcome that it wanted. The fact is, the Board did not reject the Project because it fell short of even a single County ordinance (it did not) or because it created unacceptable risk (it was within County capacity and risk thresholds). The Board rejected the Project because a majority of Supervisors do not like the oil industry and do not want ExxonMobil to restart SYU under any circumstances. As one County Supervisor said during the Board's deliberations, "I think what I'm hearing is . . . there is no scenario where their project can be approved." The Board's *sub silentio* ban on the transportation of oil is also an abuse of discretion requiring that the Denial be set aside and that the Court enter an order requiring the Board to reconsider the Project.

## ARGUMENT

**I.     Because the Board's Denial of the Trucking Permit Application Denies ExxonMobil's Fundamental Vested Right to Restart SYU, the Court Must Evaluate the Evidence Applying the Independent Judgment Test.**

ExxonMobil's fundamental vested right to restart SYU is meaningless without a means to transport its oil to market. The Board's decision to deny the Project forces SYU to remain shut-in unless and until a pipeline becomes available,

and there is no timeline for when that might be.[1]  Because a vested right is at stake, the independent judgment standard applies.  EM Mot. at 15–18.

The Board and Intervenors do not dispute that ExxonMobil has a vested right to restart and operate SYU.  37-AR-014573, 014810.  Nor do they dispute that SYU remains shut-in because its oil cannot be transferred from the facility.  37-AR-014648–49.  Instead, they argue that ExxonMobil does not possess a vested right *to transport oil by truck*—a "right" ExxonMobil never claimed—and that the right at issue is not fundamental because the Denial has not put SYU out of business—yet.[2]  Bd. Reply at 2–8; Intvs. Reply at 2–8.  Both arguments are premised on a myopic misunderstanding of California law.

Whether an administrative decision substantially affects a fundamental vested right is a case-by-case determination, and "no exact formula exists by which to make this determination . . ." *301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.*, 228 Cal.App.3d 1548, 1556 (1991).  But the California Supreme Court has provided guidance:

> The essence to be distilled is this: **When an administrative decision affects a right which has been legitimately acquired** or is **otherwise 'vested,'** and when **that right is of a fundamental nature from the standpoint of its economic aspect** or its 'effect . . . in human terms and the importance . . . to the individual in the life situation,' **then a full and independent judicial review of that decision is indicated**.

---

[1] Since SYU's shut-in, ExxonMobil has continued to maintain, inspect, and monitor the SYU platforms and facilities to ensure their integrity.  37-AR-014581; *see also* EM Mot. at 4.  Each year, the company spends tens of millions of dollars to maintain the facilities and pays the County more than $1 million in taxes.  37-AR-014639.  ExxonMobil has the undisputed vested right to restart production at SYU at any time and is working to restore a means of transporting oil from LFC to market.  37-AR-014573, 014810.  The Project is a key component of those efforts.  EM Mot. 5–6; 37-AR-014807.

[2] The issue here is not whether ExxonMobil, as a corporation, can continue to operate its business in spite of the Denial, but what impact the Denial has on SYU's operations.

1  *Interstate Brands v. Unemployment Ins. Appeals Bd.*, 26 Cal.3d 770, 780 (1980)

2  (quoting *Strumsky v. San Diego Cnty. Emps. Ret. Ass'n*, 11 Cal.3d 28, 34–45 (1974)

3  (emphasis added)).  This case meets that standard.  ExxonMobil legitimately

4  acquired the right to operate SYU over 30 years ago when, among other things, the

5  County approved its Development Plan.  And this right became even more concrete

6  based on the substantial work and significant investments in the facility that

7  ExxonMobil made over the decades.  *See* 37-AR-014848–51.  The Board nullified

8  that right by denying the Project.

9        The Board and Intervenors attempt to reframe the scope of that right,

10  suggesting that ExxonMobil has a right to restart SYU only to the extent that

11  SYU's oil can be transported via pipeline.  Both argue that because ExxonMobil

12  does not already possess a trucking permit, the Denial implicates no vested right.

13  Bd. Reply at 4; Intvs. Reply at 3–4.  But the Development Plan—one source of

14  ExxonMobil's vested right—explicitly provides that the facility's oil can be

15  transported by other means if a pipeline is *not* available and if local law is satisfied.

16  37-AR-014810, 014821–22; *see also* EM Mot. at 5–6, 10, 13.  And the California

17  Supreme Court has made clear that the application of the independent judgment

18  rule is not as rigid as the Board and Intervenors claim.  *See Interstate Brands*, 26

19  Cal.3d at 779 (". . . [the] concern [in *Bixby*] was directed toward providing a

20  doctrinal basis through which [independent judgment] review could be extended to

21  'decisions or classes of decisions' which, although not involving vested property

22  rights in the traditional sense, nevertheless had an impact on the individual

23  'sufficiently vital . . . to compel a full and independent review' by the court.")

