1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11  EXXON MOBIL CORPORATION,              ) Case No. CV 22-3225-DMG (MRWx)
                                          )
12              Petitioner-Plaintiff,     ) **ORDER RE CROSS-MOTIONS FOR**
                                          ) **SUMMARY JUDGMENT [33] [34] [44]**
13         v.                             )
                                          )
14  SANTA BARBARA COUNTY BOARD            )
15  OF SUPERVISORS,                       )
                                          )
16              Respondent-Defendant,     )
                                          )
17         v.                             )
                                          )
18  ENVIRONMENTAL DEFENSE                 )
19  CENTER; GET OIL OUT!; SANTA           )
20  BARBARA COUNTY ACTION                 )
    NETWORK; SIERRA CLUB;                 )
21  SURFRIDER FOUNDATION; CENTER          )
22  FOR BIOLOGICAL DIVERSITY; and         )
    WISHTOYO FOUNDATION,                  )
23                                        )
24              Defendant-Intervenors.    )
                                          )
25  _____     )

26
27
28

This case seeks reversal of a decision by Respondent-Defendant Santa Barbara County Board of Supervisors ("the County" or "the Board") to deny an interim trucking permit sought by Respondent-Defendant Exxon Mobil Corporation ("Exxon Mobil" or "Exxon") to transport oil inland from three of its offshore platforms until a pipeline becomes available.

Before the Court are three cross-motions for summary judgment ("MSJs"), brought by Defendant-Intervenor non-governmental organizations ("NGOs" or "Intervenors") Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Surfrider Foundation, Center for Biological Diversity, and Wishtoyo Foundation [Doc. # 33-1 ("NGO MSJ")]; the Board [Doc. # 34-1 ("Board MSJ")]; and Exxon Mobil [Doc. # 44-1 ("Exxon MSJ")].  Exxon's MSJ also contains its Opposition to the NGO MSJ and Board MSJ.  The County and NGOs filed omnibus Oppositions to Exxon's MSJ and Reply Briefs in support of their own MSJ.  [Doc. # 46 ("Board Reply"), 47 ("NGO Reply").]  Exxon also filed a Reply.  [Doc. # 48 ("Exxon Reply").]

Pursuant to the parties' proposed bifurcated schedule which was ordered by the Court [Doc. ## 16, 21], these cross-motions for summary judgment solely address the Complaint's first cause of action for a writ of mandate pursuant to California Code of Civil Procedure section 1094.5.  [Doc. ## 33, 34, 44.]  The Court held a hearing on the motions on September 22, 2023.  For the following reasons, the Court **DENIES** Exxon's MSJ and **GRANTS** the Board's and Intervenors' respective MSJs.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND[1]**

**A.    Santa Ynez Unit**

In 1987, the County approved Exxon Mobil's Development Plan for its Santa Ynez Unit ("SYU").  *See generally* Conditions of Approval, Admin. Record ("A.R.") 30841–

---

[1] The facts in this section are drawn from the Administrative Record, except where otherwise indicated.  The Court has reviewed the entire record, but only discusses the facts that are necessary to or affect its analysis.

922 (Vol. 67 at 41–Vol. 68 at 49) [Doc. # 28].[2]  The SYU contains three offshore platforms in the Santa Barbara Channel and some onshore facilities, including the Las Flores Canyon processing plant ("LFC"), as well as infrastructure to allow transportation of the oil to refineries.  *See* Executive Summary, Revised Final Suppl. Environmental Impact Report ("Revised Final SEIR"), A.R. 14802 (Vol. 37 at 633).  The 1987 Conditions of Approval for the original Permit state:

> All oil processed by ExxonMobil's oil treatment facility shall be transported from the facility and the County by pipeline in a manner consistent with the Santa Barbara County Local Coastal Plan Policy 6-8.  Transportation by a mode other than pipeline may be permitted only in accordance with Coastal Zoning Ordinance Section 35-154.5(i), applicable Local Coastal Plan policies and Control Measure R-12 of the Air Quality Attainment Plan, to the extent it is applicable.

Conditions of Approval, A.R. 30865 (Vol. 67 at 65).

Until 2015, Exxon used two pipelines to transport the oil out of the County, Lines 901 and 903, but both were shut down after Line 901 ruptured in May 2015 and spilled 142,000 gallons of oil into the ocean near Refugio State Beach.  *See* Planning & Development Letter to County (1st), A.R. 14548 (Vol. 37 at 379); Sept. 8, 2021 Staff Report, A.R. 14580 (Vol. 37 at 411).

In response, Exxon shut down SYU production in June 2015 and implemented preservation plans for its facilities.  Sept. 8, 2021 Staff Report, A.R. 14581 (Vol. 37 at 412).  After initially denying Exxon's application to do so, the County granted it an emergency permit in February 2016, allowing it to transport its inventory of 400,000 barrels of crude oil via approximately 2,500 trucks.  *Id.*, A.R. 14580–81 (Vol. 37 at 411–12).  This "de-inventory" process was successfully completed without incident.  *Id.*, A.R. 14581 (Vol. 37 at 412).  In or about August 2017, Plains All American, LLC ("Plains"), which owned Lines 901 and 903 until 2023, submitted an application to the County to replace the pipelines.  *Id.*, A.R. 14582 (Vol. 37 at 413); Exxon MSJ at 7 n.2.  Exxon

---

[2] All citations to the A.R. herein will have the following format:  Bates Citation (Volume Number at CM/ECF Page Number).  All other citations to the docket will refer to the page numbers inserted by the CM/ECF system.

estimates that it spends tens of millions of dollars to maintain the facilities and pays the County more than $1 million in taxes annually while SYU is shut down.  Sept. 8, 2021 Staff Report, A.R. 14639 (Vol. 37 at 470).

**B.   Interim Trucking Plan**

On September 22, 2017, Exxon Mobil applied to the County to allow for trucking from LFC to local refineries while the new pipelines were being constructed (the "Interim Trucking Plan"), which was estimated to take four to seven years after the Plan's approval. Sept. 8, 2021 Staff Report, A.R. 14567 (Vol. 37 at 398); *see* Interim Trucking Plan Application, A.R. 29885–92 (Vol. 65 at 140–46).

Under the Interim Trucking Plan, Exxon Mobil initially proposed to transport approximately 11,000 barrels of crude oil each day from LFC to either the Phillips 66 Santa Maria Pump Station ("SMPS") near the City of Santa Maria, or to the Pentland Terminal in Kern County ("Pentland").  Interim Trucking Plan Application, A.R. 29889, 29891, 29903 (Vol. 65 at 143, 145, 157); Executive Summary, Revised Final SEIR, A.R. 14805 (Vol. 37 at 636).  The trucking would occur seven days per week, 24-hours per day, with no more than 70 trucks leaving the facility within a 24-hour period.  *Id.*, A.R. 29891 (Vol. 65 at 145).  The Interim Trucking Plan would only be in effect for seven years, or until a pipeline was operational.  *Id.*, A.R. 29903–04 (Vol. 37 at 157–58).