24  (discussing *Bixby v. Pierno*, 4 Cal.3d 130, 143 (1971)).

25        Contrary to the Board's and Intervenors' assertion, a fundamental vested

26  right can exist without a formal permit, as illustrated by *The Termo Co. v. Luther*,

27  169 Cal.App.4th 394 (2008).  There, the court held that the plaintiffs had a

28  fundamental vested right in the continued operation of 28 oil wells even though a

-4-

permit granting a right to operate the wells had not been issued. *Id.* at 408. As the court noted, "[t]o argue that the issuance of a license or permit per se is outcome determinative is to elevate form over substance." *Id.* The same is true of the Board and Intervenors' insistence that a permit to truck is a prerequisite for applying the proper standard to protect ExxonMobil's right to restart and operate SYU.[3]

Similarly, in *Goat Hill Tavern v. City of Costa Mesa*, the court held that the plaintiff had a fundamental vested right in the continued operation of his business despite the expiration of a conditional use permit for an expansion. 6 Cal. App. 4th 1519, 1527 (1992). "[T]he tavern's original rights as a legal nonconforming use and its right to operate in the expanded capacity under the conditional use permit have become inextricably intertwined and denying renewal of the conditional use permit puts the tavern out of business." *Id.* at 1526 n.3. Just as in *Goat Hill Tavern*, ExxonMobil's right to restart and operate SYU is inextricably intertwined with its ability to transport processed oil to market, and denying the Project prevents ExxonMobil from continuing to operate SYU.

The Board and Intervenors next argue that the independent judgment test should not apply because the Denial implicates only economic interests—*i.e.*, ExxonMobil's return on its use of the SYU property—and courts often find that "purely economic privileges" do not constitute a "fundamental" vested right. Bd. Reply at 4; Intvs. Reply at 5. Independent judgment review, they explain, is only available in land-use cases where an administrative decision prevents the continued operation of a preexisting legal business. Bd. Reply at 5–7; Intvs. Reply at 6–7.

---

[3] As the *Termo* court noted, oil is "an extraordinarily valuable resource, especially in the current economic era," and the right to extract oil is "fundamental considering its potentially massive economic aspect and its considerable effect in human terms." 169 Cal. App. 4th at 407-08. The same was true when the Board denied the Project. *See* 1-AR-000091–93; 1-AR-000119–20. And it remains so today.

But that is exactly the case here: The Board's Denial stops ExxonMobil from restarting SYU—that is, from continuing to operate a preexisting legal business—because it cannot transport its oil.  EM Mot. at 17–18.

The Board and Intervenors criticize ExxonMobil's reliance on *Goat Hill Tavern* and *Termo* as misplaced because the administrative decisions in those cases effectively put the plaintiffs out of business.  Bd. Reply at 4–8; Intvs. Reply at 5–8.  Both contend that the independent judgment rule does not apply here because ExxonMobil can—maybe, eventually—use a pipeline to transport SYU's oil.  Bd. Reply at 5; Intvs. Reply at 7.[4]  They go on to assert that the circumstances here are more akin to cases where administrative decisions increased the cost of doing business or limited property use but stopped short of shutting down a business and that the independent judgment rule should not apply.  *See* Bd. Reply at 6–8; Intvs. Reply at 5, 7–8.  This contention fails for at least two reasons.

*First*, it misstates the law.  In *Interstate Brands*, the Supreme Court flatly rejected the proposition that fundamental vested rights "only [exist] in such cases where . . . [the administrative decision] would operate to drive the particular employer out of business." 26 Cal.3d at 777.  And even the cases the Board and Intervenors cite acknowledge that "the independent judgment test is applied to review administrative decisions that will drive an owner out of business *or significantly injure the business's ability to function*."  *Amerco Real Est. Co. v. City*

---

[4] The Board and Intervenors conveniently avoid acknowledging that there continues to be uncertainty as to whether a pipeline will ever come back online.  An application to replace the pipelines—filed six years ago—remains in limbo.  *See* EM Mot. at 4.  And on April 26, 2023, the Planning Commission denied ExxonMobil affiliate PPC's request for permission to install 16 new safety valves on Lines 901 and 903 in order to comply with a state law requiring pipeline operators to install the "best available technology" on existing pipelines in the coastal zone to reduce the amount of oil released in an oil spill.  PPC appealed that decision to the Board of Supervisors on May 8, 2023.  *See* https://www.readysbc.org/880/901903-Valve-Upgrade.

*of W. Sacramento*, 224 Cal.App.4th 778, 784 (2014) (emphasis added); *see also, e.g.*, *JMS Air Conditioning & Appliance Serv., Inc. v. Santa Monica Cmty. Coll. Dist.*, 30 Cal.App.5th 945, 960 (2018) ("Purely financial effects . . . affect 'fundamental' rights . . . when an administrative decision imposes 'operating conditions [that] *severely impair [a company's] ability to function* or . . . drive [the company] out of business.'") (emphasis added).