The County found the Interim Trucking Plan Application complete on February 20, 2018, and determined it was subject to environmental review under the California Environmental Quality Act ("CEQA").  Revised Final SEIR, A.R. 14845 (Vol. 37 at 676). Accordingly, the County prepared a Notice of Preparation ("NOP") for the Interim Trucking Plan and solicited comments throughout a 30-day comment period from June to July 2018.  *Id.*  The County issued a Draft SEIR on April 12, 2019, with a public comment period that ran through June 4, 2019.  *Id.*  A public meeting on the Draft SEIR was held on May 6, 2019.  *Id.*  After considering the public's input, the County released a Proposed Final SEIR in July 2020, along with a Staff Report that recommended approval of a modified project eliminating Pentland as a receiver site, requiring Exxon to solely truck to

1  SMPS. *Id.*; July 22, 2020 Staff Report, A.R. 26641, 26694–95 (Vol. 60 at 615, 668–69);

2  *see generally* July 22, 2020 Staff Report, A.R. 26640–836 (Vol. 60 at 614–810).

3  **C.   Shutdown of Phillips 66 Facility**

4       In August 2020, Phillips 66 announced that it would be shutting down the SMPS.

5  *Id.*, A.R. 14843 (Vol. 37 at 674).  Hearings on the Interim Trucking Plan were scheduled

6  to begin in September 2020, but were put on hold pending review of the impact of this

7  announcement.  *Id.*, A.R. 14845 (Vol. 37 at 676); *see also* Letter to County Planning

8  Commission, A.R. 26639 (Vol. 60 at 613).

9       The County determined that a Revised Final SEIR should be prepared that addressed

10 the future shutdown of the SMPS, since it was likely to occur during the lifetime of the

11 Interim Trucking Plan.  *Id.*, A.R. 14846 (Vol. 37 at 677).

12 **D.   Modified Interim Trucking Plan**

13      In August 2021, the County issued its Revised Final SEIR, which contemplated the

14 eventual closure of the SMPS facility.  *See generally* A.R. 14787–851 (Vol. 37 at 618–Vol.

15 41 at 148).  The Revised Final SEIR identified one "significant unavoidable adverse

16 impact[]," categorized as a "Class I" impact, which "cannot be effectively avoided or

17 mitigated."  Revised Final SEIR, A.R. 14584–85, 14811–12 (Vol. 37 at 415–16, 642–43).

18 The identified impact was "an offsite accidental spill of crude oil from a truck accident that

19 has the potential to impact sensitive resources including biological, cultural, and water

20 resources."  *Id.*

21      Following completion of the Revised Final SEIR, County Staff issued a Staff Report

22 to the Planning Commission, dated September 8, 2021, recommending approval of a

23 modified version of the Interim Trucking Plan (the "Modified Plan").  Sept. 8, 2021 Staff

24 Report, A.R. 14582 (Vol. 37 at 413).  Under the Modified Plan, there would be no trucking

25 during heavy rain periods and Pentland Terminal would not be a main receiver site for the

26 duration of SMPS's normal operations, since it had previously determined that trucking

27 only to SMPS would alleviate the risk of a severe oil spill entering a waterway.  Sept. 8,

28

2021 Staff Report, A.R. 14571 (Vol. 37 at 402); SEIR Revision Letter, A.R. 26828 (Vol. 60 at 802).

**E.      Planning Commission and County Board of Supervisors Review**

The Planning Commission held a hearing on the Modified Plan on September 29, 2021, at which time its Staff recommended conditional approval. Certified Tr. of Sept. 29, 2021 Planning Commission Hrg. ("Sept. 29, 2021 Tr."), A.R. 26388–591 (Vol. 60 at 363–565). After that hearing, the Planning Commission continued the item to November 3, 2021, and directed Staff to return with draft findings to deny the Modified Plan. Sept. 29, 2021 Planning Commission Meeting Marked Agenda, A.R. 26386 (Vol. 60 at 360). On November 3, 2021, the Planning Commission recommended by a 3-2 vote that the Board make the findings for denial. Certified Tr. of Nov. 3, 2021 Planning Commission Meeting ("Nov. 3, 2021 Tr."), A.R. 26365 (Vol. 60 at 339).

The Board held a hearing on March 8, 2022, to consider the Planning Commission's recommendation of denial. *See* Minute Ord. re Mar. 8, 2022 Board of Supervisors Hrg., A.R. 000014–16 (Vol. 1 at 34–36); *see also generally* Certified Tr. of Mar. 8, 2022 Board of Supervisors Meeting ("Mar. 8, 2022 Tr."), A.R. 000043–193 (Vol. 1 at 63–213). After considering the evidence presented, the Board denied the Modified Plan by a 3-2 vote on the basis that it could not make the requisite findings to approve the Modified Plan. Minute Ord. re Mar. 8, 2022 Board of Supervisors Hrg., A.R. 000016 (Vol. 1 at 36). In doing so, the Board adopted findings for denial. *Id.*

Specifically, the Board moved to make required findings for denial of the Modified Plan pursuant to section 35.82.080.E.1 of the County Land Use and Development Code ("LUDC") and CZO section 35-174.5, determine that denial of the Modified Plan is exempt from CEQA pursuant to CEQA Guidelines Section 15270(a), and deny the Modified Plan. *See* County Action Letter to Exxon Mobil ("Action Letter"), A.R. 000006–13 (Vol. 1 at 26–33). The legally-required findings the Board found it could not support were: (1) "Streets and highways will be adequate and properly designed to carry the type and quantity of traffic generated by the proposed use" and (2) "The proposed project will not

be detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood and will not be incompatible with the surrounding area." *Id.*, A.R. 000011–12 (Vol. 1 at 31–32).

**F.     Exxon Mobil Files Suit**

On March 11, 2022, Exxon Mobil filed the instant lawsuit against the Board, challenging its decision to deny a permit for the Modified Plan. [Doc. # 1.]  On November 1, 2022, the Court granted the NGOs' Motion to Intervene. [Doc. # 25.] These cross-MSJs seek summary adjudication of the Complaint's first cause of action, a petition for a writ of mandate pursuant to California Code of Civil Procedure section 1094.5.

# II.
# LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In an action challenging the final decision of an administrative agency, "the Court does not utilize the standard analysis for determining whether a genuine issue of material fact exists."  *California RSA No. 4 v. Madera Cnty.*, 332 F. Supp. 2d 1291, 1301 (E.D. Cal. 2003).  Instead, courts must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Id.* (quoting *In Occidental Engineering Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)); *see also* Cal. Civ. Proc. Code § 1094.5(b).