  *Second*, it misses the point. ExxonMobil sought a trucking permit in 2017 because there was no pipeline available. 37-AR-014567, 014569–70. The Project is essential to safely restart SYU and the continuation of SYU's operations until a pipeline becomes available. 37-AR-014807. A pipeline is still not available. The Denial does not merely impair ExxonMobil's ability to restart and continue to operate SYU; it makes it impossible. EM Mot. at 17–18. Thus, the Court should apply the independent judgment rule.

## II. Regardless of Which Standard the Court Applies, the Evidence Shows the Board Abused Its Discretion in Denying the Project.

  No matter which standard of review the Court applies, the evidence in the record compels a finding that the Board abused its discretion by denying the Project.[5] Under the independent judgment standard, the Court "exercises its independent judgment upon the evidence disclosed in a limited trial de novo." *Bixby*, 4 Cal.3d at 143. An "abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." Cal. Civ. Proc. Code § 1094.5(c). If the Court applies the substantial evidence standard, an abuse of discretion is found if the findings are not supported by the substantial

---

[5] Tellingly, the Board and Intervenors do not even attempt to engage with an analysis of the evidence test under the independent judgment standard. Intervenors contend that their focus on the substantial evidence standard "aligns with the Joint Report." Intvs. Reply at 3. However, the "Synopsis of Principle Issues" section clearly states that "ExxonMobil has a vested right to restart and operate SYU…" Dkt. No. 16 at 2.

1   evidence in light of the whole record. *Id.* Even under this more lenient test, the

2   Court still must consider both the supporting and contrary evidence in the record

3   and weigh the evidence to "fairly estimate [its] worth." *Lucas Valley Homeowners*

4   *Ass'n v. Cnty. of Marin*, 233 Cal.App.3d 130, 141–42 (1991).

5        The Board's task was to evaluate if the Project complied with applicable laws

6   and whether the evidence supported the required findings for approval. The Project

7   met all applicable requirements, including the at-issue provisions of the LUDC and

8   CZO. EM Mot. at 6–10, 18–32. Nevertheless, the Board chose to deny the Project,

9   ignoring evidence from the Staff Report and Final SEIR—including the County's

10  *own* safety thresholds—and instead relied on general policy statements and public

11  commentary to support its conclusion that the Project was purportedly too

12  dangerous to approve. That is an abuse of discretion, which requires the Court to

13  set the Denial aside. *See Gabric v. City of Rancho Palos Verdes*, 73 Cal.App.3d

14  183, 200 (1977) (city's denial of a permit was not supported by the evidence

15  because, *inter alia*, all zoning and related laws had been satisfied); *Martinez v. City*

16  *of San Diego*, 4 Cal.Rptr.2d 753, 759 (1992), ordered not to be officially published

17  (May 21, 1992) (city's denial of a development permit was unsupported in part

18  because there was no evidence in the EIR showing substantial negative impacts).

19       The actual evidence the Board and Intervenors rely on shows only that tanker

20  truck accidents resulting in oil spills have happened along the affected routes. Bd.

21  Reply at 10, 14–15; Intvs. Reply at 9, 11. That evidence does *not* show that the

22  Project, with its numerous mitigation measures and higher safety standards, would

23  have the same result. *Banker's Hill, Hillcrest, Park W. Cmty. Pres. Grp. v. City of*

24  *San Diego*, 139 Cal.App.4th 249, 274 (2006) (rejecting public comments that did

25  not show the project "*will produce a particular adverse effect*"). Nor does it

26  provide the necessary details to enable the Board—much less this Court—to draw

27  that conclusion. *Topanga Ass'n for a Scenic Cmty. v. Cnty. of Los Angeles*, 11

28  Cal.3d 506, 515 (1974). And the Board cannot justify its Denial by demanding that

-8-

ExxonMobil meet standards for the Statement of Overriding Considerations that *no* project could hope to meet. *Chalk v. U.S. District Court*, 840 F.2d 701, 707–08 (9th Cir. 1988) (finding that the agency "improperly placed an impossible burden of proof on the petitioner").

### A.   The Evidence Shows That the Project's Impact on the Streets and Highways Would Be *Less Than Significant.*

The record makes clear that the net cumulative increase in crude oil trucks using State Route 166 would be about nine trucks per day, or "less than one truck per hour." EM Mot. at 20. [6]  Neither the Board nor Intervenors explains how this warranted a finding that the streets and highways were not adequate or properly designed for the Project.  Nor does either address the Final SEIR's findings that the Project's cumulative impact on traffic and oil truck accidents along Route 166 would be "*less than significant.*" *Id.* at 21.  And both ignore the fact that the Project would not exceed applicable safety and capacity thresholds for the affected routes.  *Id.* at 21–23.  In an effort to undermine these facts, the Board and Intervenors offer several arguments.  None is availing.  Instead, they demonstrate that the Findings for Denial failed to "bridge the analytic gap between the raw evidence and [the Board's] ultimate decision." EM Mot. at 34 (quoting *Topanga Ass'n*, 11 Cal.3d at 515).