**III.**
**DISCUSSION**

**A.    Standard of Review**

As a threshold matter, the parties dispute which standard of review the Court should apply to its review of the administrative record in this case.  *See* Board MSJ at 13–16; Exxon MSJ at 17–22; NGO MSJ at 17–25.

To resolve this dispute, the Court must determine whether the Board's denial of Exxon's Modified Interim Trucking Plan Application interfered with a "fundamental vested right."  *See Bixby v. Pierno*, 4 Cal. 3d 130, 144 (1971).  In *Bixby*, the California Supreme Court explained "[i]f the decision of an administrative agency will substantially affect such a right, the trial court not only examines the administrative record for errors of law but also exercises its independent judgment upon the evidence disclosed in a limited trial de novo."  *Id.* at 143.

When addressing whether a right is "vested" for an administrative writ of mandate, California courts use the term "in a nontechnical sense to denote a right already possessed or legitimately acquired."  *Harlow v. Carleson*, 16 Cal. 3d 731, 735 (1976) (internal quotation marks and citations omitted).

As for whether the right is "fundamental" for this purpose, *Bixby* also instructs that this determination must be decided "on a case-by-case basis," considering not just "the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation."  4 Cal. 3d at 144–45; *see also Interstate Brands v. Unemployment Ins. Appeals Bd.*, 26 Cal. 3d 770, 780 (1980) ("[A] right may be deemed fundamental within the meaning of *Bixby* on either or both of two bases:  (1) the character and quality of its economic aspect; (2) the character and quality of its human aspect.").  This distinction is intended to "preclude" the "extinction or abridgement" of such important rights by an administrative body, "lacking in judicial power."  *301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.*, 228 Cal. App. 3d 1548, 1556 (1991) (emphasis deleted) (citations omitted).

- 7 -

Exxon contends that the Board's decision in this case interfered with its fundamental vested right to operate its SYU facilities, and thus the Court should apply its "independent judgment," *i.e.*, *de novo* review of the record. Exxon MSJ at 17; Exxon Reply at 6–11. The Board and NGOs characterize the issue more narrowly and maintain that the "substantial evidence" standard applies because Exxon does not have a fundamental, vested right to truck oil from its SYU facilities. *See* Board MSJ at 13–16; NGO MSJ at 17–25; Board Reply at 8–14; NGO Reply at 13–16.

Overall, courts rarely uphold the application of the independent judgment test in judicial review of land use decisions by administrative agencies such as this one. *Amerco Real Est. Co. v. City of W. Sacramento*, 224 Cal. App. 4th 778, 784 (2014) (citing *Goat Hill Tavern v. City of Costa Mesa*, 6 Cal. App. 4th 1519, 1526 (1992)); *see also Acad. of Our Lady of Peace v. City of San Diego*, 835 F. Supp. 2d 895, 903 (S.D. Cal. 2011) ("Cases involving abuse of discretion charges in the area of land use regulation do not involve fundamental vested rights.") (quoting *Topanga Ass'n. for a Scenic Community v. County of Los Angeles*, 214 Cal. App. 3d 1348, 1356 n.4 (1989)). Even so, Exxon urges the Court to do so here.

### 1. Exxon's Right to Truck Oil is Not Vested

Exxon's claim to a vested right stems from the County's grant of a Final Development Plan Permit in 1987 to build and operate the SYU facilities. Exxon MSJ at 7–8. According to Exxon, the Permit gave it a vested right "to restart and operate SYU at any time without the County's permission," which the Board's withholding of permission to truck oil renders hollow. Exxon MSJ at 7, 17, 19; *see also* Mar. 8, 2022 Tr., A.R. 146 (Vol. 1 at 166) ("ExxonMobil currently has a vested right to operate the asset. Our facilities require no additional permits to restart. And we're just here for the temporary trucking permit."). Additionally, Exxon has invested significant work and funds into the SYU facilities over the years. Revised Final SEIR, A.R. 14848 (Vol. 37 at 679).

The Conditions of Approval for the 1987 Permit state that Exxon's oil "shall" be transported by pipeline "in a manner consistent with the Santa Barbara County Local

Coastal Plan Policy 6-8," and that "[t]ransportation by a mode other than pipeline may be permitted only in accordance with Coastal Zoning Ordinance Section 35-154.5(i), applicable Local Coastal Plan policies and Control Measure R-12 of the Air Quality Attainment Plan, to the extent it is applicable." Conditions of Approval, A.R. 30865 (Vol. 67 at 65).

For its part, the County Local Coastal Plan Policy 6-8—adopted in 1982 and republished in June 2019—expresses a policy preference that "[t]he County should assure that [oil] producers have access to competitive markets" and allows for other methods of oil transportation "[u]ntil pipelines become available."[3] County Local Coastal Plan Policy 6-8 at 5–6 [Doc. # 45-1]. The Coastal Zoning Ordinance ("CZO") section 35-154.5(i) provides several necessary conditions for oil transportation by a mode other than pipeline, including "[w]hen the environmental impacts of the alternative transportation mode are required to be mitigated to the maximum extent feasible," and when a shipper has committed to using a pipeline in the future whenever feasible. [Doc. # 45-2 at 5–6].

Under California law, there is a common law doctrine allowing a landowner or builder to claim a "vested right," estopping the government from preventing development pursuant to a land use permit even when there is an intervening change of law. This is not the same use of "vested" at issue when interpreting Section 1094.5. The term "vested" for the purpose of determining standard of review of an administrative writ of mandate is used in a more general, "nontechnical" sense, to merely mean a preexisting right. *Harlow*, 16 Cal. 3d at 375. These terms refer to similar concepts but are not doctrinally identical. *See McCarthy v. Cal. Tahoe Reg'l Plan. Agency*, 129 Cal. App. 3d 222, 230 (1982).

To claim a common law "vested right" for development on a particular piece of land, a builder must show that the business "has performed substantial work and incurred

---

[3] Both Exxon Mobil and the Board submitted requests for judicial notice ("RJNs") in support of their motions, seeking judicial notice of the County Coastal Plan Policy 6-8, CZO §§ 35-174 and 35-154, and LUDC §§ 35.52.060.B.10 and 35.82.080.E.1(c). [Doc. ## 35, 45.] All exhibits to both RJNs are official government documents and ordinances of uncontested authenticity, which are properly the subject of judicial notice. *See* Fed. R. Evid. 201; *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006). The Court therefore **GRANTS** both RJNs in full.