The Board asserts that the findings in Section 4.5 of the Final SEIR should be dismissed because "major portions" were based on the 2019 traffic study prepared by Association of Transportation Engineer ("ATE"), based on data from 2018 or

---

[6] The Board and Intervenors focus on—and often repeat—that the Project would put up to 78 trucks per day on the affected routes.  Bd. Reply at 9–11; Intvs. Reply at 8.  While technically accurate (the Project sought authorization for up to 68 trucks per day, with 78 allowed only for catch-up trips following rainy days when no trucking would be allowed, 37-AR-014571), both ignore the fact that SMPS's closure would decrease the number of trucks on the routes, such that the Project would cumulatively only add nine additional trucks per day.  38-AR-015121–22.

earlier.  Bd. Reply at 9–10.  But, they point to no evidence in the record indicating that traffic along the affected routes at the time of Denial was materially different, let alone worse, than it was during the years evaluated by ATE or County Staff and Caltrans.  Without such evidence, the Board is left with nothing but its own conjecture—and that is not enough to justify disregarding the Final SEIR.

The Board also argues that it necessarily "considered Section 4.5" because it selectively cited that section in its Findings for Denial.  Bd. Reply at 10.  But those selective citations show that the Board misinterpreted the Final SEIR's findings.  According to the Findings for Denial: "Existing accident rates on certain segments of Highway 101 and State Route 166 within the project area are currently above the state average (*see* SEIR page 4.5-7), and the project would add an additional risk for accidents above these existing conditions (SEIR Section 4.5 pages 20-22)."  1-AR-000012.  The Final SEIR reached the *opposite* conclusions.  In fact, the part of Section 4.5 that the Board cited in its Findings states that "the proposed Project would *not* result in an exceedance of any of the roadway capacities, *nor* would the proposed Project result in a substantial increase in traffic on any of the project roadways."  38-AR-015107 (emphasis added).  Section 4.5 goes on to find that the implementation of the RISK-1 (Truck Hazard Plan) mitigation measures "would reduce the likelihood of an oil truck accident by about 33%," making the Project's impact on potential accidents "less than significant."  38-AR-015107–09; *cf. Martinez*, 4 Cal.Rptr.2d at 759 (finding that there was not substantial evidence to support denial of permit where "such risks are insignificant in light of the mitigation measures described in the EIR").  Neither the Board nor Intervenors cite *any* evidence demonstrating that the Project's additional trucks would fall outside the acceptable ranges discussed in the Final SEIR.[7]

---

[7] The Board also notes that "Section 4.5 of the SEIR does not discuss or analyze specific oil tanker accidents."  Bd. Reply at 10.  That is because those specific risks are addressed by Section 4.3 of the Final SEIR, discussed *infra* § II.B.

1    In short, the weight of the evidence demonstrates that the affected routes are

2    adequate and properly designed for the Project.  And there is no substantial

3    evidence in the record that could allow the Board or this Court to find otherwise.

4    **B.    The Evidence Shows That the Project Would Not Be Detrimental
         to the Safety of Impacted Neighborhoods Because the Incremental**

5    **Risk of Oil Spills Was Mitigated to the *Maximum Extent Feasible*
         and Falls Within the County's Risk Thresholds.**

6

7    To determine whether the Project met the "detrimental to the comfort,

8    convenience, welfare, health, and safety" requirements of LUDC Section

9    35.82.080.E.1(e) and CZO Section 35-174.7.1(e), the Board needed—but failed—

10   to heed the County's policies.  Specifically, it needed to analyze the Project in the

11   context of the County's requirements for non-pipeline transportation of oil—LUDC

12   Section 35.52.060.B.10.b and CZO Section 35-154.5(i)—and the County's existing

13   safety thresholds.[8]  *See* EM Mot. at 21, 32–33, 35–36.  But the Board did not

14   consider those factors.  Had it done so, the evidence would have demanded a

15   different outcome. The Final SEIR found that risk of oil spills associated with the

16   Project had been mitigated to the *maximum extent feasible* and was within the

17   County's acceptable risk range.  *Id.* at 21, 27.  This undisputed evidence

18   demonstrates that the Board's Denial was arbitrary and not supported by the

19   evidence.