1   substantial liabilities in good faith reliance upon a permit issued by the government." *See*
2   NGO Reply at 9 n.1 (quoting *Avco Cmty. Devs., Inc. v. S. Coast Reg'l Comm'n*, 17 Cal. 3d
3   785, 791 (1976)); *see also Russ Bldg. P'ship v. City and Cnty. of San Francisco*, 44 Cal.
4   3d 839, 854 (1988) (traditional vested rights are "no greater than those specifically granted"
5   via permit).   In general, this right can be claimed by an individual or entity that already
6   possesses the right to do that which it seeks. *See Harlow*, 16 Cal. 3d at 735 ("[T]his court
7   has distinguished generally between applicants and recipients in determining whether a
8   right is 'vested' for the limited purpose of determining the applicable scope of review.").
9   Exxon argues that it has done so here, but its estoppel arguments do not extend to its desired
10  *modification* of its permit. *See Russ Bldg.*, 44 Cal. 3d at 845 (common law "vested rights"
11  do not exceed the scope of "those specifically granted" by permit).

12      But Exxon does not have a vested right to transport SYU oil by truck per the
13  Modified Plan that would trigger "independent judgment" review.   The original Conditions
14  of Approval of its Permit do not guarantee transportation by a mode other than pipeline—
15  only that non-pipeline transport "*may* be permitted" if in accordance with the applicable
16  local ordinances and policies.   A.R. 30865 (Vol. 67 at 65) (emphasis added).   The Permit
17  makes clear that Exxon must obtain a new or modified permit if it seeks to modify the
18  Permit's material terms.   Conditions of Approval, A.R. 30851 (Vol. 67 at 51).   The general
19  statements in the 1987 Permit, Coastal Plan Policy, CZO, and other County documents are
20  not the "functional equivalent" of a permit to transport oil by truck in this specific manner,
21  nor could those statements be taken to override the Board's discretion to consider
22  alternative modes of transport. *See, e.g.*, *Toigo v. Town of Ross*, 70 Cal. App. 4th 309, 324
23  (1998) (non-binding policy documents or government actions encouraging development
24  do not bestow a vested right or give rise to an estoppel theory regardless of the property
25  owner's detrimental reliance on them).

26      When the California Supreme Court stated that "the independent judgment standard
27  of review is proper when a developer seeks review of a Commission decision denying a
28  vested rights claim," in *Halaco Engineering Co. v. South Central Coast Regional*

*Company*, it referred to the common law definition of vested rights.  42 Cal. 3d 52, 57
(1986); *cf.* Cal. Pub. Res. Code § 30608 (defining "vested rights" pursuant to California
Coastal Act).  *Halaco* involved a scrap metal plant that had been continuously operating
pursuant to a building permit containing information about its "settling pond" and "waste
disposal" area since its first approval in 1970.  *Id.* at 58.  After the state's adoption in 1972
of the California Coastal Act, the plant applied to the Regional Commission to approve a
claim of vested rights to continue using the settling pond and waste disposal area—
explicitly contained in its previously-obtained permit—without applying for an additional
permit after the change in law.  *Id.* at 59.  The Regional Commission partially rejected
Halaco's claim, and the trial court applied the independent judgment standard to overturn
the Regional Commission's determination.  *Id.* at 57.  On review, the California Supreme
Court determined that, considering the Coastal Act's specific statutory scheme, the trial
court's independent judgment review was appropriate.  *Id.* at 66.  Since Exxon's existing
permit does not guarantee it the right to transport oil by truck, *Halaco* is distinguishable.

The parties do not dispute that Exxon has a vested right to operate the SYU facilities
to extract oil and transport it via pipeline per its 1987 Permit, but the Court does not
consider that vested right to encompass its Modified Interim Trucking Plan in light of the
permissive language in the County's policies, plans, and ordinances.

## 2. Exxon's Permit Modification Does Not Implicate a Fundamental Right

Exxon's right to transport oil by truck is neither vested nor "fundamental" under
*Bixby*.  Exxon relies heavily on *Goat Hill Tavern* to argue that the right is fundamental,
and thus independent judgment review applies.

In this case, unlike *Goat Hill Tavern*, Exxon seeks a permit to change the current
status quo, SYU's dormancy.  6 Cal. App. 4th at 1529–30; Executive Summary, Revised
Final SEIR, A.R. 14802 (Vol. 37 at 633) ("The proposed Project would allow for the
phased *restart* of the SYU facilities . . . until a pipeline alternative becomes available.")
(emphasis added); *see* County Reply at 14 ("Exxon has presented no evidence that denial
of the interim trucking plan would do anything more than leave Exxon in the same position

it has been in since the pipeline rupture."). In *Goat Hill Tavern*, the owner sought to renew a permit he already possessed, to continue his ongoing, "pre-existing use of his property." *Id.* at 1529. The agency's decision would change the status quo and put the tavern out of business completely, and part of his investment was undertaken specifically at the city's behest. *Id.* at 1529–30. Here, it is not the denial of the Interim Trucking Plan Application that has caused Exxon to cease oil production in its SYU facilities, but an unrelated, intervening event (the shuttering of the pipelines). *See* NGO Reply at 12. This situation is also unlike the facts of *Termo*, which involved a Supervisor's Order directly ordering plaintiff's oil wells to be plugged and abandoned and that all production facilities be removed. *Cf. The Termo Co. v. Luther*, 169 Cal. App. 4th 394, 400 (2008).

For the purposes of judicial review, "[a]dministrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests," instead of involving "fundamental" rights. *E.W.A.P., Inc. v. City of Los Angeles*, 56 Cal. App. 4th 310, 325 (1997); *cf. Amerco Real Estate Co.*, 224 Cal. App. at 782–85 ("the independent judgment test is applied to review administrative decisions that will drive an owner out of business or significantly injure the business's ability to function.").[4]

The Board's decision in this case does not permanently implicate Exxon's vested right to use its SYU facilities, but only halts its proposed "restart" which itself was a temporary fix to a bigger problem: the lack of viable pipeline transport. That is a problem not caused by the Board's decision. And since Exxon is actively pursuing reinstatement

---

[4] In *Interstate Brands*, cited by Exxon, the California Supreme Court expresses "disagreement" with a bright-line rule applied in unemployment insurance cases that reviewing courts use independent judgment review *only* when the employer can show that the agency decision could put them out of business entirely. 26 Cal. 3d at 776–77; *see* Exxon Reply at 10. *Interstate Brands* primarily discusses the distinction between judicial review sought by *employees* versus *employers* in that specific context. *See* 26 Cal. 3d at 776–77. It does not support a conclusion that the "case-by-case" analysis of whether a vested right exists *cannot* consider the magnitude of the economic harm caused by an agency decision, especially in cases unrelated to unemployment insurance. *Cf.* Exxon Reply at 10. This Court did not find, nor did Exxon provide, any cases citing *Interstate Brands* in judicial review of a decision about a development permit or anything similar to the facts of this case.

of the pipelines, its economic harm is not indefinite.  Revised Final SEIR, A.R. 14581 (Vol. 37 at 413); *cf. Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 202 Cal. App. 4th 404, 417 (2011) (distinguishing *Goat Hill Tavern* and *Termo* and determining that no fundamental vested right was implicated where administrative decision required plaintiff to temporarily cease operation until obtaining a permit).