20   The Board failed to consider the mitigation measures and how they would

21   minimize the Project's single Class I impact—the risk of an accidental oil spill

22   from trucking—to the "maximum extent feasible."  EM Mot. at 25–27, 33–34.  The

23   Board and Intervenors continue to ignore this fact in their briefs.  The Board argues

24   _____

25   [8] The Board essentially concedes that the Project satisfies the requirements of

26   LUDC Section 35.52.060.B.10.b and CZO Section 35-154.5(i), the local laws
     authorizing transportation by means other than pipeline.  *See* Bd. Reply at 12

27   ("Meeting that requirement [of CZO 35-154.5(i)(2)] did not require approval of the

28   project.").

-11-

that ExxonMobil cannot control other drivers or road conditions.  Bd. Reply at 12.
And Intervenors point out that many of the tanker truck accidents along proposed
routes "were caused by external factors."  Intvs. Reply at 9.  However, neither
actually analyzes the Truck Hazard Mitigation Plan, which addressed these
concerns and distinguishes the Project from other ongoing trucking of oil in the
County.  *See* EM Mot. at 24–26; 38-AR-015028-29 (requiring, among other things,
extensive driver training, trucks with roll stability control system and dual-side
dashboard cameras, integrated satellite tracking and mapping systems, and regular
safety inspections).

Trucks transport oil along the proposed Project route today, just as they have
for decades.  Indeed, most of the oil producers in the County transport their oil to
market by truck.  1-AR-000152.  In other words, the Project was not a binary
choice of whether oil trucking would occur in the County.  The Board and
Intervenors do not dispute this fact (e.g., Intvs. Reply at 13), yet fail to recognize its
salience to the present Project in which the Board singled out ExxonMobil based on
purported traffic safety and environmental risks without substantial evidence of the
Project meaningfully increasing such risks.  Although it is impossible to entirely
eliminate the risk of a trucking accident, the County has not passed a law banning
trucking of oil and, thus, must accept some level of risk.  The existence of some
risk—in this case *once in every 17 years*, 38-AR-015022, cannot, on its own, serve
as a justifiable basis to deny the Project.[9]

In fact, the County has adopted a rubric for assessing the acceptable level of
risk discussed in Section 4.3—Hazardous Materials and Risk of Upset—of the
Final SEIR.  These thresholds are used to "determine the potential level of public

---

[9] Intervenors take issue with Section 4.3's findings regarding the probability of
accidents, asserting that the risk is actually an accident "every two and a half
years."  Intvs. Reply at 11.  Again, they miss the point by relying on *other*
accidents.  Section 4.3's specifically calculated the risk of accidents *involving
Project* trucks and factored in its mitigation measures. 38-AR-015014-22.

-12-

1   safety impacts from the risk of upset events . . ." 38-AR-015010-11; Bd. Reply at

2   10.  The Final SEIR shows that the risk profile for the Project—individually and

3   cumulatively—falls within the County's acceptable range.  38-AR-015010-13,

4   015020, 015037; *see also* 38-AR-015014-39; EM Mot. at 21 (Figure 4.3-13).

5   Neither the Board nor Intervenors dispute this.  Nor do they provide evidence or

6   argument that the four additional truck accidents identified by Intervenors would

7   push the Project's risk profile beyond the County's acceptable thresholds.

8        The Board and Intervenors argue that the Board had discretion in

9   determining whether to grant or deny the Project.  *See* Bd. Reply at 13; Intvs. Reply

10  at 16.[10]  But that discretion has limits and does not give the Board free rein to select

11  which evidence to consider and which to ignore.  Cal. Civ. Proc. Code § 1094.5(c).

12  This kind of selective discretion would allow the Board to make permitting

13  decisions based on its members' whims rather than on the record as a whole, an

14  arbitrary process that could unfairly deprive applicants of their property rights.  *See*

15  *Martinez*, 4 Cal.Rptr.2d at 758 (holding that ambiguous phrases like "adversely

16  affect" in a city ordinance must be interpreted narrowly to avoid unfairly depriving

17  property owners of their expectant rights and reversing denial on that ground).

18       The interpretation of the LUDC and CZO is a question of law to be decided

19  by this Court.  *See id.* (citing Cal. Evid. Code § 310(a)).  Here, the "not detrimental

20  to the comfort, convenience, welfare, health, and safety" requirements of LUDC

21  Section 35.82.080.E.1(e) and CZO Section 35-174.7.1(e) should be read narrowly

22  and in the context of the County's requirement that impacts of non-pipeline

23  transportation be "mitigated to maximum extent feasible"—LUDC Section

24  ————————————————

25  [10] Intervenors claim that ExxonMobil only partially quotes from the Coastal Land

26  Use Plan, which provides that the County "*should* assure that producers have access
    to competitive markets."  Intvs. Reply at 16.  Not so.  ExxonMobil included the

27  allegedly missing text in its Motion, EM Mot. at 5, and further attached the full text

28  in its Request for Judicial Notice, Ex. A at 66–67.