For the foregoing reasons, the Court will apply the substantial evidence standard to its review of the Board's decision.

**B.     Analysis**

California Code of Civil Procedure section 1094.5 instructs reviewing courts to find an abuse of discretion when (1) the decision is contrary to law; (2) it is not supported by the findings, or (3) the findings are not supported by the evidence.  Cal. Civ. Proc. Code §§ 1094.5(b), (c); *Topanga Ass'n*, 11 Cal. 3d at 515.  Here, the Board's inability to make the necessary findings under the LUDC and CZO dovetails with the Board's denial of the Modified Plan Application, so the Court will focus its analysis on whether the Board's findings are supported by substantial evidence and conclude with an analysis of whether the Board's decision is contrary to law.  *See* LUDC §§ 35.82.080.E.1(c), (e); CZO § 35-174.5; *see also* Board MSJ at 16–17.

**1.     Substantial Evidence Standard**

The substantial evidence standard asks whether the Board's findings were "supported by substantial evidence in the light of the whole record."  Cal. Civ. Proc. Code §§ 1094.5(b), (c).  In land use cases applying this standard, the Court may reverse the Board's decision "only if, based on the evidence before the agency, a reasonable person could not have reached the conclusion reached by the agency."  *Bowman v. Cal. Coastal Com.*, 230 Cal. App. 4th 1146, 1150 (2014) (quoting *La Costa Beach Homeowners' Assn. v. Cal. Coastal Com.*, 101 Cal. App. 4th 804, 814 (2002)).

For evidence to be "substantial," it "must be of ponderable legal significance[,] . . . reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law required in a particular case."  *Bank of Am. v. State Water Res.*

*Control Bd.*, 42 Cal. App. 3d 198, 213 (1974) (citation omitted).  Courts must "resolve reasonable doubts in favor of the administrative findings and decision," and "deny the writ if there is any substantial evidence in the record to support the findings." *Topanga Ass'n*, 11 Cal. 3d at 514; *Breakzone Billiards v. City of Torrance*, 81 Cal. App. 4th 1205, 1244 (2000) (citation omitted).  A petitioner seeking to overturn an agency decision has the burden to show "there is no substantial evidence whatsoever to support" the agency's findings. *Desmond v. Cnty. of Contra Costa*, 21 Cal. App. 4th 330, 336–37 (1993) (citation omitted).

### 2.   Substantial Evidence Supports the Board's Findings

The purpose of the findings requirement for judicial review under California Code of Civil Procedure section 1094.5 is "to bridge the analytic gap between the raw evidence and ultimate decision or order" by the agency, and to show "the analytic route the administrative agency traveled from evidence to action." 11 Cal. 3d at 515.  An agency's findings should be "liberally construed to support rather than defeat the decision under review." *Fair Employment Practice Com. v. State Personnel Bd.*, 117 Cal. App. 3d 322, 329 (1981).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *California RSA No. 4*, 332 F. Supp. 2d at 1302 (citation omitted).

#### a.   Traffic Safety

##### i.   The Board's Findings

The Board determined that it could not approve the Modified Plan, in relevant part, because of "the impact of the project on the residents of the County and other users of the proposed route related to traffic safety." *See* Action Letter, A.R. 000012–13 (Vol. 1 at 26–33).  Exxon argues that this finding is not supported by substantial record evidence, and thus the Board abused its discretion in making this finding, ignoring the material evidence in Section 4.5 of the Revised Final SEIR ("Transportation and Circulation") which favored approval.  Exxon MSJ at 24; Exxon Reply at 13–15.

The Modified Plan provides that the trucks would use Calle Real and the
Refugio/U.S. Highway 101 interchange to enter and exit LFC, heading to two terminals.[5]
*See* Executive Summary, Revised Final SEIR, A.R. 014805 (Vol. 37 at 636).  The closer
terminal, the SMPS, is accessible directly from Highway 101, but travel to and from
Pentland, which is located in Kern County, requires significant additional travel on State
Route 166.  A map of the routes to both terminals is below.



Figure ES-2, Proposed Truck Routes to Receiving Facilities, Revised Final SEIR, A.R.
014806 (Vol. 37 at 637).  The distance from LFC to SMPS is 54.2 miles, and the distance
to Pentland is 140 miles.  *See* Table 2, Site Information, Revised Final SEIR, A.R. 14576
(Vol. 37 at 407).  Due to an ongoing Caltrans project, there would be short intermittent
periods during which the Highway 101 southbound off-ramp would be closed to trucks,
rerouting them to use the El Capitan State Beach Road exit and to take surface roads to the
LFC facility.  Executive Summary, Revised Final SEIR, A.R. 014805 (Vol. 37 at 636).

Based on its consideration of the evidence, the Board found that the Modified Plan
would "create impacts regarding traffic safety along Calle Real, Highway 101, and State
Route 166 due to the addition of tanker truck trips to and from [LFC] to [Pentland]."  Action
Letter, A.R. 000012 (Vol. 1 at 32).  It cited "[e]xisting accident rates on certain segments

---

[5] Exxon proposed the risk mitigation measure of not allowing crude oil truck traffic on Calle Real
between the Refugio/Highway 101 exchange and the LFC facility during the hours that school students
are in transit to and from school.  Section 4.5.4, Revised Final SEIR, A.R. 15102 (Vol. 38 at 217).

of Highway 101 and State Route 166" which were "currently above the state average," and concluded that the Modified Plan would generate even more risk. *Id.*; *see also* Table 4.5-8, SMPS Route Collision Analysis, Revised Final SEIR, A.R. 15093 (noting statistically significant collision rates on Highway 101 north of Refugio Road and Highway 101 southbound off-ramp at Betteravia Road); Table 4.5-12, Pentland Terminal Route Collision Analysis, Revised Final SEIR, A.R. 15096 (Vol. 38 at 211).

"Of particular concern" to the Board was traffic safety along State Route 166, a narrow two-lane highway across difficult terrain, with few turnouts and passing lanes. *Id.* Between 2018 and 2020, there were numerous fatal trucking accidents on State Route 166, including four recent tanker truck incidents that caused oil to spill into nearby waterways. *Id.* Several of these incidents were not considered by the Revised Final SEIR's figures because they postdate the traffic study data. Board Reply at 20; NGO Reply at 15.