35.52.060.B.10.b and CZO Section 35-154.5(i)—and the County's existing safety thresholds. *See Martinez*, 4 Cal.Rptr.2d at 758. So properly interpreted, the Denial cannot be supported by the weight of the evidence or substantial evidence standards and constitutes an abuse of discretion.

      **C.**     **The Evidence of Actual Accidents the Board and Intervenors Rely on Is Not an Appropriate Substitute for the Data Evaluated by County Staff.**

      The Board and Intervenors contend that this Court should brush aside the findings in the Staff Report and Final SEIR—findings reached after four years of review—in favor of the accident descriptions provided by Intervenors.[11] Bd. Reply at 11, 14–15; Intvs. Reply at 9, 11. But that information on its own—and lacking any analysis connecting it to the Project—is *not* sufficient to support the Board's Denial. As the *Banker's Hill* court recognized, project opponents must produce evidence "that a project will *produce a particular adverse effect*." 139 Cal.App.4th at 274 (citing *Ass'n for Prot. etc. Values v. City of Ukiah*, 2 Cal.App.4th 720, 735–36 (1991)). Here, as in *Banker's Hill*, Intervenors' accident descriptions may provide evidence of the nature of the affected routes, but it does not support a conclusion that the Project would necessarily exacerbate these conditions, especially given the robust mitigation measures proposed.

      Indeed, there is *no* evidence in the record that trucks involved in these accidents were subject to any particular safety measures, much less to the same or

---

[11] The Board and Intervenors argue that ExxonMobil places too much emphasis on the Staff Report and its recommendation to approve the Project because they are not the decision makers. *See* Bd. Reply at 13–14; Intvs. Reply at 11–12. While the ultimate determination whether or not to approve the Project lay with the Board, the Staff and the experts who worked on the Final SEIR, 38-AR-015227-28, are the local bodies that spent years evaluating the proposed Project and working closely with ExxonMobil to design mitigation measures. Their findings should not be dismissed so lightly. *See Bank of Am. v. State Water Res. Control Bd.*, 42 Cal.App.3d 198, 213 (1974) (noting that expert agency analysis is "entitled to great weight"); *Martinez*, 4 Cal.Rptr.2d at 759.

even similar stringent mitigation measures outlined in the Project's Truck Hazard Mitigation Plan.  Information about these accidents in the record is scant:

- **September 13, 2016** – crash involving oil tanker truck and semi-tractor trailers along Route 166.  3-AR-000870; 57-AR-025305.
- **May 20, 2018** – accident involving sedan crashing into oil tanker truck on Route 166.  3-AR-000871; 57-AR-025304-05, 025309.
- **December 12, 2018** – pickup truck crashed into oil tanker truck on Route 166.  57-AR-025305; 025309.
- **March 21, 2020** – oil tanker truck overturned down an embankment along Route 166, considered in Section 4.3 with additional mitigation measures added to support spill response.  3-AR-000871; 37-AR-014574; 38-AR-014974-014979, 015028-015032; 57-AR-025310; EM Mot. at 26-27.[12]

These summaries generally include no information about numerous factors that the Project's mitigation measures sought to address.  *See* EM Mot. at 34.  For instance, they include no information about the companies involved (none of which were ExxonMobil), driver experience, training, familiarity with the road, or traffic conditions; nothing about the make and model of trucks involved or the technology they were equipped with; and nothing about the involvement of drugs or alcohol.  Without this additional information, the Board had no way of comparing the factors that led to these accidents to the mitigation measures included in the Project. *Topanga Ass'n*, 11 Cal.3d at 515.

This cherry-picked evidence, lacking any context, does not support the Denial.  And contrary to the Board's and Intervenors' arguments, Bd. Reply at 10–

---

[12] While the Intervenors reference additional accidents as evidence to support the Board's Denial (Intvs. Reply at 9–10), ExxonMobil focuses on these four accidents, which the Board relied on in coming to its decision. Bd. Reply at 14–15; 1-AR-000012-13.  In any event, consideration of Intervenors' accidents does not impact the analysis, as they suffer from the same dearth of information.

11; Intvs. Reply at 11, it provides no basis for concluding that consideration of these accidents would push the Project outside of the County's safety thresholds. *See supra* §§ II.A–B.  The Court should consider all of the information before the Board—information that, when considered as a whole, supports the finding that the Board should have approved the Project.  EM Mot. at 20–27.

**D.     The Board Abused Its Discretion by Applying Impossible-to-Meet Standards in Evaluating the Project's Overriding Considerations.**

The Board also erred by arbitrarily demanding that the Project's minimal risk—an estimated *one spill in 17 years*—be offset by an immense economic or environmental windfall that no project could hope to provide.  *Cf. Chalk*, 840 F.2d at 707–08.  The Board's expectations of the Project's benefits are even more nonsensical given that the trucking was only proposed to continue for a maximum of seven years.  37-AR-014802.  At that point, if not earlier due to the availability of a pipeline, ExxonMobil could restart its operations at full capacity, bringing back additional jobs and contributing increased taxes and oil production to the County and State.  Moreover, the Board looked beyond the record before it and determined that it could only approve the Project if it would substantially improve the environment or economy in the County.  *See, e.g.,* 1-AR-000167, 170–71, 182; Bd. Reply at 17–18.