The Board's decision "incorporated by reference all of the public comments submitted for the March 8, 2022 hearing, which detail additional accident data and safety concerns." *Id.* Its findings cite a lengthy comment letter submitted by Intervenors Get Oil Out!, Santa Barbara County Action Network, and the Environmental Defense Center ("EDC") dated September 27, 2021, which goes into detail about these accidents. *See* A.R. 00013 (Vol. 1 at 33); A.R. 25307–13 (Vol. 57 at 112–18). In particular, the Board highlights the evidence about a 2020 tanker truck incident (after the data used for the Revised Final SEIR) on Route 166 which spilled 4,500 gallons of crude oil into the Cuyama River. Action Letter, A.R. 000008 (Vol. 1 at 28); Sept. 8, 2021 Staff Report, A.R. 26646 (Vol. 60 at 620).

In addition, Calle Real is a rural road with pedestrian and bicycle traffic connecting to two California state parks, not equipped for tanker truck traffic. *See* Transportation and Circulation, Revised Final SEIR, A.R. 15109–10 (Vol. 38 at 224–25).

### ii.    Evidence Supporting the Board's Findings

The record is replete with different statistics, figures, and measurements attempting to quantify the amount of additional truck traffic that would be generated by the Modified

Plan.  The Revised Final SEIR based its analysis on Exxon's estimate of 70 trucks going to the SMPS or 68 going to Pentland per day, with no more than 70 trucks leaving the LFC facility within a 24-hour period.  *Id.*, A.R. 14805, 14807 (Vol. 37 at 636, 638).  It also says that the number of trucks that would be going to each terminal each day is "unknown," at least until the closure of SMPS (at which time all traffic would go to Pentland).  *See* Executive Summary, Revised Final SEIR, A.R. 14807 (Vol. 37 at 638).

Exxon insists that the Modified Plan would "cumulatively only add nine additional trucks per day" to current figures after the SMPS closes, since the baseline number of trucks would decrease, and deemphasizes that the Plan would "generate up to 70 trucks per day." Exxon Reply at 10 n.6; Transportation and Circulation, Revised Final SEIR, A.R. 15103 (Vol. 38 at 218); *see also* Exxon Mobil Powerpoint, SYU Trucking Application (from Sept. 29, 2021 Hrg.), A.R. 26630 (Vol. 60 at 604).

While this math is explained in the Revised Final SEIR, A.R. 15121 (Vol. 38 at 236), the figure only compares the 2018 figures with the projected figures after the SMPS shuts down.  *See* Table 4.5-20, Baseline Average Daily Truck Deliveries to SMPS by Location, Revised Final SEIR, A.R. 15119 (Vol. 38 at 234) (noting baseline data derived from averages from Q1-2016 to Q2-2018); *see also* Table 4.5-23, Peak Cumulative Oil Truck Trips, Revised Final SEIR, A.R. 15123 (Vol. 38 at 238).  Exxon's representative at the September 29, 2021 Hearing, Brian Anderson, emphasized the "nine additional trucks" figure in his presentation to the Commission, as did Scott Schell from Associated Transportation Engineers ("ATE"), the consulting company that did the traffic study.  *See* Sept. 29, 2021 Tr., A.R. 26340, 26423 (Vol. 60 at 314, 397).  After public comment concluded, Commissioner C. Michael Cooney asked Schell about this figure and confirmed that it was only the *net* increase before and after the SMPS closure.  *Id.*, A.R. 26539–40 (Vol. 60 at 513–14).  Ultimately, the Board found it more significant that the Plan "would generate up to 78 daily round truck trips" in their findings.  County Action Letter to Exxon Mobil, A.R. 000013 (Vol. 1 at 33).  Even without considering the net impact of nine

additional trucks, there is already a statistically significant number of collisions on that route.

Additionally, it was established at the September 29, 2021 Planning Commission Hearing that ATE's traffic data used by Exxon (and on which the Final SEIR was based) incorporated the 2018 figures as the "baseline," which themselves were extrapolated from raw numbers collected earlier. *See* Sept. 29, 2021 Tr., A.R. 26538 (Vol. 60 at 512); Video at 5:19:22–5:20:25; Table 4.5-20, A.R. 15119 (Vol. 38 at 234). When speaking to Commissioner Cooney, Schell acknowledged that at the time of the hearing, future traffic levels were still somewhat difficult to predict due to the impact of the pandemic and other factors. *Id.* Commissioner Parke stated at the November 3, 2021 hearing that he was not comfortable with the "baseline" traffic estimates in the SEIR for these reasons. Nov. 3, 2021 Tr., A.R. 26335 (Vol. 60 at 309).

The Board submits that it did properly consider Section 4.5 of the SEIR, *see* County Reply at 15–16, and that it was required to consider public comment from local residents describing their experiences driving on State Route 166, *id.* at 16. It argues that the Revised Final SEIR relied on statistical probabilities, while the Board looked to the "actual history" of 14 tanker truck accidents in 15 years, eight of which occurred along the planned route. *See* Mar. 8, 2022 Tr., A.R. 000179–80 (Vol. 1 at 200–01). Many public comments addressed these accidents and the fear of worsening conditions on State Route 166 with more tanker trucks. *See, e.g.*, Mar. 8, 2022 Video from 1:19:08–1:21:19 (video re traffic incidents); Letter from Sierra Club (Sept. 21, 2021), A.R. 22860–22863 (Vol. 51 at 24111–14) (showing photos of crashes); A.R. 25307–13 (Vol. 57 at 112–18) (EDC Letter); Mar. 8, 2022 Tr., Testimony of Lynn Carlisle, Executive Director of the Cuyama Valley Resource Center, A.R. 132–33 (Vol. 1 at 152–53) ("[State Route 166] is already a dangerous road. Every single person I've ever talked to in Cuyama has a horror story about 166. We've all seen folks passing on blind curves, passing across double yellow lines, all trying to get past the trucks that already use the route every day. Add more truck traffic, as this proposal recommends, and the road becomes even more dangerous."). Supervisor

Williams stated at the March 8, 2022 deliberations that he believed that the safety impacts of the Modified Plan would be "significant and unmitigable," and inherent to the trucking itself.  Mar. 8, 2022 Tr., A.R. 160 (Vol. 1 at 180).  These are all legitimate reasons for the Board to conclude it could not make the requisite finding even though the Modified Plan ostensibly would not exceed any safety or capacity thresholds.  *See* Exxon MSJ at 25.

Before voting to recommend denial of the Modified Plan Application to the Board, multiple Planning Commissioners spoke about their own harrowing experiences on that road in their deliberations and were struck by the magnitude of public concern about traffic safety on Route 166.  *See, e.g.*, Sept. 29, 2021 Tr., A.R. 26551, 26567 (Vol. 60 at 525, 541) (Commissioner Parke's comments that "I know I'll have a hard time looking people in the face that regularly travel this and say it's no different than any other highway" and describing his "darn scary" personal experience driving on State Route 166); A.R. 26561 (Vol. 60 at 535) (Commissioner Bridley noting "[t]he amount of public comment, the very, very heavy weighted concerns from the public about accepting these trucks on the 166").