First, the Board argues that the Project would have only a "small impact" on California's energy independence because it would produce less than one percent of the crude oil usage in California.  Bd. Reply at 17.  Putting aside all of the benefits of California-produced oil over foreign crude, Mot. at 28–29, the notion that the Project is too small to justify its risks turns the Board's position on its head.  If this notion were true, then it would stand to reason that the Board would be more likely to approve the Project if SYU produced *much more oil* and thus required even more truck trips.  Put another way, the Board claims to believe that the Project would risk spilling too much oil but, at the same time, it would produce too little to care about.

-16-

1   The Board cannot have it both ways.

2   Second, the Board minimizes the benefits that the Project would bring to the

3   community by bringing back jobs and increasing expenditures at local businesses.

4   EM Mot. at 29–31. The Board argues that there is no evidence that SYU's shut-in

5   has affected school closures or County services and that ExxonMobil has cited no

6   evidence of the "dire need for jobs or tax income" in the interim between 2022 and

7   2029. Bd. Reply at 17. But approval of this or any other project should not hinge

8   on whether an applicant can show that the County is in a perilous fiscal or

9   employment position. ExxonMobil presented evidence of public comments

10  expressing County residents' personal negative experiences as a result of the shut-

11  in. EM Mot. at 30. Since SYU was shut-in, employment at the facility has been

12  reduced by 75%. 1-AR-000093–94. Reopening the facility could bring back up to

13  250 employees for ExxonMobil's operations and up to 30 construction and trucker

14  jobs. 1-AR-000073, 000148, 000162; 37-AR-014639–40, 014861, 014884. And

15  evidence in the record shows that in 2014, during SYU's full operation, the County

16  benefited from millions of dollars in expenditures. 37-AR-014338. Increasing jobs

17  and expenditures would have *some* benefit to the community, particularly now,

18  after a pandemic that adversely impacted local businesses and industries. 1-AR-

19  000124. And these were just some of the Project's many benefits.

20  Finally, the Board questions how ExxonMobil's contributions to the Coastal

21  Resource Enhancement Fund ("CERF") outweighs eliminating the risk of accident

22  by denying the Project. Bd. Reply at 18. Again, the Board fails to recognize that

23  the CERF is one of several benefits that must be considered as a whole, alongside

24  other benefits not discussed in the Board's Reply, like the additional tax revenue to

25  the County. EM Mot. at 31–32. In doing so, the Board misconstrues

26  ExxonMobil's argument, which is that the benefits *collectively* are worth the

27  minimal risk of accident, especially in light of the Project's suite of mitigation

28  measures.

### III. The Record Demonstrates That the Board Failed to Proceed in the Manner Required by Law.

In denying the Project, the Board effectively—and improperly—implemented a policy that bans oil production and transport in the County. Though the Board asserts that ExxonMobil has provided no factual support for that argument, Bd. Reply at 18, Supervisor Nelson not only agreed but also addressed this issue directly at the hearing. *See* EM Mot. at 38. Recognizing that ExxonMobil complied with all applicable requirements, he questioned how the Board's use of discretion in this case differed from a policy to ban oil: "I think what I'm hearing is that, um, there is no scenario where the project can be approved." 1-AR-000176. Supervisor Nelson went so far as to suggest that the County pass an ordinance rejecting applications that include any risk of oil spills or similar hazards, saying that, although he would not support such a policy, doing so "would be an honest process for us to do in this county." *Id.*; *cf. Martinez*, 4 Cal.Rptr.2d at 753, 761 n.2 (noting that if the City wanted to prohibit projects based on particular factors, it should adopt an ordinance with objective standards by which a project can be evaluated to avoid arbitrary decisions on granting or denying permits).

Other Board members struggled and ultimately failed to provide Supervisor Nelson with a satisfactory response to his suspicion about the Board's true motivation in denying this application. Indeed, none of the Board members who voted for the Denial were able to identify what more ExxonMobil could have done to get its permit approved. *See* 1-AR-000178-80 (Vice Chair Williams admitting that "with two attempts attempted to try to answer your basic question . . . I think we're going down a rabbit hole"). And, Supervisor Lavagnino recognized that the current Board simply will not approve oil projects. *See* 1-AR-000179 ("Do we just ban . . . do we put something out there that says . . . there's no sense applying . . . because there's, uh a ban, which I think is different than having a board that has a difference of opinion . . .").