Additionally, the March 8, 2022 hearing raised some issues of local concern that were not considered in the Revised Final SEIR's data analysis.  Route 166 is the only road that goes through the Cuyama Valley, and the school district had already submitted a resolution raising concerns about the truck traffic passing by their schools.  *See* Letter from Cuyama Joint Unified School District board, A.R. 23388–92 (Vol. 52 at 400–04).  Another aggravating factor is the growth of the cannabis industry also increasing trucking along State Route 166.  As Commissioner Parke pointed out at the September 29, 2021 Hearing, the Caltrans data and projections used in the Revised Final SEIR did not reflect the traffic pattern changes brought by the cannabis industry because the ordinance was not even passed until 2018, which contributed to the Planning Commission's recommendation.  *See* Sept. 29, 2021 Tr., A.R. 26526–27 (Vol. 60 at 500–01); *see also* Testimony of Soham Ray on behalf of University of Santa Barbara Environmental Affairs Board, Mar. 8, 2022 Tr., A.R. 109–10 (Vol. 1 at 129–30) (discussing growth of cannabis industry in Cuyama Valley).

The public input addressed Exxon's proposed traffic safety mitigation measures, such as driver training and truck safety. *See* Exxon MSJ at 10, 29–31; Proposed Modified Conditions of Approval (Exhibit B to Sept. 8, 2021 Staff Report), A.R. 14737–38 (Vol. 37 at 567–69); *see also* Cal. Pub. Res. Code § 21100(b)(3) (CEQA requires EIR to propose mitigation measures "to minimize significant impacts on the environment"). The SEIR's mitigation measures include a "Truck Hazard Mitigation Plan" aimed at reducing the risk of traffic incidents, and several other mitigation measures aimed at reducing the impact of an oil spill if one occurs. Transportation and Circulation, Revised Final SEIR, A.R. 15028–32 (Vol. 38 at 143–47).

According to EDC's letter to the Board, these mitigation measures are insufficient because they cannot address the external factors such as reckless driving, road conditions, or unexpected hazards. Mar. 4, 2022 EDC Letter, A.R. 868–74 (Vol. 3 at 26–32). Exxon responds that the Board did not actually analyze their Truck Hazard Mitigation Plan, which addresses the risks of their own trucks causing incidents. Exxon Reply at 12, 16–17. But the Board's consideration of the Plan's impact on traffic safety does not need to be limited only to potential accidents caused by Exxon's trucks, given that there was immense public concern regarding the overall conditions on Route 166 and the large number of other drivers on the road. *See* Mar. 8, 2022 Tr., A.R. 00155–56 (Vol. 1 at 175–76) (comments of Supervisor Williams). Furthermore, the Revised Final SEIR itself acknowledges that the risk of oil spills relating to trucking accidents "may not be fully mitigated" by its proposed mitigation plan, as demonstrated by the estimate that the measures would only reduce the likelihood of a truck incident by about 33 percent. Executive Summary, Revised Final SEIR, A.R. 14823 (Vol. 37 at 654); Sept. 8, 2021 Staff Report, A.R. 014585 (Vol. 37 at 416). The Plan's compliance with the County Comprehensive Plan Circulation Element and land use codes is necessary to, but not sufficient for, the project's approval. *See* Transportation and Circulation, Revised Final SEIR, A.R. 15099–100 (Vol. 38 at 214–15).

These issues raised in public comment are not adequately reflected in a pure statistical analysis of averages, and were properly considered by the Board.  *See Banker's Hill, Hillcrest, Park W. Cmty. Pres. Grp. v. City of San Diego*, 139 Cal. App. 4th 249, 274 (2006) ("In the context of an administrative hearing, 'relevant personal observations are evidence.  For example, an adjacent property owner may testify to traffic conditions based upon personal knowledge.'") (quoting *Leonoff v. Monterey County Bd. of Supervisors*, 222 Cal. App. 3d 1337, 1351–52 (1990)); *see also Pocket Protectors v. City of Sacramento*, 124 Cal. App. 4th 903, 928 (2004) ("Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence").  When the public comment raises new information substantiating facts already in the record, such as the school district's resolution and the growth of the cannabis industry, it may constitute substantial evidence.  *Banker's Hill*, 139 Cal. App. at 274.  It is reasonable for the Board to conclude that a 33% reduction of accidents was insufficient in light of the four tanker truck accidents on the route between 2018–2020 and the SEIR's apparent failure to consider those in the data it used to predict the probability of an oil spill.  *See* Board Reply at 20; EDC Letter, A.R. 25312 (Vol. 38 at 117).  CEQA does not require a project to "rigidly conform" to other local standards and policies as long as there is a general rationale which is consistent with those policies.  *Cf. Holden v. City of San Diego*, 43 Cal. App. 5th 404, 412 (2019) (acknowledging that agency discretion is not strictly tethered to parameters of local plans and policies when finding is still supported by substantial evidence).

Having considered the evidence in the record regarding traffic safety, the Court finds that the Board's decision is supported by substantial evidence.  *Cf. Topanga Ass'n*, 11 Cal. 3d at 514; *Desmond*, 21 Cal. App. 4th at 336–37.  Under the substantial evidence standard, "all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision."  *Holden*, 43 Cal. App. 5th at 410.  There is voluminous evidence in this record of a traffic safety issue on Route 166, and the data used to project the Modified Plan's impact on that issue does not account for many significant recent developments, including the pandemic, growth of new

industry along the route, and additional serious tanker truck accidents. Substantial evidence supports the Board's decision to deny the project even though the SEIR identified strong mitigation measures.

**b.    General Welfare**

Much of the Board's reasoning regarding its second finding is closely related to the traffic concerns discussed above. *See supra* Part II.B.2; *see also* Action Letter, A.R. 00008–09 (Vol. 1 at 28–29). Since it is the Court's assessment that the Board's finding on traffic safety was supported by substantial evidence, it need not address the Board's second finding, that the Modified Project might be "detrimental to the comfort, convenience, general welfare, health, and safety of the neighborhood." *See* LUDC § 35.82.080.E.1(c); CZO § 35-174.7.1(c).

The Board's conclusion that it could not support a finding that the "[s]treets and highways will be adequate and properly designed to carry the type and quantity of traffic generated by the proposed use," A.R. 000011 (Vol. 1 at 31), was based on substantial evidence and supports denial of the Application. *See* LUDC §§ 35.82.080.E.1(c), (e); CZO § 35-174.5. Since one finding supported by substantial evidence is sufficient to uphold the Board's decision, the Court need not address whether the Board abused its discretion in finding that no "overriding conditions" existed to mitigate the identified Class I environmental impact in the Revised Final SEIR. *See* Board MSJ at 23–27; Cal. Pub. Res. Code § 21081.