-18-

A blanket refusal to approve oil projects is not a discretionary choice but a legislative policy.  And legislating through administrative decisions constitutes an abuse of discretion for failing to proceed in a manner required by law.  *See Gabric*, 73 Cal.App.3d at 192.  Both the Board and Intervenors attempt to differentiate *Gabric* from the present case by arguing that (1) the Board has discretion to deny ExxonMobil's permit, (2) ExxonMobil failed to show that the Board ignored or misapplied any laws, and (3) the Board's decision relied on existing ordinances and evidence in the record.  *See* Bd. Reply at 18–19; Intvs. Reply at 15.  These arguments have no bearing on the *Gabric* court's reasoning.  There, "the City denied appellant Gabric a building permit not because appellant failed to meet any zoning or building requirements or failed to comply with the law, but because the City was contemplating the future adoption of a new zoning ordinance."  *Id.* at 190.

There, as here, the court found that the City could not legislate through its decisions in its quasi-judicial administrative role.  *Id.* at 192.  The County's policy, plan, code, and ordinance authorizing the transportation of oil by means other than a pipeline are not in place to sanction a potential ban on oil or its transportation.  *See* EM RJN Exs. A–C.  Rather, they represent the balance between the County's preference for pipelines, its policy imperative to "assure that producers [of oil] have access to competitive markets," RJN Ex. A at 66–67, 70, and its environmental concerns by requiring that such impact be "mitigated to the maximum extent feasible," RJN Ex. B at 9–6; Ex. C at 5–13.  They establish the criteria the Project must meet, so the Board must judge the Project according to their standards and other applicable law, not according to Supervisors' personal interests and biases.

The Board's attempt to minimize the evidence of bias in public comments made by Supervisors Williams, Hart, and Hartmann is unpersuasive.  *See* Bd. Reply at 19-20; *see also* Intvs. Reply at 14–15.  Rather than simply address the issue before them—whether the Project could be approved—these Supervisors postured

1    about broader political issues before ultimately stating their decision.[13]   Each of

2    these individuals took time on the record to express their concerns about the

3    environment and the oil industry.   Though the Board may not have included such

4    considerations in its Findings for Denial, it is clear from these Supervisors'

5    statements that they played a central role in the Denial.   And the Findings for

6    Denial itself began with broader concerns under its Statement of Overriding

7    Considerations, which the Board and Intervenors now try to wave away as

8    gratuitous and irrelevant.   Intvs. Reply at 1–2, 15 fn. 2.

9                                   **CONCLUSION**

10           For the foregoing reasons, ExxonMobil respectfully requests that this Court

11   grant summary judgment on its First Cause of Action for Petition for Writ of

12   Administrative Mandate, set aside the Denial of ExxonMobil's trucking Project,

13   and order the Board to reconsider the Project in light of the Court's opinion and

14   judgment, all requirements of CEQA, and all other applicable state and local

15   policies, plans, laws, codes, ordinances, and regulations.

16

17

18   ———————————

19   [13] ExxonMobil cited two cases for the proposition that "[w]here an administrative

20   body's decision is alleged to be politically motivated, courts may inquire into
     whether the hearing process was fair and whether that body abused its discretion."

21   EM Mot. at 36 (citing *Jones v. City of Orange Cove*, 454 F.App'x 601, 603 (9th

22   Cir. 2011); *Harrison v. City of Davis*, 16 Cal.App.5th 420, 435 (2017)).
     Intervenors argue that *Jones* is irrelevant because the court did not address the

23   plaintiff's claim of political motivation.   However, *Jones* makes clear that courts

24   should consider allegations of this type seriously.   *See* 454 F.App'x at 603
     (considering that the writ "allege[d] that the City Council's decision was politically

25   motivated, reasonably prompting an inquiry into whether her trial was fair and

26   whether the City Council abused its discretion").   Intervenors also argue that
     *Harrison* is misapplied because the plaintiff failed to prove evidence of political

27   motivation.   Intvs. Reply at 14–15.   Here, the Board's own comments provide

28   evidence of political motivation.

Dated:  May 31, 2023                     Respectfully submitted,


                                          By:   */s/ Dawn Sestito*
                                                Dawn Sestito

                                          Attorneys for Petitioner and Plaintiff
                                          Exxon Mobil Corporation

EXXONMOBIL'S REPLY IN SUPPORT OF CROSS-MOTION AND OPPOSITION TO SUMMARY JUDGMENT MOTIONS

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Petitioner/Plaintiff Exxon Mobil Corporation, certifies that this brief contains 6,997 words, which complies with the word limit of Local Rule 11-6.1.

Dated:  May 31, 2023

By:     */s/ Dawn Sestito*
        Dawn Sestito

        Attorneys for Petitioner and Plaintiff
        Exxon Mobil Corporation

EXXONMOBIL'S REPLY IN SUPPORT OF CROSS-MOTION AND OPPOSITION TO SUMMARY JUDGMENT MOTIONS