**3.    Contrary to Law**

Lastly, the Court will address Exxon's argument that the Board's action was contrary to law and County policy. *See* Exxon MSJ at 39–43; Exxon Reply at 22–24.

Exxon cites the language of the 1987 Conditions of Approval, which acknowledge the possibility of non-pipeline oil transportation, as well as the language in the County Coastal Plan that "[t]he County should assure that producers have access to competitive markets . . . . Since pipelines are not yet in place and may not be constructed to all refining centers, other methods of oil transportation are needed for production that precedes pipeline

construction and operation and for refining centers not served by pipeline."  Conditions of Approval, A.R. 30865 (Vol. 67 at 65); County Coastal Plan at 5.  Policy 6-8 in the Coastal Plan also provides that "[u]ntil pipelines become available, and for refining centers not served by pipeline, other modes of oil transportation are allowed consistent with County policies."  County Coastal Plan at 6.  Additionally, the Modified Plan satisfied every element of CZO 35-154.5(i) and LUDC 35.52.060.B.10.b:  it limited trucking to the permitted capacity, all "Class risks" would be mitigated per Exxon's agreement to accept the proposed mitigation measures, the permit was limited to seven years or the restart of pipeline operations, and there was no current alternative.  Exxon MSJ at 40.

It is undeniable that there are comments in the record—both by the public and some Planning Commission members and County Supervisors—that reflect a desire to end oil production in Santa Barbara County altogether.  *See, e.g.*, Mar. 8, 2022 Tr., A.R. 000155–56 (Vol. 1 at 175–76) (Supervisor Williams' comments), A.R. 170–71 (Vol. 1 at 190–91) (Supervisor Hart's comment that "I believe our community wants to send a clear message that we are unwilling to risk damage to our environment in exchange for short-term corporate profits, uncertain local jobs, and modest tax revenue" and expressing interest in "phasing out oil production").  And the Supervisors who voted to deny the Application, Williams, Hart, and Hartmann, each did express concerns about the environmental impacts of oil trucking writ large and dependence on fossil fuels.  *See* Mar. 8, 2022 Tr., A.R. 000155–58 (Vol. 1 at 175–78) (Supervisor Williams), A.R. 000166–67, 69–70 (Vol. 1 at 186–87, 189–90) (Supervisor Hart), A.R. 182 (Vol. 1 at 202) (Chair Hartmann).

But their expression of these concerns does not mean they acted contrary to law, nor that there is no set of conditions under which the Board would approve a permit to transport oil in Santa Barbara County.  The County Coastal Plan explains that the County "need not provide unlimited flexibility to all [oil] producers," and contemplates non-pipeline transport for only a "fraction" of oil in the County.  County Coastal Plan at 5; LUDC § 35.52.060.B.10.b.

Indeed, Supervisors Williams, Hart, and Hartmann expressed concerns specific to the Modified Plan before them.  Supervisor Williams, for example, expressed that he "will support denial of the project" because "I cannot see how the safety impacts are mitigable . . . not because of the behavior of your drivers" but because of the overall dangerous driving that happens on Route 166.  *See* Mar. 8, 2022 Tr., A.R. 000155–56 (Vol. 1 at 175–76).  Chair Hartmann also expressed deep concern over the risks of accidents on Highway 101 and Route 166, noting that trucking on Route 166 is "inherently risky."  *Id.*, A.R. 000180–81 (Vol. 1 at 200–01).  The original County Staff Report in July 2020 recommended solely allowing Exxon to truck oil to SMPS, and not to Pentland, for this exact reason.  *See* July 22, 2020 Staff Report, A.R. 26641, 26694–95 (Vol. 60 at 615, 668–69).  There is no *"de facto* ban" on trucking oil in Santa Barbara County, nor does this decision cause one.  At the March 8, 2022 meeting, Supervisor Nelson asked about whether any ordinance banned trucking, and was reminded by one of Exxon's representatives that most oil transport in the County occurs by truck.  Mar. 8, 2022 Tr., A.R. 000152 (Vol. 1 at 172).

The Supervisors also expressed that the articulated benefits of allowing the Modified Plan did not outweigh the risks, another reason counseling them to exercise their discretion in favor of denying the Application.  *See* Mar. 8, 2022 Tr., A.R. 000170 (Vol. 1 at 190) (Supervisor Williams' statement that "I will be voting to deny this application, because I cannot make the finding that the significant adverse environmental impacts, as identified in the [Revised Final SEIR], can be overridden by the project benefits").  There is no evidence of any Board member improperly "bow[ing] to political pressure over their better judgment," since each one expressed rational reasons, supported by the evidence, to justify their exercise of discretion on this vote.  *Cf. Harrington v. City of Davis*, 16 Cal. App. 5th 420, 436 (2017).  Even Supervisor Nelson, in his comments in support of his vote to approve the project, acknowledged that "our Board does have broad discretion here."  Mar. 8, 2022 Tr., A.R. 000177 (Vol. 1 at 197).  A writ of mandate "cannot be used 'to force a public entity to exercise discretionary powers in any particular manner.'"  *Lafayette*

*Bollinger Dev. LLC v. Town of Moraga*, 93 Cal. App. 5th 752, 772 (2023) (citing *Ellena v. Dep't of Ins.*, 230 Cal. App. 4th 198, 205 (2014)).

General plans, like the County Coastal Plan, "typically reflect a range of competing interests." *Friends of Lagoon Valley v. City of Vacaville*, 154 Cal. App. 4th 807, 816 (2007) (citation omitted). "Nevertheless, a city's land use decisions must be consistent with the policies expressed in the general plan." *Id.* (citation omitted). When it approved the 1987 Permit, the Board acted consistently with the County Coastal Plan's policy preferences, and now it exercises its discretion to deny Exxon's request to modify that permit in this specific manner. None of the law cited by Exxon *requires* the Board to approve oil trucking if the conditions are met, only that the enumerated conditions are necessary to approval of such a plan. Since each Supervisor voting to deny the Application provided rational reasons for their vote, supported by the evidence in the record, the Board did not abuse its discretion or act contrary to law when it denied Exxon's Application.

## IV.
## CONCLUSION

In light of the foregoing, the Court **DENIES** Exxon's MSJ on the Writ of Mandate claim, and **GRANTS** the Board's and Intervenors' respective MSJs. Pursuant to the Court's previous Scheduling Order [Doc. # 21-1], the parties will meet and confer and will submit a Joint Status Report by **October 27, 2023** with a proposed schedule for Phase II of this litigation.

**IT IS SO ORDERED.**

DATED:  September 27, 2023

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

- 25 -